# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

Exhibit Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iv

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The VA directs Grot to redesign the project . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Differing site conditions - lack of conduit in manholes . . . . . . . . . . . . . . . . . . . . . . 10

Additional cost incurred as a result of the Contracting Officer's directive to proceed with a "fire watch" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Failure to make prompt payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Grot was severally crippled by loss of bonding capacity . . . . . . . . . . . . . . . . . . . . . 19

Recapitulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The VA warrants the adequacy of plans and specifications . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Certification

## INDEX OF EXHIBITS

Exhibit 1 - First two pages of the original Solicitation, Offer and Award . . . . . . . . . . . . 1

Exhibit 2 - Contracting officer's transmittal and Amendment One . . . . . . . . . . . . . . . . 1

Exhibit 3 - Government's electronic release inviting bids on the project and the Instructions, Conditions and Notices to Offerors . . . . . . . . . . . . . . . . . . . 1

Exhibit 4 - Contracting officer's transmittal and Amendment Two . . . . . . . . . . . . . . . . 2

Exhibit 5 - Notice from the contracting officer for the pre-bid conference . . . . . . . . . . . 2

Exhibit 6 - Contracting officer's minutes from the pre-bid conference and phone list of attendees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 7 - Memorandum from Ricky Kirk to contracting officer outlining questions and answers for pre-bid conference . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 8 - Amendment Three to the solicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exhibit 9 - Grot's protest letter of September 14, 2001 to the General Accounting Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 10 - VA's letter of October 18, 2001 to the Comptroller General requesting dismissal of Grot's protest and the VA's letter of October 29, 2001 indicating that the VA was cancelling the solicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 11 - First three pages of Grot's response to the Solicitation, Offer and Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exhibit 12 - Notice to Proceed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhibit 13 - Notes from pre-construction conference . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhibit 14 - Contracting officer's technical representative's June 24, 2002 e-mail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Exhibit 15 - Grot's letter of June 25, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Exhibit 16 - Contracting officer's August 23, 2002 letter . . . . . . . . . . . . . . . . . . . . . . . 6

Exhibit 17 - Grot's letter of September 5, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Exhibit 18 - Contracting officer's September 17, 2002 letter . . . . . . . . . . . . . . . . . . . . 6

Exhibit 19 - Grot's September 18, 2002 letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Exhibit 20 - Contracting officer's September 18, 2002 letter . . . . . . . . . . . . . . . . . . . . 7

Exhibit 21 - Contracting officer's September 18, 2002 letter . . . . . . . . . . . . . . . . . . . . 7

Exhibit 22 - Grot's letter of September 25, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Exhibit 23 - Mraz's November 4, 2002 letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Exhibit 24 - Recapitulation of cost associated with redesign . . . . . . . . . . . . . . . . . . . . 9

Exhibit 25 - Recapitulation of cost associated with the lack of conduit in the manholes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Exhibit 26 - Contracting officer's letter of July 17, 2003 . . . . . . . . . . . . . . . . . . . . . . 12

Exhibit 27 - Grot's letter of July 17, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Exhibit 28 - COTR's letter of July 17, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Exhibit 29 - Grot's letter of April 29, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Exhibit 30 - Grot's letter of May 27, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Exhibit 31 - Contracting officer's letter of July 20, 2003 . . . . . . . . . . . . . . . . . . . . . . 14

Exhibit 32 - Grot's letter of July 20, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Exhibit 33 - Grot's letter of July 22, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Exhibit 34 - Grot's letter of July 23, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Exhibit 35 - Mraz's e-mail of July 23, 2002 (sic) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Exhibit 36 - Grot's letter of July 31, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Exhibit 37 - VA's Termination for Default Letter of August 7, 2003 . . . . . . . . . . . . . . 15

Exhibit 38 - Recapitulation of cost associated with maintaining the fire watch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Exhibit 39 - e-mail series . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Exhibit 40 - Grot's counsel's letter of May 19, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . 17

Exhibit 41 - List of pay applications, the date submitted and the date of payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Exhibit 42 - Application Number 19 for retainage . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Exhibit 43 - Scott McCauley deposition transcript pages 56-64 . . . . . . . . . . . . . . . . . 21

Exhibit 44 - Mark S. Fratto deposition transcript page 23 . . . . . . . . . . . . . . . . . . . . . 23

## INTRODUCTION

Grot, Inc. ("Grot") is an emerging HubZone small business located in Lexington Kentucky. Approximately, Eighty-five percent (85%) of Grot's contracts are with the United States government. In addition, Grot holds a General Services Administration ("GSA") Schedule 70 Contract specifically, Contract No. GS-35F-0358L.

