Throughout the course of this project, the VA has been a minimum of sixty (60) days late in making payments to Grot. When payments were received, they did not contain prompt payment interest as required by the FARs. As of this response, Grot still has not been paid for its applications in April, May or June. While I acknowledge that it is a contractor's responsibility to provide adequate financing for contract performance, it is not the contractor's responsibility to fully finance the project. Failure to make required payments to the contractor has been held to constitute an excusable cause of delay. *Virginia Electronics Co., Inc.*, ASBCA 18,778, 77-1 BCA ¶12393, *United States Services Corp.*, ASBCA 8,291, 1963 BCA ¶3703. Further, excusable delay has been found where a contractor's financial incapacity is caused by acts or omissions of the government. *TCG Contracting Corp. v. United States*, 736 F2d 1512, 1515 (Fed. Cir. 1984), *Murdock Machine & Eng'g Co. v. United States*, 873 F2d 1410 (Fed. Cir. 1989).

Your letter threatens termination for default. Grot believes such a threat to be wholly unjustified. Notwithstanding the dispute over the design responsibilities, failure to make payment, the delays in responding to requests for information, the failure to respond to requests for information and the refusal to meet with Grot and its subcontractors, Grot has continued to try and complete this project. Grot has incurred a significant amount of cost and expense in trying to follow what Grot considers to be the VA's wrongful interpretation of its own plans and specifications. Grot is continuing to try and complete this project and as of this letter anticipates being complete by October 3rd using reasonable construction practices and assuming that there are no additional changes to the contract documents and Grot receives responses to its pending inquiries not later than August 11th. Under the circumstances, a default termination would do nothing but further delay and increase the VA's cost in completing this project.

Prior to any further directive being issued, Grot again requests a meeting with you, your COTR and anyone else that you believe appropriate. This meeting could fully address the outstanding questions and the schedule of performance in concluding this project. Grot has repeatedly requested this meeting and has repeatedly been denied this opportunity. At this juncture, Grot believes a meeting not to be just critical, but imperative. Please advise as to the VA's availability to meet on August 4th, 5th or 6th.

This will also reaffirm that my counsel will not be present in the meeting.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

GROT, INC.

G- 002915

**DATE:** August 3, 2003

**SUBJ:** Replace Fire Alarm System
Contract #V549C-599-1
Project #B01-114
Grot Incorporated, Contractor

**TO:** John Mraz
Contracting Officer

**FROM:** Rickey L. Kirk
Contracting Officer's Technical Representative

John,

In answer to Grot's letter of July 31, 2003, responding to the Show Cause Notice, I submit the following.
I will endeavor to answer paragraph by paragraph.

The first paragraph is one subject with two parts.
Part I
Mr. Evans, Grot's on-site supervisor, has been told on numerous occasions that when I am unavailable he is to contact Mr. Larry Waldrop, my coworker across the hall. If Mr. Evans needed a door opened or advise or even to get in touch with Mr. John Mraz, Contracting Officer, he was to contact Mr. Waldrop.
Part II
Mr. Grot states that Building 1 was provided with fire protection in accordance with this contract. What Mr. Grot sees as fire protection, in accordance with the contract, in Building 1, at this time, is some pull stations through 5 floors and 22 smoke detectors, and 5 strobe lights to cover a 71,000 square foot building. There is no coverage whatsoever in the south wing of the first floor or basement or penthouse. In the event of a fire there would be no elevator recall function, no air conditioning equipment shutdown, smoke doors would not function properly, no way to tell if sprinklers are flowing. The Fire Alarm Control Unit for Building 1 is not wired in accordance with Siemen's on Marketing Update of February 28, 2001. As it is wired now any alarm signal through this panel could short out the entire system.
On February 25, 2002 the first meeting for the Fire Alarm project was held between the VA, Grot and Siemens. One of the items discussed in this meeting was the temporary fire alarm system. It was agreed that Grot could install a temporary system in each building, as they came to it, as long as the temporary system provided as good a coverage as the old existing system. This was instead of providing a fire watch for the transition between the old and new systems.
Also in Specification Section 13850, Paragraph 1.1, sub-paragraph E, it states:

> *The Contractor shall provide a dedicated fire watch person all times any normally protected area is disconnected from a fire alarm system as a result of the project work.*

On July 17, 2003 it was discovered that contractor had failed to tie any pull stations into the temporary fire alarm system in Building One. Mr. Evans was directed to set up a fire watch within Building One until proper coverage had been achieved. It was accomplished by 8:30p.m. However, while contractor was working on Building 1, it was determined that Building 29 did not have proper coverage in accordance with the contract and NFPA Codes. Contractor was directed to set up a fire watch in building 29 during all non-regular business hours. On July 18

contractor installed another temporary system in building 29 that included more pull stations and smoke detectors. Due to the deficiencies found after a minor inspection a more thorough inspection was done by Mel Harrison, Chris Forner and myself on July 20th, the results of which can be found in my letter of July 20th to the Contracting Officer, John Mraz. This inspection resulted in my directing Mr. Evans to set a fire watch in Buildings 1, 2, 3, 24, and 29. Most of these deficiencies still exist. See my Fire Alarm Pre-Test letter sent to the Contracting Officer on August 1.

