**Cause No. 03-1951C**
**(Judge Baskir)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**GROT, INCORPORATED,**

**Plaintiff,**

**vs.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

**GROT, INC.**

**Andrew J. Kilpatrick, Jr., ID#656**
**Gore, Kilpatrick & Dambrino, PLLC**
**Post Office Drawer 2900**
**Ridgeland, Mississippi 39158**
**Tele: 601.957.1595**
**Fax: 601.957.1790**
**akilpatrick@hgglaw.com**
**MSB#3763**

**Dated: January 25, 2006** **Counsel for Plaintiff**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

I. STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. STATE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Contract Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Grot Begins to Construct the Project . . . . . . . . . . . . . . . . . . . . . . . 8

III. The VA Directs Grot to Redesign the Project . . . . . . . . . . . . . . . 10

IV. The Government Terminates Grot's Contract . . . . . . . . . . . . . . 17

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I. Review of the Contracting Officer's Decision . . . . . . . . . . . . . . . 19

II. The Contract Does Not Require Grot to Redesign the Entire Project for the Purpose of Installing a Fire Alarm System . . . 20

III. The VA Warrants the Adequacy of Plans and Specifications . . 24

IV. Grot Properly Interpreted the Contract and Its Interpretation was Reasonable Under the Circumstances . . . . . . . . . . . . . . 34

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

Case Authority:

*Argo Technology, Inc.*,
ASBCA No. 30522, 88-1 BCA ¶ 20,381 at 103,063 . . . . . . . . . . . . . 25

*Big Chief Drilling Company v. United States*,
26 Cl. Ct. 1276, 1293 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Blinderman Constr. Co. v. United States*,
39 Fed. Cl. 529, 539 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Delcon Construction Corporation v. The United States*,
27 Fed. Cl. 634, 637 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Fry Communications v. United States*,
22 Cl. Ct. 497, 503 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Hol Gar v. United States*,
169 Ct. Cl. 384, 388 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*IMS Services, Inc. v. United S*tates,
33 Fed. Cl. 167, 185 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Kenneth Reed Construction Corp. v. The United States*,
475 F.2d. 583, 586 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Kenneth Reed Construction Corp. v. The United States*,
475 F.2d. 583, 587 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Neal & Co. V. United States*,
19 Cl. Ct. 463, 467-68 (1990),
aff'd 945 F. 2d 835 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 25

*New York Trust Co. v. Island Oil & Transport Corp.*,
34 F. 2d 655, 656 (2d Cir. 1929) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*NVT Technologies v. United States*,
370 F. 3d 1153, 1159 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 35

*P.R. Burke Corp. v. United States*,
47 Fed. Cl. 340, 351 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Peter Vicari, General Contractor, Inc. v. United States*,
47 Fed. Cl. 353, 359 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Record Steel and Construction, Inc. v. The United States*,
62 Fed. Cl. 508, 513 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Record Steel and Construction, Inc. v. The United States*,
62 Fed. Cl. 508, 517 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Renda Marine, Inc. v. United States*,
66 Fed. Cl. 639, 647 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United Pacific Insurance Co. v. United States*,
204 Ct.Cl. 686, 49 F2d 1402 (1974) . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Spearin*,
248 US 132 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*WPC Enterprises, Inc. v. United States*,
163 Ct.Cl. 1, 323 F2d 874, 877 (1964) . . . . . . . . . . . . . . . . . . . . . . 24

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **GROT, INCORPORATED,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **No. 03-1951C** |
| | **)** | **(Judge Baskir)** |
| **THE UNITED STATES,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT UPON THE ISSUE OF WHETHER THE CONTRACT REQUIRED GROT TO DESIGN AND INSTALL A FIRE ALARM SYSTEM**

COMES NOW Grot, Incorporated ("Grot"), plaintiff, and submits this its response to the motion of defendant for partial summary judgment on the issue of whether plaintiff was required to "design and install" a fire alarm "system". Contrary to defendant's argument, there appear to be significant issues of material fact as to the interpretation of the contract specifications in question and the contract as a whole not just by Grot but by other bidders to the project and the defendant itself. It is respectfully submitted that, upon a review of the pleadings, discovery and other supporting documentation, this Court will come to the inescapable conclusion that this was not a design build project as argued by defendant

or, alternatively, that the plans and specifications for the project were ambiguous and that Grot's interpretation, as well as that of others was reasonable under the circumstances.

## PLAINTIFF'S BRIEF

## STATEMENT OF THE ISSUES

I. Whether the plans and specifications for the project in question required Grot to completely redesign a "project" in order to install a fire alarm system specific to a particular manufacturer.

## STATEMENT OF THE CASE

I. Nature of the Case

Grot has filed this appeal being aggrieved by the final decision of a contracting officer wrongfully terminating Grot for default under a contract between Grot and the defendant. Grot bases its appeal and dispute of the termination on several issues. The issue addressed by defendant's motion for partial summary judgment is whether the plans and specifications for the project required Grot to "design" and install a "fire alarm system". The real issue is whether the specifications required Grot to "completely redesign a **project**" which had already been designed for defendant by design professionals in order to install a fire alarm system specific to a

particular manufacturer.

Grot has never disputed that it was required to provide a fire alarm system that met the plans and specifications for the project. Grot did dispute the contracting officer's interpretation that this was a design/build project and that Grot was required to completely **redesign a project** that had already been designed by registered engineers under separate contract with defendant. It is the **project** that is in issue not the system.

Notwithstanding Grot's dispute as to the contracting officer's interpretation of the plans and specifications, Grot proceeded to provide a design that met the plans and specifications for the project and was in the process of installing a system in compliance with that design when it was wrongfully terminated. Should the Court determine that this was in fact a "design/build" contract, issues still remain as to, among other things, whether or not Grot was performing in accordance with the plans and specifications for the project at the time of termination and whether the contracting officer acted pursuant to the applicable Federal Acquisition Regulations at the time the termination was issued.

## STATEMENT OF FACTS

I. Contract Award

On February 1, 2002, the Department of Veterans Affairs ("VA") awarded to Grot contract number V549P-609-2 (the "Contract") for performance of the work generally described as Campus-Wide Fire Alarm, Project No. 099-108 at the Sam Rayburn Memorial Veterans Center, East Ninth and Lipscomb Streets, Bonham, Texas (the "Project").