As everyone associated with this claim is aware, this project was being performed for the Department of Veterans Affairs ("VA"). This project was initially released for bid as Solicitation IFB 549-64-01. A copy of the first two pages of the original Solicitation, Offer and Award is attached as Exhibit "1". The original bid date was July 11, 2001 but was extended until July 31, 2001 to accommodate prospective bidders that had not received copies of the plans and specifications. A copy of the contracting officer's transmittal and Amendment One to the solicitation is attached collectively as Exhibit "2". Also, included in Exhibit "2" as a part of the contracting officer's transmittal were answers to certain questions that had been raised by prospective bidders concerning interpretation of the plans, specifications and drawings.

The government's electronic release inviting bids on the project and the Instructions, Conditions and Notices to Offerors provided with the information to bidders, copies of which are attached collectively as Exhibit "3", described the work to be performed as follows:

> The contractor **shall furnish all labor, equipment, materials and supervision to replace the "Fire Alarm System"** at the Sam Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX **in accordance with the contract drawings and specifications**. The project shall involve **general construction, demolition, alterations, grading, electrical and mechanical work**. Contract work shall be

> performed in compliance with the most up-to-date industry standards and codes as required by the city, county, state and Federal Government. The period of performance is ninety (90) calendar days. (Emphasis added).

Again, conspicuously absent from the VA's notice is any reference to the word "**design**". Nowhere in the VA's electronic notice is any contractor put on notice that the contractor will be responsible for **design** of the fire alarm system. As will be seen later, the lack of such notice will be critical to Grot's performance under the contract,

As stated above, the original contract completion time was ninety (90) days. However, for some reason never disclosed to the bidders, the contract completion time was increased to two hundred seventy (270) days by Amendment Two. A copy of the contracting officer's transmittal and Amendment Two to the solicitation are attached collectively as Exhibit "4".

Subsequent thereto, the contracting officer noticed a pre-bid conference for July 20, 2001. A copy of the notice from the contracting officer for the pre-bid conference is attached as Exhibit "5". A copy of the contracting officer's minutes from the pre-bid conference and list of attendees is attached collectively as Exhibit "6". A copy of a memorandum from Ricky Kirk to the contracting officer outlining the questions and answers from the pre-bid conference is attached as Exhibit "7".

By amendment dated July 27, 2001, the amended bid date was again extended, this time until August 28, 2001. A copy of Amendment Three to the solicitation is attached as Exhibit "8". At the bid opening, ADT Security Services, Inc. ("ADT") was determined to be the lowest bidder for the Project. However, Grot protested the award of the Contract to ADT in that among other things, the contracting officer had allowed

ADT to increase its bid price to the detriment of other bidders. A copy of Grot's protest letter of September 14, 2001 to the General Accounting Office is attached as Exhibit "9". Following Grot's protest, the VA cancelled the solicitation due to what the VA determined were "**inadequate specifications**". A copy of the VA's letter of October 18, 2001 to the Comptroller General requesting dismissal of Grot's protest and the VA's letter of October 29, 2001 indicating that the VA was cancelling the solicitation are attached collectively as Exhibit "10".

Again it is important to note that at no time during the solicitation process did the VA ever indicate that design of the fire alarm system was the responsibility of the contractor. In fact, the very reason for cancellation of the original solicitation was "**inadequate specifications**". If the contractor was responsible for design of the system as the VA subsequently determined, how could the specifications be inadequate?

On January 8, 2001, the VA received bids on IFB 549-23-02 which replaced IFB 549-64-01. A copy of the first three pages of Grot's response to the Solicitation, Offer and Award is attached as Exhibit "11". Again on the VA's solicitation you find the description of the work. It again states as follows:

> The contractor **shall furnish all labor, equipment, materials and supervision to replace the "Fire Alarm System"** at the Sam Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX **in accordance with the contract drawings and specifications**. The project shall involve **general construction, demolition, alterations, grading, electrical and mechanical work**. Contract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the city, county, state and Federal Government. The period of performance is 270 calendar days. (Emphasis added).

The only difference between the original description of the work and that contained in

the rebid was the period of contract performance.

As noted on the third page of Exhibit "11", on February 1, 2002, the VA awarded to Grot contract number V549P-609-2 (the "Contract") for performance of the work described as Campus-Wide Fire Alarm, Project No. 099-108 at the Sam Rayburn Memorial Veterans Center, East Ninth and Lipscomb Streets, Bonham, Texas (the "Project"). The Contract provided that the Project was to be completed within two hundred seventy (270) days following receipt of the Notice to Proceed. The Notice to Proceed was received by Grot on February 1, 2002 with work to begin within 10 days thereby making the original Contract completion date for the Project November 10, 2002. A copy of the Notice to Proceed is attached hereto as Exhibit "12".