2 of 6 Aug 13, 2003

Contractor's argument about not being specific about where he has failed to meet NFPA 101 is an old and tiring one. On numerous occasions we have repeatedly told him exactly where in the Codes he has failed to meet the Codes. Reference my letters to Contracting Officer dated January 30th 2003, February 7, March 19 and finally in a letter on June 10th I asked the contractor to refer to our letter of August 23, 2002 which in part states, **"that the contractor must submit redesign drawings which would include all items originally shown on plans plus any new items required by code or manufacturer's requirements."** Contractor seems to fixate on the Codes and ignores the contract requirements. He knows what is required of him but insists upon arguing to the end.

Contractor states that Siemens has certified their design. Siemens name is on the plans but no such certification have I seen. Once again he's arguing the codes and once again I say he must follow NFPA 101, chapter 4, 4.1.1 through 4.2.2.4 and chapter 9, 9.6.1 through 9.7.1 and chapter 18, 18.1 through 18.7.9.1.

As far as citing paragraphs from NFPA 101 2000 edition is concerned, nothing we have quoted is not in the 1997 edition. The only difference between the 2000 edition and the 1997 edition are codes that have been added and at no time have we quoted any one of the new codes. If contractor will look at his 1997 edition of NFPA 101 he will find 9.6 through 9.7.6.2 on pages 93 through 95. He can't seem to realize that we're not throwing new things at him. We are only telling him what he agreed to do when he signed the contract.

Now to the old argument of design/install project or just install project. Until May 5, 2002 concentration was on the back and forth issue of the training of our personnel. On that day a meeting was held between the VA, Grot, Siemens and Fratto Engineering, the designers of the project. Grot was informed that their submitted plans seemed to be exact duplicates of the original project drawings. The were informed that our plans were a general guide and that they were responsible for compliance with the specifications and all applicable codes. On May 13, 2002 I asked contractor when was Siemens going to walk the site for the design. I was told they didn't know. I asked again on June 16th and received the same response. On June 24 I spoke to both Jon Evans and Scott Stead of Siemens about this matter and Mr. Stead stated, "We have no intention of walking the site." On July 2, 2002 a meeting was held at the Dallas facility in the Engineering Service conference room to clarify matters. Attendance was by VA personnel, Fratto Engineering personnel, and Grot personnel, including the owner Mr. Jerry Grot. Two issues decided were that Grot was responsible for the cost of training and defray expenses for four VA persons to attend and that I would go back to my office and make a determination as to whether or not this was a design/install project or just an install project. After careful study I determined that this was a design/install project (see memo of August 21, 2002). On September 5, Mr. Grot protested my decision. On September 12th I was asked to justify my decision. I returned a two and half page justification that same day. On September 17th Mr. Mraz sent a Ten Day Cure Notice. On September 18th Mr. Grot sent a letter stating he had instructed his firm to

begin design. Mr. Grot would have you believe that his crew had been putting forth a great effort in accomplishing this project for se[illegible]months. In part it's true. Actual work on site did not begin until April 15th. Then when you only have two (2) men working on a job for four months they do have to work extra hard. During most of the month of July 2002, Mr. Evans was the only Grot employee on the site.

On September 25 Mr. Grot sent the VA a letter asking us to show him everything we wanted installed and where it was wanted. On October 8th I sent a reply, to Mr. Grot's letter, to Mr. Mraz. In it I state that it is not the VA's job to design this project for him, that is his obligation by contract. I did receive a drawing of Bldg. 9 on September 24th. This being the quickest one to design. It was returned within two weeks. Mr. Grot sent a query on December 18th,by e-mail, as to the delay in returning plans. I sent a response to Mr. Mraz that same day. In it I explain and I believe I make it quit clear that no significant delays to the contractor were incurred. I cannot find in my paper work or Mr. Mraz's a letter from Grot on October 18th. His letter of April 29th was concerning contaminated water in manholes. This matter was taken care of in a meeting held on January 17th, 2003. Meeting was attended by Mr. Jon Evans, Grot, Mr. Darrell Brewer, VA Safety Specialist, and myself. In this meeting the VA told Mr. Evans we would supply his employees with Personal Protective Equipment whenever they had to enter manholes. Mr. Evans agreed and I thought the matter was taken care of. Then comes Mr. Grot's letter of April 29th. I responded to this letter on May 6th and asked the Contracting Officer to make a clear and final determination on three different subjects within my response. There were actually two letters of May 27th one concerned the returning of unused materials. The other concerned NFPA 4.6.7, which in this instance is actually found in the 1997 edition at 1.3.7.