This Project was initially released for bid as Solicitation IFB 549-64-01. Plaintiff's Appendix ("Pl. App.") at 1. The government's electronic release inviting bids on the project and the Instructions, Conditions and Notices to Offerors provided with the information to bidders, described the work to be performed as follows:

> The contractor **shall furnish all labor, equipment, materials and supervision to replace the "Fire Alarm System"** at the Sam Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX **in accordance with the contract drawings and specifications**. The project shall involve **general construction, demolition, alterations, grading, electrical and mechanical work**. Contract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the city, county, state and Federal Government. The period of performance is ninety (90) calendar days. (Emphasis added). Pl. App. at 1,3,5.

As stated above, the original contract completion time was ninety (90) days. However, for some reason never disclosed to the bidders, the contract completion time was increased to two hundred seventy (270) days

by Amendment Two. Pl. App. at 6,7.

The original bid date was July 11, 2001 but was extended until July 31, 2001 to accommodate prospective bidders that had not received copies of the plans and specifications. Pl. App. at 8,9. Included in the contracting officer's transmittal extending the bid opening date were answers to certain questions that had been raised by prospective bidders concerning interpretation of the plans, specifications and drawings. Pl. App. at 10. None of the questions addressed design of the Project. Subsequent thereto, the contracting officer noticed a pre-bid conference for July 20, 2001. Pl. App. at 11. By amendment dated July 27, 2001, the amended bid date was again extended, this time until August 28, 2001. Pl. App. at 12.

Subsequent to the pre-bid conference and prior to the date scheduled for the opening of bids, personnel from Siemens Cerebus Division, a division of Siemens Building Technologies, Inc. ("Siemens") were aware that Chris Forner and Mel Harrison, representatives of the VA who were not present at the pre-bid conference, had information relative to the performance of the work on the Project that was not disclosed in the plans and specifications for the Project or at the pre-bid conference. Pl. App. at 186-188.

Representatives of Siemens met with Mr. Forner and Mr. Harrison at the Project and discussed in detail the specifics of what they wanted to be installed on the Project. These disclosures indicated to Siemens that the they wanted considerably more fire protection devices and other equipment than was reflected on the plans and specifications for the Project. Pl. App. at 177, lines 6-10 & 19-22. Notwithstanding, neither VA personnel nor Siemens disclosed the information provided by Mr. Forner and Mr. Harrison to any other bidder prior to bid opening.

At the initial bid opening, ADT Security Services, Inc. ("ADT") was determined to be the lowest bidder for the Project at $864,791.00. However, ADT's price was submitted in error and the correction raised the ADT's price to $969,656.00. Pl. App. at 21. The contracting officer accepted the change and determined to award the Contract to ADT.

Grot's bid was $1,039,591; $69,935.00 or 7% over the "low" bid. Pl. App. at 22. The bid of Siemens was $1,299,711.00; $330,055.00 or 34% above the "low" bid. Pl. App. at 23.

Grot immediately protested the award of the Contract to ADT in that among other things, the contracting officer had allowed ADT to increase its bid price to the detriment of other bidders. Pl. App. at 24. Following the

filing of Grot's protest, the VA cancelled the solicitation due to what the VA determined were "**inadequate specifications**". Pl. App. at 26-28.

It is important to note that at no time during the solicitation process did the VA ever indicate that design of the fire alarm system was the responsibility of the contractor. In fact, the very reason for cancellation of the original solicitation was "**inadequate specifications**". Pl. App. at 28.

On January 8, 2002, the VA received bids on IFB 549-23-02 which replaced IFB 549-64-01. Again on the VA's solicitation you find the description of the work and, again, it states as follows:

> The contractor **shall furnish all labor, equipment, materials and supervision to replace the "Fire Alarm System"** at the Sam Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX **in accordance with the contract drawings and specifications**. The project shall involve **general construction, demolition, alterations, grading, electrical and mechanical work**. Contract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the city, county, state and Federal Government. The period of performance is 270 calendar days. (Emphasis added). Pl. App. at 29.

The only difference between the original description of the work and that contained in the rebid was the period of contract performance.

At the second bid opening, Grot was determined to be the lowest bidder at $934,310.00. Simplex was second low bid at $969,249.00; or 3%

over Grot's bid. Siemens was the third low bid at $984,657.00; now only 5% over Grot's bid and $315,000.00 lower than its initial bid. Pl. App. at 32-33.

As previously noted on February 1, 2002, the VA awarded the Contract to Grot. The Contract provided that the Project was to be completed within two hundred seventy (270) days following receipt of the Notice to Proceed. The Notice to Proceed was received by Grot on February 1, 2002 with work to begin within 10 days thereby making November 10, 2002 the original Contract completion date for the Project. Pl. App. at 34.

II. Grot Begins to Construct the Project

After award of the Contract, Grot began the process of issuing subcontracts and vendor purchase orders one of which was to Siemens. Siemens was to provide technical assistance, equipment and working drawings based upon the plans and specifications provided by the VA upon which Grot based its pricing for the Contract. It is important to note that at all times during the bid process, Grot relied upon the plans, specifications and drawings provided by the VA to develop its price and to schedule work for the Project. Pl. App. at 242, ¶ 2. The plans, specifications and

drawings were prepared by Fratto Engineering, Inc. ("Fratto").

A pre-construction conference was held on February 25, 2002. A review of the notes from the meeting indicates that there was a discussion about "submittals" and installation of the approved submittals. Nowhere in the meeting notes does it reflect that the VA advised Grot that it was responsible for design of the Project. Pl. App. at 35-37.

Grot took the plans, specifications and drawings provided by the VA and requested Siemens to provide field installation drawings in accordance with the VA's bid documents. Siemens provided the requested drawings which were submitted to the VA for review and approval. Pl. App. at 242, ¶ 3. The VA delivered the drawings to Fratto for review and approval. The drawings were returned by the VA stamped as "approved" or "approved as corrected". In some instances the VA determined unilaterally that it wanted additional devices that were not shown on the original drawings provided by the VA and prepared by Fratto. Pl. App. at 243, ¶ 7. **Grot had drawings approved by the VA and Fratto for all of the buildings involved in the Project by the end of March 2002 and had begun installation of the new fire alarm system.** Pl. App. at 243, ¶ 8.