After award of the Contract, Grot began the process of issuing subcontracts and vendor purchase orders one of which was to Siemens Building Technologies, Inc. ("Siemens"), one of the original bidders to the VA. Siemens was to provide technical assistance, equipment and working drawings based upon the plans and specifications provided by the VA upon which Grot based its pricing for the Contract. It is important to note that at all times during the bid process, Grot relied upon the plans, specifications and drawings provided by the VA to develop its price and to schedule work for the Project. The plans, specifications and drawings were prepared by Fratto Engineering, Inc. ("Fratto").

A pre-construction conference was held on February 25, 2002. A copy of the notes from the pre-construction conference is attached as Exhibit "13". A review of the notes from the meeting indicates that there was a discussion about "submittals" and installation of the approved submittals. But nowhere in the meeting notes does it reflect

that the VA advised Grot that it was responsible for design of the Project.

Grot took the plans, specifications and drawings provided by the VA and requested Siemens to provide field installation drawings in accordance with the VA's bid documents. Siemens provided the requested drawings which were submitted to the VA for review and approval. The VA delivered the drawings to Fratto for review and approval. The drawings were returned by the VA stamped as "approved" or "approved as corrected". In some instances the VA determined unilaterally that it wanted additional devices that were not shown on the original drawings provided by the VA and prepared by Fratto. **Grot had drawings approved by the VA and Fratto for all of the buildings involved in the Project by the end of March and had begun installation of the new fire alarm system.**

Again it is important to note that at no time during the solicitation process, the award or the preconstruction conference, did the VA ever indicate that design of the fire alarm system was the responsibility of the contractor.

**THE VA DIRECTS GROT TO REDESIGN THE PROJECT**

Then, unbelievably, after Siemens and Grot submitted the drawings and the VA and Fratto made modifications and changes thereto and then approved the drawings for construction, the VA determined that it was Grot's responsibility to "design" the Project. This determination was first made in writing to Grot on or about June 24, 2002; four months and fourteen days after the issuance of the Notice to Proceed and after Grot had performed extensive work on the Project **based upon the VA and Fratto approved drawings.** A copy of the contracting officer's technical representative's June

24, 2002 e-mail is attached as Exhibit "14".

Grot protested the directive of the VA advising that the specifications do not state that the Project is a design/build project nor was Grot contracted to design the fire alarm system. A copy of Grot's letter of June 25, 2002 is attached as Exhibit "15".Grot repeatedly asked for meetings with the contracting officer to review the directive. Incredulously, the contracting officer refused to have "any " meetings with Grot to discuss the directive or any other issue on the Project for that matter. Instead, by letter of August 23, 2002, the contracting officer, again without meeting with Grot, directed Grot to design the fire alarm system for the Project. A copy of the contracting officer's August 23, 2002 letter is attached as Exhibit "16". Grot immediately responded by letter of that same date and by letter of September 5th, Grot protested the direction of the VA clearly pointing out the fallacy of the rational used to make the determination. Grot requested a meeting with the contracting officer to try and come to an understanding as to the respective parties' position. A copy of Grot's letter of September 5, 2002 is attached as Exhibit "17".

As was the norm throughout the entire Project, by letter of September 17th, the contracting officer rejected Grot's request for a meeting and then directed that Grot furnish the VA with the "design/install" fire alarm system although nowhere in the specifications is the phrase "design/install" found. A copy of the contracting officer's September 17, 2002 letter is attached as Exhibit "18".

Grot immediately responded by letter of September 18th indicating that Grot was proceeding to redesign the project by curing the deficiencies in the original plans and specifications. At all times Grot reserved its rights to dispute the decision made by the

contracting officer. A copy of Grot's September 18, 2002 letter is attached as Exhibit "19".

The contracting officer responded by letter of that same day, again refusing to meet with Grot, and now taking the position that if there was an ambiguity in the contract documents, that it was Grot's duty to point out the ambiguity during the bid process. However, the contracting officer's reliance on that requirement is misplaced when the ambiguity is latent. Again the contracting officer found that the specifications "clearly state that the contractor shall provide a **design/install** fire alarm system". Yet the contracting officer has never pointed to where in the specifications the phrase "design/install" is found. A copy of the contracting officer's September 18, 2002 letter is attached as Exhibit "20".

Later that same day, again without meeting with Grot despite repeated request to do so, the VA issued a cure notice directing Grot to "cure" "failures . . . . . . endangering performance of the contract". A copy of the contracting officer's September 18, 2002 letter is attached as Exhibit "21". The contracting officer's cure letter fails to meet the requirements of the FARs in that it does not specify at all what the "failures" are that Grot must cure. It is totally devoid of any substantive information with respect to what Grot must "cure". Grot proceeded with the redesign of the Project while reserving its rights under the Contract Dispute Act.

By letter of September 25, 2002, Grot protested the contracting officer's directive. But, consistent with its obligations under the contract, Grot began to perform in compliance with the directive. Notwithstanding, there were a substantial number of questions to be resolved and Grot requested a meeting with the contracting officer to

begin the process of redesigning the Project. A copy of Grot's letter of September 25, 2002 is attached as Exhibit "22".