The only ambiguity in the drawings has been that contractor has not followed Contract Specifications and NFPA Codes. All instructions given to Mr. Grot have always been the same, follow the Contract Specifications and NFPA Codes. The only conflict has been Mr. Grot refusal to follow Contract Specifications and NFPA Codes. Every request by Mr. Grot was answered as quickly as possible.

With this paragraph I must repeat myself. On August 23, 2002 contractor was sent a letter, which states in part, **"Resubmitted drawings shall include everything contained on the original drawings as well as any additional devices required by NFPA Codes that did not appear on the original submittals."** Once again contractor is refusing to acknowledge written instructions and contract requirements and is fixating on the NFPA Codes. Granted they are ~~an~~ important part of requirements but they are not the only requirements of this contract. The drawings were stamped with the following, **"Approved for general arrangement only. No responsibility assumed for quantities or dimensions. Contractor required to comply with contract documents, plans, and specifications. Contractor is responsible for field verification of quantities and dimensions; fabrication process and techniques of construction; coordinating the work with other trades and satisfactory performance of his work."** The FAR he references is a part of the contract he agreed to and also states in part, **"Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern."** Contractor has not been asked to install anything that is not a part of the scope of work. Yes it does apply to the government provided drawings and I return your attention to the first quote in this paragraph.

The matter was submitted to Contracting Officer in the July 2, 2002 meeting. Contracting Officer made his determination in his letter of August 23, 2002. Additionally under VAAR 852.236-71, of the contract, sub-paragraph a states, **"The contracting officer's interpretation of the drawings and specifications will be final, subject to the disputes clause."**

Beginning with the first meeting in February 2002, the VA has continuously given verbal and written direction to the contractor. Here again the contractor shows his continuing disregard of VA directives and wants nothing but his interpretation allowed.

Concerning Ms. Sprouse's e-mail of July 29th I return your attention to three paragraphs above and the quote of the stamp. While I am not a NICET Level III Technician or a design engineer or a fire protection engineer, these people are available within the VA and in Architectural Engineering firms to consult with. The Fratto Engineering stamp says virtually the same thing as the VA stamp. While the stamps do approve general arrangement they do not relieve the contractor of the responsibility to meet the entire contract requirements. It can also be said that Mr. Grot uses others to help him interpret and clarify plans, drawings and codes.

The VA is not wishing anything. The VA is simply endeavoring to have installed a Fire Alarm System that meets all the requirements of the contract drawings and specifications and a system that will keep our patients and personnel safe.

At no time was it said that we would pre-fail anything. What was said was, if, on the inspection of the 30th, no smoke detectors were installed in the elevator shafts they would not pass the inspection. Mr. Evans was told a week in advance these would be required. They are not additional devices they are simply required by Code and Contract Specification Section 13850, paragraph 3.4, sub-paragraph D. Mr. Grot states that during the test elevators recalled as required. One did, however when smoke was applied to the smoke detector outside the **south** elevator, on the second floor, the elevator on the **north** side of the building was recalled to the first floor. This elevator is 200 feet away, on the opposite side of the building and cannot even be seen from the south elevator. I would hardly call this functioning as required.

Contractor is once again stating something that was not said. Once again Mr. Evans was warned that all flow and tamper switches would have to be tied to the system or we could not pass them. If contractor would read the contract specifications he would find in section 13850, paragraph 2.8, sub-paragraph D, the requirements for flow switches and paragraph 3.2, sub-paragraph K, the requirements for tamper switches. Also if he would look at Appendix 'A' of the specifications he would find a complete listing and locations of all devices.

Drawings referred to were made available to Mr. Evans at the beginning of the project as well as the listing in Appendix 'A' of the specifications. During the pre-test of building 24 on the July 27th, we were walking the building looking for flows and tampers and Mr. Evans stated more than once he had missed this tamper switch or that flow switch because they were not where the drawings showed them. Verifying that he had had drawings.

Once again Mr. Grot refers to a letter he sent on October 18, 2002. Neither the Contracting Officer nor myself have such a letter. Anytime contractor has requested information or anything we have provided it.

Again nothing that is pertinent to this contract has been withheld from the contractor when asked for. The VA has gone more than the extra mile in working with this contractor.