Again it is important to note that at no time during the solicitation

process, the award or the preconstruction conference, nor the initial production of construction drawings, did the VA ever indicate that re-design of the Project for the fire alarm system was the responsibility of the contractor.

III. The VA Directs Grot to Redesign the Project

After Siemens and Grot submitted the drawings and the VA and Fratto made modifications and changes thereto and then approved the drawings for construction, the VA determined that it was Grot's responsibility to "design" the Project. This determination was first made in writing to Grot on or about June 24, 2002; four months and fourteen days after the issuance of the Notice to Proceed and after Grot had performed extensive work on the Project **based upon the VA and Fratto approved drawings.** Pl. App. at 38-39.

Grot protested the directive of the VA advising that the specifications do not state that the Project is a design/build project nor was Grot contracted to "design" the Project. Pl. App. at 38-39. Grot repeatedly asked for meetings with the contracting officer to review the directive. With the exception of one time, July 22, 2002, the contracting officer refused to have "any " meetings with Grot to discuss the directive or any other issue

on the Project for that matter. The July 22nd meeting was for the purpose of discussing the dispute as to Grot's responsibility for design of the Project. The issue was not resolved.

Instead, by letter of August 23, 2002, over a month later and after research by the contracting officer's technical representative, the contracting officer, again without meeting with Grot, directed Grot to design the fire alarm Project. Pl. App. at 40-41. Grot immediately responded by letter of that same date and by letter of September 5th, Grot protested the direction of the VA clearly pointing out the fallacy of the rational used to make the determination. Grot requested a meeting with the contracting officer to try and come to an understanding as to the respective parties' position. Pl. App. at 42-43. As was the norm throughout the entire Project, by letter of September 17th, the contracting officer rejected Grot's request for a meeting and then directed that Grot furnish the VA with the "design/install" fire alarm system although as previously demonstrated, nowhere in the Instructions, Conditions and Notices to Offerors, the Solicitation, Offer and Award, the specifications or any published notice of the Project is the phrase "design/install" found. Pl. App. at 44-45.

Grot responded by letter of September 18th indicating that Grot was

proceeding to redesign the project by curing the deficiencies in the original plans and specifications. At all times Grot reserved its rights to dispute the decision made by the contracting officer. Pl. App. at 46.

The contracting officer responded by letter of that same day, again refusing to meet with Grot, and now taking the position that if there was an ambiguity in the contract documents, that it was Grot's duty to point out the ambiguity during the bid process. Again the contracting officer found that the specifications "clearly state that the contractor shall provide a **design/install** fire alarm system". Yet the contracting officer has never pointed to where in the specifications the phrase "design/install" is found. Pl. App. at 47-48.

Later that same day, again without meeting with Grot despite repeated request to do so, the VA issued a cure notice directing Grot to "cure" "failures . . . . . . endangering performance of the contract". The contracting officer's cure letter fails to meet the requirements of the FARs in that it does not specify at all what the "failures" are that Grot must cure. It is totally devoid of any substantive information with respect to what Grot must "cure". Pl. App. at 49. Grot proceeded with the redesign of the Project while reserving its rights under the Contract Disputes Act.

By letter of September 25, 2002, Grot, facing termination, immediately protested the contracting officer's directive. But, consistent with its obligations under the Contract, Grot began to perform in compliance with the directive. Notwithstanding, there were a substantial number of questions to be resolved and Grot requested a meeting with the contracting officer to begin the process of redesigning the Project. Pl. App. at 50-51.

The requested meeting was denied. In fact, throughout the redesign process Grot repeatedly requested meetings with and direction from the contracting officer. **Not one time would the contracting officer meet with Grot despite the fact that Grot was trying to redesign a project pursuant to the contracting officer's directive.** Pl. App. at 243, ¶ 10 and 244, ¶11.

During construction of the Project, the VA agreed for Grot to install temporary fire alarm equipment when working on the existing fire alarm system in a building that could not be changed over and working at the end of the work day. Among the types of temporary fire alarm equipment were temporary pull stations The purpose of the temporary pull stations is to provide additional fire alarm capability when portions of the system are

deactivated. The temporary systems are removed when construction is complete for that portion of the building. However, the fact that the temporary pull stations may not have been installed does not mean that there is no fire protection for that building. Pl. App. at 244, ¶¶ 13-15 & 245, ¶16.

On July 17, 2003, Grot inadvertently failed to install temporary pull stations while working in Building 1. As a result, the contracting officer issued a cure notice to Grot to cure the deficiency and to establish a fire watch for the building until the temporary pull stations were installed. Pl. App. at 52. While Grot disputed the contracting officer's conclusion that the building was "without fire protection", Grot immediately acknowledged the inadvertent mistake with respect to the temporary pull stations and conducted the fire watch as directed. The temporary pull stations were installed before completion of work on that same day. Pl. App. at 53.

By letter of July 17th, the COTR issued a directive to maintain a fire watch in Building 29 due to what the COTR determined was "inadequate fire safety coverage". However, as admitted by the contracting officer, the COTR never defined what he considered to be "inadequate fire safety coverage" or the basis for compelling the fire watch. Pl. App. at 55 & 108,

lines 5-19 & 109, lines 1-2.

Further, an issue had arisen between Grot and the VA regarding the installation of additional corridor smoke detectors in Building 29. By letter of April 29, 2003, Grot had pointed out that the smoke detectors were not a requirement under NFPA 101, 1997 Edition, and requested a meeting to clarify the issues between Grot and the VA. Pl. App. at 56. As was the case throughout the Project, the VA did not respond.

By letter of May 27, 2003, Grot again raised the issue of the additional smoke detectors and pointed out to the contracting officer that various specifications upon which the contracting officer's representatives were relying were not a part of the 1997 Edition of the NFPA 101. Pl. App. at 57. Again Grot asked for direction and none was forthcoming.

Instead the COTR issued the July 17th fire watch notice. By letter of July 18th, Grot reminded the contracting officer of Grot's repeated request for direction and a meeting. Again no response was forthcoming. Not only was the contracting officer relying on the **2000 Edition** of NFPA 101 and not the 1997 Edition as required by the specifications, after the termination, Grot learned that the contracting officer's technical representative was not relying on the correct VA fire protection manual. Pl. App. at 145, lines 20-

24 & 146, lines5-22.