The requested meeting was denied. In fact, throughout the redesign process Grot repeatedly requested meetings with and direction from the contracting officer. **Not one time would the contracting officer meet with Grot despite the fact that Grot was trying to redesign a project pursuant to the contracting officer's directive.**

The directive by the VA caused Grot to incur significant increases in the cost of performing its work under the Contract and extended the time of performance for which the VA is liable. By letter from the contracting officer of November 2, 2002, the VA acknowledged that Grot was entitled to an extension in the Contract completion time until June 23, 2003 but did not increase the Contract price to reflect the extended impact cost incurred by Grot. A copy of contracting officer's November 4, 2002 letter is attached as Exhibit "23". Grot did not sign the change order as the extension of the contract time recognized by the VA was not sufficient given the scope of the redesign directed by the contracting officer and the fact that Grot was still awaiting answers from the contracting officer or his technical representatives.

Specifically, Grot incurred additional direct cost in the amount of $143,342.33 for materials and labor directly associated with the directive to redesign the Project. Grot also incurred additional engineering cost and expense to Siemens for engineering the redesign in the amount of $14,262.00. Grot and Siemens minimized the impact of redesign cost to the VA by returning equipment not required under Grot and Siemens' design. This was in compliance with the contracting officer's directive to redesign in

accordance with NFPA 101 and 72. This was brought to the attention of the VA at the time of redesign and since the VA never acknowledged to the contrary, the proposal was accepted.

Further, the directive of the contracting officer for Grot to redesign the Project extended Grot's time for performance from the original contract completion date of November 10, 2002 until at least August 8, 2003; a period of two hundred seventy-one (271) days. This extension directly impacted Grot's job site cost in the amount of $13,170.00 and created extended and unabsorbed home office overhead in the amount of $126,145.08.

In addition, Grot incurred additional direct cost with Siemens for work on the redesign in the amount of $14,262.00. This amount was actually mitigated by Grot through the return of ceratin devises that would no longer be needed due to the VA's directive. As Siemens is a direct subcontractor to Grot, Grot is entitled to overhead and profit in the amount of $2,995.02 for a total cost from Siemens' additional work of $17,257.02

When coupled with the direct additional cost incurred by Grot for labor and materials together with other incidental cost such as additional bond premiums, the total additional cost incurred by Grot in redesigning the Project including overhead and markup is $308,009.72. A copy of the recapitulation of cost associated with the redesign is attached as Exhibit "24".

The cost for additional material and labor reflected on the attachments to this claim are based upon Grot's price schedule with the GSA and, specifically, Contract # GS-35F-0385L. Accordingly, this pricing insures the best value to the VA for the

additional cost incurred. Any pricing based upon normal commercial industrial pricing would be significantly higher.

**DIFFERING SITE CONDITIONS-LACK OF CONDUIT IN MANHOLES**

Part of the construction for the Project involved the installation of a continuous network loop around the campus which tied in all of the panels for the system. Minutes from the pre-bid conference of July 20, 2001clearly show that "no trenching should be necessary". In fact, the notes indicate that all lines should be run through existing conduits and the steam tunnel. A copy of the minutes from the pre-bid conference are attached as Exhibit "6".

While the conduit was available in rare instances, in most cases the conduits were being utilized by other services and in some instances it did not exist at all. When Grot determined that the conduits were not as represented in the minutes, Grot advised the contracting officer through the technical representative. As was the case throughout the Project, the VA never provided any guidance to Grot for installation of the network loop outside the conduits. As a result, Grot began installation of the network loop as best it could under the circumstances.

The lack of capacity or complete absence of conduit in the manholes leaves no doubt that Grot encountered significantly differing site conditions at the Project. In order to prevail on a differing site condition claim Grot need only prove that the conditions indicated in the contract varied materially from the conditions actually encountered during the performance of the contract. *Stuyvesant Dredging Co. v. United States*, 834 F. 2d 1576, 1581 (Fed. Cir. 1987), *quoting P.J. Maffei Bldg. Wrecking Corp. v. United*

*States*, 732 F. 2d 913, 916 (Fed. Cir. 1984). In this case the VA can not deny that the conditions actually encountered were not materially different than represented in the Contract.

The differing site conditions encountered by Grot were textbook "Type I" conditions. In other words, the site condition differed from a representation made about the site in the contract. See, e.g., *Servidone Construction Corp. v. United States*, 19 Ct. Cl. 346, 360 (1990). The underlying issue in a Type I differing site condition claim is whether the contractor reasonably could have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents, its inspection of the site and its general experience as a contractor. *Erickson-Shaver Contracting Corp. v. United States*, 9 Cl. Ct. 302, 304 (1985). In this case the representation was made by the contracting officer himself. If the differing site condition causes an increase in the contractor's cost or the time required to perform the work, then the contractor is entitled to an equitable adjustment in the contract. FAR 52.236-2.