How many times must it be said to the contractor. The plans state they are generic and in Contract Specification Section 13850, paragraph 1.1, sub-paragraph B, states in part that **"The system design shall be provided by a technician that is certified NICET Level III."** Further in the same spec section, paragraph 1.2, sub-paragraph B, states, **"A new fire alarm system *shall be designed and installed* in accordance with the specifications and drawings. Device location and wiring runs shown on the drawings are for reference only unless specifically dimensioned. Actual locations shall be in accordance with NFPA 72 and this specification."**

One more time. The only one not in agreement is the contractor. He was directed by the Contracting Officer to design and install this contract in accordance with the plans, specifications and applicable codes. When you have clearly marked specifications and drawings one does not need to be clairvoyant.

There is no limiting language or special disclaimers within the drawings or specifications. All is clearly spelled out in black and white. As for the specifications and drawings being labeled "advisory", I don't know where he came up with that one. No one is trying to defeat the right of the contractor to rely on the specifications. Quite the contrary we are trying to get contractor to follow the specifications.

Contractor has in no way relied upon the original plans. He totally disregarded them.

I can understand how contractor could be at a loss as to how I came up with the 59% complete. Considering it would be virtually impossible to figure it by his submitted schedules that he can't stick to. I was forced to estimate the percentages. I broke it down as follows:

| Work Item | Percent of Project | Percent Complete |
|---|---|---|
| Main Loop | 20% | 18% |
| Sm. Detectors | 20% | 12% |
| Strobes | 15% | 11% |
| Flow Switches | 15% | 7% |
| Tamper Switches | 15% | 7% |
| Post Indicator Valves | 5% | 0% |
| Elevators | 5% | 3% |
| Tie to Dallas VA | 1.5% | 0% |
| Tie to Paging System | 1.5% | 0% |
| Patch & Paint | 2% | 0% |
| Allowance for error | | 1% |
| TOTAL | 100% | 59% |

Contractor is nowhere near completion. Many of the systems are still tied in with temporary wiring. As you can see by the above chart some items aren't even started.

Unless contract progress warrants it, or I am directed otherwise. I work progress payments once a month. The 2nd progress payment went out on May 15, 2002. I started work on the 3rd progress payment on June 18, 2002 and saw that contractor was asking for payment on stored materials. I told the contractor's on-site supervisor, Jon Evans, that I could not pay for stored materials

Aug. 23, 2003 6 of 6

without receipts. He stated he would let his company know. On July 1st I informed Mr. Evans again that I needed these receipts. I not only told him but a Ms. Angela Lafferty at the home office called me about this and I informed her of this also. On July 10th Mr. Evans brought me packing slips from a freight company on the materials in storage. However they contained no prices. I informed Mr. Evans of this fact and then e-mailed Mr. Bell at Grot and asked them to send me material cost before I could make payment. I received the receipts from Siemens on July 21st. On July 22, 2002 I sent the 3rd progress payment on. Between the first time I requested the receipts and receiving them, 67 days passed causing a delay in payment. From that point on every payment would have a delayed date from the time of receipt to time of payment of approximately 60 days. Unless work progress justified a payment of more than once a month. It hasn't.

Grot has created any dispute, himself, by continuing to argue something that the VA has directed him to do.

The VA sees no reason to meet with Mr. Grot to continue this line of disregard to our directives. Mr. Grot has recourse under the Disputes Clause of his contract. All he has to do is accomplish the contract as per the plans, specifications and codes as he agreed to by the signing of the contract.

All documents referenced in this response can be produced for inspection.

I am,

Rickey L. Kirk

Rickey L. Kirk
Contracting Officer's Technical Representative

August 7, 2003

Aug. 7 2003
1 of 2

North Texas Veterans Health Care System
Dallas Veterans Medical Center
4500 S. Lancaster Road
Dallas, TX 75216

Mr. Jerry Grot
Grot, Incorporated
324 Henry Street
Lexington, KY 40508

## Termination for Default

Subject: Contract V549P-609-2
Design/Install Fire Alarm System, Bonham, TX

Dear Mr. Jerry Grot:

You are hereby notified that your right to proceed with the work under Contract, V549P-609-2/ Design/Install Fire Alarm System Project for the Sam Rayburn Veterans Memorial Center, Bonham, TX awarded to Grot, Incorporated on February 1, 2002 is terminated. The effective date of the termination is August 8, 2003.

The decision to terminate your contract was made after I evaluated the history of Contract V549P-609-2 in its entirety, and is based on your failure to provide adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29 at the Sam Rayburn Veterans Memorial Center, Bonham, TX as directed in my letter of July 17; 2003; your failure to perform in compliance with the technical requirements of the contract; your failure to complete the contract by the extended completion date of June 23, 2003; and your failure, in your letter of July 31, 2003, to "Show Cause" to my Show Cause Notification Letter of July 23, 2003.