Then, three days later, on July 20th, the contracting officer issued a directive to initiate a fire watch for buildings 1, 2, 3, 24 and 29; the entire Project. The sole basis for the directive was that the contracting officer had determined that there was “inadequate fire safety coverage”. Pl. App. at 58. As can be seen by the directive, there were no specifics given. With the exception of the inadvertent failure to install the temporary pull stations in Building 29, which was cured before the close of the day, the VA had not raised an issue as to the adequacy of fire protection in the other buildings.

The institution of a campus wide fire watch was going to be a significant cost to Grot and Grot immediately asked for a meeting with the contracting officer to review the concerns and misunderstandings which seemed to be prevalent on the Project. When no response was forthcoming, Grot issue another request for a meeting. Pl. App. at 59.

Instead of addressing Grot’s concerns the contracting officer stated that he, “not the contractor” would determine the need for a meeting. Pl. App. at 60-61. This position was taken even when the contracting officer knew there were substantial disagreements over the interpretation of the plans and specifications for the Project. This refusal to meet and address

the issues involved in this Project had a direct impact on the completion of the Contract.

On July 23rd, Grot reaffirmed that it was conducting the mandated fire watch but was doing so under protest with the intent to pursue all cost and expense incurred by Grot in performing per the contracting officer's directive. Pl. App. at 62,63,64. As previously stated, Grot had continually requested a list of the alleged deficiencies as the contracting officer's letters were totally devoid of content. Apparently it would not have mattered if a list had been given. The contracting officer had already determined that if a list of deficiencies was given, it would not be complete. Pl. App. at 61. There was no way for Grot to succeed.

IV. <u>The Government Terminates Grot's Contract</u>

Then, almost immediately by the contracting officer's e-mail of July 23, 2002 (sic), the VA issued its "Show Cause Letter" to Grot in which the VA stated that Grot had 10 days after receipt of the Show Cause Letter to provide a schedule to complete the Contract. Pl. App. at 65-66. By e-mail of July 31, 2003 Grot responded and fully addressed all of the issues raised in the Show Cause Letter and further provided to VA a completion date of October 3, 2003 **assuming that the VA provided answers to**

**outstanding questions by August 11th**. Pl. App. at 67-74.

Without further comment or challenge to Grot 's July 31, 2003 letter and without addressing the issues raised in the letter or providing answers to questions contained in Grot's letter or letters previously provided by Grot, by letter of August 7, 2003, the VA wrongfully terminated the Contract for default; the alleged basis of the default was that the contracting officer had determined that Grot:

a) had failed to provide adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29 as directed in Mr. Mraz's letter of July, 17, 2003; and

b) had failed to perform in compliance with the technical requirements of the contract; and

c) had failed to complete the Contract by the extended completion date of June 23, 2003; and

d) had failed in Grot's letter of July 31, 2003 to "Show Cause" to the Mr. Mraz's "Show Cause Notification Letter of July 23, 2003. Pl. App. at 75-76.

At all times from July 22nd until August 8th, Grot maintained the fire watch mandated by the contracting officer and kept working to complete the project. Finally, in his deposition, the contracting officer admitted that it was not fair not to tell Grot where Grot's system failed to meet the requirements of NFPA 101. The alleged deficiencies were never reduced to

writing by the contracting officer. Pl. App. at 110, lines 2-14.

## ARGUMENT

I. Review of the Contracting Officer's Decision

This Court reviews the decisions of a contracting officer *de novo*. *Peter Vicari, General Contractor, Inc. v. United States*, 47 Fed. Cl. 353, 359 (2000). The findings of fact in a contracting officer's decision are not binding on the parties or entitled to any deference. *De novo* review precludes reliance on the presumed correctness. *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 647 (2005). In the instant case, the actual decision was made by the contracting officer's technical representative. As will be seen in this argument, the contracting officer did nothing to verify the technical representative's interpretation. Upon *de novo* review and when viewed in the light of the events leading up to award of the Contract, the performance by Grot and Siemens until directed to redesign and the VA's own interpretations of the specifications, this Court will come to the inescapable conclusion that the contracting officer's decision was incorrect. Either this was not a design/build project as argued by defendant or the plans and specifications for the Project were latently ambiguous.

II. The Contract Does Not Require Grot to Redesign the Entire Project for the Purpose of Installing a Fire Alarm System

Contrary to defendant's argument on page 25 of its brief, the specifications do not state "throughout" that Grot was responsible for designing a fire alarm system. In fact, out of the entire set of specifications for this Project, defendant bases its claim that this was a "design/build" project on one word in two sections of the specifications. The first is specification section 13850, paragraph 1.1.B which provides in part as follows:

> "The fire alarm system shall comply with the requirements NFPA 101 and NFPA 72. The system **design**, system layout, submittal documents, preparation, and supervision of installation and testing shall be provided by a technician that is certified [National Institute for Certification in Engineering Technology ("NICET")] Level III or a registered fire protection engineer. The NICET certified technician shall be on site for the supervision and testing of the system. Equipment manufacturer factory engineers thoroughly familiar and knowledgeable with all equipment utilized, shall provide additional technical support at the site as required by the Contracting Officer or his authorized representative. Installers shall have a minimum of five (5) years experience installing fire alarm systems." (Emphasis added).

The second specification section is specification 13850, paragraph 1.2.B, entitled "Scope", which provides in part as follows:

> "A new fire alarm system shall be **designed** and installed **in accordance with the specifications and drawings**. Device location and wiring runs shown on the drawings are for reference only unless specifically dimensioned. Actual location shall be in accordance with [National Fire

Protection Association ("NFPA") Code] 72 and this specification." (Emphasis added).

It is important for the Court to understand that this is the only location in the entire specification section where the word "design" is utilized. Further, this is the only place throughout the entire solicitation where the word "design" was utilized. Nor does either section say that the "contractor" is "to" design the Project as argued on page 25 of defendant's brief. The interpretation which the government seeks to place based on this one word in this section totally misconstrues the reasonable interpretation of these specifications. In both instances the word "design" is related to the "system" to be installed. Grot has never denied that it was Grot's responsibility to provide a "system" which met the **specifications and drawings** for the Project as required by 13850. However, the "system" may differ from manufacturer to manufacturer and, to a certain extent, each manufacturer would have to "design" its components of the system to meet those specifications and **drawings**. It did not mean that Grot was responsible for completely re-designing the Project once it was awarded the Contract.