In this case not only did the site conditions themselves create a problem, the VA's delay in responding to Grot's request for information, change orders and directives compounded the problem. Grot would have completed this Contract as it intended but for delays that are solely attributable to the VA. The lack of available conduit directly impacted Grot's cost of performing its work on the Project. This differing site condition resulted in additional labor and material cost to Grot in the amount of $44,990.02. A copy of the recapitulation of cost associated with the lack of conduit in the manholes is attached as Exhibit "25".

Again, the cost reflected on Exhibit "25" is based upon Grot's price schedule with

the GSA per the previously referenced Contract # GS-35F-0385L. This again insures the best value to the VA for the additional cost incurred..

**ADDITIONAL COST INCURRED AS A RESULT OF THE CONTRACTING OFFICER'S DIRECTIVE TO PROCEED WITH A "FIRE WATCH"**

During construction of the Project, the VA agreed for Grot to install temporary fire alarm equipment when working on the existing fire alarm system in a building that could not be changed over and working at the end of the work day. Among the types of temporary fire alarm equipment were temporary pull stations The purpose of the temporary pull stations is to provide additional fire alarm capability when portions of the system are deactivated. The temporary systems are removed when construction is complete for that portion of the building. However, the fact that the temporary pull stations may not have been installed does not mean that there is no fire protection for that building.

On July 17, 2003, Grot inadvertently failed to install temporary pull stations while working in Building 1. As a result, the contracting officer issued a cure notice to Grot to cure the deficiency and to establish a fire watch for the building until the temporary pull stations were installed. A copy of the contracting officer's letter of July 17, 2003 is attached hereto as Exhibit "26". While Grot disputed the contracting officer's conclusion that the building was "without fire protection", Grot immediately acknowledged the inadvertent mistake with respect to the temporary pull stations and conducted the fire watch as directed. The temporary pull stations were installed before completion of work on that same day. A copy of Grot's letter of July 17, 2003 is attached hereto as Exhibit "27".

By letter of July 17th, the COTR issued a directive to maintain a fire watch in Building 29 due to what the COTR determined was "inadequate fire safety coverage". However, the COTR never defined what he considered to be "inadequate fire safety coverage" or the basis for compelling the fire watch. A copy of the COTR's letter of July 17, 2003 is attached as Exhibit "28".

Further, an issue had arisen between Grot and the VA regarding the installation of corridor smoke detectors in Building 29. The VA had requested the installation of additional smoke detectors. By letter of April 29, 2003, Grot pointed out that the smoke detectors were not a requirement under NFPA 101, 1997 Edition, and requested a meeting to clarify the issues between Grot and the VA. As was the case throughout the Project, the VA did not respond. A copy of Grot's letter of April 29, 2003 is attached hereto as Exhibit "29".

By letter of May 27, 2003, Grot again raised the issue of the additional smoke detectors and pointed out to the contracting officer that various specifications upon which the contracting officer's representatives were relying were not a part of the 1997 Edition of the NFPA 101. A copy of Grot's letter of May 27, 2003 is attached hereto as Exhibit "30". Again Grot asked for direction and none was forthcoming.

Instead the COTR issued the July 17th fire watch notice. By letter of July 18th, Grot reminded the contracting officer of Grot's repeated request for direction and a meeting. Again no response was forthcoming. It was not until after the termination that Grot was advised that the contracting officer was relying on the 2000 Edition of NFPA 101 and not the 1997 Edition as required by the specifications.

Then, three days later, on July 20th, the contracting officer issued a directive to

initiate a fire watch for buildings 1, 2, 3, 24 and 29; the entire Project. The sole basis for the directive was that he had determined that there was "inadequate fire safety coverage". There were no specifics given. It is not to be forgotten that, with the exception of the inadvertent failure to install the temporary pull stations in Building 29, the VA had not raised an issue as to the adequacy of fire protection in the other buildings. Notwithstanding, and with no guidance as to the alleged deficiencies, the VA ordered the fire watch. A copy of the contracting officer's letter of July 20, 2003 is attached as Exhibit "31".

The institution of a campus wide fire watch was going to be a significant cost to Grot and Grot immediately asked for a meeting with the contracting officer to review the concerns and misunderstandings which seemed to be prevalent on the Project. A copy of Grot's letter of July 20th, 2003 is attached hereto as Exhibit "32". When no response was forthcoming, Grot issue another request for a meeting. A copy of Grot's letter of July 22, 2003 is attached hereto as Exhibit "33".