Therefore, in accordance with FAR Clause 52.249-10 your right to proceed with the work that has been delayed is terminated. Your delays and your failure to meet your contractual obligations are inexcusable.

The Contracting Officer's final decision to terminate your contract makes your request for a meeting moot and is denied. Thus, you are hereby directed to "Stop Work", terminate subcontracts and make no further shipment of contract building materials. Moreover, the Government may purchase the supplies or services terminated against the contractor's account and the contractor will be held liable for any excess costs. Furthermore, the Government reserves all its rights and remedies provided by law under this contract, in addition to charging excess costs.

Ricky Kirk, the Contracting Officer's Technical Representative, will contact you a few days after the effective terminate date of August 8, 2003 to schedule a meeting to ascertain ownership so that you can remove contractor property and cleanup the work site.

26

Aug 7, 2003 2012

The Contracting Officer has determined that your failure to perform is inexcusable and that the notice of termination constitutes that decision. This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

The Department of Veterans Affairs Board of Contract Appeals (VABCA) is the authorized representative of the Secretary for hearing and determining such disputes. The rules of the VABCA are published in section 1.783, of Title 38, Code of Federal Regulations. The address of the Board is 810 Vermont Avenue, N.W., Washington, DC 20420.

JOHN MRAZ
CONTRACTING OFFICER

cc: Travelers Casualty & Surety Company of America



2

**Department of**
**Veterans Affairs**

# Memorandum

Date: August 9, 2003

From: Contracting Officer

Subject: Termination for Default V549P-609-2

To: Contract File

The following information is provided in accordance with Federal Acquisition Regulation Part 49.402-3(f):

1. Contracted V549P-609-2 for Design/Install Fire Alarm System, Bonham, TX was awarded on February 1, 2002 with an initial Contract Completion Date of November 10, 2002 and an Extended Contract Completion Date of June 23, 2003.
2. Specific Failures: failure to provide adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29 at the Sam Rayburn Veterans Memorial Center, Bonham, TX as directed in my letter of July 17, 2003; failure to perform in compliance with the technical requirements of the contract; and failure to complete the contract by the initial completion date of November 10, 2002 and the extended completion date of June 23, 2003.
3. Siemens of Dallas is available to complete the project.
4. This is life threatening, as the medical center must have fire protection. Siemens is a sub-contractor under Grot, Incorporated on this project and is available, without delay, to complete the contract.
5. N/A: Grot has a GSA Contract.
6. N/A
7. Contractor's failure to "Show Cause" to my Show Cause Notification Letter of July 23, 2003.

JOHN MRAZ

John Mraz

27

Aug 12 2003 1 of 2

To: VA North Texas Health Care System
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

Date: 8/12/2003

Doc No.: Corr-19

Project: Bonham Tx.-VA
2002.006

Attn: John Mraz

Subject: Notice of Termination for Default
Request to Rescind

Sam Rayburn Memorial
East Ninth
Bonham, Tx 75418

Dear John Mraz:

Grot, Inc. ("Grot") has considered your letter of August 7, 2003 terminating the above contract for what the VA considers to be Grot's default. After further review and consultation with our counsel we are still of the opinion that your letter does not meet the requirements of FAR clause 52.249-10 and the requirements for default termination as determined by United States Court of Federal Claims.

First, your Show Cause Notice of July 23rd only requires that Grot provide you with a schedule to complete the above contract. In Grot's response of July 31st, Grot pointed out various questions pending before your office which had to be answered before Grot could complete construction. As we stated in our response, we cannot provide you a "schedule" until we have answers to these questions. Notwithstanding, we did advise you that we anticipated the project being cr[illegible]te by October 3rd if we received answers to our questions by August 11th. **To date, we still do not have answers to t[illegible]uestions.**

In your July 23rd letter you insinuate that Grot has not met the requirements of NFPA 101. However, you do not provide Grot with any specific areas of its construction that are not in compliance. As stated in Grot's reply, a cure notice must provide a contractor with specific notice of the deficiency so that it may be corrected. **To date, you still have not provided Grot with any instance where its construction does not meet NFPA 101. The fact of the matter is you cannot do so or you would have addressed such deficiency more specifically.**

Your termination letter now states that Grot has failed to provide adequate fire alarm protection for buildings 1, 2, 3, 24 and 29. Again, you do not specify where Grot's fire alarm protection is inadequate in these buildings. If you review your Show Cause Notice you will find that you did not allege that the fire alarm protection was inadequate in these buildings. You simply state in the Show Cause Notice that Grot has failed to make progress and repairs. To the extent that the default termination is based upon "failure to provide adequate fire alarm protection" in the referenced buildings, you have not provided Grot an opportunity to cure any alleged deficiency.