With respect to project drawing #EF00-01, General Note 5, the fact that the drawings are "generic" is only to assure that there is no

misinterpretation that the drawings may dictate a sole source procurement. In fact, the remainder of that note clarifies that quantities and spacing is dependent on the devices and may vary from the system equipment manufacturer. Nowhere in that general note does it state that the contractor is responsible for walking the Project, investigating every nook and cranny and re-designing the Project.

Further, reliance by the government on specification section 01001, General Conditions, paragraph 1.1, subparagraph (d) is likewise misplaced. The fact that it may have been "impractical" to detail all items in the specifications does not make this a design specification. It is the purpose of shop drawings to detail installation procedure for the devices as shown on the drawings. However, it was not "impractical" for Grot to believe that the devices shown were to be installed as shown. It is important to note that pursuant to NFPA all manufacturers' devices must cover a ceratin amount of square footage area regardless of manufacturer. Installation of the system is governed by the usage and square footage of each particular room. Grot was not given the room type on the drawings thereby assuming that the engineer for the Project had determined the use of the room and its size. Pl. App. at 243, ¶6. Regardless, nowhere in this

section does it state that the contractor is responsible for design.

Defendant also relies upon section 13850, paragraph 1.1, subparagraph A. However, this section again does not provide that the contractor is responsible for the design of the Project. It merely states that when the fire alarm system is installed, it will be a “complete” system. Use of the phrase “but not limited to” does not in any way imply that Grot is responsible for design. This is nothing more than a generic listing of systems which will be included in the fire alarm program. The fact that each item is not specifically mentioned or described means only that the contractor will provide all of the incidental equipment necessary to make the items listed in the specifications and drawings function. Pl. App. at 244, ¶12.

Section 13850, paragraph 3.2(a) is important for another reason. This paragraph details installation of the new system and provides that the system shall be in accordance with NFPA 70, 72, 90A and 101 **as shown on the drawings,** and as recommended by the major equipment manufacturer. The remaining paragraphs to paragraph 3.2 dictate the method of installation. Again, if it was the intent of the design professional for the fire alarm contractor to design the Project, why did the design

professional go to such detail in specifications? Why did the design professional require installation **as shown on the drawings**? The fact of the matter is that was never the intent of these specifications; **otherwise the specifications would have specifically defined that the contractor was to design the Project and would have simply provided performance specifications.** That is not what occurred.

III. The VA Warrants the Adequacy of Plans and Specifications

One issue for consideration is whether the plans and specifications reasonably communicated the scope of the contractor's obligations under the Contract.

It is long settled that the government has the obligation to prepare specifications and drawings that reasonably communicate the scope of the contractor's obligations and the contractor is entitled to rely on the accuracy of the information and the requirements contained in government documents. *WPC Enterprises, Inc. V. United States*, 163 Ct.Cl. 1, 323 F2d 874, 877 (1964). The warranty relieves contractors of any obligation to check and verify the correctness, adequacy, or feasibility of the government documents. *Argo Technology, Inc., ASBCA No. 30522*, 88-1 BCA ¶ 20,381 at 103,063. When specifications are of a "design" type, the

government must accept the responsibility for any errors or defects therein. *Big Chief Drilling Company v. United* States, 26 Cl. Ct. 1276, 1293 (1992); *Neal & Co. V. United States*, 19 Cl. Ct. 463, 467-68 (1990), aff'd 945 F. 2d 835 (Fed. Cir. 1991). This includes the duty to insure that the specifications are not susceptible to more than one reasonable interpretation. *United Pacific Insurance Co. V. United States*, 204 Ct.Cl. 686, 49 F2d 1402 (1974). If some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted -- unless the parties' intention is otherwise affirmatively revealed. The government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions -- as well as the main risk of a failure to carry that responsibility. *IMS Services, Inc. v. United S*tates, 33 Fed. Cl. 167, 185 (1995).

Remember that none of the solicitations issued by the contracting officer referenced "design" in the scope of work. It is respectfully argued that all of the bidders at the first bid interpreted these specifications the exact same way with the exception of Siemens. This was because

Siemens had been provided information of what certain individuals in the VA wanted as a part of the fire alarm system. It is a "system design" and not a "project design" as ultimately determined by the contracting officer.

The very reason given by the contracting officer for cancellation of the original solicitation was "**inadequate specifications**". This begs the question: If the contractor was responsible for design of the system as the VA subsequently determined, how could the "original" specifications be inadequate? Especially in the light of the fact that the only change in the specifications prior to the second bid was deletion of the alternates and the addition of money for training VA personnel on the operation of the system. Pl. App. at 120, lines 4-10.

When Siemens submitted its price for the re-bid, it disregarded the information provided by Mr. Harrison and Mr. Forner and submitted its bid on the plans and specifications for the Project. Pl. App. at 190, lines 23-25 & 191, line 1. Siemens would make up the difference in what was shown on the plans and what was wanted by Mr. Harrison and Mr. Forner through change orders. Pl. App. at 194, lines 2 -6. In fact, this was clearly outlined in Siemens' proposal. Pl. App. at 77-78. The contracting officer accepted Siemens' proposal at bid opening without objection.

Further evidence that the solicitation and Contract do not clearly set forth the contractor's obligations is found in the VA's definition for a design/build project. As admitted by the contracting officer during his deposition, the VA defines a design/build project as the "procurement by the Government , under **one contract**, with **one firm** or joint venture for **both design and construction services** for a specific project. (Emphasis added). Pl. App. at 79-96 & 135, lines 6-18. He did not utilize the VA's form or comply with the applicable FAR for a design/build project in this solicitation. Pl. App. at 132, lines 2-25 & 133 lines 9-11. Further, even though there had been a running dispute as to whether this was a design/build contract for 18 months, the reprocurement contract with Siemens did not even reference the Project as design/build. That was because the contracting officer "thought the A/E designed the project". PL. App. at 171, lines 5-12.