Instead of addressing Grot's concerns the contracting officer stated that he, "not the contractor" would determine the need for a meeting. A copy of the contracting officer's letter of July 23, 2003 is reflected on Exhibit "33". This position was taken even when the contracting officer knew there were substantial disagreements over the interpretation of the plans and specifications for the Project. This refusal to meet and address the issues involved in this Project had a direct impact on the completion of the Contract.

On July 23rd, Grot reaffirmed that it was conducting the mandated fire watch but was doing so under protest with the intent to pursue all cost and expense incurred by

Grot in performing per the contracting officer's directive. A copy of Grot's letter of July 23, 2003 is attached hereto as Exhibit "34". Then, almost immediately by Mraz's e-mail of July 23, 2002 (sic), the VA issued its "Show Cause Letter" to Grot in which the VA stated that Grot had 10 days after receipt of the Show Cause Letter to provide a schedule to complete the Contract. A copy of Mraz's e-mail of July 23, 2003 is attached hereto as Exhibit "35". By e-mail of July 31, 2003 Grot responded and fully addressed all of the issues raised in the Show Cause Letter and further provided to VA a completion date of October 3, 2003 **assuming that the VA provided answers to outstanding questions by August 11th**. A copy of Grot 's letter of July 31, 2003 letter is attached hereto as Exhibit "36".

Without further comment or challenge to Grot 's July 31, 2003 letter and without addressing the issues raised in the letter or providing answers to questions contained in Grot's letter or letters previously provided by Grot, by Mraz's letter of August 7, 2003, the VA wrongfully terminated the Contract for default; the alleged basis of the default was that Mraz had determined that Grot:

a) had failed to provide adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29 as directed in Mraz's letter of July, 17, 2003; and

b) had failed to perform in compliance with the technical requirements of the contract; and

c) had failed to complete the Contract by the extended completion date of June 23, 2003; and

d) had failed in Grot's letter of July 31, 2003 to "Show Cause" to the Mraz's "Show Cause Notification Letter of July 23, 2003.

A copy of VA's Termination for Default letter of August 7, 2003 is attached hereto

as Exhibit "37". At all times from July 22nd until August 8th, Grot maintained the fire watch mandated by the contracting officer and kept working to complete the project.

As the direct result of the contracting officer's directive to conduct the unnecessary fire watch and his refusal to even meet with Grot to discus the necessity or cost of same, Grot incurred additional cost and expense in maintaining the mandated fire watch. The total cost to Grot was $74,250.11. A copy of the recapitulation of cost associated with maintaining the fire watch is attached as Exhibit "38".

**FAILURE TO MAKE PROMPT PAYMENT**

Throughout the course of the Project, the VA failed to make payments in a timely manner. The initial application from Grot in March and April of 2002 requested payment for materials stored on-site. The applications did not contain the invoices for the materials which was backup documentation requested by the contracting officer. It took Grot several weeks to provide the requested information which delayed payment of the first two applications. Grot does not question the requirement for the back-up although the contracting officer could have payed that portion of the request which was not in dispute.

However, beginning with the May 2002 application, all subsequent applications contained the requisite backup. Notwithstanding, payments were intolerably delayed some running behind as long as one hundred five (105) days. In a series of e-mails Grot repeatedly inquired about the status of payment without any response. By e-mail of March 11, 2003, Grot inquired as to the status of the December 2002 pay request which was received by the VA via fax on December 20, 2002 and the January 2003 pay request which was received by the VA via fax on January 22, 2003. The contracting

officer failed to respond and by e-mail of March 18th, Grot again inquired as to the status of the December and January payments. The contracting officer apparently forwarded Grot's inquiry to the COTR who provided a most unusual response. A copy of the e-mail series is attached as Exhibit "39".

It was the COTR's position that since the first pay application was late two (2) months being paid due to the fault of Grot, that every pay application would be two (2) months late. This position is totally without any basis in the FAR's or the law and makes absolutely no sense. Even if you accepted this novel theory, the fact remains that the failure to make payment timely often exceeded the two (2) month "float" that the COTR thought he was entitled to receive.

The FAR's clearly address the time frame for payment under government contracts. Pursuant to the General Conditions of the Contract, Section 01001 ¶1.23(a)(1)(i)(A), Prompt Payment for Construction Contracts (FAR 52.232-27)(June 1997), payment by the VA was due within thirty (30) days after receipt of the payment request. Despite the delay in payment, the VA never included interest under the prompt payment provisions of the contract. If payment is not received within that time period, an interest penalty is payable **automatically**.

By letter and e-mail of May 19, 2003, counsel for Grot made specific demand upon the contracting officer for payment of the prompt payment penalties. A copy of Grot's counsel's letter of May 19, 2003 is attached hereto as Exhibit "40". Not only was the prompt payment penalties not forthcoming, the contracting officer did not even acknowledge the letter.