Throughout the course of this project you or your COTRs have repeatedly referred to the wrong sections of the NFPA. Further, when questioned about the intent of such referrals, you have not replied. Your termination letter's reference to your " letter of July 17, 2003" is further evidence of your failure to pay attention to the questions raised by Grot during this project as that letter does not address the issues which you contend must be addressed. Grot's reply to the Show Cause Notice specifically addresses issues such as this. However, you do not address any of the comments in Grot's response; you simply terminate the contract. **Again, you do not address the issues because you have no contractual or[illegible] basis to do so.**

28

Aug. 12, 2003 2012

Your termination letter states that Grot has failed to "show cause" but you have not addressed a single issue of Grot's response. Throughout this process Grot has repeatedly requested the opportunity to meet with you, the COTRs and ne else you felt necessary to discuss the issues involved in this contract. **You have never agreed to such a meeting, ys finding some excuse that such a meeting is "moot".** We again request such a meeting.

In the light of your apparent failure to give consideration to Grot's response of July 31st, we are asking that the termination of this contract be rescinded. We are proceeding with preparing our appeal to the United States Court of Federal Claims and intend to file same by Monday, August 18th. Accordingly, unless we have heard from you by 12:00 Noon eastern daylight time Friday, August 15th, we will assume that you have no intention of rescinding the termination and will proceed to perfect our appeal.

I Remain,
Grot, Incorporated

Jerry Grot
President

cc: Andrew J. Kilpatrick. Gore. Kilpatrick, Purdy. Metz & Adcock
Mark S. Marino. Travelers Insurance

we had the NICET Level 3 and the expertise to apply the equipment that was -- that was shown to be installed and to interpret the specifications and make sure that we gave them the information to install the pipe and wire properly. 13:34

Q. Okay. I'm going to show you an exhibit. This is Exhibit 6. And if you could just read -- familiarize yourself with that.

A. Exhibit 6. From Mraz to Adam Dearing.

THE REPORTER: Excuse me, sir. I need to hear you if you're going to speak out loud. 13:35

Q. (BY MS. WILLIAMS) You can read it to yourself.

A. Okay.

Q. This is an e-mail originally from John Mraz, the contracting officer, to Adam Dearing, who is a contract specialist at the VA -- 13:37

A. Okay.

Q. -- Dated September 13th, 2002. Additionally, the e-mail was forwarded, or it looks like Adam Dearing responded to John Mraz as well. I want to draw your attention to the e-mail that's from John Mraz to Adam Dearing dated September 13th, 2002, to the third paragraph, which states, "Our informant told us that Grot requested two class proposals from the 13:37 13:37

subcontractor, Siemens, one install only and two design-install."

A. Okay.

Q. Does that sound familiar to you at all? Do you have any idea what that's referring to? 13:38

A. Huh-uh.

Q. So Siemens only produced one cost proposal to Grot at the beginning of this contract.

A. No. I would have to say that we submitted a proposal to Grot that had additional devices not shown on the drawings. 13:38

Q. Can you clarify that for me, please? And when you say "drawings," because we're talking about a lot of drawings. We have Fratto's drawings. We have Siemens' drawings. Just clarify. 13:38

A. The contract drawings, that had additional devices on the contract drawings.

Q. Okay. And again, I'm sorry, but I'm trying to understand what you're saying. So your proposal to Grot included devices that were not included on Fratto's drawings. 13:38

A. Our initial proposal.

Q. Okay. And what happened with that proposal?

A. That proposal was not accepted.

Q. And why not? 13:39

A. Because we were going to bid on the devices that were shown on the drawings and provide a, a system that was designed by Fratto.

Q. Did Grot direct you to resubmit a cost proposal based solely on the devices shown on Fratto's drawings? 13:39

A. That -- I don't know if they directed me to. But after discussions, we decided that was what we were going to do.

Q. Did Grot convey to you that that's what they wanted you to do? 13:39

A. That's what they wanted me to do? I don't know if I could say "wanted" or not, if that's the case. I can't --

Q. Well, after your discussions with Grot, what was it about your discussions with Grot that led you to believe that you needed to resubmit a cost proposal based solely on the devices shown on the Fratto drawings? 13:39

A. Because I guess we did -- we did that because once we reviewed the specifications and reviewed the documents, we decided that we were going to provide a system that was designed by the engineer. He wasn't looking for us to do the design, as far as that, because the system was already designed. 13:39 13:40

Q. Okay. Let's go back for a minute to your original cost proposal. Why did you include additional devices that weren't shown on the contract drawings in your original proposal?