The Court should also consider the VA's procurement of the design services for the Project in determining what the questioned specification really means. As will reappear later in this brief, the solicitation for architectural and engineering (A/E) services clearly sets out that the A/E shall provide "**fully developed working drawings and specifications, as**

**well as construction period services".** (Emphasis added). Pl. App. at 97-98. This is the same language contained in the contract ultimately entered into by the VA and Fratto for design services. Pl. App. at 98-99. In addition, the A/E contract required Fratto to design "all buildings, structures, etc." to "conform to all codes specified in the various Veterans Administration Construction Standards . . . ." Pl. App. at 101. It also required Fratto, as part of its construction period services, to "check the contractor's **shop drawings and detailed drawings,** schedules, descriptive literature and samples . . . ." (Emphasis added). Pl. App. at 102. The A/E was to check Grot's **submittals for conformity with the contract documents.** It said nothing about checking the contractor's design of the Project.

In the instant case, neither of the VA's solicitations ever advised Grot, or the other contractors, of the VA's interpretation that the successful bidder was to "design" the Project. In fact, conspicuously absent from the VA's notice is any reference to the word "**design**". Nowhere in the VA's electronic notice is any contractor put on notice that the contractor will be responsible for **design** of the Project. This was clearly evident by the spread between the competing bidders. In the first bid, with the exception of Siemens, all of the other bidders were in the same general range

indicating that they were all bidding on plans and specifications. Scott McCauley of Siemens came to this exact same conclusion prior to submitting Siemens' second bid. Pl. App. at 191, lines 2-7.

Contrary to defendant's argument on page 23, Grot **did not know** that its interpretation differed from that of the VA prior to submitting shop drawings. In fact since Grot's shop drawings were being approved for construction by the VA and Fratto, pursuant to its obligations under its contract with the VA, Grot had no reason to think otherwise.

The sole basis upon which defendant relies to support this position is one brief portion of the deposition testimony of Mr. McCauley. Mr McCauley testified that when Siemens provided Grot Siemens' first quotation, Siemens asked Grot if it wanted the devices requested by Mr. Harrison and Mr. Forner. Grot said to price the job according to the plans and specifications as Grot had bid the Project. Pl. App. at 178, lines 7-21.

However, a closer review of the testimony provides that Mr. McCauley went on to testify that after reviewing the specifications, Siemens came to the conclusion that the engineer was not "looking for us to do the design". Pl. App. at 176, lines 20-25 & 179, lines 16-23. Lost in the analysis by defendant is the fact that neither Mr. Harrison nor Mr. Forner

were part of the design team put together by Fratto nor were they NICET Level III technicians; they could not design. They were simply relaying a wish list to Siemens. This "wish list" mentality is what drove the Project. As testified to by the COTR, regardless of whether NFPA 72 or 101 required a devise in a certain room or location, "if my supervisors and those I am consulting with want it, yes, they will go there". Pl. App. at 237, lines 8-14 . Regardless of whether it was needed. If the contractor was to design the Project, how was he supposed to do so if the location of devises was up to the whim of the contracting officer's technical representative?

As testified to by Mr. McCauley in his deposition of February 3, 2005, Siemens bid not upon the plans and specifications but upon what was conveyed to Siemens by Mr. Harrison and Mr. Forner. Pl. App. at 190, lines 23-25 & 191, lines1-7. The devices that Mr. Harrison and Mr. Forner were requesting were not disclosed in the bid documents nor was their any way for any of the other bidders to have known about what would be required absent each bidder having the exact same information from the exact same people that was specially provided to Siemens. Pl. App. at 191, lines 16-25.

The VA has argued that if Grot had "walked the site" it would have known what the specifications required. Grot was not at the pre-bid

conference and walkthrough; that is not disputed. However, it would not have mattered if Grot had been there because neither Mr. Harrison nor Mr. Forner were at the walkthrough either. They were the only ones who knew exactly what "they" wanted as evidenced by their private revelations to Siemens. That revelation resulted in Siemen's bid being over $300,000.00 above Grot's bid which at the time of the first bid was third lowest. As testified to by Mr. McCauley, it was clear to him that Siemens was not bidding "apples to apples" with the other bidders. Pl. App. at 190, lines 13-15.

In addition and contrary to defendant's argument that Grot should have inquired at the time of bid, it would not have mattered if Grot has asked for clarification because the contracting officer did not recognize this as a design/build project until August 2002. Pl. App. at 154, lines10-12. **Had he known it was a design/build project he would have complied with the VA's requirements for a design/build project.** Pl. App. at 157, lines 5-18.

Interestingly, during the deposition of Mark Fratto, the principal engineer for the Project, he continually asserted that the plans and specifications were prepared so that the bid process would be "**apples to**

**apples**". Pl. App. at 241, lines 3-12. Clearly that did not happen as indicated by the bids. There was no way the plans and specifications could be interpreted the same by all bidders without the exact same information being provided by the same VA personnel to all bidders.

Further with respect to the walkthrough and as evidence of what the VA was thinking pre-bid, the minutes from the meeting indicate that a question was raised as to changes at the facility not noted in the drawings such as "rooms being converted from patient area to waiting room area, **missed strobes, device layouts**, etc." (Emphasis added). Mr. Kirk, the same individual that issued the opinion that this was a design/install project responded to the contractor to "notify him of any changes that need to be noted on the drawings and he will do an addendum to the project". Pl. App. at 14. If this was a design/install project, why would it matter what the room designation was? It would have been the contractor's responsibility to determine room usage. There would be no need for an addendum.

Further, to suggest that the appearance at the pre-bid conference would have alerted any contractor to the interpretation to ultimately be made by the VA is incredulous. Aside from the responses from Mr. Kirk to the contractor's questions which gave no indication that the contractor was

going to be responsible for design, the pre-bid conference lasted less than a day. It took Fratto 264 days to design the Project. Pl. App. at 155, lines 19-23. Fratto ran over the Project design completion date by 176 days and was never terminated. The contractor was going to have 270 days to produce nongeneric drawings, **redesign and build** the Project according to the nongeneric drawings. All within 10 days of the time it took Fratto, the engineer for the Project, to produce a set of "generic" drawings. Pl. App. at 156, lines 1-18; that simply makes no sense.

The government also warrants that if the contractor follows the specifications and drawings, a satisfactory product will result. The leading case establishing this warranty is *United States v. Spearin*, 248 US 132 (1918). The Spearin Doctrine provides as follows:

> "If the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.......This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans and to inform themselves of the requirements of the work...."
>
> (248 US at 136).