The failure to make payment of the interest provided by Section 01001, General

Conditions ¶1.23(a)(4) within time frames provided therein entitles Grot to payment of an additional penalty pursuant to Section 01001, General Conditions ¶1.23(a)(6)(iii) in an amount equal to 100% of the original late payment penalty.

The total on unpaid pay applications at the time of the termination is $195,331.68. Attached hereto as Exhibit "41" is a list of pay applications, the date submitted and the date of payment. The applicable interest rates under the Prompt Payment Act for the periods in question are as follows:

| | |
|---|---|
| 07/01/02 - 12/30/02 | 5.25% |
| 01/01/03 - 06/30/03 | 4.25% |
| 07/01/03 - 12/31/03 | 3.125% |
| 01/01/04 - 6/30/04 | 4.00% |
| 07/01/04 - 12/30/04 | 5.50% |
| 1/01/05 - 06/30/05 | 4.25% |

The following is the calculation of interest owing on the payments.

| Invoice Amount Due | Received | Paid | Days of Interest | Interest Due |
|---|---|---|---|---|
| $81,322.85 | 5/23/02 | 7/31/02 | 39 | $456.36 |
| $33,329.23 | 6/25/02 | 8/9/02 | 9 | $71.85 |
| $17,447.28 | 7/22/02 | 9/17/02 | 27 | $67.50 |
| $18,630.00 | 8/21/02 | 10/9/02 | 19 | $50.73 |
| $102,712.00 | 9/22/02 | 11/8/02 | 16 | $236.32 |
| $9,856.98 | 10/22/02 | 4/7/03 | 82 | $104.80 |
| $17,137.98 | 12/20/02 | 4/7/03 | 67 | $153.87 |
| $48,331,71 | ½2/03 | 4/28/03 | 67 | $377.99 |

| | | | | |
|---|---|---|---|---|
| $74,492.91 | 3/31/03 | 6/19/03 | 50 | $434.10 |
| $114,062.99 | 5/1/03 | 3/31/05[1] | 670 | $9,178.23 |
| $51,994.89 | 5/30/03 | 3/31/05 | 641 | $3,983.77 |
| $35,505.95 | 6/30/03 | 3/31/05 | 610 | $2,746.81 |
| $25,767.85 | 7/21/03 | 5/31/04 | 589 | $1,947.26 |
| $38,219.62 | 3/18/04 | 3/31/05[2] | 375 | $1,972.44 |
| Total Prompt Payment Interest Due | | | | $21,782.03 |

In addition, and as a result of the contracting officer's failure to pay the prompt payment interest as it became due, Grot is entitled to the maximum additional penalty in the amount equal to 100% of the original late payment penalty not to exceed $5,000.00 on any one payment. Thus, Grot is entitled to a penalty in the amount of $21,782.03.

Finally, at the time of termination, Grot was owed the sum of $84,938.97 in retainage. No interest has been calculated on the retainage as the application for retainage was not issued. A copy of Application Number 19 for retainage is attached as Exhibit "42".

<u>**GROT WAS SEVERALLY CRIPPLED BY LOSS OF BONDING CAPACITY**</u>

Immediately following the termination, Grot was advised that its bonding capacity was being placed on hold pending final resolution of the dispute with the VA. As a

---

[1] All invoices from this point forward remain unpaid. Interest was computed through the date of certification of the claim, March 31, 2005.

[2] This invoice represents the work completed by Grot from the date of application number 17 through the date of termination, August 7, 2003. The application was not sent until March 18, 2004. Prompt payment interest is computed from the date the application was issued to the VA.

result, Grot was unable to obtain performance and payment bonds for future projects and its ability to bid and obtain significant government work was virtually extinguished. The impact of the loss of bonding capacity had a catastrophic impact on Grot's operating cost. In fact, as the direct result of the termination and resulting loss of bonding capacity, Grot incurred operating losses in the amount of $933,635.30 as of March 31st.

This loss is calculated by taking the average operating cost for the last five (5) years which was $75,598.00 per month. Grot bonds 90% of its work and has not been able to acquire a bond due to the wrongful termination. Allowing an additional discount of 25% due to economic conditions and other variables, Grot has lost operating cost of $49,138.70 per month. As of the certification of this claim, Grot has been without bonding capacity of any significance for nineteen (19) months for a total impact of $933,635.30.