A. Well, because -- and this goes back to the first bid. We were intimate with the project. We knew that, that when we walked it and talking with Mel and Chris and everybody concerned, that they wanted additional devices to -- in areas that needed coverage that weren't necessarily designed on the drawings. 13:40 13:40

Q. So from --

A. And that's -- well, okay. Go ahead.

Q. No. That's fine, if you have more.

A. I was just going to say, that's why, when we put our first bid out when they first did the solicitation, we were at $1.3 million. 13:40

Q. So based upon your, your prebid walk-through, your prebid site visit that you did before the first bid, you were aware of the fact that the VA was looking for more than the devices that were shown on Fratto's drawings? 13:41

A. In discussion with Mel and Chris, yeah. I don't know if that was brought out in -- I didn't attend the, the prebid meeting. I know there was a bunch of questions brought up that Lee said. I know 13:41

there was some questions and answers about clarifying, you know, how many people were going to be trained and who was paying for training and things like that.

But, yeah, we knew that, that if we were going to design it, that it would take, you know, more than what's shown on those drawings. 13:41

Q. And knowing that and based upon that knowledge, that's why you included additional devices in your first cost proposal to Grot?

A. Uh-huh. 13:41

Q. I'm sorry. You have to say "yes" or "no."

A. Yes. Yes. Yes.

Q. And when you met with Grot, how did you first know that that cost proposal was not acceptable to them? 13:42

A. When, when we started discussing what was -- what the specifications and what was shown on the plans and that it -- that we weren't going to design the system because it was already designed, and we were going to provide a bid per the plans and specifications specifically. 13:42

Q. So in that meeting Grot, officials from Grot and Siemens sat down and read through the specifications. And based upon --

A. I think we did it over the phone but -- 13:42

Q. Okay. So sat down in your individual offices --

A. Right.

Q. -- and read through the specifications and determined that the contract did not require you to do anything other than install what was shown on the Fratto drawings. 13:42

A. Yeah. That's what we decided, yes.

Q. Okay. And did you notify or inform Grot that at one point in time the VA had led you to believe that that was not what they wanted from the contract? 13:43

A. I probably said that, yeah. I said that. I could have said that what Mel and -- what Mel and Chris are looking for is, you know, a fully, you know, every nook and cranny covered. 13:43

But after discussions like I've said earlier, when we discussed the documentation that was given to us and that it was stamped and approved by an engineer, then we decided that, yeah, this is a -- this is already in a design system; and we will provide -- 13:43 you know, per the contract documents, we will provide an application system. We'll apply our system to what's shown on the drawings.

Q. And when you informed representatives of Grot that Mel and Chris had made this clear to you -- 13:44

A. Uh-huh.

Q. -- and that that was why you had created your cost proposal in the way that you created it, what was their response?

A. That it was -- it was not a design project, that it was a plans-and-specifications project is what they informed me and what we discussed. And, you know, I think in reviewing the documents, you know, whenever -- and I've been in this situation before where an engineer will put a design out and had to deal with the Texas -- what is it? Texas Board of Engineers. I don't know if that's exactly what they're called. 13:44 13:44

But I've got a -- I've got a statement in there that when an engineer puts a design on a set of drawings, he's responsible for the design, not the people that are contracted to do the work. We're supposed to follow the plans. If he puts one device on there, then it's his design. 13:44

Q. Did Fratto Engineering have a stamp that they would put on their drawings? 13:45

A. Uh-huh.

Q. Do you recall whether or not that stamp stated that the contractor was responsible for creating the plans, for installing the system exactly as -- 13:45

"Our directive was to value engineer the project."

A. Okay.

Q. What does "value engineer" mean?

A. Bring -- meet the minimum code requirements. Would say to put in the -- put the design in with the equipment, the minimum requirements of what's in the code, which we do quite a bit on projects. 14:16

Q. Okay. Would it surprise you if I told you that there was a specification that said -- that directed the contractor -- that stated that if the contract drawings or the specifications required something greater than the codes, that the contractor was directed to follow the drawings and the specifications? 14:17

A. Would it surprise me? 14:17

Q. Correct.

A. No, I don't think so. Probably says that.

Q. Do you -- in your opinion, is it -- strike that. So as you stated, value engineer means to design the system to meet the minimum of the code requirements. 14:17

A. Uh-huh. I would say that.

Q. And when you say that -- when you state, "Our directive was to value engineer the project," who directed you? 14:17

A. That's when Jerry -- I guess, we were having -- they were having some issue with the drawings and trying to get, get the system installed. And we were directed -- I guess Grot got directed or we got directed by Grot to re -- to actually redesign, go in and put everything that was required by life safety 101. 14:18

Q. Okay. So listen to my question. When you state, "Our directive was to value engineer the project" -- 14:18

A. Uh-huh.

Q. So when you state, "Our directive was to design the project so it meets the minimum code requirements," who directed you to do that?