Here, Grot was following the plans and specifications provided by the government. Grot was providing drawings and submittal data based upon the plans and specifications prepared by Fratto and in compliance with

those plans and specifications. Grot was told to redesign the Project only when it was determined that the VA was not getting what Mr. Harrison and Mr. Forner wanted. Had the VA provided the information in writing which was verbally provided to Siemens by Mr. Harrison and Mr. Forner, then the Project would not have gone in the direction that it did. Instead, the VA withheld this information and then sought to impose this additional cost on Grot by determining that it was Grot's responsibility to "design" the Project.

IV. Grot Properly Interpreted the Contract and Its Interpretation Was Reasonable Under the Circumstances

Interpretation of a contract begins with the text of the instrument. If the language is explicit and unambiguous, the court must give affect to its plain meaning and may not refer to extrinsic evidence as an interpretive guide. *Record Steel and Construction, Inc. v. The United States*, 62 Fed. Cl. 508, 513 (2004). Here the Contract is obviously being interpreted in at least two different ways not just by Grot, but by the other bidders and, as will be seen, the VA itself. It can not be said that the Contract is explicit or unambiguous. Thus the Court should give consideration to the extrinsic evidence to consider the interpretation of the referenced sections.

The general rule for choosing between competing interpretations of ambiguous contract language is *contra proferentem*, which requires that

ambiguities be construed against the drafter. The essential ingredients of the rule of *contra proferentem* are: (1) that the contract specifications were drawn by the Government; (2) that language was used therein which is susceptible of more than one interpretation; (3) that the intention of the parties does not otherwise appear; and (4) that the contractor actually and reasonably construed the specifications in accordance with one of the meanings of which the language was susceptible. *Record Steel and Construction, Inc. v. The United States*, 62 Fed. Cl. 508, 517 (2004). The doctrine of *contra proferentem* properly puts the risk of latent ambiguity, lack of clarity, and absence of proper warning on the drafting party that could have forestalled the controversy. *Fry Communications v. United States*, 22 Cl. Ct. 497, 503 (1991).

A dispute over contract interpretation is a question of law. Whether a contract is ambiguous, either patent or latent, is also a question of law to be determined on a case by case basis. *NVT Technologies v. United States*, 370 F. 3d 1153, 1159 (Fed. Cir. 2004). A court must first determine whether an ambiguity in the contract exists. An ambiguity is said to exist if the contract is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. A government

contractor does not bear the burden of interpreting a contract correctly **only of interpreting it reasonably**. (Emphasis added). *Delcon Construction Corporation v. The United States*, 27 Fed. Cl. 634, 637 (1993). The non-drafter's (Grot's) interpretation must only be reasonable, not necessarily superior to the drafter's (VA's) interpretation. *P.R. Burke Corp. v. United States*, 47 Fed. Cl. 340, 351 (2000); *Blinderman Constr. Co. v. United States*, 39 Fed Cl. 529, 539 (1997).

In resolving a conflict in interpretation, it is a fundamental precept of common law that the intention of the parties to a contract controls its interpretation. *Kenneth Reed Construction Corp. v. The United States*, 475 F.2d. 583, 586 (Ct. Cl. 1973). If the meaning to be attributed to a contract provision is ambiguous or is not manifest from the four corners of the contract and if a reasonable man could reasonably interpret the contract in different ways, that interpretation will be given the document which is more favorable to the party who did not draw it. *Id.* at 587.

Thus the question, could a reasonable man interpret this contract differently than did the contracting officer's technical representative? When you take into account that the other bidders for the Project obviously bid with the same interpretation as Grot and Siemens testified that it had come

to the same conclusion even knowing that VA representatives had their own wish list, then the interpretation by Grot must be considerable a reasonable interpretation. Further evidence is found in the deposition testimony of the contracting officer.

By recap, the contracting officer, testified that he did not “know” it was a design/install project at first. He did not come to that conclusion until August 2002, some six months after the Project started, and then based only on the opinion of Mr. Kirk. The contracting officer did not consult with any other VA regions regarding the interpretation of the specification sections in issue. If the contracting officer did not know it was a design/build project, how was a contractor supposed to know?

As further evidence of the misinterpretation by the contracting officer’s technical representative, consider that the same specification language contained in Section 13850, Part 1, Paragraphs 1.1(B) and 1.2(B), the language relied upon by the contracting officer in this case, was used in a fire alarm project for the VA in Lexington, Kentucky. Grot, in the light of the problems on the Project , questioned the contracting officer for the Lexington project as to whether it was a design/build project. Pl. App. at 104. The contracting officer, based upon information and direction from

her engineering services division, replied as follows:

> No, this is not a design/build project. The project documents, drawings and specifications, are a **fully developed set of documents** for the fire alarm **system**. (Emphasis added).
>
> The referenced spec sections and paragraphs refer to the **submittal process, specifically the shop drawings**, that would be prepared and submitted by the contractor for review and approval. (Emphasis added). Pl. App. at 103.

The drawings and specifications were a fully developed set, just like what Fratto was to deliver to the VA under its design contract with the VA, and the referenced section applied to the submittal process and shop drawings, just like Fratto was to do under its constructions services provisions. This is exactly what Grot was arguing to the contracting officer when directed to redesign the Project. When questioned about the Lexington contracting officer's interpretation of the section, the contracting officer testified that he did not know if that section is interpreted the same by other regions of the VA. Pl. App. at 248, lines 14-25 & 249, line 1.

In furtherance of that line of questioning, the contracting officer was also questioned about a VA fire alarm project in Salt Lake City, Utah where the same language was again included. He testified that it would not surprise him that the VA in Salt Lake City would likewise say that it is not a design/build project. In fact, he testified that he did not know of another VA

region that interpreted the section the way he had interpreted it. Pl. App. at 251 & 252, lines 1-5.

"It is elementary that the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person **acquainted with the contemporaneous circumstances**." (Emphasis added). *Hol Gar v. United States*, 169 Ct. Cl. 384, 388 (1965); *New York Trust Co. V. Island Oil & Transport Corp.* 34 F. 2d 655, 656 (2d Cir. 1929)***.*** Here both Grot and other VA regions, acquainted with the contemporaneous circumstances, interpreted the provisions the same way.