**RECAPITULATION**

| | |
|---|---|
| Unpaid Progress Payments | $195,331.68 |
| Retainage | 84,938.97 |
| Prompt Payment Interest | 21,782.03 |
| Prompt Payment Penalties | 21,782.03 |
| Additional Cost Associated With the Redesign of the Project | 308,009.72. |
| Additional Cost Associated With the Lack of Conduit in the Manholes | 44,990.02 |
| Additional Cost Associated With the Fire Watch | 74,250.11 |

| | |
|---|---|
| Lost Operating Cost Sept. 2003-March 2005 | 933,635.30 |
| Total Request for Equitable Adjustment | $1,684,719.86 |

**THE VA WARRANTS THE ADEQUACY OF PLANS AND SPECIFICATIONS**

The government has the obligation to prepare specifications and drawings that reasonably communicate the scope of the contractor's obligations. The contractor is entitled to rely on the accuracy of the information and the requirements contained in government documents. *WPC Enterprises, Inc. V. United States*, 163 Ct.Cl. 1, 323 F2d 874, 877 (1964); *XPLO Corp. DOTBCA No. 1251*, 86-2, BCA ¶ 18,863. The warranty relieves contractors of any obligation to check and verify the correctness, adequacy, or feasibility of the government documents. *Argo Technology, Inc., ASBCA No. 30522*, 88-1 BCA ¶ 20,381 at 103,063. When specifications are of a "design" type, the government must accept the responsibility for any errors or defects therein. *Air Tech Remsel Corp., ASBCA No. 19,948,* 76-2 BCA ¶ 11,919 at 57,130. This includes the duty to insure that the specifications are not susceptible to more than one reasonable interpretation. *United Pacific Insurance Co. V. United States*, 204 Ct.Cl. 686, 49 F2d 1402 (1974).

In the instant case, the VA's solicitation never advised Grot, or the other contractors, of the VA's interpretation that the successful bidder was to "design" the project. This was clearly evident by the spread between the competing bidders. With the exception of Siemens, all of the other bidders were in the same general range indicating that they were all bidding on plans and specifications. As testified to by Scott McCauley in his deposition of February 3, 2005, Siemens bid not upon the plans and

specifications but upon what was conveyed to Siemens by Mel Harrison and Chris Forner. Exhibit "43", page 59, line 6-9. The devices that Mr. Harrison and Mr. Forner were requesting were not disclosed in the bid document nor was their any way for any of the other bidders to have known about what would be required absent each bidder having the same information that was specially provided to Siemens. Exhibit "43", page 62, line 14-19.

The VA has consistently argued that if Grot had "walked the site" it would have known what the specifications required. Grot was not at the pre-bid conference and walkthrough; that is not disputed. However, it would not have mattered if Grot had been there because neither Mr. Harrison nor Mr. Forner were at the walkthrough either. They were the only ones who knew exactly what the VA wanted as evidenced by their private revelations to Siemens. That revelation resulted in Siemen's bid being over $300,000.00 above Grot's bid which at the time of the first bid was third lowest. As testified to by Mr. McCauley, it was clear to him that Siemens was not bidding "apples to apples" with the other bidders. Exhibit "43", page 60, line 11-15. In fact, when Siemens submitted its price for the re-bid, it disregarded the information provided by Mr. Harrison and Mr. Forner and submitted its bid on the plans and specifications for the Project. Exhibit "43", page 60, line 25 - page 61 line 1. Siemens would make up the difference in what was shown on the plans and what was wanted by Mr. Harrison and Mr. Forner through change orders. Exhibit "43", page 64, line 2 -6.

The government also warrants that if the contractor follows the specifications and drawings, a satisfactory product will result. The leading case establishing this warranty is *United States v. Spearin*, 248 US 132 (1918). The Spearin Doctrine provides as

follows:

> "If the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.......This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans and to inform themselves of the requirements of the work...." (248 US at 136).

Here, Grot was following the plans and specifications provided by the government. Grot was providing drawings and submittal data based upon the plans and specifications prepared by Fratto and in compliance with those plans and specifications. Grot was told to redesign the project only when it was determined that the VA was not getting what Mr. Harrison and Mr. Forner wanted. Had the VA provided the information in writing which was verbally provided to Siemens by Mr. Harrison and Mr. Forner, then this project would not have gone in the direction that it did. Instead, the VA withheld this information and then sought to impose this additional cost on Grot by determining that it was Grot's responsibility to "design" the project.

Interestingly, during the deposition of Mark Fratto, the principal engineer for the Project, he continually asserted that the plans and specifications were prepared so that the bid process would be "apples to apples". Exhibit "44", page 23, line 11 -14. Clearly that did not happen as indicated by the bids and confirmed by Mr. McCauley. As drafted, there was no way the plans and specifications could be interpreted the same by all bidders without the exact same information being provided by the same VA personnel to all bidders. This was never available.

**<u>CONCLUSION</u>**

Grot, Incorporated request a total equitable adjustment to the contract price in

the amount of $1,684,719.86 together with interest thereon pursuant to the Contract Disputes Act of 1978 from the date of certification until paid and its reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C.A. §2412. Further, Grot, Incorporated hereby requests a contracting officer's final decision on this request for equitable adjustment.

Grot Claim Revised 033105