A. I would say Grot. 14:18

MS. WILLIAMS: This is going to be the next exhibit.

(EXHIBIT NO. 118 IDENTIFIED.)

Q. (BY MS. WILLIAMS) This is Exhibit 118. Just take a minute to look over that. 14:18

A. This looks like a proposal from Lee to Grot.

Q. Okay. This is a document from Lee Bledsoe to Jerry Grot, dated June 10th, 2003. At the top it states Proposal for, further down, Project VA Bonham Hospital. Have you ever seen this document before? 14:19

A. Have I -- yeah, I'm sure I have.
Q. Do you know what it is?
A. It's a proposal.
Q. Okay. For what?
A. It's a pricing proposal for adding and deleting devices in a, in a design. Looks like they're deleting quite a few smoke detectors, and they're adding heats and ducts and adding a bunch of speaker -- or strobes, one-horn strobes and some speaker strobes and some monitor modules. 14:19 14:19
Q. Okay. Do you know why this cost proposal was submitted in June of 2003?
A. Sure. This was when we went back, and there was issues coming up out at the VA Bonham, and we were told to redesign the system per NFPA 101 minimum code. 14:20
Q. And when you say, "We were told to redesign the system per NFPA 101 minimum code," who told you?
A. Grot. I mean we were -- that's what the -- that's what -- since there couldn't -- we couldn't find a way to make progress, then we decided -- you know, I probably was in on the conversations with Jerry and decided to put out a design that would meet minimum code, life safety 101 code, because we had already had an approved set of drawings stamped by Fratto saying we, we had met the intent, because it said accepted 14:20 14:20

except for a couple of "accepted as noted."

And then we did the second design. And when we did the second design, it was going to cost us more engineering time. You know, our second set of drawings was going to cost us more engineering time. 14:20 And there was going to be a cost impact to Siemens to go through the process of researching, putting devices on there, reshowing all the wiring and regenerating drawings and re -- putting together another proposal. I mean another submittal. 14:21

Q. So at this point where it states, "Proposal: We propose to furnish and install a Siemens Building Technologies redesign of the fire alarm system to meet the NFPA codes" --

A. Uh-huh. 14:21

Q. So at this point were the specifications at all incorporated into this redesign, or was this only on NFPA codes?

A. I would say it would only be on looking at NFPA codes. That was a bad transformer. 14:21

MS. WILLIAMS: This is Exhibit 119. Wait. Let me see what I gave you. That's not right. We can go off the record a second.

(Off the record.)

Q. (BY MS. WILLIAMS) All right. Go back on. 14:24

A. Yeah. I think there, there was definitely some issue with who was going to be there, when he was going to be there and a lot of discussion about it, yeah. It went on. But I believe that when we got down to it, I thought that we'd met the -- I think early on in the job we -- there was some discussion about us not having someone. And we -- actually either it was us or Grot actually agreed to pay some extra money to Monty to be out there at one point to make sure we were meeting the intent. 14:56 14:56

MR. KILPATRICK: Okay. Nothing further.

MS. WILLIAMS: I have a couple of things.

FURTHER EXAMINATION

BY MS. WILLIAMS: 14:56

Q. Just to clarify, Mr. McCauley, so your first -- the first cost proposal that Grot accepted from you --

A. Uh-huh.

Q. -- was based upon creating drawings that looked solely at Fratto's drawings, correct? 14:57

A. Yeah.

Q. Okay.

A. When we -- when we -- yeah.

Q. So the drawings that you, that Siemens, first 14:57

handed to Grot were exact replicas of Fratto's original drawings with your -- with your devices plugged in.

A. Yeah.

Q. Correct?

A. As close as -- like I said, as close as possible. Seemed like we missed a couple. And then there was a couple added. I mean there was -- that was the intent anyway. 14:57

Q. And Siemens did not take into account NFPA codes at that point in time. 14:57

A. I would say we designed it with the devices that were shown on the drawings.

Q. And Siemens did not take into account the requirements of the specifications at that time. Let me rephrase that. 14:58

Siemens assumed that the Fratto drawings had incorporated the specification requirements at that time, correct?

A. Yeah. I believe they took into account some of the -- I mean there were certain things I thought we had -- I'd have to look at the drawings. But I don't know. I think in the spec, or was it on the drawing, that it said something about removing a McCullough transmitter. And we may have had a note or two about that. It may have been in the spec. I can't really 14:58 14:58