Clearly, if different regions of the VA and Grot come to the same interpretation, it must be a reasonable interpretation. It is one thing for defendant to argue that Grot's interpretation is unreasonable. It is a totally different argument that another VA regions' interpretation is unreasonable. The Court would have to determine that the other regions' interpretation was incorrect; a material issue of fact would exist.

## CONCLUSION

For the reasons set forth above, this Court must conclude that this was either not a design/build nor design /install contract or, if so, that the specification was ambiguous. If the specification was ambiguous, then it

was latently ambiguous and Grot's interpretation was reasonable under the circumstances.

Respectfully submitted,

GROT INCORPORATED

s/ Andrew J. Kilpatrick, Jr.
Andrew J. Kilpatrick, Jr. ID#656
Gore, Kilpatrick & Dambrino, PLLC
Post Office Drawer 2900
Ridgeland, Mississippi 39158
akilpatrick@hgglaw.com
Telephone: 601.957.1595
Facsimile: 601.957.1790

January 25, 2006 Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I, Andrew J. Kilpatrick, Jr., do hereby certify that I have this day mailed via United States Mail a true and correct copy of the above and foregoing Plaintiff's Response to Defendant's Motion for Partial Summary Judgment to counsel for defendant, Lindsay E. Williams, Commercial Litigation Branch, Civil Division, Department of Justice, Attn: Classification Unit 8th Floor, 1100 L Street, N.W., Washington, D.C. 20530.

This 25th day of January, 2006.

s/ Andrew J. Kilpatrick, Jr.
Andrew J. Kilpatrick, Jr.

# APPENDIX TABLE OF CONTENTS

Solicitation, Offer and Award IFB 549-64-01 . . . . . . . . . . . . . . . . . . . . . . 1-2

Government's Electronic Release Inviting Bids . . . . . . . . . . . . . . . . . . . . 3-4

Instructions, Conditions and Notices to Offerors . . . . . . . . . . . . . . . . . . . . . 5

Amendment of Solicitation/Modification of Contract No. 2 . . . . . . . . . . . 6-7

Amendment of Solicitation/Modification of Contract No. 1 . . . . . . . . . . . 8-9

June 23, 2001 Questions & Answers . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Notice of Pre-Bid Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Amendment of Solicitation/Modification of Contract No. 3 . . . . . . . . . . . . 12

Pre-Bid Meeting Minutes July 20, 2001 . . . . . . . . . . . . . . . . . . . . . . . 13-17

E-Mail of John Mraz August 1, 2001 With Pre-Bid
Conference Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

Mraz Bid Protest Memo September 11, 2001 . . . . . . . . . . . . . . . . . . . . . 21

Abstract of Offers June 1, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

Grot Bid Protest Letter September 14, 2001 . . . . . . . . . . . . . . . . . . . 24-25

DVA Response to Bid Protest October 18, 2001 . . . . . . . . . . . . . . . . 26-27

Mraz Letter October 29, 2001 Cancelling First Solicitation . . . . . . . . . . . 28

Grot Solicitation, Offer and Award January 8, 2002 . . . . . . . . . . . . . . 29-31

Abstract of Offers January 8, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . 32-33

Notice to Proceed February 1, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Pre-Construction Meeting Notes February 25, 2002 . . . . . . . . . . . . . 35-37

Grot Letter of June 25, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

DVA Letter August 23, 2002 Decision on Design/Build . . . . . . . . . . . 40-41

Grot Letter of September 5, 2002 Protesting Design/Build Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-43

DVA Letter of September 17, 2002 Responding to Grot's September 5, 2002 Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

Grot Letter of September 18, 2002 in Response to Mraz Letter of September 17, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

DVA Letter of September 18, 2002 in Response to Grot's Letter of September 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . 47-48

DVA Letter of September 18, 2002 Cure Notice . . . . . . . . . . . . . . . . . . . 49

Grot's Letter of September 25, 2002 Response to Cure Notice . . . . . 50-51

DVA Letter of July 17, 2003 Regarding Pull Stations Building 1 . . . . . . . 52

Grot's Letter of July 17, 2003 Regarding Pull Stations Building 1 . . . 53-54

Rickey L. Kirk Memo of July 17, 2003 Regarding Fire Watch . . . . . . . . . 55

Grot's Letter of April 29, 2003 Protesting Additional Smoke Detectors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Grot's Letter of May 27, 2003 Requesting Response to Previous Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Rickey L. Kirk Memo of July 20, 2003 Establishing Fire Watch on Entire Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

E-Mail from Grot dated July 20, 2003 Requesting Meeting on Fire Watch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

E-Mail Stream of July 22, 2003 Regarding Meeting Requested by Grot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60-61

Grot's E-Mail of July 23, 2003 Regarding Fire Watch . . . . . . . . . . . . . . . 62

Mraz E-Mail of July 23, 2003 Rejecting Fire Watch Meeting . . . . . . . 63-64

Show Cause Notice dated July 23, 2003 . . . . . . . . . . . . . . . . . . . . . . 65-66

Grot's Letter of July 31, 2003 Responding to Show Cause Notice . . . 67-74

Termination for Default dated August 7, 2003 . . . . . . . . . . . . . . . . . . 75-76

Siemens Proposal for Second Bid dated January 8, 2002 . . . . . . . . . 77-78

VA Proposal for Design/Build Services . . . . . . . . . . . . . . . . . . . . . . . 79-96

Request for Proposal for Architectural and Engineering Services . . . 97-98

Architect-Engineer Contract dated June 5, 2000 . . . . . . . . . . . . . . . 99-100

Page SP-12 from Architect-Engineer Contract . . . . . . . . . . . . . . . . . . . . 101

Page SP-15 from Architect-Engineer Contract . . . . . . . . . . . . . . . . . . . . 102

E-Mail Stream from Grot to VA Contracting Officer at Lexington, Kentucky . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103-104

Deposition Testimony of John Mraz . . . . . . . . . . . . . . . . . . . . . . . 105-171

Deposition Testimony of Scott McCauley . . . . . . . . . . . . . . . . . . . . 172-197

Deposition Testimony of Rickey L. Kirk . . . . . . . . . . . . . . . . . . . . . 198-239

Deposition Testimony of Mark S. Fratto . . . . . . . . . . . . . . . . . . . . . 240-241

Affidavit of Jerry Grot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242-245

Additional Mraz Deposition Testimony . . . . . . . . . . . . . . . . . . . . . . 246-252