Cause No. 03-1951C
(Judge Baskir)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

GROT, INCORPORATED,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

---

# PLAINTIFF'S APPENDIX TO RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

GROT, INC.

Andrew J. Kilpatrick, Jr., ID#656
Gore, Kilpatrick & Dambrino, PLLC
Post Office Drawer 2900
Ridgeland, Mississippi 39158
Tele: 601.957.1595
Fax: 601.957.1790
akilpatrick@hgglaw.com
MSB#3763

Dated: January 25, 2006

Counsel for Plaintiff

# APPENDIX TABLE OF CONTENTS

Solicitation, Offer and Award IFB 549-64-01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

Government's Electronic Release Inviting Bids . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

Instructions, Conditions and Notices to Offerors . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Amendment of Solicitation/Modification of Contract No. 2 . . . . . . . . . . . . . . . . . . . . . 6-7

Amendment of Solicitation/Modification of Contract No. 1 . . . . . . . . . . . . . . . . . . . . . 8-9

June 23, 2001 Questions & Answers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Notice of Pre-Bid Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Amendment of Solicitation/Modification of Contract No. 3 . . . . . . . . . . . . . . . . . . . . . 12

Pre-Bid Meeting Minutes July 20, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-17

E-Mail of John Mraz August 1, 2001 With Pre-Bid Conference Notes . . . . . . . . . . 18-20

Mraz Bid Protest Memo September 11, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Abstract of Offers June 1, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

Grot Bid Protest Letter September 14, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

DVA Response to Bid Protest October 18, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

Mraz Letter October 29, 2001 Cancelling First Solicitation . . . . . . . . . . . . . . . . . . . . . 28

Grot Solicitation, Offer and Award January 8, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 29-31

Abstract of Offers January 8, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-33

Notice to Proceed February 1, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Pre-Construction Meeting Notes February 25, 2002 . . . . . . . . . . . . . . . . . . . . . . . 35-37

Grot Letter of June 25, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

DVA Letter August 23, 2002 Decision on Design/Build . . . . . . . . . . . . . . . . . . . . . . 40-41

Grot Letter of September 5, 2002 Protesting Design/Build Determination . . . . . . . 42-43

DVA Letter of September 17, 2002 Responding to Grot's September 5, 2002 Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

Grot Letter of September 18, 2002 in Response to Mraz Letter of September 17, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

DVA Letter of September 18, 2002 in Response to Grot's Letter of September 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47-48

DVA Letter of September 18, 2002 Cure Notice . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Grot's Letter of September 25, 2002 Response to Cure Notice . . . . . . . . . . . . . . . 50-51

DVA Letter of July 17, 2003 Regarding Pull Stations Building 1 . . . . . . . . . . . . . . . . 52

Grot's Letter of July 17, 2003 Regarding Pull Stations Building 1 . . . . . . . . . . . . . 53-54

Rickey L. Kirk Memo of July 17, 2003 Regarding Fire Watch . . . . . . . . . . . . . . . . . . 55

Grot's Letter of April 29, 2003 Protesting Additional Smoke Detectors . . . . . . . . . . . 56

Grot's Letter of May 27, 2003 Requesting Response to Previous Letter . . . . . . . . . . 57

Rickey L. Kirk Memo of July 20, 2003 Establishing Fire Watch on Entire Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

E-Mail from Grot dated July 20, 2003 Requesting Meeting on Fire Watch . . . . . . . . 59

E-Mail Stream of July 22, 2003 Regarding Meeting Requested by Grot . . . . . . . . 60-61

Grot's E-Mail of July 23, 2003 Regarding Fire Watch . . . . . . . . . . . . . . . . . . . . . . . . 62

Mraz E-Mail of July 23, 2003 Rejecting Fire Watch Meeting . . . . . . . . . . . . . . . . 63-64

Show Cause Notice dated July 23, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65-66

Grot's Letter of July 31, 2003 Responding to Show Cause Notice . . . . . . . . . . . . . 67-74

Termination for Default dated August 7, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . 75-76

Siemens Proposal for Second Bid dated January 8, 2002 . . . . . . . . . . . . . . . . . . . 77-78

VA Proposal for Design/Build Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79-96

Request for Proposal for Architectural and Engineering Services . . . . . . . . . . . . . 97-98

Architect-Engineer Contract dated June 5, 2000 . . . . . . . . . . . . . . . . . . . . . . . . 99-100

Page SP-12 from Architect-Engineer Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Page SP-15 from Architect-Engineer Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

E-Mail Stream from Grot to VA Contracting Officer at Lexington, Kentucky . . . . 103-104

Deposition Testimony of John Mraz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105-171

Deposition Testimony of Scott McCauley . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172-197

Deposition Testimony of Rickey L. Kirk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198-239

Deposition Testimony of Mark S. Fratto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240-241

Affidavit of Jerry Grot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242-245

Additional Mraz Deposition Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246-252

SOLICITATION, OFFER, AND AWARD
*(Construction, Alteration, or Repair)*

IFB 549-64-01

X ADVERTISED *(IFB)*

06/01/01



IMPORTANT — The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. | 5. REQUISITION/PURCHASE REQUEST | 6. PROJECT NO. NRM 99-115 |
|---|---|---|

7. ISSUED BY CODE

JOHN MRAZ Contracting Officer (90C)
Department of Veterans Affairs
VA North Texas Health Care System
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

ADDRESS OFFER TO

same as block # 7

| 9. FOR INFORMATION CALL: | A. NAME John Mrazl | B. TELEPHONE NO. *(Include area code) (NO COLLECT CALLS)* (214) 857-0021 |
|---|---|---|

## SOLICITATION

NOTE: In advertised solicitations "offer and offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS *(Title, identifying no., date)*:

**Project # B01-114, Replace Fire Alarm System, Sam Rayburn Memorial Veterans Center, Bonham, TX**

The contractor shall furnish all labor, tools, equipment, materials and supervision to replace the "Fire Alarm System" at the Sam Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX in accordance with the contract drawings and specifications. The project shall involve general construction, demolition, alterations, grading, electrical and mechanical work. Contract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the city, county, state and Federal Government. The period of performance is ninety (90) days.

11. The Contractor shall begin performance within 14 calendar days and complete it within 90 calendar days after receiving ☐ award, ☒ notice to proceed. This performance period is ☒ mandatory, ☐ negotiable. *(See _______________.)*

12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS?
*(If "YES," indicate within how many calendar days after award in Item 12B.)*

☒ YES ☐ NO Performance and Payment Bond

12B. CALENDAR DAYS 10

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 1 copy to perform the work required are due at the place specified in Item 8 by **1:30 PM** local time on July 11, 2001

B. If this is an advertised solicitation, offers will be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

C. An offer guarantee is X☐ required.

D. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

E. Offers providing less than 60_ calendar days for Government acceptance after the date offers are due will be considered nonrespon-sive and will be rejected.

EXHIBIT
tabbies
"1"

14. NAME AND ADDRESS OF OFFEROR (Include ZIP Code)

GROT, INC.
P. O. BOX 54353
LEXINGTON, KY 40555-4353
Duns # 154514590

CODE FACILITY CODE

15. TELEPHONE NO. (Include area code)
859 254 3968

16. REMITTANCE ADDRESS *(Include only if different than Item 14)*

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government within 60 calendar days after the date offers are due. *(Insert any number equal to or greater than the minimum requirement stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.)*

AMOUNTS ▶ 103959.00

18. The offeror agrees (a) to carry out this offer if the Government accepts it by signing Item 31B within the time specified in Item 13D, and to furnish any required performance and payment bonds.

19. ACKNOWLEDGMENT OF AMENDMENTS

*(The offeror acknowledges receipt of amendments to the solicitation — give number and date of each)*

| AMENDMENT NO. | 1 | 2 | 3 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DATE | 6/23/01 | 7/10/01 | 7/27/01 | | | | | | |

20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)*
KERRY J. RUSSELL
CONTRACT ADMINISTATOR

20B. SIGNATURE
Kerry J Russell

20C. OFFER DATE
8-28-01

AWARD *(To be completed by Government)*

21 ITEMS ACCEPTED:

22. AMOUNT

23. ACCOUNTING AND APPROPRIATION DATA

24. SUBMIT INVOICES TO ADDRESS SHOWN IN *(4 copies unless otherwise specified)* ▶ ITEM

25. NEGOTIATED PURSUANT TO
☐ 10 USC 2304(c) ( ) ☐ 41 USC 253(c) ( )

26. ADMINISTERED BY CODE

27. PAYMENT WILL BE MADE BY

*CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE*

☐ 28. NEGOTIATED AGREEMENT *(Contractor is required to sign this document and return _______ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform work, requisitions identified on this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications or incorporated by reference in or attached to this contract.

☐ 29. AWARD *(Contractor is not required to sign this document.)* Your offer on this solicitation, is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary.

30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN *(Type or print)*

31A. NAME OF CONTRACTING OFFICER *(Type or print)*
John Mraz

DEPARTMENT OF COMMERCE ★ UNITED STATES OF AMERICA ★

# CBDNet

## Notice Accepted

### Submission No. 50N6S7

**June 1, 2001 -- 11:25**

```
[Commerce Business Daily: Posted in CBDNet on June 1, 2001]
From the Commerce Business Daily Online via GPO Access
[cbdnet.access.gpo.gov]

PART: U.S. GOVERNMENT PROCUREMENTS
SUBPART: SERVICES
CLASSCOD: Y--Construction of Structures and Facilities
OFFADD: Contracting Officer (90C), Department of Veterans Affairs,
  North Texas Health Care System, 4500 South Lancaster Road,
  Dallas, TX 75216
SUBJECT: Y--CONSTRUCTION OF STRUCTURES AND FACILITIES--FIRE ALARM
  SYSTEM
SOL IFB 549-64-01
DUE 071101
POC John Mraz, (214) 857-0021
DESC: The Department of Veterans Affairs, North Texas Veterans
  Health Care System is seeking a contractor to replace the "Fire
  Alarm System" at the Sam Rayburn Memorial Veterans Center,
  1201 East Ninth Street, Bonham, TX 75418. The contractor shall
  furnish all labor, tools, equipment, materials and supervision
  to replace the Fire Alarm System at the Bonham VA in accordance
  with the project contract drawings and specifications. This
  project shall involve general construction, demolition, alterations,
  grading, electrical and mechanical work. Work shall be performed
  in compliance with the most up-to-date industry standards and
  codes as required by the city, county, State and Federal Government.
  The cost range for this project is between $500,000 and $1,000,000.
  The period of performance shall be ninty (90) days. The issue
  date is June 1, 2001 and the due date is not later than 1:30
  P.M. on July 11, 2001. For a copy of Solicitation IFB 549-64-01,
  e-mail John Mraz at john.mraz@med.va.gov Please, include your
  name and address, telephone number, fax number and e-mail address.
CITE: (W-152 SN50N6S7)
```

PLAINTIFF'S EXHIBIT 25

G- 002982

http://cbdnet.access.gpo.gov/cgi-bin/Xcbdsubmit.cgi?fileName=AY00150N.6S7 6/1/01

CBD*Net* is provided through an alliance of the United States Department of Commerce and the United States Government Printing Office.

Questions or comments regarding this service? Contact the GPO Access User Support Team by Internet e-mail at cbd-support@gpo.gov or toll-free at 1-888-293-6498.

CBD Home GPO Home Docs Home GPO INET services

URL: http://cbdnet.gpo.gov/ACCEPT.template
LAST MODIFIED: February 18, 1997 by JER

---

G- 002983

# INSTRUCTIONS, CONDITIONS AND NOTICES TO OFFERORS

## DESCRIPTION OF WORK

## COST RANGE: BETWEEN $500,00 and $1,000,000

**Project # B01-114, Replace Fire Alarm System, Sam Rayburn Memorial Veterans Center, Bonha TX**

The contractor shall furnish all labor, tools, equipment, materials and supervision to replace the "Fire Alarm System" at the Sam Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX i accordance with the contract drawings and specifications. The project shall involve general construc demolition, alterations, grading, electrical and mechanical work. Contract work shall be performed i compliance with the most up-to-date industry standards and codes as required by the city, county, st and Federal Government. The period of performance is ninety (90) calendar days.

---

## BASIS OF CONTRACTOR SELECTION:

The Government reserves the right to reject any or all offers; to award a contract to other than the bidder submitting the lowest total price; and to award a contract to the bidder submitting the proposal determined by the VA to be most advantageous to the Government, price and other price related factors considered, such as past performance, previous experience and quality.

EXHIBIT
tabbles
"3"

**Attached is a copy of Amendment Two (2) to the Bonham Fire Alarm System Project, which changes the performance period from ninety (90) days to two hundred and seventy (270) days. Please, e-mail acknowledgement of this message.**

**Thanks,**

**John**

EXHIBIT
tabbies
"4"

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | | |
|---|---|---|---|
| 1. CONTRACT ID CODE | | PAGE 1 | OF PAGES 1 |
| 2. AMENDMENT/MODIFICATION NO. Modification Two | 3. EFFECTIVE DATE 07/10/01 | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
| 6. ISSUED BY CODE 549 / 90C<br>Contracting Officer (90C)<br>VA North Texas Health Care System<br>Dallas VA Medical Center 4500 South Lancaster Rd.<br>Dallas, TX 75216 | | 7. ADMINISTERED BY *(If other than Item 6)* CODE<br>Same as Item 6 | |
| 8. NAME AND ADDRESS OF CONTRACTOR *(No. Street, county, State and ZIP: Code)* | | (4) X | 9A. AMENDMENT OF SOLICITATION NO. IBF 549-64-01<br>9B. DATED *(SEE ITEM 11)* 06/01/01<br>10A. MODIFICATION OF CONTRACT/ORDER NO.<br>10B. DATED *(SEE ITEM 13)* |
| CODE | FACILITY CODE | | |

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offerss extended, [ X ]is extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning one (1) copy of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATA SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and data specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

No cost modification

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS,
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (4) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | |

E. IMPORTANT: Contractor [ ] is not, [X ] is required to sign this document and return one (1) copies to the issuing office.

**The contract performance time for the Bonham Fire Alarm System Project has been changed from ninety (90) days to two hundred and seventy (270) days.**

| | | | |
|---|---|---|---|
| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*<br>John Mraz, Contracting Officer | |
| 15B. CONTRACTOR/OFFEROR<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY *(Signature of Contracting Officer)* | 16C. DATE SIGNED<br>10 Jul 01 |

NSN 7540-01-152-8070
UNUSABLE

30-105
Computer Generated

STANDARD FORM 30 S EDITION
Prescribed by GSA
FAR (48 CFR) 53.243

Attached are copies of Amendment One to the Bonham Fire Alarm System Project, which extends the due date from "NLT 1:30 PM on July 11, 2001" to "NLT 1:30 PM on July 31, 2001. The due date was extended to accommodate prospective bidders that haven't received copies of the prints and specifications due to the unanticipated demand. Prospective bidders that haven't received copies of the prints and specifications will receive them next week.

In addition, I've attached a list of "Questions & Answers" that are relevant to the project.

Please e-mail acknowledgement of this message.

Thanks,

John Mraz
Contracting Officer

EXHIBIT
tabbies
"2"

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE — PAGE 1 OF 1 PAGES

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| Amendment One (1) | 06/23/01 | | |

| 6. ISSUED BY | CODE 549 / 90C | 7. ADMINISTERED BY (If other than Item 6) | CODE |
|---|---|---|---|
| Contracting Officer (90C)<br>VA North Texas Health Care System<br>Dallas VA Medical Center 4500 South Lancaster Rd.<br>Dallas, TX 75216 | | Same as Item 6 | |

8. NAME AND ADDRESS OF CONTRACTOR (No. Street, county, State and ZIP: Code)

| (4) | |
|---|---|
| X | 9A. AMENDMENT OF SOLICITATION NO. IFB 549-64-01 |
| | 9B. DATED (SEE ITEM 11) 06/01/01 |
| | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| | 10B. DATED (SEE ITEM 13) |

CODE | FACILITY CODE

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offerss extended, [ X ]is extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning one (1) copy of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATA SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and data specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

No cost modification

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (4) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | |

E. IMPORTANT: Contractor [ ] is not, [X ] is required to sign this document and return one (1) copies to the issuing office.

**The due date for Solicitation IFB RFP 549-64-01, the Bonham Fire Alarm System Project, has been changed from "Not Later Than 1:30 P.M. on July 11, 2001" to "Not Later Than 1:30 P.M. on July 31, 2001". The bid opening shall be held at 1:30 PM on July 31, 2001 at the Dallas Veterans Medical Center, Building 8, 4500 S. Lancaster Road, Dallas, TX.**

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| | | John Mraz, Contracting Officer | |
| 15B. CONTRACTOR/OFFEROR<br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY (Signature of Contracting Officer) | 16C. DATE SIGNED<br>23 Jun 01 |

NSN 7540-01-152-8070 UNUSABLE — 30-105 Computer Generated — STANDARD FORM 30 S EDITION Prescribed by GSA FAR (48 CFR) 53.243

A-2

# MEMO

**From: John Mraz, Contracting Officer**

**To: Prospective Bidders**

**Date: June 23, 2001**

**Subject: Questions & Answers concerning the Bonham Fire Alarm System Project**

Number 1. On Sheet 01.01 on the North side of Room 168, the Firebox Symbol with a circle is an existing alarm bell that is to be removed.

Number 2. On Sheet 03.01 in the Northeast corner of the lobby the Firebox Symbol with a half circle is an existing alarm bell that is to be removed.

Number 3. On Sheet 11.01 of the enlarged plan of Room 102 the box with an M and the Triangle is a new master system horn.

Number 4. What is the size of existing exterior conduits? Answer: Four (4) inches.

Number 5. What is the length of the connecting corridor between Buildings 1, 2 and 3? Answer: Building 1 to Building 2 is 365' and Building 2 to Building 3 is 290'.

Number 6. How is alarm paging handled throughout the center? Answer: When the alarm is pulled in a building the alarm sounds in that building and in the Boiler Plant, Main Control Center. The alarm is simultaneously sent to the Center Paging System and pages employees whose response is required.

VAMC 603

**DEPARTMENT OF VETERANS AFFAIRS**
**NORTH TEXAS MEDICAL VETERANS HEALTH CARE SYSTEM**
**DALLAS VETERANS MEDICAL CENTER**
**4500 S. LANCASTER ROAD**
**DALLAS, TX 75216**

July 17, 2001

Dear Prospective Bidder:

A pre-bid conference has been scheduled for the Bonham Fire Alarm Project. The meeting shall be held in Building 1 at 10:00 A.M. on Friday, July 20th, at the Sam Rayburn Memorial Veterans Center, 1201 East Ninth Street, Bonham, TX.

Copies of notes taken at the meeting shall be sent to all bidders.

If you have any questions about the meeting, call Ricky Kirk at (903) 583-6494. If you have any contractual questions, call me at (214) 857-0021 or send e-mail to: john.mraz@med.va.gov

Sincerely,

John Mraz
Contracting Officer

EXHIBIT
tabbles
"5"

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE — PAGE 1 OF PAGES 1

2. AMENDMENT/MODIFICATION NO.: Amendment Three
3. EFFECTIVE DATE: 07/27/01
4. REQUISITION/PURCHASE REQ. NO.:
5. PROJECT NO. *(If applicable)*:

6. ISSUED BY — CODE 549 / 90C
Contracting Officer (90C)
VA North Texas Health Care System
Dallas VA Medical Center 4500 South Lancaster Rd.
Dallas, TX 75216

7. ADMINISTERED BY *(If other than Item 6)* — CODE
Same as Item 6

8. NAME AND ADDRESS OF CONTRACTOR *(No. Street, county, State and ZIP: Code)*

CODE — FACILITY CODE

(4) X — 9A. AMENDMENT OF SOLICITATION NO.: IFB 549-64-01
9B. DATED *(SEE ITEM 11)*: 06/01/01
10A. MODIFICATION OF CONTRACT/ORDER NO.:

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

X☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offerss extended, [ X ]is extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning one (1) copy of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATA SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(4) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

E. IMPORTANT: Contractor [ ] is not, [X] is required to sign this document and return one (1) copies to the issuing office.

**The due date for Solicitation IFB 549-64-01, the Bonham Fire Alarm System Contract Project, has been changed from "Not later than 1:30 PM on July 31, 2001" to "Not later than 1:30 PM on August 28, 2001. The bid opening shall be held at 1:30 PM in Building 8, at the Dallas Medical Center, 4500 S. Lancaster Road, Dallas, TX.**

**In addition, a bid guarantee is NOT REQUIRED for this contract.**

15A. NAME AND TITLE OF SIGNER *(Type or print)*

16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*: John Mraz, Contracting Officer

15B. CONTRACTOR/OFFEROR
*(Signature of person authorized to sign)*

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY
*(Signature of Contracting Officer)*

16C. DATE SIGNED: 27 JUL 01

NSN 7540-01-152-8070
UNUSABLE

30-105
Computer Generated

STANDARD FORM 30 S EDITION
Prescribed by GSA
FAR (48 CFR) 53.243

EXHIBIT "8"
tabbies

# REPLACE FIRE ALARM
# BONHAM, VAMC

DATE: July 20, 2001

SUBJECT: Pre-Bid Conference

PRESENT: Rickey Kirk, VA C.O.T.R.
Larry Waldrop, Engineering Technician
John Mraz, Contracting Officer
David Morrison, FRATTO Engineering
Daniel Raap, Honeywell
Tom Backham, Alpha Burglar & Fire Alarm Systems
Johnny Stacy, Alpha Burglar & Fire Alarm Systems
Bobby Harper, Alpha Burglar & Fire Alarm Systems
Lee Bledsoe, Siemens
Chuck Roy, Westfire
Bill Black, Raven Construction Supply
Sarah Permenter, Raven Construction Supply

DISCUSSION:

A) Contractor: Inquired as to whether or not dampers are tied into the system and also noted that all dampers are not indicated on drawings.

David Morrison: Stated that the existing equipment has dampers and smoke detectors that should be incorporated with this campus-wide fire alarm system

Rick Kirk: Will get total number of dampers throughout the facility and submit to contractors as soon as possible. *Including stairwells.

B) Contractor: Stated that all old copper valves will have to be cut back and replaced with new flow and tamper switches.

David Morrison: Confirmed that this will be the contractors responsibility to replace copper valves as necessary.

C) Contractor: Asked for clarification of statement requesting that panel be equipped to provide 100% spare capacity (add additional equipment, double speakers, strobes, etc).

David Morrison: Intent is to provide the enclosure so that the space could be utilized at a later date if needed.

Rick Kirk: Will provide Letter of Intent sometime next week.

EXHIBIT
tabbies
"6"

D) Contractor: Requested drawings that indicate exact square footage of each floor noted in project.

Rick Kirk: Will provide contractor with square footage of each floor.

E) Rick Kirk: VA will provide space to set-up trailer. Contractor will be required to supply trailer and all storage needed to complete project.

F) Contractor: Inquired as to whether or not all existing conduit will have to be removed.

David Morrison: Contractor will be required to remove all accessible conduit.

G) Contractor: Expressed concerns for changes taking place at facility not noted in drawings. Such as: Room being converted from a patient area to waiting room area, missed strobes, device layouts, etc.

Rick Kirk: Instructed contractor to notify him of any changes that need to be noted on drawings and he will do an addendum to the project.

H) Contractor: Inquired as to whether or not graphics and building floor plans will be needed at main work station located in central plant.

David Morrison: Informed contractor that this project requires Text only and that graphics and building floor plans will not be necessary.

I) Contractor: Inquired as to their accountability to train VA employees on new system.

Rick Kirk: Contractor will provide training to 4 VA employees at the level of manufactures technicians. This training will take place at the alarm system provider's central office. The VA will be responsible for providing employees transportation, food & lodging expenses.

J) Contractor: Noted that section 13850, page 8, item no. 3, states "5 year warranty" as opposed to "3 year warranty".

Rick Kirk: Will correct typing error in contract to state 3 year warranty.

K) Contractor: Inquired as to whether or not Building 6 has a FACU.

Rick Kirk: Will provide FACU for Building 6.

David Morrison: Commented that the control unit in Building 3 will pick up Buildings 4, 5 & 6.

Contractor: Commented that drawing for Building 6 indicates that a fire alarm control unit exist.

David Morrison: Stated that this is not correct and that Building 6 should only indicate having a terminal cabinet. He commented that he will clarify this information.

L) Contractor: Inquired as to whether or not there is existing circuitry that will be used to report back or will it be necessary to bury more conduit between buildings.

David Morrison: Stated that the Site Plan Drawing indicates spare conduits that were installed approximately 2-3 years ago. Spare 4" conduit runs from Building 24 to Building 4 to Building 6. He commented that the conduit also routes thru the interior of the buildings and that most are tied together thru corridors, walkways, etc.

M) Contractor: Inquired as to whether or not contractor will be expected to dig trenches to lay spare conduit.

David Morrison: Contractor will be required to use existing conduit for project as opposed to digging trenches to lay new conduit.

N) Contractor: Inquired as to the City of Bonham's involvement in project, such as, local permits, etc.

David Morrison: None

Larry Waldrop: Inquired as to whether or not a Bid Bond would be required by contractor.

John Mraz: First responded with "yes", but upon discussion decided that this would not be necessary. However, he did state that a Performance & Payment Bond will be required.

O) John Mraz: Informed contractor that the Bid Opening has been scheduled for July 31st at 1:30 p.m. at the Dallas VAMC. Upon discussion, it was decided that a 2 week extension would be added to the solicitation date of project. John stated that he will make this amendment. John also explained the Bid Opening Procedure in detail to contractor.

P) Contractor: Inquired as to whether or not all wiring will be required to be in conduit. If so, what is the contractors responsibility to repairing walls and ceiling that may be damaged while gaining accessibility to conduit.

**David Morrison: Contractor will be expected to make all necessary repairs to walls and ceilings that are damaged during the course of this project.**

**Q) Contractor: Will existing fire alarm panel in Building 8 be moved prior to the beginning of this project.**

**Rick Kirk: Stated that we will move panels prior to project.**

**R) John Mraz: Commented that he will send out e-mail messages announcing the selected contractor as soon as possible following the Bid Opening.**

**REPLACE FIRE ALARM**
**PRE-BID CONFERENCE**
**JULY 20, 2001**

**PHONE LISTING OF ATTENDEES:**

1) **DAVID MORRISON, FRATTO Engineering / (817) 461-2337**

2) **DANIEL RAAP, Honeywell / Office: (720) 344-9034 Fax: (720) 344-9035**
**E-Mail Address:** daniel.raap@honeywell.com

3) **TOM BECKHAM, Alpha Burglar & Fire Alarm Systems / Office: (903) 892-0555 Fax: (903) 892-9710**

4) **JOHNNY STACY, Alpha Burglar & Fire Alarm Systems / Office: (903) 892-0555 Fax: (903) 892-9710**

5) **BOBBY HARPER, Alpha Burglar & Fire Alarm Systems / Office: (903) 892-0555 Fax: (903) 892-9710**

6) ~~**LEE BLEDSOE, Siemens / Office: (972) 812-5602 Fax: (972) 915-3896**~~

7) **CHUCK ROY, Westfire / Office: (214) 340-1700 Fax: (214) 344-0017** 214-869-9192

8) **BILL BLACK, Raven Construction & Supply / Office: (903) 870-9325 Fax: (903) 870-9827**

9) **SARAH PERMENTER, Raven Construction & Supply / Office: (903) 870-9325 Cell Phone: (903) 815-7126 Fax: (903)870-9827**

10) **Rickey Kirk, VANTHCS / (903) 583-6494**

11) **Larry Waldrop, VANTHCS / (903) 583-6492**

12) **John Mraz, VANTHCS / (214) 857-0021**

**Subject:** Bonham Fire Alarm System
**Date:** Wed, 1 Aug 2001 13:20:36 -0700
**From:** "Mraz, John P." <John.Mraz@med.va.gov>
**To:** "'kerry@grotinc.com'" <kerry@grotinc.com>

Attached are copies of the "Questions and Answers" and notes from the pre-bid conference. August 14th. is the deadline for questions: and the Bid Due Date is Aigust 28th.

Thanks,

John

<<Fire Alarm Q & A Aug 1.doc>> <<Fire Alarm Q & A Num 2 1 Aug.doc>>

| | |
|---|---|
| Fire Alarm Q & A Aug 1.doc | **Name:** Fire Alarm Q & A Aug 1.doc<br>**Type:** WINWORD File (application/msword)<br>**Encoding:** base64 |
| Fire Alarm Q & A Num 2 1 Aug.doc | **Name:** Fire Alarm Q & A Num 2 1 Aug.doc<br>**Type:** WINWORD File (application/msword)<br>**Encoding:** base64 |

EXHIBIT
tabbles
"7"

Date: July 26, 2001

To: John Mraz
Contracting Officer

Subj: Replace Fire Alarm

From: Rickey L. Kirk
C.O.T.R.

1. On Friday, July 20th, a pre-bid conference was held in Bldg. 1, Room 172 at 10 a.m. The following is a result of that meeting. Also you will find attached a transcript of that meeting.

2. Clarifications and Corrections to Project Documents are as follows:

Existing equipment has dampers and smoke detectors that should be incorporated into new system. The number of dampers in Buildings are as follows:
- Building 24 – 58 fire dampers, 11 smoke dampers, 6 combination fire and smoke.
- Building 29 – 39 fire dampers, 2 smoke dampers

If valves must be replaced to include the required supervisory sensing devices, then the valves are to be included in the project work.

Installed ciruits are to have 100% spare capacity as the specification is written. The installed system panels and enclosures are to have capacity for a 100% addition of the installed ciruits as specified.

Building 6 drawing indicates a FACU panel be installed. This is an error. Building 3 will have a FACU that will pick up Buildings 4, 5, & 6. Building 6 should only indicate having a terminal cabinet.

No trenching should be necessary. All lines should be run through existing conduits and steam tunnel.

Contractor will be required to make all necessary repairs to walls and ceilings that are damaged during the course of install new equipment.

The panel at Building 8 will be moved by the VA.

The communication loop circuits are to be separated by not less than 6 feet except where the existing 4" underground conduit is used for access to Buildings 9, 10, & 20. The site plan EF00.02 shows possible routes, including tunnels. Note that there are connecting corridors between many of the buildings; these corridors have accessible ceiling cavities. There is not an intent to require additional buried raceways between buildings.

Length of connecting corridors are:
Between Bldg. 3 and Bldg. 24 is 180'.
Between Bldg. 1 and Bldg. 29 is 265'.

The printer in Specification Section 13850, paragraphs 2.3.K.4 and 2.5.B is the same printer.

Specification Section 13850, paragraph 1.6.G.3 the last sentence: "years 2 through 5" should read "years 2 through 3".

VA will provide an area for Contractor to set up a construction trailer and storage site.

The existing fire alarm system components which are not reused and are accessible (not just readily accessible) shall be removed.

If differing site conditions are found and requires added work to contractor, notification is to be made to Contracting Officers Technical Representative and if necessary a change order will be made.

No special graphics or building floor plans are necessary at the Master WorkStation. Text only.

Specification Section 13850, paragraph 1.2.G.: Delete paragraphs 3., 4., 5., and 6.

There will be no connection between the facility EMS system and this fire alarm system except if required to shutdown equipment.

Specification Section 13850, paragraph 2.8.C.4.: Replace the last sentence with "The heat detector shall be fixed temperature, intermediate classification (175-249 degrees F)".

Contractor shall provide training for 4 VA employees as per Specification Section 13850, paragraph 3.7.B. VA will be responsible for providing transportation, food & lodging expenses.

The Energy Center Workstation is to be used for monitoring of, control of, and modifications to the fire alarm system. It is more than a monitoring station. The more stringent listing applies.

3. Please see that all prospective bidders receive this information.

Rickey L. Kirk
C.O.T.R.

# MEMO

**To: File**

**From: John Mraz, Contracting Officer**

**Subject: Bonham Fire Alarm System Contract Award**

**Dared: September 11, 2001**

Six bids were received in response to Solicitation IFB 549-64-01, Bonham Fire Alarm System Project. The low bid of $864,791.00 was submitted by ADT Security. However, in a telephonic conference between ADT and the VA held on August 30, 2001 it was discovered that ADT's bid of $864,791.00 was submitted in error. ADT didn't include the three alternate deducts in their base bid which would have changed their bid from $864,791.00 to $969,656. Since the correction of the mistake in bid didn't displace the second lowest bidder and there was confusion about the alternate bids, (three of the six bidders failed to list the alternate deducts) it was the Contracting Officer's decision to accept ADT's revised bid of $969,656. An award letter was sent to ADT this date. In addition, the five unsuccessful bidders were sent letters notifying them of ADT's contract award.

## ABSTRACT OF OFFERS - CONSTRUCTION

| | |
|---|---|
| 1. SOLICITATION NUMBER | IFB 549-64-01 |
| 2. DATE ISSUED | June 1, 2001 |
| 3. DATE OPENED | August 28, 2001 |
| PAGE 1 OF 1 PAGES | |
| 4. ISSUING OFFICE | Dallas Veterans Medical Center<br>4500 S. Lancaster Road<br>Dallas, TX 75216 |
| I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation. | NAME AND TITLE OF CERTIFYING OFFICIAL (TYPE): Adam Dearing, Contracting Officer<br>BID RECORDER<br>SIGNATURE: [signature]<br>DATE SIGNED: 8/28/01 |
| 5. PROJECT TITLE | Project No. NRM 99-115<br>Bonham Fire Alarm System |
| 6. NUMBER OF AMENDMENTS ISSUED | |

**8. GOVERNMENT ESTIMATE** (Check A, B or C and complete D, E, and F.)
- A. HIRED LABOR
- B. REASONABLE CONTRACT (Without Profit)
- C. REASONABLE CONTRACT (Including Profit)

**9. OFFERS**

| | NO. 1 | NO. 2 |
|---|---|---|
| A. OFFEROR | PRECISION ELECTRIC<br>MESQUITE, TX | GROTE, INC<br>LEXINGTON, KY |
| B. BID SECURITY (Type and amount) | | |
| C. AMENDMENTS ACKNOWLEDGED | | |

| 7A. ITEM NO. | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | 8D. UNIT | 8E. UNIT PRICE | 8F. ESTIMATED AMOUNT | No. 1 D. UNIT PRICE | No. 1 E. ESTIMATED AMOUNT | No. 2 D. UNIT PRICE | No. 2 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | $ 1,251,000.00 | | 1,039,591.00 |
| 1. | BASE BID | | | | | | | | |
| | | | | | | | $ | | |
| | ALT I | | | | | | - 109,000 | | |
| | ALT II | | | | | | - 51,000 | | |
| | ALT III | | | | | | - 3,500 | | |

NSN 7540-01-150-0981 501419-101 NOTE: If more than two offers are received, continue on OF 1419A. OPTIONAL FORM 1419 (11-88) Prescribed by GSA - FAR (48 CFR) 53.236-1



G- 003127

000000022

## ABSTRACT OF OFFERS - CONSTRUCTION CONTINUATION SHEET

1. SOLICITATION NUMBER: IFB 549-64-01

PAGE 2 OF 1 PAGES

INSTRUCTIONS - Attach this form to OF 1419, Abstract of Offers - Construction, when more than 2 offers are received on a construction project. Each Continuation Sheet will accomodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use additional OF 1419's for contract items in excess of 14 and attach additional Continuation Sheets (OF 1419A) as needed.

2. PROJECT TITLE: Bonham Fire Alarm System # NRM 99-115

4. OFFERS (Continued)

| | NO.: 3 | NO.: 4 | NO.: 5 | NO.: 6 |
|---|---|---|---|---|
| A. OFFEROR | Raven Bldg & Supply Sherman TX | Simplex Time Recorder Co. Lewisville TX | ADT Security Carrollton, TX | Siemens Irving, TX |
| B. BID SECURITY (Type and Amount) | | | | |
| C. AMENDMENTS ACKNOWLEDGED | | | | |

3. CONTRACT ITEMS

| A. ITEM NO. | B. ESTIMATED QUANTITY | C. UNIT | No. 3 D. UNIT PRICE | No. 3 E. ESTIMATED AMOUNT | No. 4 D. UNIT PRICE | No. 4 E. ESTIMATED AMOUNT | No. 5 D. UNIT PRICE | No. 5 E. ESTIMATED AMOUNT | No. 6 D. UNIT PRICE | No. 6 E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BASE BID | | | 1,745,845 | | 1,035,385 | | 864,791 | | 1,299,711 |
| | | | | | | | | | | |
| ALT I | | | | -192,880 | | | | | | -227,128 |
| ALT II | | | | -88,880 | | | | | | -84,190 |
| ALT III | | | | -3,200 | | | | | | |

5502 501419-201

OPTIONAL FORM 1419A (11-88) Prescribed by GSA - FAR (48 CFR) 53.236-1



G- 003126

000000023

Grōt Incorporated

Electrical Contractors

688 Grot Drive
P.O. Box 54353
Lexington, Kentucky
40555-4353

Telephone: (606) 254-3848
Facsimile: (606) 254-3847
E-mail: office@grotinc.com
Internet: www.grotinc.com

September 14, 2001

Comptroller General
General Accounting Office
Attn: Procurement Law Control Group
441 G. Street, Room 1103
Washington, DC 20548

Protest After Award

Ref: Solicitation #IFB 549-64-01
Offer Date: 8/28/01

Under Clause 52.233-2 of the FAR, Service of Protest, please be advised that Grot, Inc. is protesting the award of the above referenced project. This acquisition has been awarded to ADT in the amount of Nine Hundred Sixty-nine Thousand Six Hundred Fifty-six Dollars ($969,656.00). This award was made on accumulation of four bid items as follows:

Item #1-GENERAL CONSTRUCTION: Work includes general construction, alterations, grading, fire alarm, mechanical and electrical work.

Total $864,791.00

Alternate No. 1: DELETE Building 24 from the included work except for the token ring communication loop cabling. Note that implementation of this alternate requires that Alternate No 3 be implemented as well.

Total $ 72,962.00

Alternate #2: DELETE Building 29 from the included work except for the token ring communications loop cabling. Note that implementation of this alternate requires that Alternate #3 b implemented as well.

Total $28,503.00

Alternate No. 3: Do not completely remove the existing fire alarm equipment at the Security office and do not remove the existing fire alarm enunciator at the Energy Center. Remove only those portions of the equipment whose functions have been replaced by the new fire alarm system

Total $3,400.00

Block 17 on page 2 of the solicitation did not include provisions for the inclusion of four bid items. We also protest the fact that Alternate 1, 2, and 3, are deducts and not adds and therefore, the cumulative award amount of Nine Hundred Sixty-nine Thousand Six Hundred Fifty-six Dollars ($969,656.00) is erroneous. It is apparent that the contracting officer has allowed ADT to increase its bid

tabbies EXHIBIT "9"

Grot Incorporated

price by more than $100.000/00 to the detriment of other bidders. This action severely compromises the competitive bid process and calls into question the responsiveness of ADT's bid.

Grot, Inc. requests that a ruling be made by the agency that the bid made by ADT is non-responsive and that award be made to Grot, Inc. as the lowest responsive bidder on the project. Further any award made to Simplex Time Recorder Company, the apparent second low bidder, jeopardizes the competitive bid process, as both ADT and Simplex are owned by the same parent company, TYCO, and Simplex provided pricing to Grot, Inc. as a supplier on the project.

Information was received by Grot, Inc. 9/12/01 that an award in the amount of Nine Hundred Sixty-nine Thousand Six Hundred Fifty-six Dollars was made to ADT by the contracting officer on 9/11/01. This protest is immediately being filed to establish timeliness for filing this protest.

Sincerely

Kerry J. Russell,
Contract Administrator

Cc: Contracting Office 90C 0 Building 8
VA North Texas Healthcare System
4500 S. Lancaster Road
Dallas, Texas 75216

Cc: Andy Kilpatrick, Attorney-at-Law

DEPARTMENT OF VETERANS AFFAIRS
Office of the General Counsel
Washington DC 20420

OCT 1 8 2001

In Reply Refer To:

Mr. Anthony Gamboa
Senior Associate General Counsel
General Accounting Office
441 G. Street, NW
Washington, DC 20548

Attn: Paul Jordan, Esquire

Dear Mr. Gamboa:

This is in response to the protest of Grot, Incorporated (Grot) filed under B-288921.1.

This protest involves the award of a contract to replace the Fire Alarm System at the Sam Rayburn Memorial Veterans Center located in Bonham, Texas. The agency has determined to take corrective action by canceling the solicitation because it does not accurately reflect the agency's minimum needs. In particular, the Department of Veterans Affairs (VA) has determined that the fire alarm system specification needs to be revised because it does not reflect the VA's recent decision to issue a fire alarm system specification that contains more performance characteristics in its design. VA has also determined that the basis for award, which includes the accumulation of four bid items must be clarified. After these changes have been made, VA intends to issue a new solicitation.

Therefore, VA respectfully requests that GAO dismiss this protest. The jurisdiction of GAO is established by the bid protest provisions in the Competition in Contracting Act of 1984, 31 U.S.C.A. §§ 3551-3556. GAO's role in resolving bid protests is to ensure that the statutory requirements for full and open competition are met. *Brown Assocs. Management Serv., Inc.—Recon.*, B-235906.3, March 16, 1990, 90-1 CPD ¶ 299 at 4. An agency may take corrective action by canceling a solicitation where the agency determined that the specifications needed to be revised. *EDL Construction, Inc.*, B-281499, 1999 U.S. Comp. Gen. Lexis 24, 99-1 CPD ¶ 34. GAO Bid Protest Regulations provide that GAO may dismiss the protest at the time the propriety of a dismissal becomes clear based upon information provided by the contracting agency. 4 C.F.R. § 21.5.

RECEIVED
OCT 2 2 2001
GROT INC

EXHIBIT
"10"

Mr. Anthony Gamboa

Millicent Gompertz and Charlma Quarles participated in the preparation of this response.

Sincerely,

Phillipa L. Anderson
Assistant General Counsel

cc: Kerry J. Russell
Contract Administrator
688 Grot Drive
Lexington, KY 40555-4353

DEPARTMENT OF VETERANS AFFAIRS
NORTH TEXAS VETERANS MEDICAL HEALTH CARE SYSTEM
DALLAS VETERANS MEDICAL CENTER
4500 S. LANCASTER ROAD
DALLAS, TX 75216

October 29, 2001

Grot, Inc.
688 Grot Drive
Lexington, KY 40505

Mr. Kerry Russell:

The contract for the Bonham Fire Alarm System at Sam Rayburn Veterans Memorial Center, Bonham, TX awarded to ADT Security Systems has been cancelled due to inadequate specifications. The VA will send you a copy of the new solicitation when it becomes available in a few weeks. We look forward to hearing from you again.

If you have any questions, call me at 214-857-0027.

Sincerely,

John Mraz
Contracting Officer

| SOLICITATION, OFFER, AND AWARD (Construction, Alteration, or Repair) | 1. SOLICITATION NO. IFB 549-23-02 | 2. TYPE OF SOLICITATION X ADVERTISED (IFB) | 3. DATE ISSUED 12/06/01 | PAGE OF PAGES 1 of 80 |
|---|---|---|---|---|

ͻORTANT — The "offer" section on the reverse must be fully completed by offeror.

| ONTRACT NO. V549P-609-2 | 5. REQUISITION/PURCHASE REQUEST | 6. PROJECT NO. NRM 99-115 |
|---|---|---|

| ;SUED BY | CODE | | ADDRESS OFFER TO |
|---|---|---|---|
| )HN MRAZ Contracting Officer (90C)<br>ɔartment of Veterans Affairs<br>North Texas Health Care System<br>)0 S. Lancaster Road, Bldg. 8<br>las, Texas 75216 | | | same as block # 7 |

| )R INFORMATION CALL: | A. NAME John Mrazl | B. TELEPHONE NO. (Include area code) (NO COLLECT CALLS) (214) 857-0021 |
|---|---|---|

## SOLICITATION

TE: In advertised solicitations "offer and offeror" mean "bid" and "bidder".

'HE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS (Title, identifying no., date):

**ject # B01-114, Replace Fire Alarm System, Sam Rayburn Memorial Veterans Center, Bonham, TX**

: contractor shall furnish all labor, tools, equipment, materials and supervision to replace the "Fire Alarm System" at the Sam 'burn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX in accordance with the contract drawings and cifications. The project shall involve general construction, demolition, alterations, grading, electrical and mechanical work. ıtract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the city, nty, state and Federal Government. The period of performance is 270 days.

ection 01010 General Requirements, page 01010-1, Section 1.2 Statement of Bid Item(s), B, C & D have been deleted. re are no "alternate bids" for this project.

; solicitation, IFB 549-23-02, replaces Solicitation IFB 549-64-01, which was cancelled due to changes in the contract ɹirements.

ɛu of STANDARD FORM 1442 (Automated)

EXHIBIT
tabbies
"11"

11. The Contractor shall begin performance within 10 calendar days and complete it within 270 calendar days after receiving ☐ award, ☒ notice to proceed. This performance period is ☒ mandatory, ☐ negotiable. (See ______.)

| 12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? (If "YES," indicate within how many calendar days after award in Item 12B.) ☒ YES ☐ NO -- Performance and Payment Bond | 12B. CALENDAR DAYS 10 |
|---|---|

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 1 copy to perform the work required are due at the place specified in Item 8 by **1:30 PM** local time on January 4, 2002

B. . If this is an advertised solicitation, offers will be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due

C. An offer guarantee is X☐ required.

D. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

E. Offers providing less than 60 calendar days for Government acceptance after the date offers are due will be considered nonrespon-sive

**OFFER** *(Must be fully completed by offeror)*

| 14. NAME AND ADDRESS OF OFFEROR *(Include ZIP Code)* | 15. TELEPHONE NO. *(Include area code)* |
|---|---|
| GROT, INC.<br>P. O. BOX 54353<br>LEXINGTON, KY 40555-4353<br>Duns #154514590 | 859-241-3848 |
| CODE FACILITY CODE | 16. REMITTANCE ADDRESS *(Include only if different than Item 14)* |

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government within 60 calendar days after the date offers are due. *(Insert any number equal to or greater than the minimum requirement stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.)*

AMOUNTS ▶ 934,310.00
Nine Hundred Thirty-four Thousand Three Hundred Ten Dollars and zero cents

18. The offeror agrees (a) to carry out this offer if the Government accepts it by signing Item 31B within the time specified in Item 13D, and (b) furnish any required performance and payment bonds.

19. ACKNOWLEDGMENT OF AMENDMENTS
*(The offeror acknowledges receipt of amendments to the solicitation — give number and date of each)*

| AMENDMENT NO. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DATE | | | | | | | | | |

| 20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)* | 20B. SIGNATURE | 20C. OFFER DATE |
|---|---|---|
| Jerry N. Grot President | [signature] | 1-8-02 |

**AWARD** *(To be completed by Government)*

21 ITEMS ACCEPTED:

ALL ITEMS ACCEPTED

| 22. AMOUNT | 23. ACCOUNTING AND APPROPRIATION DATA |
|---|---|
| $934,310.00 | |

24. SUBMIT INVOICES TO ADDRESS SHOWN IN (*4 copies unless otherwise specified*) ▶ ITEM

25. NEGOTIATED PURSUANT TO

☐ 10 USC 2304(a) ( ) ☐ 41 USC 252(c) ( )

26. ADMINISTERED BY CODE

27. PAYMENT WILL BE MADE BY

*CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE*

☐ 28. NEGOTIATED AGREEMENT (*Contractor is required to sign this document and return ______ copies to issuing office.*) Contractor agrees to furnish and deliver all items or perform work, requisitions identified on this form and any continuation sheets for the consideration slated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications or incorporated by reference in or attached to this contract.

☐ 29. AWARD (*Contractor is not required to sign this document.*) You on this solicitation, is hereby accepted as to the items listed. This awar summates the contract, which consists of (a) the Government solicitatic your offer, and (b) this contract award. No further contractual docum necessary.

30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN (*Type or print*)

Jerry M. Grot President

30B. SIGNATURE

[signature]

30C. DATE

2-1-02

31A. NAME OF CONTRACTING OFFICER (*Type or print*)

John Mraz

31B. UNITED STATES OF AMERICA

BY [signature]

31C. AWARD DATE

1 Feb 02

# ABSTRACT OF OFFERS – CONSTRUCTION

| 1. SOLICITATION NUMBER | 2. DATE ISSUED | 3. DATE OPENED | PAGE OF PAGES |
|---|---|---|---|
| IFB 549-23-02 | 12/06/01 | 01/08/02 | |

ISSUING OFFICE: Dallas AMMS

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation.

SIGNATURE: [signature] DATE SIGNED: 8-Jan-02

PROJECT TITLE: Fire Alarm Project, Bonham, TX

NUMBER OF ADDENDA ISSUED:

8. GOVERNMENT ESTIMATE (Check A, B or C and complete D, E and F.)

- A. HIRED LABOR
- B. REASONABLE CONTRACT (Without Profit)
- C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

| | NO. 1 | NO. 2 |
|---|---|---|
| A. OFFEROR | Grat Inc | Siemens |
| B. BID SECURITY (Type and amount) | | |
| C. ADDENDA ACKNOWLEDGED | | |

| 7B. DESCRIPTION OF OFFERED ITEM | 7C. ~~EST.~~ QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | No. 1 D. UNIT PRICE | No. 1 E. ~~ESTIMATED~~ AMOUNT | No. 2 D. UNIT PRICE | No. 2 E. ~~ESTIMATED~~ AMOUNT |
|---|---|---|---|---|---|---|---|---|
| ~~Grat Inc.~~ VRC | 1 | job | | | — | $934,310.00 | — | $984,657.00 |

Recorded by: Giselle K. Caldwell

540-01-152-0981 1415 STANDARD FORM (10-83) Prescribed by GSA

## 9. OFFERS *(Continued)*

| NO. 3 | | NO. 4 | | NO. 5 | | NO. 6 | | NO. 7 | |
|---|---|---|---|---|---|---|---|---|---|
| A. OFFEROR Simplex | | A. OFFEROR ADT | | A. OFFEROR | | A. OFFEROR | | A. OFFEROR | |
| B. BID SECURITY *(Type and Amount)* | | B. BID SECURITY *(Type and Amount)* | | B. BID SECURITY *(Type and Amount)* | | B. BID SECURITY *(Type and Amount)* | | B. BID SECURITY *(Type and A* | |
| C. ADDENDA ACKNOWLEDGED | | C. ADDENDA ACKNOWLEDGED | | C. ADDENDA ACKNOWLEDGED | | C. ADDENDA ACKNOWLEDGED | | C. ADDENDA ACKNOWLEDGE | |
| D. UNIT PRICE | E. ~~ESTIMATED~~ AMOUNT | D. UNIT PRICE | E. ~~ESTIMATED~~ AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMA AMOUN |
| — | $ 969,249.00 | — | $ 1,299,837.00 | | | | | | |

STANDARD FORM 1419 BACK

☆ GPO : 1984 O - 461-275 (319)

DEPARTMENT OF VETERANS AFFAIRS
NORTH TEXAS VETERANS HEALTH CARE SYSTEM
DALLAS VETERANS MEDICAL CANTER
4500 S. LANCASTER ROAD
DALLAS, TX 75216

Date: February 1, 2002

# NOTICE TO PROCEED

Contract No. V549P-609-2, Project NRM 99-115-
Bonham Fire Alarm System, Rayburn Memorial
Veterans Center, Bonham, TX

You are hereby notified to proceed with Contract V549P-609-2 and install a Fire Alarm System at the Sam Rayburn Memorial Veterans Center, Bonham, TX.

Work shall begin within ten (10) calendar days after receipt of this "Notice to Proceed" and shall be completed within 270 days after receipt of this "Notice to Proceed". The contract completion date is November 10, 2002

John Mraz
John Mraz
Contracting Officer

## ACKNOWLEDGEMENT

Received and acknowledged by: [signature] 2-1-02
Signature Dated
President
Title

EXHIBIT
tabbies
"12"

NOTES OF
1ST MEETING ON
REPLACE FIRE ALARM
February 25, 2002
Rickey L. Kirk
C.O.T.R.

See attached sheet for personnel in attendance.

I began the meeting by introducing everyone.
I asked Mr. Clyde Bell, contractor, when they planned to move on site. He stated that they were planning to move there storage trailer on site by the end of the week, March 1st. He then introduced Jon Evans as the on site supervisor for Grot.
We then went straight into Items of concern:

All submittals must have a cover sheet stating under what spec section and paragraph that they were being submitted. Mr. Bledsoe asked if we needed all the submittals up front or if a partial package would be ok to get started. I stated that we needed as many as possible before work could begin and that nothing could be installed that had not been previously approved.

I stated that we were concerned that Siemens had changed who was going to be their supervisor on the project. Mr. Bledsoe stated that Mr. Bloodworth was as capable as the other. I state that the supervisor needed to be a NICET level III technician as per spec section 13850, paragraph 1.1. Mr. Bledsoe state that Mr. Bloodworth was. I then stated that we would need copies of his certification. Mr. Bledsoe asked what would happen if a change order was necessary? I stated that if and when a change order was shown to be needed we would issue a change order.

I stated that training must be accomplished as soon as possible. Mr. Bledsoe stated that he could bring in a working mock of the fire system to give some preliminary training. We then set a date of March 11th & 12th at 2p.m. for this preliminary training. Mr. Bledsoe asked who would be attending the technician's training classes. I told him that two of them would be Mr. Mel Harrison and Mr. Chris Forner of the Dallas station and that the other two had not been decided on yet. I also stated that Mr. Harrison and Mr. Forner were already familiar with the system and that they would be helping me to watch over the project. Therefore they would not take the training at the same time as the others but at the end of the project so that they could be here to help me. I then told Mr. Bledsoe that we needed the training schedule as soon as possible so that whoever was chosen could start setting their schedules to attend.

Mr. Bledsoe then asked who was responsible for the cost of room, board and travel. I stated the contractor was responsible for this as per spec section 13850, paragraph 3.7, sub paragraph B. Mr. Bledsoe stated that they had not included these costs in their bid because his spec stated that the VA was responsible for these costs. I stated that he had the old spec book from last years original bid

EXHIBIT
tabbles
"13"

package which had been cancelled then reworked and put out for new bids. I then reiterated that the contractor was responsible for these costs.
Darrell Brewer our Safety Specialist addressed the safety issues concerning this project. He stated that all VA safety requirements were to be met. He went on to say that all penetrations were to be resealed. All work was to meet NPFA 101 and 72 standards. He reviewed station policies concerning no fire arms or drugs or alcohol was to be brought on station. He stated that the station had a speed limit and that the VA Police could give out Federal Fines for violations. Mr. Brewer was concerned with how we were going to take down the old system then put a new system and still maintain a secure center. I stated that the main trunk line for the new system would be installed first then the old system would be taking out of service one floor at a time. Then the new system for that floor would be installed and tied into the new main and brought on line before moving to the next floor. I went on to say that while the old system was down and before the new was installed a fire watch would be maintained by the Contractor. I stated that the individual chosen by the contractor as fire watch must be trained in proper procedure by our Safety people. Mr. Bledsoe said that he wanted to proposed that instead of doing it that way he would come in and set up a temporary system in each building. This system would monitor each floor and would allow the removal of the entire old system and installation of the new without bothering with a fire watch and going floor by floor. This proposal was talked over by all present and it was agreed that if the temporary system gave as good a coverage as the old and that if training was given on the temporary system it would be acceptable. Mr. Brewer told the contractor that we were expecting an inspection by the Joint Commission in July. He also warned them to stay off the orange pvc fire sprinkler lines because they broke very easy.
Mr. Evans was concerned about gaining access to areas. I told him that we would issue him an EC key which would allow him to enter all mechanical spaces. I went on to say that I would let him into other areas as needed.
Meeting ended.

# Fire Alarm Project Meeting
2-25-02

| Name | Representing |
|---|---|
| Melvin Harrison | VAMC |
| Chris Forner | VAMC |
| Clyde Bell | GROT INC. |
| Jon Evans | Grot Inc. |
| LARRY C. WALDROP | 138 |
| Rickey Kirk | VA C.O.T.R. |
| DARRELL BREWER | VA "SAFETY" |
| LEE BLEDSOE | SIEMENS |
| DAN BLOODWORTH | SIEMENS |
| Tom Sentelle | Sentelle Ent. INC. |
| Mark Daniel | VA |

Grot Incorporated Est. 1986

Electrical & Technology Contractors

688 Grot Drive
Lexington, Kentucky
40505-3835

Telephone: (859) 254-3848
Facsimile: (859) 254-3847
Toll Free: (888) 254-3847
Website: www.grotinc.com

To: VA North Texas Health Care System
Dept. of Veterans Affairs
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

Attn: Tongee Flemming

Date: 6/25/2002

Doc No. 1
Project: Bonham Tx.-VA
2002.006
Sam Rayburn Memorial Veterans East Ninth
Bonham, Tx 75418

Subject: Response to E-mail dated 06/24/02

Dear Tongee Flemming:

In reviewing the e-mail received from Rickey Kirk, I need a little clarification and would like to clarify several matters.

1. It came to Mr. Kirk's attention that a Mr. Scott Stead of Siemens will be the project manager for the project. Who brought this to Mr. Kirk's attention? The Prime contractor on the project, Grot Inc., Has not received such information from Siemens that such a change has been made. Construction protocol mandates that any correspondence, conversations, etc. shall be between owner and prime contractor and not with the prime contractor's subcontractors.

2. The supervision of installation and testing shall be inacorradance with specifications.

3. The fire protection system shall be installed as designed by Fratto Engineering Inc. in accordance with the specifications. To provide a set of plans for the project that meets all codes is not a requirement of the contractual documents. It is the responsibility of the Engineering firm for the project to design a workable system which meets all applicable codes.

4. It has been brought to my attention that the owner has given direction to Mr. Stead with Siemens. The OWNER needs not to give any direction to Grot Inc. subcontractors, unless they are willing to incur the additional charges that may relate to said direction. As stated in item 1, and communication, directives, or correspondence should be addressed to Grot Inc., the prime contractor, for this project. Grot Inc. has a full time Project Manager, Mr. Jon Evans on site and is the person that any and all directives, and job site communications should be directed to.

5. Grot Inc. submitted drawings for the Siemens Fire Protection System Installation for the owners review and approval in accordance with the specification section 13850-4 paragraphs 1.4 subparagraphs B. On the last half of the drawings the owner corrected the following items and added additional items.
   a. Siemens drawing FA-17/Fratto Drawings EF-2.01E Room 137 the owner has requested two additional smoke detectors.
   b. Siemens drawing FA-21/Fratto drawing EF-2.04 two speakers were not shown on the Siemens drawings, they shall be installed as shown on Fratto drawings.

Grot Incorporated

c. Siemens drawing FA-27/Fratto EF2.401C Room 131 is missing a flasher; one shall be installed as shown on Fratto drawing.
d. Siemens drawing FA-36/Fratto EF.01.01 one ceiling smoke is not shown and it shall be installed as shown on the Fratto drawing.

6. As stated in Item 5, plans were submitted for review by the owner in accordance with the specifications. Grot Inc. was not contracted with to design the project. The design was the responsibility of the Owner's engineers, Fratto Engineering Inc. The installation of the fire alarm systems shall be as shown on the plans and per the specifications. It is not the responsibility of Grot Inc. to redesign the project.
7. The plans are diagrammatic in nature and thus moving a device from one wall to the other shall be shown on as built drawings.

Please feel free to contact me at my office, if you should have any other questions or issues.

Sincerely,
Grot, Incorporated
Clyde Bell
Clyde Bell
Project Manager

cc: John Mraz, VA North Texas Health Care System

DEPARTMENT OF VETERANS AFFAIRS
NORTH TEXAS VETERANS MEDICAL HEALTH CARE SYSTEM
DALLAS VETERANS MEDICAL CENTER
4500 S. LANCASTER ROAD
DALLAS, TX 75216

Mr. Jerry Grot
Grot, Inc.
324 Henry Street
Lexington, KY 40508

Date: August 23, 2002

Subj: Replace Fire Alarm System
Contract V549P-609-2, Project #B01-114
Grot Inc., Contractor

Dear Jerry Grot:

In our July 22nd. meeting we discussed, without resolution, the question as to whether the work for the Bonham Fire was to be installed in accordance with the contract specifications and the NFPA Codes or installed using only the prints as a generic guideline. While the contract states in FAR Clause 52.236-21--Specifications and Drawings for Construction found on page 3-54 that **"Anything mentioned in the specifications and not shown on the drawings, or shown on the drawing and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern."** it was decided that Ricky Kirk, the Contracting Officer's Technical Representative (COTR) would again, review the plans and specifications before making a finding. Mr. Kirk's findings are listed below.

"1. On project drawing #EF00.01, General ~~Note 5~~ states:

*These drawings are **GENERIC** with respect to any particular manufacturers equipment. Quantities of ~~FATC and spacing~~ dependent devices may vary with the system equipment manufacturer.*

2. In the project specifications in Section 01001, General Conditions, paragraph 1.1, sub-paragraph (d) states:

*In some instances it may have been impracticable to detail all items in specifications or on drawings because of variances in manufacturer's methods of achieving specified results. In such instances the contractor will be required to furnish all labor, materials, drawings, services and connections necessary to produce systems or equipment which are completely installed, functional, and ready for operation by facility personnel in accordance with their use.*

3. Also in the specifications in Section 13850, Fire Alarm System, paragraph 1.1, Description, sub-paragraph A, states:

*This section of the specifications includes: the furnishing, installation, and connection of fire alarm equipment to form A COMPLETE multi-building analog addressable-device fire alarm and emergency notification system; testing and placing the new system into operation; training of the owner's personnel; and removal of the old system. The new system shall include, **but not be limited to,** alarm initiating devices, alarm notification appliances, control units, fire safety control devices and interfaces,*

EXHIBIT
tabbies
"16"

*annunciators, power supplies, remote alarm interfaces, and wiring as shown on the drawings and as specified. All devices and accessories necessary for a complete* ***operating system shall be included even though each item is not specifically mentioned or described herein.***

*Sub-paragraph B, states in part:*

*~~The fire alarm~~ system* ***shall comply*** *with requirements of NFPA 101 and NFPA 72.* ***The system design,*** *system layout, submittal documents preparation, and ~~supervision of ins~~tallation and testing shall be provided by a technician that is certified NICET level III or a registered fire protection engineer.*

3. Also in Section 13850, paragraph 1.2, Scope, sub-paragraph B, states:

*A new fire alarm system* ***shall be designed and installed*** *in accordance with the specifications and drawings. Device location and wiring runs shown on drawings are* ***for reference only*** *unless specifically dimensioned. Actual locations shall be in accordance with NFPA 72 and this specification."*

**"After careful review I, Ricky Kirk, the COTR, have concluded that this is a design and installation project and that Grot Inc. must design and install a complete fire alarm system in accordance with contract plans and specifications as well as the NFPA Codes.**

**Furthermore, I request that the contractor, Grot, Inc., resubmit all previous drawings. The resubmitted drawings shall include everything contained on the original drawings as well as any additional devices required by NFPA Codes that did not appear on the original submittals. In addition, the contractor shall provide all information and drawings requested in the specifications, paying particular attention to the requirements of spec. section 13850, paragraph 1.4, submittals."**

Jerry, please instruct your representatives to comply with the COTR's findings. Since "reasonable people can reason together" and we all are reasonable people, I'm convinced that the finished project shall meet everyone's expectations.

In you have any questions, call me at 214-857-0021.

Sincerely,

John Mraz
Contracting Officer

Grot Incorporated Est. 1986

*Electrical & Technology Contractors*

688 Grot Drive
Lexington, Kentucky
40505-3835

Telephone: (859) 254-3848
Facsimile: (859) 254-3847
Toll Free: (888) 254-3847
Website: www.grotinc.com

To: VA North Texas Health Care System
Dept. of Veterans Affairs
4500 S. Lancaster Road,
Dallas, Texas 75216

Date: 9/5/2002

Doc No. 7
Project: Bonham Tx.-VA
2002.006
Sam Rayburn Memorial East Ninth
Bonham, Tx 75418

Attn: John Mraz

Re: Contract No. V549P-609-2
Project No. Bo1-114
Replace Fire Alarm System

Subject: Response to August 23, 2002 e-mail.

Dear John Mraz:

This is to respond to you e-mail letter of August 23, 2002 wherein you outline the findings of Ricky Kirk, the Contracting Officer's Technical Representative. Grot, Inc. disputes the findings of the COTR and respectfully request a Contracting Officer's Final Decision.

The COTR's reliance upon general contract specification is misplaced. With respect to project drawing #EF00.01, General Note 5, the fact that the drawings are "generic" is only to assure that there is no misinterpretation that the drawings may dictate a sole source procurement. Nowhere in that general note does it state that the contractor is responsible for the "design" of a complete fire alarm system.

Further, reliance upon specification Section 01001, General Conditions, paragraph 1.1 subparagraph (d) is likewise misplaced. The fact that it may have been "impractical" to detail all items in the specifications does not make this a design specification. It is the purpose of shop drawings to detail installation procedure for the devices as shown on the drawings. Again, nowhere in this section does it state that the contractor is responsible for design.

Next, the COTR relies upon Section 13850, Fire Alarm System, paragraph 1.1, subparagraph A. None of these sections provides that the contractor is responsible for the design
of the system. It merely states that when the fire alarm system is installed, it will be a "complete" system. Use of the phrase "but not be limited to" does not in any way imply that Grot is responsible for design. This is nothing more than a "generic" listing of systems which will be included in the fire alarm program. The fact that each item is not "specifically mentioned or described herein" means only that the contractor will provide all of the incidental equipment necessary to make the items listed in the specifications and drawings function.

In relying upon Section 13850, paragraph 1.1, subparagraph B, the COTR misconstrues the meaning of the language. It is not the responsibility of the NICET Level III technician to design the entire system. If that is the case, then why are there any specifications for the fire

Grot Incorporated

alarm system or, for that matter any reference to any fire alarm information on the drawings. The architect for this project saw fit to delineate 1732 fire alarm devices on the drawings. Nowhere on the drawings or in the specifications does it state that any reference to fire protection devices shown on the drawings are for demonstrative purposes only and that the contractor should satisfy himself as to the number of fire alarm devices to be installed. At best, the only argument that can be made is that the drawing is ambiguous.

However, even the ambiguity argument fails in the light of Section 13850, paragraph 3.2(a). This paragraph details installation of the new system and provides that the system shall be in accordance with NFPA 70, 72, 90A, and 101 **as shown on the drawings**, and as recommended by the major equipment manufacturer. Further, the remaining paragraphs to paragraph 3.2 dictate the method of installation. Again, if it was the intent of the architect for the fire alarm system contractor to design the project, why did the architect go to such detail in the specifications. The fact of the matter is that was never the intent of these specifications; **otherwise the specifications would have specifically defined that the contractor was to design the system.**

As a result of the findings of the COTR, he has requested that Grot resubmit drawings that shall include all original devices shown and any additional devices required by NFPA. I request the determining factor as to how the COTR is knowledgeable to the additional devices that may be required for the project, and at what date and time the COTR became aware of additional devices needed for the project and whom instructed the COTR to the alleged need. If in fact it shall be necessary for Grot to provide an additional number of devices, the cost of these devices shall be provided upon determining the number of each device type and location. In the alternative, should the contracting officer refuse to reconsider the findings of the COTR, then Grot hereby requests a contracting officers final decision in accordance with the Contract Disputes Act of 1978.

If the contracting officer desires, Grot, along with counsel if necessary, is prepared to meet with the contracting officer, the COTR and any other necessary representatives of the government in an attempt to resolve this issue. However, time is of the essence. Delay in the issuance of the contracting officers final decision could cause delay in completion of the project. If so, then Grot will submit an additional claim for the impact of such delay.

Sincerely,
Grot, Incorporated

Jerry A. Grot

Jerry Grot
President

cc: Andrew J. Kilpatrick, Counsel for Grot Inc.

DEPARTMENT OF VETERANS AFFAIRS
JOHN MRAZ (90C)
DALLAS VETERANS MEDICAL CENTER
4500 S. LANCASTER ROAD
BUILDING 8,
DALLAS, TX 75216

Grot, Incorporated
688 Grot Drive
Lexington, KY 40505-3835

Attn: Jerry Grot

Dated: September 17, 2002

Re: Contract No. V549P-609-02
Project No. BO1-114
Replace Fire Alarm

Subject: Response to your letter dated 9/5/02/Cure Notice

Dear Jerry Grot:

This letter is in response to your letter dated September 5, 2002 wherein you requested a contracting officers final decision in accordance with the Contract Disputes Act of 1978 with respect to my declaration in a letter dated August 23, 2002 that by right the VA is entitled to the design/install fire alarm system it contracted for and Grot, Incorporated is obligated under that contract to design and install said system.

There are three requirements for a valid CDA claim. "The requirements are: (1) A written demand (2.) Seeking as a matter of right, and (3.) The payment of money in a certain sum." See, e.g., Reflectone, Inc. v. Dalton, 60F.3d 1572, 1575 (Fed. Cir. 1995). Thus, since your request for a final decision under CDA does not include the "payment of money in a certain sum" it cannot be considered a formal claim. In Bridgewater Construction Corporation, VABCA Nos. 2866 et al, 90-2 BCA p 22,764 the board held that, "A contracting officer cannot 'jump the gun' and issue a final decision before the contractor has actually submitted...a written claim"; and in Norfolk Shipping and Drydock Corporation DOT BCA 1936, 88-2 BCA p 20,674 the board stated that "One purpose of the CDA is to induce resolution of disputes by negotiation rather than litigation and the premature issuance of a final decision, in the absence of a valid claim, thwarts that purpose".

The declaration I made in my letter dated August 23, 2002 was based on the Contract Scope, 1.2,B page 13850-3 of the Contract Specifications which states, "A new fire

EXHIBIT
tabbies
"18"

alarm system shall be designed and installed in accordance with the specifications and drawings": and General Description, b. of the Contract Specifications on page 13850-2 which states "The system design, system layout, submittal documents preparation, and supervision of installation and testing shall be provided by a technician that is certified NICET Level III or a registered fire protection engineer" still stands.

In my letter I requested that Grot meet their contractual obligations when I declared that Grot design and install the fire alarm system in compliance with the contract specifications. I did not request a cardinal or constructive change to Contract V5495-609-2 and in no way will furnishing the design/install fire alarm system called for in the contract specifications alter the contracts intent. Furthermore, since your letter is not a valid claim under CDA there can be no "final decision" by the Contracting Officer let alone contractor appeal rights to a "final decision" that was never made.

Therefore, since further discussions lack merit Grot is hereby directed to furnish the VA with the design/install fire alarm system in accordance with the contract specifications.

You have ten (10) days from the receipt date of this letter to cure the deficiency and provide the VA with a design/install fire alarm system or risk contract termination by default.

Sincerely,

John Mraz
Contracting Officer

Grōt Incorporated Est. 1986

*Electrical & Technology Contractors*

324 Henry Street
Lexington, Kentucky
40508-1215

Telephone: (859) 254-3848
Facsimile: (859) 254-3847
Toll Free: (888) 254-3847
Website: www.grotinc.com

To: VA North Texas Health Care System
Dept. of Veterans Affairs
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

Date: 9/18/2002

Doc No. 8
Project: Bonham Tx.-VA
2002.006
Sam Rayburn Memorial East Ninth
Bonham, Tx 75418

Attn: John Mraz
Subject: Response to Letter Dated September 17, 2002.

Dear John Mraz:

I am in receipt of your letter dated September 17, 2002 and shall direct my firm to begin the process of designing a cure to the deficiencies contained in the plans and specifications designed by the government's Consultant. As I am certain you are aware, the government warrants the adequacy of the plans and specifications provided for construction. Ambiguities in those plans and specifications are construed against the owner. Even accepting the conclusions and decision of the COTR as correct, which we specifically deny, the plans and specifications are, at best, ambiguous. Grot will ultimately be provided a change order to compensate it for the additional cost. When we have completed our evaluation of your directive, we will submit a formal claim for the additional cost Grot will incur.

This is your formal notice from Grot Inc. that we stand by our position in my letter dated August 23, 2002 that the work asked for is outside the scope of Grot's contract and as such is, among other things, a different site condition and thus any and all cost, expense, delays and other damages incurred by Grot Inc. shall be accrued and a claim shall be made against the owner.

We have turned this matter over to counsel. We stand willing to meet and discuss your decision in an attempt to resolve this short of the claim process but time is of the essence. I request a meeting with you and your counsel and the engineering firm on Monday September 23 2002 before 11:30 a.m., please respond by 4:00 p.m. today so arrangements can be made.

I thank you in advance for your consideration on this matter.

Sincerely,
Grot, Incorporated

Jerry A. Grot

Jerry Grot
President

cc: Andrew J. Kilpatrick, Goza, Kilpatrick Counsel

EXHIBIT
"19"

HUBZone Historically Underutilized Business Zone

ABC

IEC PRIDE Independent Electrical Contractors, Inc.

GSA Schedule Contract GS-35F-0358L

DEPARTMENT OF VETERANS AFFAIRS
JOHN MRAZ (90C)
DALLAS VETERANS MEDICAL CENTER
4500 S. LANCASTER ROAD
BUILDING 8,
DALLAS, TX 75216

Grot, Incorporated
688 Grot Drive
Lexington, KY 40505-3835

Attn: Jerry Grot

Dated: September 18, 2002

Re: Contract No. V549P-609-02
Project No. BO1-114
Replace Fire Alarm

Subject: Response to your letter dated 9/18/02

Dear Jerry Grot:

In response to your letter dated September 18, 2002 I did not direct your firm to "begin the process of designating a cure to the deficiencies contained in the plans and specifications designed by the government's consultant." However, I did direct your firm to complete the contract in accordance with the contract specifications. The government did not, does not and will not lend credence to your assertion that a dispute existed, exists or may exist as to whether Grot is to provide the VA with an install only or design/install fire alarm system.

Moreover, if the there is a conflict between the prints and specifications as you allege, 52.236.21 Specifications and Drawings for Construction on Contract page 3-54 states, "Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern." While the government denied/denies your assertion of contract specification ambiguities, even if your assertion had merit, the non-drafting party has an obligation, "before bidding to seek clarification of an ambiguity of which it was or should have been aware. By failing to inquire the contractor forfeits the opportunity to rely on its unilateral, uniformed interpretation and bears the risk of interpretation. MWK Int'l, Ltd v. U.S., 2 Cl. Ct. 206 (1983)." The contract specifications are not silent, let alone vague, about the contractor's obligations: they clearly state that the contractor shall provide a design/install fire alarm system.

EXHIBIT
tabbles
"20"

Since there is no room for accommodation, I respectfully decline your invitation to meet with your counsel. You have two options: you can provide the design/install fire alarm system as directed and file a claim under the Contract Disputes Acts upon contract completion, or risk contract termination by default.

In addition, I have also, this date, sent you an official "cure notice". Compliance with the cure notice does not jeopardize your right, upon contract completion, to file a claim under the Contract Disputes Act.

Sincerely,

John Mraz
Contracting Officer

DEPARTMENT OF VETERANS AFFAIRS
DALLAS VETERANS MEDICAL CENTER
4500 S. LANCASTER ROAD
DALLAS, TX, 75216

Grot, Incorporated
688 Grot Drive
Lexington, KY 40505-3835

September 18, 2002

Subject: Delinquency Notice

Dear Mr. Jerry Grot:

You are hereby notified that the Government considers your failures to Contract V549P-609-02, the Bonham Fire Alarm Project, are endangering performance of the contract. Therefore, unless this condition is cured within ten (10) days after receipt of this notice, the Government may terminate for default under the terms and conditions of FAR Clause 52.249-10, Default (Fixed Price Construction).

If you have any questions, call me at 214-857-0021.

Sincerely,

John Mraz
Contracting Officer

RECEIVED
SEP 2 6 2002
GROT INC

EXHIBIT
"21"

Grot Incorporated Est. 1986

*Electrical & Technology Contractors*

324 Henry Street
Lexington, Kentucky
40508-1215

Telephone: (859) 254-3848
Facsimile: (859) 254-3847
Toll Free: (888) 254-3847
Website: www.grotinc.com

To: VA North Texas Health Care System
Dept. of Veterans Affairs
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

Date: 9/25/2002

Doc No. 11
Project: Bonham Tx.-VA
2002.006
Sam Rayburn Memorial East Ninth
Bonham, Tx 75418

Attn: John Mraz
Subject: Progress on "cure" notice.

Dear John Mraz:

We are proceeding to prepare documents for submission to the VA in compliance with your directive of September 18, 2002. However, as we stated in our letter of September 18, 2002, we must know the specific deficiencies, which the VA contends, is the subject of the "cure" letter.

In that regard, we specifically request that the VA indicate on the drawings the location of each deficiency and the location of each device the VA contends is missing from our drawings. We request this information for two reasons. Obviously, the VA knows where it believes the drawings are deficient or you could not issue the "cure" notice. Advising us of this information will expedite our work and mitigate any damage we will incur and ultimately submit to the VA for a change order.

Second, it is important that we know what the VA is looking for with respect to the individual rooms. Otherwise, we are operating in the dark, as we believe that our original submission meets the intent of the specifications. We must know what the specific rooms are being utilized in order to comply with your directive. Please provide a detailed breakdown as to what each room is being utilized for so we can proceed.

Although we are proceeding pursuant to your directive, we are doing so with a full reservation of our right to pursue all cost and expense incurred by Grot and our subcontractors in complying with your directives. Additionally, we remind you that this type of engineering cannot be done overnight. We anticipate that it will take between six to eight weeks to **complete** this process. This is, of course, dependant upon how quickly we can obtain information from the VA responsive to our questions. We will present drawings to the VA as they are developed and have delivered some drawings to the VA on September 24, 2002.

We believe the VA's decision on this matter to be in error. There is no indication in the plans and specifications that we are to "design" the project. The "design" language relied upon by the VA to attempt to justify its position is generic and not a specific directive to design the project. Our consultant and we took the engineer's design and applied the products that were available to our consultant to meet the intent of the design. The engineer **reviewed** Grot/Siemens drawings, **approved the drawings with modifications** and we began construction. It was not until a July 2 2002 meeting before anyone "questioned" whether the drawings met the VA interpretation of the specifications. When did the VA reach the conclusion that our drawings were deficient? Who brought this to your attention?

EXHIBIT
tabbies
"22"

HUBZone Historically Underutilized Business Zone
ABC
IEC Independent Electrical Contractors, Inc.
GSA Schedule Contract GS-35F-0358L

Grōt Incorporated

You have directed us to design the project per the specification and plans to thus comply with NFPA 101 & 72. Are you and the persons giving you advise aware, that pursuant to NFPA 101 & 72 we can and shall remove devices that are shown on the VA drawings? We are assume that VA will not be opposed to our company removing devices that are shown on the VA **GENERIC** bid drawings if not required by **NFPA 101 & 72.**

This is to notify you that your directive will cause Grot to incur substantial additional cost and expense and an increases in manpower to comply. While we are confident that we will ultimately prevail, we are still being required to finance this unwarranted change. We again request a meeting with you, the engineer for the project, the COTR and anyone else who can respond to our questions to try and resolve these issues in a fair an equitable manner without the necessity of costly litigation for both parties.

Please understand that Grot Inc. and its subcontractors and suppliers are committed to completing this project in accordance with your directives. We can argue about the cost and who is responsible later. **But we must know the specific deficiencies in order to correct them and complete the project in a timely manner**.

Sincerely,
Grot, Incorporated

Jerry Grot
President

cc: Andy J. Kilpatrick Attorney

**DEPARTMENT OF VETERANS AFFAIRS**
**DALLAS VETERANS MEDICAL CENTER**
**4500 S. LANCASTER ROAD**
**DALLAS, TX, 75216**
**JOHN MRAZ, CONTRACTING OFFICER 90C**
**TEL; 214-857-0021**
**FAX: 214-857-0027**
**E-MAIL: john.mraz@med.va.gov**

Grot, Incorporated
688 Grot Drive
Lexington, KY 40505-3835

July 17, 2003

Re: Contract V549P-609-02
Bonham Fire Alarm System

Subject: Disarmed Fire Alarm System, Bldg 1, at the Bonham, VA

Dear Mr. Jerry Grot:

I was informed this day by Charles Ballard, Chief of Engineering for the Bonham and Dallas Veterans Medical Centers, that Grot, Inc. has "disarmed the fire alarm system in Building 1, Sam Rayburn Medical Center, Bonham, TX without informing the VA as required by Contract V549P-609-02. Building 1 did not have fire alarm protection last night, July 16, 2003 and does not have fire alarm protection as of this minute."

You are hereby directed to correct the problem immediately and you are also responsible for administering a "Fire Watch" until the fire alarm system is activated for Building 1. The unauthorized deactivation of the fire alarm system for Building 1 is totally unacceptable and must be corrected immediately. Any cost incurred by the VA in connection with the deactivation and reactivation of the fire alarm system for Building 1 will be borne by Grot, Inc.

Upon receipt of this letter contact me at 214-857-0021 and Ricky Kirk and Charles Ballard at 903-583-6444.

Sincerely,

John Mraz
Contracting Officer

EXHIBIT
tabbies
"26"

July 17, 2003

Electronic Mail to John.Mraz@med.va.gov
& Regular Mail

John Mraz
Contracting Officer
Department of Veterans Affairs
Dallas Veterans Medical Center
4500 S. Lancaster Road
Dallas, TX. 75216

Re: Grot, Inc.
Contract No. V549P-609-2
Project No. B01-114
Replace Fire Alarm System

Subject:

Dear Mr. Mraz:

This will acknowledge receipt of your letter of July 17, 2003 regarding the disarming of the fire alarm system in Building 1, Sam Rayburn Medical Center, Bonham, Texas. While I do not agree with your letter that Building 1 did not have fire alarm protection, Grot does acknowledge that it appears that temporary pull stations were not installed as they should have been. We apologize for this oversight and assure you that it was not intentional. For your information, this issue will be corrected before Grot leaves the job site today. In addition, we are administering a "fire watch" until the pull station issue is resolved.

In the light of these events, procedures are now in place to prevent this from ever happening again. However, I do want to assure you that Building 1 was not without fire alarm protection. Smoke alarms, strobes and other visual fire alarm protection were present. All that was lacking were the pull stations.

EXHIBIT
tabbles
"27"

For the record, Grot did notify the VA of its intention to work in Building 1 by e-mail to Ricky Kirk, COTR, last week. We do not know why the VA did not receive notification.

Again, while there was fire alarm protection available, it does not excuse the failure to install the pull stations. We acknowledge this error and are moving to correct it and make sure it does not happen again.

We would appreciate the VA's patience with us on this matter.

Sincerely,

GROT, INC.

Jerry Grot

JG:dmc

**DATE:** July 17, 2003

**SUBJ:** Replace Fire Alarm System
Contract #V549C-599-1
Project #B01-114
Grot Incorporated, Contractor

**TO:** Mr. Jon Evans
Contractor's On-site Supervisor

**FROM:** Rickey L. Kirk
Contracting Officer's Technical Representative

Mr. Evans,

It has been determined that there is inadequate fire safety coverage in Building 29, Nursing Home Care Unit, as per NFPA 101, chapters 18 and 4, and our letter to your home office dated August 23, 2002. This inadequate coverage we believe poses a threat to life and limb of the occupants of said building.
Therefore, upon my authority as Contracting Officer's Technical Representative, I do hereby direct you to either:

Set up a fire watch within Building 29, that will be maintained 24 hours a day until required coverage has been installed and functioning.

Or you may install a temporary system within Building 29, which would include 4 smoke detectors in each wing of Building 29, until required coverage has been installed and functioning.

Rickey L. Kirk

Rickey L. Kirk
Contracting Officer's Technical Representative.

EXHIBIT
"28"

Grot Incorporated Est. 1988

*Electrical & Technology Contractors*

324 Henry Street
Lexington, Kentucky
40508-1215

Telephone: (859) 254-3848
Facsimile: (859) 254-3847
Toll Free: (888) 254-3847
Website: www.grotinc.com

To: VA North Texas Health Care System
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

Date: 4/29/2003

Doc No. 26
Project: Bonham Tx.-VA.
2002.006
Sam Rayburn Memorial East Ninth
Bonham, Tx 75418

Attn: John Mraz
Subject: Response to Letter Dated April 8. 2003
Design of Building 29.

Dear John Mraz:

It is Grot Inc's. position that the request for additional smokes request to be furnished in this building in the corridor is not a requirement for the design. You have quoted the NFPA, 101 Chapter 4, Subparagraph 4.6.7 which states: "Any alteration or any installation of new equipment shall meet, as nearly as practicable the requirements for new construction." Grot Inc has not altered any aspect of this building and the new equipment does meet as nearly as practicable the requirements for new construction. Therefore the new smoke detectors will not be provided unless a modification is provided to Grot Inc.

In numerous previous letters and emails Grot Inc. invited the Government to attend meetings to discuss design and layout of each building, and the Government has refused to attend. To go back and redesign this building for the THIRD time is absurd. Therefore, if you are not in agreement with my position on this matter I am requesting a Contracting Officers final decision.

Sincerely,
Grot, Incorporated

Jerry N. Grot

Jerry Grot
President

cc: Andrew J. Kilpatrick, Gore, Kilpatrick, Purdy & Metz

EXHIBIT
"29"
tabbles'

HUBZone Historically Underutilized Business Zone
ABC
IEC Independent Electrical Contractors, Inc.
GSA Schedule Contract GS-35F-0358L

Grōt incorporated Est. 1988

*Electrical & Technology Contractors*

324 Henry Street
Lexington, Kentucky
40508-1215

Telephone: (859) 254-3848
Facsimile: (859) 254-3847
Toll Free: (888) 254-3847
Website: www.grotinc.com

To: VA North Texas Health Care System
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

Date: 5/27/2003

Doc No. 30
Project: Bonham Tx.-VA
2002.006
Sam Rayburn Memorial East Ninth
Bonham, Tx 75418

Attn: John Mraz
Subject: Building 29 redesign.

Dear John Mraz:

I have not received any response from you or your office on the letter I sent on April 29, 2003 on said subject. Since that letter I have been researching this issue. I have found that the article quoted Sub-Paragraph 4.6.7 is out of the NFPA 101 2000 edition and not the NFPA 1997 as listed in the specification book. Upon additional research into this matter I have found that in the Annex A of the NFPA 101 2000 edition there is an example of what is intended by 4.6.7 and the person or persons giving you advice on the matter has miss quoted the section. Please review this section of the Annex and give me some clarification if you agree or not. If you do agree and additional smokes are wanted by others, please advise and I shall price the additional work and submit a price for change.

I have included a copy of the Annex A for your review and approval.

Sincerely,
Grot, Incorporated
Jerry N. Grot
Jerry Grot
President

cc: Andrew J. Kilpatrick, Gore, Kilpatrick, Purdy & Metz

EXHIBIT
tabbles
"30"

HUBZone Historically Underutilized Business Zone

ABC

IEC Independent Electrical Contractors, Inc.

GSA Schedule
Contract GS-35F-0358L

**DATE:** July 20, 2003

**SUBJ:** Replace Fire Alarm System
Contract #V549C-599-1
Project #B01-114
Grot Incorporated, Contractor

**TO:** Mr. Jon Evans
Contractor's On-site Supervisor

**FROM:** Rickey L. Kirk
Contracting Officer's Technical Representative

Mr. Evans,

It has been determined that the existing new installation of fire alarm equipment and the temporary fire alarm system in Bldg. 1 is inadequate fire safety coverage at the Sam Rayburn Memorial Veterans Center, as per NFPA 101, chapters 18.1 thru 18.7.9.2 and 9.6.1 thru 9.7.6.2, and our letter to your home office dated August 23, 2002. This inadequate coverage we believe poses a threat to life and limb of the occupants of said Medical Center.
Therefore, upon my authority as Contracting Officer's Technical Representative, I do hereby direct you to:

Set up a fire watch within Buildings 1, 2, 3, 24 and 29, that will be maintained during all non-duty hours, "4:30pm to 8 am", weekends and holidays, until said systems meet the requirements of NFPA 72 and 101 and the contract specifications.

This fire watch will consist of personnel on foot patrol throughout buildings listed above and every floor of said buildings during every two-hour period. A written log will be maintained and given to the C.O.T.R. at the beginning of each business day.

Additional instructions for foot patrols will be given verbally by me to you.

An additional letter with specific deficiencies listed will be provided to your home office from me through the contracting officer.

Rickey L. Kirk

Rickey L. Kirk
Contracting Officer's Technical Representative.

EXHIBIT
"31"

**Andy Kilpatrick**

**From:** "Jerry Grot" <grot12@grotinc.com>
**To:** "John P Mraz (E-mail)" <John.Mraz@med.va.gov>; "Rick Kirk (E-mail)" <rickey.kirk@med.va.gov>; "jon (E-mail)" <jon@grotinc.com>; "clyde (E-mail)" <clyde@grotinc.com>; "Nick" <nick@GROT.LOC>; "Andy Kilpatrick (E-mail)" <akilpatrick@hgglaw.com>; <scott.mccaule@sbt.siemens.com>; <damerigo@aol.com>
**Sent:** Sonntag, 20. Juli 2003 16:48
**Subject:** Requested Meeting

jerry@grotinc.com wrote:

July 20, 2003

Department of Veterans Affairs
Dallas Veterans Medical Center
4500 S. Lancaster Road
Dallas, TX. 75216

Re: Requesting an on site meeting for July 22 @ 2:00 cst.

Dear Mr. Mraz:

Due to concerns of both Grot Inc. and the Veterans Medical Center I am requesting a meeting between you and your staff at the job site to review concerns and misunderstandings on the project. I must insist that the contracting officer's technical representatives, and you as the contracting officer with finial decision be present at this meeting so you and I may come to an understanding and complete this project. In the event I do not receive any correspondence from you, by noon on July 21, I will schedule myself and my personal to be present at the COTR's office to conduct this meeting at 2:00 job site time.

I thank you in advance for your attention on this matter.

I Remain

Jerry Grot
President

Grot Inc.

EXHIBIT
tabbies
"32"

**Harrison, Melvin**

| | |
|---|---|
| From: | Mraz, John P. |
| Sent: | Tuesday, July 22, 2003 4:19 PM |
| To: | Kirk, Rickey L.; Sprouse, Cojean C. |
| Cc: | Ballard, Charles; Brown, Kendrick D.; Harrison, Melvin |
| Subject: | RE: HELP!! Fire Alarm |

Charles:

Do you want to have a meeting? If the answer is no, we won't have one. Furthermore, we'll decide if a meeting should be scheduled, not Grot. Moreover, we'll decide when the meeting will be held and whom to invite.

Ricky:

I inform Grot of the above. If he wants to schedule a meeting tell him to contact me and I'll seek Charles approval.

In addition, I've attached a copy of the letter that I sent Grot about the "fire alarm watch".

Thanks to all,

John

I'll get back to everyone tomorrow.

Grot Fire Watch Notice July 22...    Grot's Redemy Letter Number 2 ...

-----Original Message-----

| | |
|---|---|
| **From:** | Kirk, Rickey L. |
| **Sent:** | Tuesday, July 22, 2003 2:59 PM |
| **To:** | Mraz, John P. |
| **Cc:** | Ballard, Charles; Brown, Kendrick D.; Harrison, Melvin |
| **Subject:** | HELP!! Fire Alarm |

John,
Mr. Jerry Grot has called me 7 times trying to set up a meeting. Until I am directed otherwise I can't say yes or no. I just got off the phone with him and he says he has already bought flight tickets for him and his attorney for a meeting tomorrow.
Somebody please call him and tell him something. (859) 254-3848 ext. 206.

Thank You,

Rickey Kirk

PLAINTIFF'S EXHIBIT 27

tabbies

G- 002961

July 24 2003

Fr Mraz, John P.
S Tuesday, July 22, 2003 11:32 AM
T Kirk, Rickey L.; Harrison, Melvin; Ballard, Charles; Sprouse, Cojean C.
C Brown, Kendrick D.; Forner, Chris
S ct: RE: Fire Alarm Meeting

July 22 / 11:32 A.M

Received! You'll hear from me within the nex hour. Thanks to all,

John

-----Original Message-----
**From:** Kirk, Rickey L
**Sent:** Tuesday, July 22, 2003 11:30 AM
**To:** Harrison, Melvin; Ballard, Charles; Mraz, John P.; Sprouse, Cojean C.
**Cc:** Brown, Kendrick D.; Forner, Chris
**Subject:** RE: Fire Alarm Meeting

Charles,
Mel means deficiencies not defiance. I agree with Mel's statement.

-----Original Message-----
**From:** Harrison, Melvin
**Sent:** Tuesday, July 22, 2003 11:26 AM
**To:** Ballard, Charles; Kirk, Rickey L.; Mraz, John P.; Sprouse, Cojean C.
**Cc:** Brown, Kendrick D.; Forner, Chris
**Subject:** RE: Fire Alarm Meeting

CHARLES:
I suggest we give them some of the defiance but not all of them they are determined that they are in code compliance in all the other bldg's so they along with va personal should conduct a pre test of the bldg's as mentioned in the contract under test. Page 13850-26 section 3.5 paragraph C. Rick how do you feel about this ?

-----Original Message-----
**From:** Ballard, Charles
**Sent:** Tuesday, July 22, 2003 11:04 AM
**To:** Kirk, Rickey L.; Mraz, John P.; Harrison, Melvin; Sprouse, Cojean C.
**Cc:** Brown, Kendrick D.; Forner, Chris
**Subject:** RE: Fire Alarm Meeting

This meeting has been cancelled but Mr. Grot still wants to meet. I suggest we tell him before a meeting a can be conducted he must in good faith get the system temporairy activated. We can give him a list as to what needs to be done. Rick and Mel, I need your input.

Charles

-----Original Message-----
**From:** Kirk, Rickey L
**Sent:** Sunday, July 20, 2003 7:52 PM
**To:** Ballard, Charles
**Cc:** Brown, Kendrick D.; Forner, Chris
**Subject:** Fire Alarm Meeting

Charles,
I miss read the e-mail from Grot. He's requesting the meeting for Tuesday the 22nd.

Rick

PLAINTIFF'S EXHIBIT 23



G- 003547

**Andy Kilpatrick**

**From:** <grot12@iglou.com>
**To:** "Mraz, John P."
**Sent:** Mittwoch, 23. Juli 2003 16:09
**Subject:** Re: Letter Fire Watch 7/23/03

jerry@grotinc.com wrote

Please be advised that Grot is complying with your directive to maintain a fire watch as directed in the COTR's letter of July 20th. However, Grot disputes the decision and is performing the fire watch under protest and will pursue recovery of all cost and expense incurred as aresult of the directive when same is fully determined.

Grot is performing the fire watch in accordance with the instructions and training provided by the COTR. However, your letter seems to indicate that Grot is not performing the fire watch per your interpretation of what is required. If you contend that Grot is not performing the fire watch according to the specifications, then this letter is to specifically request that you provide Grot with a detailed explanation of where Grot's performance of the fire watch is deficient. You can not simply state that a specific action "is not a permanent solution to the problem" without clarification.
The government can not sit idly by and allow a contractor to perform a task which the government knows to be deficient without advising the contractor of what the contractor is doing wrong; that case law is well settled.

If you still maintain that Grot is not performing properly, please advise as to where Grot is deficient and we will consider your position.

I Remain

Jerry Grot
President

-----Original Message-----
From: "Mraz, John P." <John.Mraz@med.va.gov>

EXHIBIT
tabbles
"34"

24.07.2003

**Andy Kilpatrick**

**From:** "Mraz, John P." <John.Mraz@med.va.gov>
**To:** "'Nick'" <nick@GROT.LOC>; <jerry@grotinc.com>; "Clyde" <clyde@GROT.LOC>; "Andy Kilpatrick (E-mail)" <akilpatrick@hgglaw.com>; "Mraz, John P." <John.Mraz@med.va.gov>; "jon (E-mail)" <jon@grotinc.com>; "Kirk, Rickey L." <Rickey.Kirk@med.va.gov>; "Scott McCauley (E-mail)" <scott.mccauley@siemens.com>; "Sprouse, Cojean C." <Cojean.Sprouse@med.va.gov>; "Brown, Kendrick D." <Kendrick.Brown@med.va.gov>; "Ballard, Charles" <Charles.Ballard@med.va.gov>
**Sent:** Mittwoch, 23. Juli 2003 08:49
**Subject:** RE: Second requested meeting for July 23, 2003

Dear Jerry Grot:

I see no need to hold a meeting at this time.

Sincerely,

John Mraz
Contracting Officer

-----Original Message-----
**From:** Jerry Grot [mailto:grot12@grotinc.com]
**Sent:** Tuesday, July 22, 2003 4:18 PM
**To:** Clyde; Andy Kilpatrick (E-mail); John P Mraz (E-mail); jon (E-mail); Jon C. Evans (E-mail); Rick Kirk (E-mail); Scott McCauley (E-mail); Jerry Grot (E-mail)
**Subject:** Second requested meeting for July 23, 2003

To: VA North Texas Health Care System
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

Date: 7/22/2003
Doc No.: Corr-12
Project: Bonham Tx.-VA 2002.006
Sam Rayburn Memorial
East Ninth
Bonham, Tx 75418

Attn: John Mraz

Subject: Second Request for Meeting on July 23, 2003 at 2:00 pm

Dear John Mraz:

EXHIBIT "33"

Due to the fact I have not received a response from the Veterans Medical Center again today concerning the requested meeting on July 23, 2003. I am once again requesting the meeting between the Veterans Medical Center and Grot Inc. at either the Dallas or Bonham location. I can only stress the urgency of this meeting to take place. I realize this is short notice, however if I can mobilize the Grot Inc. team and subcontractors, I am sure the Veterans Medical Center can schedule an hour to two hour meeting at one of these locations.

Since both Grot Inc. and the Veterans Medical Center have concerns, I am requesting a meeting between you and your staff at the job site to review concerns and misunderstandings on the project. I must insist that the contracting officer's technical representatives, and you, as the contracting officer to make final decisions, be present at this meeting so you and I may come to an understanding and complete this project. You may be able to reach me on my cell phone at 859.621.3262 or 859.536.1376 on July 23, 2003 after 8:45 am CST as I will be located in Dallas.

Sincerely,
Grot, Incorporated

Jerry Grot
President

cc: Andrew J. Kilpatrick, Gore, Kilpatrick, Purdy & Metz

July 23, 2002

Mr. Jerry Grot
Grot Incorporated
688 Grot Drive
Lexington, KY 40508

SUBJ: Contract #V549C-609-2 Design/Install Fire Alarm-Bonham, TX

**SHOW CAUSE NOTICE**

Dear Mr. Grot:

Since you have failed to make progress and make repairs to the Fire Alarm System in Buildings 1, 2, 3, 24 and 29 at the Sam Rayburn Veterans Memorial Hospital, Bonham, TX as directed in our letter of July 17, 2003 and the above contract, the Government is considering terminating the contract under the provisions for default of this contract. On July 17, 2003 it was discovered by our Engineering Service that your company had disarmed the fire alarm system in Building 1 without notifying the VA as required by the above contract. On July 17, 2003, you were directed to correct the problem immediately and Mr. Jon Evans, Grot Project Manager, was contacted and a Fire Watch was initiated. On July 20, 2003 an inspection of all the above buildings was done by the VA Safety Manager and Engineering. It was determined that the work under this contract is approximately 59% complete and does not meet Contract Specification 13850, Paragraph 1.1, sub-paragraph B which states, "The fire alarm system shall comply with requirements of NFPA 101." The contract was awarded on 2-1-02 with a completion date of 11-10-02. On 11-2-02 a time extension to 6-23-03 was granted. To date these problem have still not been corrected and accordingly, you are given the opportunity to present in writing, any facts bearing on the question to:

John Mraz, (90c)
VANTHCS
4500 S. Lancaster Road
Dallas, TX 75216

tabbles
EXHIBIT
"35"

within10 days after receipt of this notice to include a schedule to complete the above contract. Your failure to present any excuses within this time may be considered as an admission that none exist. Your attention is invited to the respective rights of the Contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for default.

Any assistance given to you on this contract or any acceptance by the Government of delinquent goods or services will be solely for the purpose of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract.

John Mraz
Contracting Officer

Cc: Travelers Casualty & Surety Company of America

jerry@grotinc.com wrote:

Grot Inc.
324 Henry St
Lexington, KY 40508
859.254.3848
859.254.3847

July 31, 2003

Electronic Mail to John.Mraz@med.va.gov
& Regular Mail

John Mraz
Contracting Officer
Department of Veterans Affairs
Dallas Veterans Medical Center
4500 S. Lancaster Road
Dallas, TX. 75216

Re: Grot, Inc.
Contract No. V549P-609-2
Project No. B01-114
Replace Fire Alarm System

EXHIBIT
tabbies
"36"

Subject: Show Cause Notice of July 23, 2003

Dear Mr. Mraz:

This will acknowledge receipt of your Show Cause Notice dated July 23, 2003. Please be advised that Grot takes specific exception to the issuance of this letter and presents the following "reasons" and not "excuses" that the project was not completed by the revised completion date.

First, with respect to the disarming of the fire alarm system in Building 1, it is incorrect to state that Grot did not comply with the contract documents. Jon Evan e-mailed Ricky Kirk advising of Grot's intent to disarm the system. Apparently, Mr. Kirk was out of the office and did not receive the e-mail prior to Grot performing this work. While Grot has acknowledged that the temporary pull stations were not present, Grot immediately responded to the issue, corrected the issue and at no time was anyone at danger of not having adequate fire protection. **At all times**, Building 1 was provided with fire protection in accordance with this contract.

Notwithstanding, Grot instituted a fire watch as required by your letter of

July 17th, which Grot believes to have been unnecessary under NFPA 7.6.1.8 and 7.6.1.9.

Your letter states that the work performed does not meet the requirements of "NFPA 101". However, your letter offers no explanation as to where this project is deficient as to NFPA 101. It is well settled that a cure notice must specify the progress failures in sufficient detail to enable a contractor to effectively utilize its opportunity to cure. It must be specific enough to enable the contractor to remedy the deficiencies. *Composite Laminates, Inc. v. U.S.*, 27 Fed.Cl. 310 (1992). For example, a cure letter that advised a contractor to submit "acceptable shop drawings" was held not to have described with any degree of specificity that which must be done to make the drawings acceptable. It was declared insufficient notice. *Insul-Glass, Inc.*, GSBCA 8223, 89-1BCA ¶ 21361. A cure notice which fails to set forth existing problems or current deficiencies that the contractor can correct is similarly deficient. *Brandywine Prosthetic-Orthotic Sbc., Ltd.*, VABCA 3441, 93-1BCA 22250.

To simply state that the work does not meet the specifications without more is insufficient under the above authority. Accordingly, Grot considers the Show Cause Notice to be deficient as to claims that Grot's performance does not meet the requirements of NFPA 101.

In addition, this finding is refuted by Siemens which has on more than one occasion certified that the project is being designed pursuant to NFPA 101. As you know, Siemens' designs were reviewed and approved by FRATTO Engineering. This letter is to specifically request a listing as to where the design does not comply with NFPA 101.

I remind you that in the last several months your office has issued notices to Grot citing paragraphs from NFPA 101 which are from the wrong edition. For example, with respect to the Building 29 redesign, you quoted sections out of the NFPA 101, **2000 edition**. The specifications require utilizing NFPA 101, 1997 edition. This is not the only case in which this has occurred. Another example is the VA's letter of July 17th in which Grot was advised that Building 29 had inadequate fire protection as per NFPA Chapters 4 and 18. However, as cited in the letter, Chapter 4 refers to "Classification of Occupancy and Hazard of Content" and Chapter 18 is applicable to "New Apartment Buildings". This was addressed to you in our letter of May 27th to which we have no response.

In a subsequent letter of July 20th, the VA refers to the same Chapter 18 again and also references 9.6.1 through 9.7.6.2. Neither 9.6.1 through 9.7.6.2. exist in the 1997 edition. Thus, in responding to our request for specifics as to where the work does not meet specification, please be certain to reference the correct edition of the NFPA.

As stated in your letter, this project was awarded on February 1, 2002 with an original completion date of November 10, 2002. Work was proceeding on the

project until on or about August 23rd when Mr. Kirk issued his letter determining that Grot was responsible for design of the entire system.

Grot protested that decision and still protests that decision and will seek the cost and expense incurred as a result of that decision.

Notwithstanding, following your letter of September 17th, Grot, in association with Siemens, began redesign of this project. I need not remind you that Mr. Kirk's determination was not made until almost seven (7) months after construction on this project had begun. Delays associated with the redesign of this project severely impacted the completion date and made completion by the original completion date impossible.

In addition, Grot has issued several letters requesting information and direction from your office without which Grot cannot proceed. For example, drawings for Buildings 3, 4, 5, 6, 7, 8, and 11 were received by the VA on November 12, 2002. By letter of December 13th, Grot was inquiring as to the status of the drawings. Further, Grot warned the VA that delay in approving the drawings would delay completion of the project. According to Mr. Kirk, the drawings were not timely reviewed because other VA personnel were busy with other issues at the VA facility in Dallas. Where the contract requires the VA to review and approve the contractor's drawings, the contractor is justified in delaying work covered by the drawings until the VA's approval is received. *T.C. Bateson & Co.*, ASBCA 4718, 58-2, BCA ¶1896. Additional requests for information were made in letters dated October 1, 2002, October 18, 2002, April 29, 2003 and May 27, 2003 and email dated January 22, 2003.

Where a contractor's requests or inquiries are prompted by ambiguous drawings or conflicting instructions, the obligation to provide a quick response is clear. *Clay Bernard Systems Int., LTD. v. United States,* 22 Cl.Ct. 804 (1991).

In the past few weeks, Grot has received verbal direction from VA representatives to add additional devices which are not shown on the approved drawings or, for that matter, the original plans and specifications. Grot has repeatedly requested that these directives be in writing. As Grot has provided a design that is pursuant to NFPA 101, Grot disputes the necessity of the additional devices. Further, Grot has advised your office that it does not believe that it has the authority to unilaterally change approved drawings. In response, VA representatives provided Grot with a copy of "FAR 52.236-21". The VA's reliance on this FAR is misplaced. This is a general FAR that ties the drawings and specifications together. It does not require the installation of devices which are not a part of the scope of work.

Further, and just as important, this FAR applies to **government provided drawings.** I remind you again, Grot has redesigned this project per your directive. The drawings being used for construction are by Siemens/Grot and

approved by FRATTO Engineering. There is no further discrepancy.

In addition, this FAR specifically provides for the directives to be in writing. It states in pertinent part as follows:

> "In case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination **in writing**. **Any adjustment by the Contractor without such a determination shall be at its own risk and expense.** The Contracting Officer shall furnish from time to time such detailed drawings and other information as considered necessary, unless otherwise provided". (Emphasis added).

Representatives of the VA have refused to provide written directive to install the disputed devices. This is not in compliance with FAR 52.236-21 and could be considered a breach of contract by the VA.

In an e-mail to my office of July 29th from Cojean Sprouse, she stated that the "approved drawings" were for "General Arrangement" only. In making that statement she relied upon a stamp placed on the drawings by Mr. Kirk. Mr. Kirk is the COTR and not the design engineer of this project. He is neither a NICET Level III technician nor a fire protection engineer. A closer review of the plans will reflect a stamp from FRATTO Engineering which says as follows:

> "Fabrication/installation may be undertaken. Approval does not authorize changes to the Contract Sum or Contract Time.

**Approval**

> **is for conformance with the design concept of the project and with the information given in the Contract Documents**, this Approval does not extend to accuracy of quantities or dimensions, designs by contract shop fabrication processes, field construction techniques and safety, or coordination of trades and their work." (Emphasis added).

This stamp verifies that the design provided by Grot meets the requirements of the contract documents. For the VA to now say that additional devices are necessary or that the drawings prepared by Grot do not meet the contract documents, is contrary to the determination made by the VA's expert. Again, these drawings are prepared by a NICET Level III technician and approved by the VA's engineers. None of the individuals giving direction on this

project to install additional devices or to change the approved drawings meet either of these qualifications.

Notwithstanding, Grot has proceeded in accordance with written direction from your office to install certain additional devices. It will continue to follow such written direction, albeit under protest, However, the VA cannot default Grot for installing a project in accordance with approved drawings simply because the VA wishes additional devices installed.

As of the preparation of this letter, testing is ongoing on the correction of the alleged deficiencies provided by Mr. Kirk on July 23rd. I am advised that your representatives have indicated to my project superintendent that they will "fail" the elevator recall test because there are no smoke detectors at the top of the elevator shaft. Neither the drawings provided by FRATTO nor Grot's redesign of this project reflect elevator shaft smoke detectors. These will be additional devices. Again, if the VA wishes those devices installed, a written directive should be issued. For the record, it is my understanding that the elevators recalled as required when tested. Again, you cannot default terminate a contract when construction is in accordance with approved drawings.

I am also advised that during the testing today, an issue arose as to tampers that were not shown on any of the drawings provided by Grot. In addition, there was a problem finding the Inspector's Test Valves to test flows. The VA's representatives indicated that they would fail Grot on the test even though we had no knowledge of these issues.

Incredulously, Mr. Kirk then produced a set of drawings which had this information; drawings that were never made available to Grot. The VA has had information which it knew was of benefit to Grot and never produced it except to use it to attempt to justify a test failure.

I do not need to remind you that this was exactly the type of information requested in Grot's letter of October 18, 2002 following the directive to redesign the project. In item 4 of that letter Grot requested "correct building mechanical drawings". In item 6, Grot requested "correct fire protection sprinkler drawings". The VA never provided the drawings it now relies on to test the system. In fact, the VA never even responded to the request.

It is long settled case law that If the government, VA, possesses material knowledge regarding the performance of a contract which it knows the contractor does not possess, it is under a duty to disclose its superior knowledge. *J.A. Jones Construction Co. v. United States*, 182 Ct. Cl. 615, 390 F.2d 886 (1968). It can not use that superior knowledge or fail to disclose that knowledge to ambush a contractor. In addition, superior knowledge means that the VA knows some critical facts not known or available to Grot, that Grot can not obtain these facts from sources outside of the VA and **the VA withholds the facts from the Grot.**

*Santa Fe Engineers, Inc.*, ASBCA No. 17,235 75-2, BCA ¶11,570. The failure to provide the drawings is inexcusable. To use the drawings now to try and discredit Grot's work borders on bad faith.

It is well established that the government warrants the adequacy of its plans and specifications to the extent that compliance with them will result in satisfactory performance. *American Line Builders, Inc. v. United States*, 26 Cl.Ct. 1155, 1193 (1992), *United States v. Spearin*, 248 U.S. 132 (1918). This implied warranty is not overcome by clauses requiring the contractor to inspect the site, to check plans and assume responsibility until work is completed. The contractor is not responsible for defects in the plans and specifications. *Sipco Services & Marine, Inc. v. United States*, 41 Fed.Cl. 196 (1998). Here, the plans were provided by the VA from the VA's design professional. Grot and every other bidder for the project relied on those plans. At no time did the VA indicate to anyone that they were not complete.

In this case, the specifications were drafted by the VA. That they are ambiguous is patently clear in that neither Grot nor the VA are in agreement as to the responsibility for the design of this project. As a result, the rule of *contra proferentum* will control. That is, the ambiguity will be construed against the party drafting the specification, the VA. Where the government has drafted the ambiguous specifications, a contractor is not required to exercise clairvoyance in determining its contractual responsibilities. *Corbetta Const. Co. v. United States*, 198 Ct.Cl. 712 (1972).

Further, the VA can not seek to avoid the warranty of specifications and drawings by including limiting language or special disclaimers. For example, the specifications, drawings or instructions may have been labeled "advisory", but it has been held that such language does not defeat the contractor's right to rely on the specifications. *Celesco Industries, Inc.*, ASBCA No. 18370, 76-1, BCA ¶ 11,766 at 56, 169; *Teledyne McCormick-Selph*, ASBCA No. 15664, 73-2 BCA ¶ 10,243 at 48,290. Thus, the COTR's reliance on the word "generic" in his determination that Grot was responsible for design will clearly fail and reliance on FAR 52-236-21 fails again if the FAR is the basis for a requirement of additional devices. Finally. Mrs. Sprouse's reliance Mr. Kirk's stamp likewise fails based upon this case law.

Similar findings have been made where specifications stated that the plans were for "information and use" in preparing bids and that the contractor was to insure that structural plans were "adequate for the intended purpose". The ASBCA held that the
contractor was still entitled to rely on the plans. *Bethlehem Steel Corp.*, ASBCA No. 13,341, 72-1 BCA ¶9,186. None of the provisions submitted to date is sufficient to shift the risk for the design of this project to Grot, yet, to avoid termination Grot provided the redesign.

Next, we are at a loss as to how the VA is determining that the project is only "59% complete". As of today, all buildings are on the network system

except Building 1 which has a temporary system in place. Further, with the exception of a few peripheral devices in each building, all devices required by the design are installed and the system is performing. Please provide the basis upon which the VA relies in making this determination.

Throughout the course of this project, the VA has been a minimum of sixty (60) days late in making payments to Grot. When payments were received, they did not contain prompt payment interest as required by the FARs. As of this response, Grot still has not been paid for its applications in April, May or June. While I acknowledge that it is a contractor's responsibility to provide adequate financing for contract performance, it is not the contractor's responsibility to fully finance the project. Failure to make required payments to the contractor has been held to constitute an excusable cause of delay. *Virginia Electronics Co., Inc.*, ASBCA 18,778, 77-1 BCA ¶12393, *United States Services Corp.*, ASBCA 8,291, 1963 BCA ¶3703. Further, excusable delay has been found where a contractor's financial incapacity is caused by acts or omissions of the government. *TCG Contracting Corp. v. United States*, 736 F2d 1512, 1515 (Fed. Cir. 1984), *Murdock Machine & Eng'g Co. v. United States*, 873 F2d 1410 (Fed. Cir. 1989).

Your letter threatens termination for default. Grot believes such a threat to be wholly unjustified. Notwithstanding the dispute over the design responsibilities, failure to make payment, the delays in responding to requests for information, the failure to respond to requests for information and the refusal to meet with Grot and its subcontractors, Grot has continued to try and complete this project. Grot has incurred a significant amount of cost and expense in trying to follow what Grot considers to be the VA's wrongful interpretation of its own plans and specifications. Grot is continuing to try and complete this project and as of this letter anticipates being complete by October 3rd using reasonable construction practices and assuming that there are no additional changes to the contract documents and Grot receives responses to its pending inquiries not later than August 11th. Under the circumstances, a default termination would do nothing but further delay and increase the VA's cost in completing this project.

Prior to any further directive being issued, Grot again requests a meeting with you, your COTR and anyone else that you believe appropriate. This meeting could fully address the outstanding questions and the schedule of performance in concluding this project. Grot has repeatedly requested this meeting and has repeatedly been denied this opportunity. At this juncture, Grot believes a meeting not to be just critical, but imperative. Please advise as to the VA's availability to meet on August 4th, 5th or 6th.

This will also reaffirm that my counsel will not be present in the meeting.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

GROT, INC.

Jerry Grot
President

August 7, 2003

North Texas Veterans Health Care System
Dallas Veterans Medical Center
4500 S. Lancaster Road
Dallas, TX 75216

Mr. Jerry Grot
Grot, Incorporated
324 Henry Street
Lexington, KY 40508

## Termination for Default

Subject: Contract V549P-609-2
Design/Install Fire Alarm System, Bonham, TX

Dear Mr. Jerry Grot:

You are hereby notified that your right to proceed with the work under Contract, V549P-609-2/ Design/Install Fire Alarm System Project for the Sam Rayburn Veterans Memorial Center, Bonham, TX awarded to Grot, Incorporated on February 1, 2002 is terminated. The effective date of the termination is August 8, 2003.

The decision to terminate your contract was made after I evaluated the history of Contract V549P-609-2 in its entirety, and is based on your failure to provide adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29 at the Sam Rayburn Veterans Memorial Center, Bonham, TX as directed in my letter of July 17, 2003; your failure to perform in compliance with the technical requirements of the contract; your failure to complete the contract by the extended completion date of June 23, 2003; and your failure, in your letter of July 31, 2003, to "Show Cause" to my Show Cause Notification Letter of July 23, 2003.

Therefore, in accordance with FAR Clause 52.249-10 your right to proceed with the work that has been delayed is terminated. Your delays and your failure to meet your contractual obligations are inexcusable.

The Contracting Officer's final decision to terminate your contract makes your request for a meeting moot and is denied. Thus, you are hereby directed to "Stop Work", terminate subcontracts and make no further shipment of contract building materials. Moreover, the Government may purchase the supplies or services terminated against the contractor's account and the contractor will be held liable for any excess costs. Furthermore, the Government reserves all its rights and remedies provided by law under this contract, in addition to charging excess costs.

Ricky Kirk, the Contracting Officer's Technical Representative, will contact you a few days after the effective terminate date of August 8, 2003 to schedule a meeting to ascertain ownership so that you can remove contractor property and cleanup the work site.



EXHIBIT
tabbles'
"37"

The Contracting Officer has determined that your failure to perform is inexcusable and that the notice of termination constitutes that decision. This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

The Department of Veterans Affairs Board of Contract Appeals (VABCA) is the authorized representative of the Secretary for hearing and determining such disputes. The rules of the VABCA are published in section 1.783, of Title 38, Code of Federal Regulations. The address of the Board is 810 Vermont Avenue, N.W., Washington, DC 20420.

JOHN MRAZ
CONTRACTING OFFICER

cc: Travelers Casualty & Surety Company of America

**SIEMENS**

**Fire Safety**

| | |
|---|---|
| Name | Lee F Bledsoe |
| Title | System Sales Representative |
| Telephone | (972) 929-5044 |
| Fax | (972) 915-3896 |
| Date | 1/8/02 |
| E-Mail | Lee.bledsoe@SBT.Siemens.com |

Attn: John Mraz
Company: Veterans Administration

Job Name: V.A. Bonham Fire Alarm Replacement Project
Proposal #: 2-340183-625
Addendum #1
Dated 12/21/01

Siemens Fire Safety is pleased to provide this Fire Alarm System proposal for the above referenced project.

Siemens Fire Safety will provide labor and materials to install a complete and operational MXLV addressable fire alarm and voice communication system control panels per the plans and specifications as designed by Fratto Engineering. Dated 3/0/01 and Revised on 12/6/01. We will install a Master FACU in building-11 that will communicate with the other FACU located in building 1,2,3,24 and 29. Building 11 FACU will also handle building 8,9,10,and 12. Building 3 FACU will handle building 4,5,6. Building 11 will have the Network Control Computer (NCC) and Printer that will receive all information from the FACU and the outer buildings. We will also provide sprinkler monitoring connections for sprinkler valves, tamper switches and water flow switches as required, elevator connections to equipment that is provided for and hvac connections and damper connections as shown on the plans and stated in the pre-bid meeting notes. We will also provide painting and patching of the walls, ceiling tile replacement as stated below in our exclusions. Activation of any fire alarm device will activate the speaker/strobe notification system per the building that the alarm is located in and send alarm device information to building 11 FACU, NCC and printer for alarm, supervisory and trouble in the system. Project is estimated as using the existing conduit were possible and panduit wired system. Conduits on the walls will be concealed were possible on board walls all concrete and solid plaster walls will be surface mounted with exposed panduit. We will also demo out the existing system conduit if not used and all devices and panels of the existing system. We expect that cad files will be provided. We expect that exiting site communications conduits can be utilized for Class-A Token ring communications loop.
In lieu of the specifications requiring the existing building fire alarm system to be operational while installation of the new building fire alarm system is installed. SBT will install a temporary smoke detection in the path of egress and strategically placed horn\strobes with alarm and trouble information being reported back to the main head end at the central plant. Proposal is based on normal working hours and a duration of 9-months of construction schedule. Any delay due to work stoppage by the VA or its Employees will be considered as a change order for the period of time delayed. We have included 3-year maintenance guarantee, performance bond, peer-to-peer configuration, digital voice messages per panel, factory training for VA personnel and spare parts.

**Base bid for building 1,2,3,4,5,6,8,9,10,11,12,24, & 29:**

| | |
|---|---|
| Our price for the Fire Alarm System equipment and Installation is: | $969,000.00 |
| Our price for the Bond is: | $15,657.00 |
| Our price for the Fire alarm system with bond is: | $984,657.00 |

**Exclusions:**

**Tax.**
**Phone Lines for Digital Communicator.**
**Mechanical system sail Switches.**
**Any Smoke Detectors required due to Beam Pocket Construction.**
**Final VA Code Approval Per Field Inspection (Added Devices).**
**Any consequential damages, loss of use. Loss of revenue and any third party consequential Damages. Damages shall be limited to coverage associated with this work performed Against Siemens Fire Safety.**
**Overtime.**
**Warranty of existing electrical work.**
**Temporary Power.**
**Asbestos Abatement.**
**Delay penalties and cost over runs due to Asbestos Abatement.**
**Cutting or patching of roof for penetrations if required.**
**Walls requiring new material such as vinyl wall covering limited to 20' running ft. of wall, with out additional cost.**
**Areas with non-replaceable materials (such as wood / old wall, tile, Etc.) to be replaced as Close as possible or repaired with new materials chosen by user within 3ft. area of repair.**
**Floor and tile repair area (around floor mounted door holder) to be limited to 9Sq. Ft. area.**
**Ceiling tile will be replaced with tile as close as possible, but may show lighter due to aging Of surrounding tile.**
**Used drywall materials in bid to repair plaster using backer board and fiberglass net tape.**
**Elevators that do not have recall shunt trip and recall light will not be provided with this materials.**
**Nicet level II project manager in lieu of Nicet Level III.**
**Maintaining 40Deg. F Temperature while working in the building.**
**Repairs to HVAC equipment & ancillary systems connected to FA system required to function as designed.**

With kind regards,

Siemens, Fire Safety
System Sales

*Lee F Bledsoe*

Lee F Bledsoe
System Sales Representative

**REQUEST FOR PROPOSAL TO DESIGN-BUILD**
(TITLE OF PROJECT)
(PROJECT NO.)
(LOCATION)

**A. PART I - GENERAL**

**A1. Scope Of Contract**

Provide all labor, materials, tools and equipment, and design-build services necessary for design and construction of a project described here in other specific tasks as further defined by this request for proposal (RFP).

Spec Writer Note: Insert title of project and define scope of design build and construction work.

**A2. Definitions**

A. Design-Build (DB) as defined by the Department of Veterans Affairs (VA) is the procurement by the Government, under one contract, with one firm or joint venture (JV) for both design and construction services for a specific project.

1. Contracting Officer: The services to be performed under this contract are subject to the general supervision, direction, control and approval of the Contracting Officer.
2. Project Manager: The Contracting Officer's representative responsible for administering contracts under the immediate direction of the Contracting Officer.
3. Resident Engineer: The Contracting Officer's authorized representative at the construction site. When more than one Resident Engineer is assigned to a construction project one is designated as being in-charge and is called the "Senior Resident Engineer". The Resident Engineer is responsible for protecting the Government's interest in the execution of the construction contract work. His duties include surveillance of all construction work to assure compliance with the contract documents, interpretation of the contract documents, approval of changed work, approval of all submittals, samples, shop drawings, etc. The Resident Engineer may issue change orders to the Contractor within the limitations set forth in his delegation of authority from the Contracting Officer.
4. Design Build Contract: This term, as used herein, refers to the Contract(s) to perform the design and construction of the project.
5. Contractor: This term, as used herein, refers to the contractor under this contract or the DB team.



tabbies
PLAINTIFF'S EXHIBIT
9
10/2/06

6. AE: This term, as used herein, refers to the Architect-Engineer firm(s)that are a part of the DB team, also referred to as DB/AE.
7. RFP/AE: The firm(s) directly hired by the VA for the preparation of the RFP Documents and to provide other technical assistance to the VA.

B. Selection Procedure - During the review of offers the VA may ask for additional information. The VA may initiate action to award a contract at any point after review of the offers. Therefore, offers should reflect the offeror's best terms both from a technical and cost standpoint. See **FAR 52. 215-1, Instructions to Offerors - Competitive Acquisition May 2001**.

C. Tentative Schedule:

| | | |
|---|---|---|
| Request for proposal issued | | |
| Pre-proposal conference | | |
| Proposal submitted | | |
| Contract award | | |
| Notice to proceed | | |
| Construction completion/final inspection/ custody receipt | | |

D. Schedule Objectives - The anticipated completion of this project is _____ days after "Notice to Proceed" (NTP). The proposed schedule may be shorter than this, see Part III, C3, 3c.

**A3. Cost Range**

The anticipated cost range for this project is between $_____ and $______.

**A4. Pre-Proposal Conference**

*Spec Writer Note: This conference is usually held at the project location or "parent" facility. The project manager arranges date, time, and place. Date should be minimum of one week after initial distribution of documents and sufficiently before bid date to allow for processing of any amendments initiated at the conference.

A pre-proposal conference will be held on (INSERT DATE, TIME, AND PLACE). All offerors, consultants, subcontractors, manufacturers and suppliers are invited to attend. The following agenda is furnished for this meeting:

1. Open meeting;
2. Review of project and design build method for construction contracting;
3. Specifications, Network analysis system and project phasing;
4. General requirements, Solicitation Documents and Offer Submission Procedure;
5. Review of "Buy American Act";
6. Questions and answers;
7. Close; and
8. Site walk through - attendance is optional.

**A5. Small Business Conference***

*SPEC WRITTER NOTE: Use this for projects with unrestricted bidding only, check with Office of Small and Disadvantaged Business Utilization for agenda.

**A6. Selection Criteria and Weightings**

A. General proposals will be evaluated and award will be made on the basis of both cost and technical considerations most advantageous to the government as per FAR Part 15. In descending order of importance evaluations will be based on cost, construction management, past performance, schedule and (small disadvantage business participation *). Responsibility determination will be made in accordance with **FAR 9.1, Responsible Prospective Contractors.**

*Spec Writer Note: Use this for unrestricted procurements only. See FAR 15.304 for dollar limits.

B. Technical Evaluations - All technical factors when combined are approximately equal in importance to cost or price. Evaluations will be based on the following technical weightings in descending order of importance:

*

60% - construction management including corporate project experience, personnel experience, technical/management approach

20% - past performance

10% - schedule

10% - small disadvantaged business participation**

*Spec Writer Note: Factors and % to be selected by the project manager based on specific project. FAR requires past

performance only on projects greater than $1 million.
**Spec Writer Note: Use this factor in unrestricted procurement specifications only.

C. Cost Proposal - Offerors are advised that if the technical proposals are essentially equal, award will be made on the basis of the lowest cost.

**B. PART II - RESPONSIBILITIES**

**B1. VA Team**

A. The RFP A/E team shall not be included as members of the offeror's DB team. The VA will retain their RFP A/E team for the remainder of the project's development for design and construction period review, and monitoring purposes. The RFP A/E team that produced the RFP documents is:

RFP/AE :

Consultants:

B. The VA team is also comprised of VA Office of Facilities Management and others at VA Headquarters located in Washington, DC, a Resident Engineer (R/E) who will be located at the construction site and VA medical center staff. The coordinator/manager of the VA team will be the R/E, who will have Contracting Officer authority.

**B2. Design-Build Team:**

A. The DB team includes all J/V partners, consultants and sub contractors to the one firm. The DB team shall provide Architectural and Engineering disciplines for the preparation of construction documents, and construction contractor capabilities for construction of the project.

B. If the DB Team A/E and contractor are a J/V (not one and the same firm) engineering and other technical consultants shall be subcontractors of

the J/V Architect - not the Design-Build construction contractor or sub contractors. If the DB Team A/E and contractor are one and the same firm (not a J/V) those consultants shall be subcontractors of DB firm not the construction subcontractors.

C. The RFP documents are intended to define existing conditions, certain required items, and design parameters to be included in the project. It is the DB Team's responsibility to complete the documents and construction in a manner consistent with the intent of the RFP documents within the required time period (contract length).

C. **PART III - PROPOSAL REQUIREMENTS**

C1. **General**

A. Proposals shall be based on solicitation documents issued for RFP Solicitation Number ______, Specification Number ____. Proposals will be in the format stipulated elsewhere in this section.

B. Proposals shall be received before __________. There will be no public opening of the proposals.

C. Submit sealed offers to:

1. US Postal Service Deliveries:

____________, Contracting Officer (183B1,B2, & B3)
Office of Facilities Management
Department of Veterans Affairs
810 Vermont Ave, NW
Washington, DC 20420; OR

2. Commercial Delivery Services / Hand Carry (Monday- Friday, 7:30 am to 4:30 PM):

_________, Contracting Officer
Office of Facilities Management
Department of Veterans Affairs
811 Vermont Ave N.W, Room 539
Washington, DC 20005.

D. Technical and Cost sections of the Offers proposals will be evaluated independently. Offeror shall separately bind each section. Each section must therefore be labeled with the Offeror's organization, business address, and VA Project Number. Offerors shall affix their names and return addresses on their envelope/packaging. E. Carefully follow "Instructions, Conditions, and Notices to Offerors". **Optional Form 308 (Solicitation and Offer – Negotiated Acquisition)** shall be used for submitting cost offers. Submit original and four copies of **Optional Form 308** with a bid guarantee as stipulated in the Section "Instructions, Conditions, and Notices to Offerors":

1. Offeror shall submit separate prices for any Bid Items indicated on the RFP Offer and award;
2. Offeror shall include all required Representations and Certifications; and acknowledge receiving amendments by number.

C2. **Proposal Revisions (FAR 52.215-1)**

A. If determined to be necessary, proposal revisions will be requested from the proposals received. The Contracting Officer will identify those offerors, whose proposals are within the competitive range, considering the selection criteria identified in this section. Negotiations may be conducted with those offerors falling within the competitive range, after which proposal revisions will be requested. Those selected as within the competitive range will be given 7 calendar days to prepare their proposal revisions. Sealed proposal revisions will be submitted as per Part III.C1.C, above, except as noted below and will be due at a time and place to be determined.

B. Offerors submitting proposal revisions will not be requested to re-submit any documents which are unchanged from their initial proposals. They should provide necessary changes to individual paragraphs, as briefly as possible, together with a table of contents, that clarifies where within the initial proposal the additional information or changed documents would be placed. Proposal revisions shall include a completed **Optional Form 308 (Solicitation and Offer – Negotiated Acquisition** and Optional Form 309 Amendment of Solicitation that acknowledges receiving all amendments, by number. A new bid bond shall be submitted only if the final proposal revisions offeror's price proposal is greater than it's initial price proposal.

C3. **Technical Proposal Requirements**

A. The proposal shall address the following evaluation factors. Evaluation scores will be based, in order of importance, upon the criteria in Part I, A6:

1. Construction Management:
   a. Corporate Project Experience - The Offeror shall demonstrate corporate experience with no more than three projects completed within the last five years by a Design Build contract (Design Build as defined by the VA, see article A1.2) and/or contract similar in size and scope to this project. Scoring will be more favorable if both criteria are met. In describing project design and construction experience, provide the following information:

1) Project title, location and brief description including the building use (Medical Facility etc) and contracting method (design build, design bid construct, CM at risk etc).
2) Project owner and name and telephone number of owner's contact person.
3) Project Design Architect and Engineers (consultants if utilized) and name and telephone number of contact person(s). **Note each firm and employee also proposed for this solicitation.**
4) Project Prime Contractor and Major Subcontractors and name and telephone number of contact person(s). Note each firm and managing persons (project manager/superintendent/foreman as the case may be) also proposed for this solicitation.
5) Project Statistics including start and completion dates (original vs. actual) for design and construction; cost (with brief explanation of what is included in the cost); square footage; foundation type; number of levels; and any awards (prizes) received.

b. Project Personnel Experience (Specialized experience and technical competence). The Offeror shall demonstrate the relevant experience of key project personnel.

1) Biographical data shall include the following:
   a) Name of individual.
   b) Company employed by.
   c) Company position title.
   d) Years with the company.
   e) Describe work experience with projects that; were completed by the design build process, were medical facilities and the company (by name) they worked for when involved in the project.
   f) An indication of which (if any) projects submitted under Corporate Experience (above) the individual participated in and what the individuals responsibility was for that project.
   g) An indication of which other individuals submitted under Project Personnel Experience this individual has worked with and the project they worked on together, noting if that project has been submitted under Corporate Experience (above).

h) Position that the individual will hold in regard to this contract/project team, description of duties and what percentage of the individual's time would be committed to the project during both the design and construction phases.

i) Describe job related educational experience including degrees, certificates etc and granting institutions.

2) Supply this biographical data for key personnel for at least the following: (Note if one individual is proposed for more than one position listed):

a) Overall Project Manager.

b) (Architect) Design Project Manager.

c) Construction Project Manager.

d) Architect/Engineer Field Representative.

c. Technical/Management Approach - The Offeror shall demonstrate the following, relevant to the subject procurement.

1) Project Delivery Philosophy - Include expectation statements concerning:

(a) Elements for Successful Partnering: Communication, Commitment and Conflict Resolution.

(b) Proposed Design Period Peer Review technical/administrative by VA & RFP AE).

2) Quality Assurance/Quality Control Plan

3) Project Organizational Chart and Narrative - Include team members submitted under Project Personnel Experience above. Clearly describe the prime responsible firm (or firms if a J/V) and individuals as well as the roles and responsibilities of individuals proposed as consultants and sub contractors. Provide a list all consultants and all proposed major subcontractors, including telephone number, address, and name of contact.

4) Capability to perform:

(a) Provide the offeror's total bonding capacity, current available bonding capacity and expected available capacity in 1999.

(b) Provide the offeror's current workload and availability of adequate staff listed under Project Personnel Experience to manage the project. Include project schedules for current and pending projects, as well as the anticipated impact of this project on those schedules and staffing plans.

5) The Offeror shall describe in a written narrative the plan for phasing the work so that the facility remains operational while utilities and access roadways are realigned. The narrative will also detail how the contractor intends to prepare the site, disassemble, relocate, reassemble, and reactivate utility services to the facility within any specified time limits.
6) Offeror shall clarify its intended uses of the portions of the site indicated to be available to the contractor elsewhere in this RFP for materials staging, temporary trailer offices, employee parking, and other activities as shown in the design solution material.

2. Past Performance (Client Satisfaction) - Contact persons supplied for projects submitted under Construction Management -Corporate Project Experience above will be contacted by the Evaluation Panel. These contact's responses will be scored based on the following elements with projects participated in by the Prime (Construction Contractor and Architect firm) being weighted more heavily than projects participated in by consultants, sub contractors and individuals.
   a. Client Overall Satisfaction with Project: Contact persons will be asked "does the project fulfill the requirements of the clients stated function, does the project require unexpected maintenance activity, and have latent defects been found?"
   b. Client Overall Satisfaction with Design Build Period Services: Contact persons will be asked "Was the team's response time to clients questions acceptable? Was the staffing level consistent with the project size and complexity? Was communication of schedule and problem issues adequate and consistent? Was there an established problem solving routine? Would the client like to use this firm again?"
3. Schedule:
   a. The progress schedule will be in a time scaled bar graph format. The horizontal axis will be scaled for time beginning with the Notice to Proceed and concluding with contract completion. The vertical axis will show the milestones and major portions of the contract work. All schedule items will show a start date and a completion date. The detailed schedule, will indicate specific tasks with dates for each step of the process including:
      1) Design Period: The design period sub periods (i.e., first and second reviews, other meetings, internal QUALITY ASSURANCE /QUALITY CONTROL plan reviews, etc.).

2) Construction Period: Mobilization; Demolition method and sequencing; Excavation; Structure Completion; Exterior finishing; Procurement and installation of equipment; Provisions for overtime or shift work; Timing of relocation of existing equipment*; Site utilities, roadway realignment; and temporary rerouted medical center vehicular and pedestrian routes, Tests and final inspection.

Spec Writer Note: Reference the list (spec reference) of existing equipment to be relocated.

3) General Project Delivery Schedule and Narrative - Show relationships between construction document development/completion (including required review activities) and construction activities for (at a minimum, utility relocation, excavation, substructure, structure, exterior façade, interior finishes, building systems, and site development.

b. The Offeror shall specify how much allowance has been made for bad weather in the schedule, the days of the week and the hours of construction operations during each phase of the work, and the percentage of contract completion that will be achieved at the end of each month of the contract.

c. Short Schedules - The Offeror will provide a written commitment as to the time frame (number of days after receipt of the notice to proceed) within which the Offeror will guarantee completion. The maximum anticipated completion of this project (including design and construction of the entire project) is indicated on the OF308 (Solicitation and Offer). Shorter schedules, if obtainable, may receive more favorable scoring. The offerors time frame will establish the contract completion date and assessment of liquidated damages (see Spec Section 01001) will be based on that date.

Spec Writer Note: Use following on unrestricted procurement only.

4. Small disadvantage business participation: The Offeror shall provide targets, expressed as percentages of the total contract value, in each of the applicable NAICS (North American Industrial Classification System) major groups, and a total target for SDB participation by the contractor, including joint venture partners and team members. The Offeror shall also provide a total target for SDB

participation by subcontractors. An SDB Offeror that waives the SDB price evaluation adjustment in the clause at 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns is to provide with its offer a target for the work that it intends to perform as the prime construction contractor. Any targets offered will be incorporated into and become a part of any resulting contract.

**D. PART IV - POST AWARD REQUIREMENTS**

**D1. Construction Document Preparation:**

A. Design Review Submissions:

1. The Design-Build Team A/E (DB A/E) shall prepare and submit complete construction documents for review and approval by the VA in accordance with standard professional practice, the Department of Veterans Affairs RFP (VA RFP), and prevailing codes.

Spec Writer Note: Selection of the appropriate number of packages allowed is the responsibility of the project manager and will be based on project specifics including phasing requirements which may facilitate the scheduling of some construction activities prior to completion of certain design elements.

2. The documents may be divided into multiple review submission packages. The VA will review as many as six (6) package submissions (examples: demolition, civil, architectural, structural, mechanical, Electrical, plumbing etc.) to facilitate the start of construction.
3. All submission packages will be reviewed at (30%) and (95%) completion stages. The (95%) review submission packages will incorporate the final review comments from the (30%) review. If any package is not complete for the required stage a post review may be required the cost of which will be borne by the DB Team.
4. Each review submission package shall include 10 hard copy sets and 3 set on CD-ROM. The package will include an index of drawings (by sheet number and tittle) and specifications (by section number and tittle) submitted. The packages will be distributed to the VA Project Manager, the VA Medical Center, RFP A/E, VA Resident Engineer and others as determined to be appropriate by the VA Project Manager.

B. Design Review Meetings:

1. A review meeting to resolve design issues will be held for each design review package submitted. The meeting will include discussion

of VA comments on functional relationships and technical peer review comments (by others).

2. Participants will include RFP A/E, VA Staff and DB team members as appropriate for the specific package to be reviewed and others. The DB team members will each allow for (1) full day for each discipline/package design review meeting. DB team management will be present at each review meeting.
3. The DB team shall allow a minimum of ten (10) working days for each review cycle. A cycle includes:
   a. The VA's receipt of the design review submission package.
   b. The review meeting.
   c. DB teams receipt of comments from the VA, either electronically, by fax, or by hard copy delivery.
4. Coordination of the review meeting schedules will be the responsibility of the VA Project Manager (for the VA and RFP AE) and the DB Team Project Manager (for the DB Team). See section H. Quality Assurance/Quality Control.

Spec Writer Note: Coordinate electronic software version requirements with Medical Center and A/E.

C. Electronic Media:

1. Design review submission drawings and final Construction Document submission drawings will be executed in electronic format //AutoCAD version 2000//
2. The drawings included in the VA RFP will be available to the DB team in electronic format in //AutoCAD version 2000// for use in preparing the construction drawings. Since data stored on electronic media can deteriorate undetected or be modified without the RFP Architect/Engineer's knowledge, the CADD drawing files are provided without warranty or obligation on the part of the RFP Architect/Engineer as to accuracy or information contained in the files. The user shall independently verify all information in the files. Any user shall agree to indemnify and hold the RFP Architect Engineer harmless from any and all claims, damages, losses, and expenses including, but not limited to, attorney's fee arising out of the use of the CADD drawing files.
3. Design review submission specifications and other 8 1/2 by 11 formatted material and final Construction Document submission specifications and other 8 1/2 by 11 formatted material will be executed in electronic format //Microsoft Office 97, Word 6.0.//

4. The specifications included in the VA RFP shall be available to the DB team in electronic format in //Microsoft Office 97, Word 6.0//, for use in preparing the construction specifications. Since data stored on electronic media can deteriorate undetected or be modified without the RFP Architect/Engineer's knowledge, the CADD version 2000 drawing files are provided without warranty or obligation on the part of the RFP Architect/Engineer as to accuracy or information contained in the files. The design builder shall independently verify all information in the files and shall agree to indemnify and hold the RFP Architect Engineer harmless from any and all claims, damages, losses, and expenses including, but not limited to, attorney's fee arising out of the use of the electronic files.
5. The construction record drawings shall be completed in //AutoCAD version 2000//.
6. Construction shop drawings are not required to be completed in // AutoCAD version 2000//.

D. Professional Licensing:
1. The DB A/E who prepares the construction documents shall be a professional architect or engineer licensed in the state in which the design work is completed.
2. The professional seal indicating such license by the state shall appear on the final construction documents. The architect whose seal is shown will be known as the Architect of Record. The DB A/E shall certify compliance with the VA RFP and all applicable codes.

E. Approved Construction Documents:
1. The final construction document submission package will be submitted by the DB team for approval by the VA after completion of the 95% review cycle for the final package to be submitted by the DB team. The VA will have 5 days to take approval action.
2. The final construction documents submission package will include a full set of construction documents including all disciplines/packages.
3. The final construction documents submission package will incorporate all VA supplied comments from the earlier 30% and 95% submission package reviews and will comply with the VA RFP.
4. If the final construction documents submission package is not complete a post submittal may be required the cost of which will be borne by the DB Team.

5. The approved final construction documents include such details that the project can be constructed and will be used for construction of the project.
6. See PART IV, D2 CONSTRUCTION PERIOD SUBMITTALS for Approved Construction Document distribution.

F. Construction Drawing Preparation - Mandatory material and equipment schedules and details may be indicated either on the drawings or in the specifications, at the option of the DB team. The construction drawings shall include a coordinated set of the following *:

1. Civil engineering drawings including demolition plans, grading and drainage plans, paving plans, utility plans, schedules calculations and details.
2. Landscape drawings including demolition plans, landscape plans, plant schedule and list, special landscape elements, proposed materials to be used for each special landscape element, calculations and details.
3. Structural drawings including foundation plans, framing plans, schedules, and details, including general notes and all calculations.
4. Architectural drawings including floor plans, building elevations, building sections, wall sections, reflected ceiling plans, stair details, toilet and bath details, door schedules and details, window schedules and details, room finish schedules, auto transport and other details.
5. Fire protection drawings including floor and roof plans, riser diagrams, equipment schedules, and details, including general notes calculations and all related calculations.
6. Plumbing drawings including floor and roof plans, riser diagrams equipment schedules, plumbing fixture schedules, and details, including general notes, and all related calculations.
7. HVAC drawings including floor and roof plans, one-line flow diagrams, equipment schedules, and details, including general notes and all related calculations. Also provide sections for mechanical equipment rooms and sequence of operation for all HVAC equipment.
8. Outside steam distribution drawings including demolition plans, system plans and profiles, manhole piping plans, calculations and sections, equipment schedules, and details.
9. Electrical drawings including site demolition plans, site, floor and roof plans (power, lighting, and other systems), one-line diagrams, panel schedules, equipment schedules, light fixture schedules calculations and details

10. Asbestos abatement drawings including site demolition plans and floor plans indicating asbestos abatement method.
11. Parking Control drawings including paving plans, schedules calculations and details for the parking fee collection/parking control system for the entire ________Facility.

*Spec Writer Note: Project manager is responsible for editing the list of disciplines as applicable for the project.

F. Construction Specifications - Project specifications shall include specifications for all products, materials, equipment, methods, and systems shown on the construction drawings in accordance with standard professional practice and the VA RFP. The specification submitted for review shall include:
1. The name of the manufacturer, the product name, model number, or other identification as appropriate to clearly identify the product that will be used in the construction of the project;
2. Other data as appropriate to clearly identify the product that will be used in the construction of the project i.e. shop drawings, product data, and samples as required by the VA RFP documents; and
3. The required stamp of the licensed architect or engineer of record will be considered as certification of compliance with the RFP requirements.

G. Design Requirements - Compliance with codes and standards.
1. Project design shall be in compliance with applicable standards and codes described in VA Program Guides and design materials included or referenced in the solicitation materials.

Spec Writer Note: The project manager is responsible for selection of applicable standards for a project. If selected, individual VA standards/guides should be indicated under each technical Specification Section's "Applicable Publications" sections. Also see Section 01090 Reference Standards 1.4 availability of specifications not listed in the GSA index of Federal Specifications, Standards and Commercial Item (FAR 52.20-4.) This paragraph should reference the internet address where VA standards are available, if applicable.

2. See Section E. Approved Construction documents, above, for required inclusion of design review comments.

3. In the design of new building and alteration work under this contract, the DB team shall consider all requirements (other than procedural requirements) of:
   1) Zoning laws:
   2) Environmental and erosion control regulations; and
   3) Laws relating to landscaping, open space, minimum distance of a building from the property line, maximum height of a building, historic preservation, and esthetic qualities of a building. Also similar laws, of the State and local political division, which would apply to the building if it were not to be constructed or altered by the U.S. Government.
4. The DB team shall consult with appropriate officials of the Federal, state, and political subdivision, and submit plans under the rules prescribed by those reviewing authorities. The A/E and VA shall give due consideration to the recommendations of the referenced building officials. VA will also permit inspection by the officials described above during the construction period in accordance with the customary schedule of inspections in the locality of the building construction. Such officials shall provide VA with a copy of the schedule before construction begins or give reasonable notice of their intention to inspect before conducting an inspection.
5. The DB team shall provide prompt, written notification to the Contracting Officer concerning conflicts with, or recommended deviations from codes, laws, regulations, standards, and opinions of review officials as described above. No work altering the scope of this contract shall be undertaken prior to receipt of written approval from the Contracting Officer.
6. No action may be brought against the DB Team or VA and no fine or penalty may be imposed for failure to carry out any of the previously described recommendations of Federal, state, or local officials. VA and its contractors, including RFP A/E, shall not be required to pay any amount for any action taken by a state or political division of a state in carrying out functions described in this article, including reviewing plans, carrying out on-site inspections, issuing permits, and making recommendations.
7. The DB team shall advise the Contracting Officer of any variances with the applicable Department of Labor, Occupational Safety and Health Standards, for occupancy requirements.

H. Quality Assurance/Quality Control:

1. To reduce design errors and omissions, the DB team shall develop and execute a QA/QC plan that demonstrates the project plans and specifications have gone through a rigorous, thorough review and coordination effort.
2. Within 2 weeks of receipt of Notice to Proceed, the DB Team will submit a detailed QA/QC plan describing each QA/QC task that will be taken during the development of the various design submission packages and the name of the DB Team member responsible for QA/QC.
   a. Upon its completion each task shall be initialed and dated by the responsible DB Team member.
   b. A 100% completed QA/QC plan shall be submitted with the final construction document submission package.

**D2. Construction Period Submittals**

A. The DB contractor shall distribute a total of 20 sets of the approved construction documents prepared by the DB Team to the VA and RFP AE, as directed by the VA Project Manager.

B. Other submittals - The DB team shall submit test results, certificates, manufacturer's instructions, manufacturers field reports, etc. as required by the VA RFP specifications, to the VA R/E.

C. Project record drawings - The DB team will maintain a set of construction documents (field as-built drawings) to record actual construction changes during the construction process as required by the RFP specifications. The project record drawings will be available for review by the VA Resident Engineer at all times.

D. Shop drawings and submittals - The DB A/E shall check government furnished and/or the DB construction contractor's shop drawings, detail drawings, schedules, descriptive literature and samples, testing labor-laboratory reports, field test data and review the color, texture and suitability of materials for conformity with the RFP Documents and construction documents. The DB A/E shall recommend approval, disapproval, or other suitable disposition to the VA RE. The VA RE will have final approval authority. The DB AE shall evaluate the submittals with reference to any companion submittals that constitute a system. When necessary, the DB A/E will request the DB Construction Contractor to submit related components of a system before acting on a single component. Should this procedure be inappropriate, the DB A/E shall review all prior submittals for related components of the system before acting on a single component. The DB A/E may be required to hold joint reviews with the VA technical staff and /or the RFP AE on complicated

system submittals. The DB A/E shall notify the VA Resident Engineer (RE) in writing of any and all deviations from the requirements of the construction documents that he has found in the submittals.

**D3. Project Close-Out**

The DB team shall comply with the requirements in the "General Conditions", Section 01001, and "General Requirements", Section 01010, for submission of final RFP as built drawings, manuals, and other documents as noted. Required as built drawings and specifications will be submitted in the same format required for the construction documents.

**D4. Site Visits and Inspections**

During the construction period the DB A/E shall make weekly visits to the project site when requested by the Resident Engineer (RE). The Resident Engineer (RE) may also request visits for special purposes. Only registered architects and engineers thoroughly familiar with the project may make these site visits. The Resident Engineer (RE) has the prerogative to determine the professional discipline(s) required for any visit. The DB A/E shall observe the construction, advise the Resident Engineer of any deviations or deficiencies or solutions to issues discussed. A site inspection report which includes the purpose of the inspection, items reviewed, deficiencies observed, recommendations and additional actions required, shall be furnished to the Resident Engineer (RE) within three work days following the site visit date.

- - - E N D - - -

The Department of Veterans Affairs, North Texas Health Care System wishes to procure Architect/Engineering services to replace the existing fire alarm system at the Sam Rayburn Memorial Veterans Center in Bonham, TX, which is sixty miles north of Dallas, TX. The A/E shall provide fully developed working drawings and specifications, as well as construction period services. The proposal is geographically restricted to A/E firms located within a one hundred and twenty-mile radius of Bonham, TX. Competitive negotiations shall be used to determine contract award. The following evaluation factors and their importance expressed in ~~percentages totally 100%, shall be used in the source selection~~ process to identify the most highly qualified sources: (a) Specialized experience and technical competence in the type of work to be performed (20%); (b) Ability to design within budget construction cost limitations and prepare an accurate construction cost estimate (20%); (c) Capability to accomplish work in the required time (10%); (d) Quality control methods to insure technical accuracy of work (10%); (e) Professional qualifications of staff and consultants proposed for the project (15%); (f) Demonstrated success in prescribing the use of recovered materials, achieving waste reduction and energy efficiency in design work (15%); (g) Experience and capability to use CAD (5%); (h) Professional reputation and standing of A/E firm (5%). All work under this contract, exclusive of Government review time, shall be completed within _____ days. CD's for the project shall be provided on AUTO CAD Version 14, along with one set of Mylar Reproducible. Interested parties shall submit copies of Standard Form 254 "Architect/Engineer and Related Services Questionnaire" and Standard Form 255 "Architect/Engineer and Related Services Questionnaire for Specific Projects" to Contracting Officer (90C), John Mraz, Sam Rayburn Memorial Veterans Center, 1201 East Ninth Street before the close of business on __________ to be considered for evaluation and possible

PLAINTIFF'S EXHIBIT 11 tabbies

G- 001375

contract award. Fax requests for copies of SF 254 & 255's to John Mraz at 903/583-6699. The construction cost estimate for this project is between $500,000.00 and $1,000,000.00. If you have any technical questions, call Ricky Kirk at 903/583-6494; and if you have any contractual questions, call John Mraz at 903/583-6270.

---

V5499-5269

# ARCHITECT-ENGINEER CONTRACT

2. DATE OF CONTRACT
06/05/00

3A. NAME OF ARCHITECT-ENGINEER
Fratto Engineering, Inc.

3B. TELEPHONE NO: *(Include Area Code)*
817-461-2337

. ADDRESS OF ARCHITECT-ENGINEER *(Include ZIP Code)*
427 Fielder, North Plaza
Arlington, TX 76012

4. DEPA[RT]MENT OR AGENCY AND ADDRESS *(Include ZIP Code)*
De[p]artment of Veterans Affairs, North Texas Health Care System, Dallas Veterans Medical Ce[n]ter, 4500 S. Lancaster Road, Dallas, TX 75216

5. PROJ[EC]T TITLE AND LOCATION
Project 99-108, Fire Alarm System Design
Sam Rayburn Memorial Veterans Center
1201 East Ninth Street
Bonham, TX 75418

6. CO[NT]RACT FOR *(General description of services to be provided)*
Provide A/E Services for developing working drawings and specifications, investigative services, site visits and construction period duties for the "Fire Alarm System Design Project", Sam Rayburn VA, Bonham, TX.

Contract Performance Time is 90 days, exclusive Government Time, and shall begin on June 5, 2000.

Review 9PM

7. CONTRACT AMOUNT *(Express in words and figures)*
Sixty Seven Thousand and Five Hundred and Ninty Dollars and Fifty Eight Cents
$67,590.58

8. NEGOTIATION AUTHORITY
Federal Acquistion Regulation, Part 36

9. ADMINISTRATIVE, APPROPRIATION, AND ACCOUNTING DATA

G- 002443

NSN 7540-01-152-8072
PREVIOUS EDITION NOT USABLE

252-102

STANDARD FORM 252 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.236-2(a)

10. The United States of America (called the Government) represented by the Contracting Officer executing this contract, and the Architect-Engineer agree to perform this contract in strict accordance with the clauses and the documents identified as follows, all of which are made a part of this contract:

If the parties to this contract are comprised of more than one legal entity, each entity shall be jointly and severally liable under this contract.
The parties hereto have executed this contract as of the date recorded in Item 2.

| | SIGNATURES | NAMES AND TITLES *(Typed)* |
|---|---|---|
| | 11. ARCHITECT-ENGINEER OR OTHER PROFESSIONAL SERVICES CONTRACTOR | |
| A | [signature] | MARK FRATTO PRES. |
| B | | |
| C | | |
| D | | G- 002444 |
| | 12. THE UNITED STATES OF AMERICA | |
| | | Contracting Officer [signature] 6/05 |

☆ GPO : 1984 0 - 461-275 (336) STANDARD FORM 252 BACK (REV. 10-83)

## SP 17 ATTENDANCE AT CONFERENCES

(a) Pre-Bid and Pre-Construction: The A/E shall participate in the following conferences at the project site at times designated by the Contracting Officer. The A/E's representatives shall be registered architect-engineers who are thoroughly familiar with the project and the contract documents.

Pre- Bid CMP Conference: ________________ representative(s) for __________ day(s).

Pre-Construction Conference: ________________ representative(s) for __________ day(s).

(b) Additional Conferences: If the Contracting Officer requires attendance at additional conferences, the A/E shall be reimbursed as prescribed in Clause SP 9.

## SP 18 COMPLIANCE WITH CODES AND STANDARDS

(a) The work under this contract, including all buildings, structures, etc. shall be designed to conform to the codes specified in the various Veterans Administration Construction Standards, FPS Series and CD-30. The A/E shall inform the Contracting Officer in writing of such requirements in local codes, which, by virtue of the site's geographical location, the A/E's experience or other compelling reason, he recommends that the local codes be followed.

(b) Should the work involve an existing structure, the A/E shall analyze the impact of the work under this contract on the conformity of the structure with the codes referred to above, and advise the Contracting Officer of any deficiencies discovered, and recommend remedial measures. However, no work beyond that in the scope of this contract shall be undertaken prior to receipt of written approval from the Contracting Officer.

## SP 19 PROJECT PHASING (CPM)

The A/E shall assist the Contracting Officer in coordinating the development of a CPM (Critical Path Method) network for the construction of the project. The CPM shall provide a phasing schedule that will promote a proper and efficient organization and sequence of construction with minimal disruption of internal hospital operations. The A/E shall, when directed by the Contracting Officer, participate in phasing conferences with the Station Director at the project site to serve as an advisor to the Contracting Officer.

The A/E during the Construction Period shall act in an advisory capacity to the Contracting Officer. He shall do nothing that may be construed as a contractual act of the Government and shall have no contacts with the Contractor's representative without the approval of the Contracting Officer. The A/E shall not disclose to the Contractor any information contained in his records of communication with the Government unless authorized in writing by the Contracting Officer. The A/E has no authority to make any decisions or approve any part of the work. When requested by the Contracting Officer, the A/E shall interpret the contract documents and recommend any actions he deems suitable for the satisfactory prosecution of the construction work. The A/E shall report to the Resident Engineer any deficiencies in the construction work that may come to his attention. The A/E shall prepare any supplemental drawings or other documents that may be required to clarify or supplement the contract documents. The Construction Period shall commence with the award of the construction contract(s) and shall terminate with the acceptance of the work by the VA.

**SP 28 SHOP DRAWINGS, SUBMITTALS, ETC.**

(a) The A/E shall check the contractor's shop drawings and detailed drawings, schedules, descriptive literature and samples; review the color, texture and suitability of materials for conformity with contract documents; and recommend approval, disapproval, or other suitable disposition. He shall evaluate the submittals with reference to any companion submittals that constitute a system. When necessary, the A/E shall through the Resident Engineer, request the Contractor to submit related components of a system before acting on a single component. The A/E shall notify the Resident Engineer in writing of any deviations from the requirements of the contract documents that he has found in the Contractor's submittals.

(b) Master Specifications, Section S, "Samples and Shop Drawings" describes the procedure for contracts to follow in submitting samples, shop drawings, etc., for approval. See CP 7.

Grot Inc.
324 Henry Street
Lexington, KY 40508
859.254.3848

-----Original Message-----
**From:** Angie.Napier@med.va.gov [mailto:Angie.Napier@med.va.gov]
**Sent:** Friday, September 03, 2004 12:51 PM
**To:** kerry
**Subject:** FW: Solicitation 596-10-04

**From:** George, Roger
**Sent:** Friday, September 03, 2004 12:34 PM
**To:** Napier, Angie; Moynihan, David G.
**Subject:** RE: Solicitation 596-10-04

Engineering Service has review the clarification request and provides the following:

No, this is not a Design/Build project. The project documents, drawings and specifications, are a fully developed set of documents for the fire alarm system.

The referenced spec sections and paragraphs refer to the submittal process, specifically the shop drawings, that would be prepared and submitted by the contractor for review and approval.

-----Original Message-----
**From:** Napier, Angie
**Sent:** Friday, September 03, 2004 9:54 AM
**To:** Moynihan, David G.
**Cc:** George, Roger
**Subject:** FW: Solicitation 596-10-04

-----Original Message-----
**From:** kerry [mailto:kerry@grotinc.com]
**Sent:** Friday, September 03, 2004 9:49 AM
**To:** angie.napier@med.va.gov
**Subject:** Solicitation 596-10-04

To: VA Medical Center Date: 9/3/2004
2250 Medical Center Bldg. 5

PLAINTIFF'S EXHIBIT 8

Lexington, Kentucky 40511-1093 Doc No. 24

Attn: Angie Napier

Subject: Solicitation #596-10-04

Dear Angie Napier:

It has been brought to our attention by one of our vendors that this job is a design-build project. Is this a design-build Project?

Reference Specification Section 13950, Part 1, Paragraph 1.1 (B).

" Fire alarm systems shall comply with requirements of NFPA 72 unless variations to NFPA are specifically identified within these contract documents by the notation: "variation". The design, system layout, document submittal preparation, and supervision of installation and testing shall be provided by a technician that is certified NICET level III or a registered fire protection engineer. ..."

Reference Specification Section 13850, Part 1m Paragraph 1.2 (B)

"The new fire alarm system shall be designed and installed in accordance with the specifications and drawings...."

Please provide clarification. Based on the above referenced paragraphs, is it the responsibility of the contractor to design the new fire alarm system and to provide drawings using AutoCAD 2000 software base on his design as required under submittals of the Section 13850 prior to performing work or are the bid drawing files provided by the VA a fully designed fire alarm system and to be considered working drawings?

Sincerely,
Grot, Incorporated

Kerry Russell
Vice-President

www.grotinc.com
kerry@grotinc.com

Grot Inc.
324 Henry Street
Lexington, KY 40508
859.254.3848

CAUSE NO. 03-1951C
(Judge Baskir)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GROT INCORPORATED,
Plaintiff,

VS.

THE UNITED STATES OF AMERICA,
Defendant.

---

VOLUME 1
ORAL DEPOSITION OF
JOHN P. MRAZ
October 12, 2004

---

oOo

*In Dallas/Fort Worth ...*

MBA REPORTING SERVICES INC.

*Court Reporters & Videographers*

*801 East Campbell Road, Suite 180 * Richardson, Texas 75081*

*972.530.6400 Fax 972.530.3307 800.283.8923*



EXHIBITS IN
SEPARATE BINDER

COPY

Q. -- for default?

A. That's correct.

Q. Have you terminated any other project for convenience of the Government?

A. No.

Q. Prior to this project, how many other fire alarm projects were -- did you serve as the Contracting Officer over?

A. None. This was the first.

1:48P Q. You -- do you have any training in fire alarm installation?

A. No, I don't.

Q. Are you NICET -- therefore, you're not a NICET Level 3 Certified Technician?

A. No, I'm not.

Q. Are there any projects -- let me rephrase that.

As a Contracting Officer or a Contracting Officer Trainee, have you been involved with any other fire alarm projects?

And let me clarify that by saying, not that you were over --

A. Uh-huh.

Q. -- but that you may have assisted other Contracting Officers in -- in the construction of

Q. As a matter of fact, Mr. Kirk had already told Grot's on-site personnel to institute a fire watch, correct?

A. Yes.

Q. And they had immediately done that, didn't they?

A. Yes.

Q. And they also explained to you in a subsequent letter following July 17th what had happened with respect to the issue involving those pull stations, didn't they?

A. Yes.

Q. And in fact, by the end of July, that day, they had corrected the pull station problem, didn't they?

A. No.

Q. The pull stations weren't activated by the end of the day?

2:14P MS. WILLIAMS: Which day?

MR. KILPATRICK: July 17th.

A. No. If they had been, the fire watch would have been terminated at the end of the day.

BY MR. KILPATRICK:

Q. And when was the fire watch terminated?

A. Oh, God. That must have been two or

documents.) Yes, he is.

Q. Building 1 was through. It was completed at 8:15, right?

A. According to this, yes.

Q. Okay. Looking at the second line -- I'm sorry, the third and fourth line of Exhibit 2, references that in the opinion of Mr. Harrison and Mr. Kirk, there was insufficient coverage for proper protection in Building 29?

A. Correct.

Q. And directed the installation or institution of a fire watch for that building, right?

2:18P A. Correct.

Q. And Grot did that, didn't they?

A. Yes, they did.

Q. But nowhere in this e-mail does it tell anyone what Mr. Kirk or Mr. Harrison determined was insufficient coverage, does it?

A. Let's see. (Witness reviews documents.) Well, it says that "...he must set up a fire watch in Building 29 or install a temporary system with four smoke detectors in each wing...until a proper system that meets code was installed."

A. No. I don't think -- I don't see anything specific.

Q. How -- if Grot is required to show cause to you as to why it is not in default, how are they to do that if you don't point out what their defaults are?

A. Correct. That's why the other order was sent with the six deficiencies.

Q. Mr. Mraz, the six deficiency letter was an issue designed -- was a letter issued regarding the Building 29 fire watch, wasn't it?

2:21P A. I'll take your word for it. I don't remember if it was 29 or 1 or --

Q. Outside of that letter --

A. Uh-huh.

Q. -- there is no other information provided this contractor as to where its contract is in default for not meeting the requirements of NFPA 101, is there?

A. No. It just says that "Fire Alarm Systems in Buildings 1, 2, 3, 24, and 29." The first sentence.

Q. I don't understand, but... This was a pretty extensive project, right?

A. Yeah. The project was worth a million

bucks. I guess so.

2:22P

Q. You're telling him that his fire alarm system doesn't comply with the requirements of NFPA 101, and asking him to show cause why he should be terminated.

A. Uh-huh.

Q. Don't you think it would have been fair to tell him where his system failed to meet NFPA 101?

A. Yes, it would have been --

Q. Okay.

A. -- to have put it in paper -- to have put it down on paper. And I agree, it isn't in this letter.

Q. When Mr. Grot got this letter, he asked to meet with you, didn't he?

A. Yes, he did.

Q. And you refused to meet with him, didn't you?

A. Correct.

Q. Why did you refuse to meet with the contractor?

A. I told him that the COTR was responsible for enforcing the contract, and that the contractor complied with the specs and plans.

A. I never did what?

Q. You never responded to Grot's letter in response to the show cause, other than issuing the termination, right?

A. Oh, I did write a letter, I believe, afterwards in response to this.

Q. Do you know where that letter would be located?

A. No.

Q. Looking at Page 2, top of the page, Mr. Grot states, "Your letter states that the work performed does not meet the requirements of 'NFPA 101.'"

Do you see that?

A. Uh-huh.

Q. And in fact, in that paragraph, Mr. Grot is requesting for you to tell -- tell Grot where his work falls short of NFPA 101, right?

2:29P A. Uh-huh.

Q. Did you ever respond to that paragraph of that letter?

A. I don't remember if I responded personally.

Q. Now Mr. Kirk wrote memos back and forth to you, correct?

A. Correct.
Q. But you don't know whether he ever gave any of those memos to Grot?
A. Yes, I do. He told me he did.
Q. He told you he did?
A. And I know he was in contact with Grot's Manager. Anytime there was a problem with technical issues, the COTR and Grot's Manager was supposed to resolve them.
Q. Well, I understand that --
A. Uh-huh.
Q. -- that that's the way you had it working.
A. Uh-huh.
Q. One of the arguments that -- that Grot had was, that Mr. Kirk would tell Grot to do something, and Grot would dispute it as not being a part of the contract, right?
A. Uh-huh.
Q. Correct?
A. Uh-huh.
Q. "Yes" or "no"? I'm sorry.
A. Yes.
Q. And Mr. Grot or Grot's company would ask that you place in writing a directive telling

them to do that which they disputed, right?

2:31P A. Correct.

Q. Did you ever do that?

A. Probably once or twice. But it had been resolved earlier that Grot was supposed to perform the work in accordance with the contract plans and specifications, and if he did any work outside the scope of the contract, he would be compensated for it.

Q. Mr. Mraz, if he performed work on an oral directive from a COTR --

A. Uh-huh.

Q. -- without it being in writing, and it was outside the scope of the contract documents, the Government could reject payment for that work, couldn't they?

A. Yes.

Q. So all Mr. Grot was doing by asking you to put it in writing was protecting his interest in the money that he might spend in doing something that he disputed, right?

A. I don't know if that's the case or not. I don't know if that's the case, or if he was trying to set up some sort of record that there really was a dispute over the specs and plans with the

government.

2:32P Q. Well, not being argumentative --

A. All right.

Q. -- but that dispute already existed, right?

A. No. That dispute was resolved.

Q. The was resolved in your mind, Mr. Mraz, correct?

A. Correct.

Q. Mr. Grot had told you that it was not resolved in his mind, correct?

A. Yes.

Q. Because he told -- he told you he was going to perform --

A. Correct.

Q. -- under protest?

A. And file a claim later.

Q. That's right.

A. Okay.

Q. And it was the same thing he was asking to do when Mr. Kirk was telling him to install additional devices --

A. Uh-huh.

Q. -- which Mr. Grot -- and when I say "Mr. Grot," I mean his company -- disputed were a

part of his work, right?

A. Yes.

Q. Okay. And if he goes in and installs those devices on Mr. Kirk's instruction without written directive from you, he basically has volunteered to install those devices, isn't that right?

2:33P A. Correct.

Q. And he may or may not ever get paid for that, correct?

A. No. He would get paid for all work performed.

Q. Are you telling me, Mr. Mraz, that every contractor that has had a contract with you that has installed work that was outside the scope of work, that did it without it being in writing, you paid him for it?

A. I've never had that problem before. He wasn't asked to do any work outside the contract.

Q. In your mind, correct?

A. Yes.

Q. Because the record is replete with instances where they were disputing whether certain devices were necessary under NFPA, right?

A. Yes. However, he was supposed to do

the work in accordance with the plans and specs. He agreed to that. He promised to do the work, and said he would file claims afterwards.

2:34P Q. By signing the contract, he did that?

A. And when I sent him a letter, I believe it was in September of '01, when he said that he would do -- perform the work -- prosecute the work in accordance with the plans and specifications of the contract, as interpreted by Rickey, the COTR with the Government.

Q. We'll get to that. The second page of Exhibit 3, third paragraph down, Grot is advising you in that paragraph that Siemens has certified the project as being designed pursuant to NFPA 101, right?

A. Correct.

Q. And again is asking you to list for him where the design does not comply with NFPA 101, right?

2:35P A. Correct.

Q. You never provided him that information, did you?

A. Personally? No, I don't think I did. That was provided by Rickey Kirk, and it was also provided in a letter with the six deficiencies.

Q. The six deficiencies, again, being deficiencies in construction that needed to be completed to get off a fire watch on Building 29, right?

A. Right.

Q. And it was disputed by Grot that those were deficiencies that necessitated a fire watch, right?

A. Yes.

Q. They -- they instituted the fire watch?

A. Uh-huh.

Q. They did what you told them to do, didn't they?

A. Uh-huh.

Q. As a matter of fact, with the exception of the fact that they disputed issues with respect to additional devices, et cetera, when you told them in writing to do something, Grot did it, didn't they?

2:36P A. Let's see. When I told him to do something in writing?

Q. Yes.

A. I told them in writing to complete the contract in accordance with the plans and specs.

Q. When you told them to institute the

fire watch in Building 1, they did it, didn't they?

A. Correct.

Q. When you told them to institute the fire watch in Building 29, they did it, didn't they?

A. Correct.

Q. When you told them to start correcting the six deficiencies to get off fire watch in Building 29, they started, didn't they?

A. Uh-huh. Yes.

Q. Can you cite -- other than a dispute as to what is required in the work as being NFPA requirements, Fratto requirements, can you cite me one instance where you told Grot to perform a function, that they didn't do it?

A. A specific function?

Q. Yes.

A. No. All I know is that they weren't cooperating with the COTR, and they were disputing just about everything the COTR wanted them to do, and claimed it was outside the scope of the contract.

2:37P Q. Okay. Look, if you would, please, sir, at the -- well, look at -- on the bottom, there's a Government Bates stamp, 2911. That will be easier than me trying to tell you the page number. Fifth

paragraph down.

A. "In the past few weeks..."?

Q. "In the past few weeks..." In that paragraph, Grot again is advising you that it was receiving verbal direction from VA reps to add additional devices Grot contends were not shown on the drawings, right?

2:38P A. Correct.

Q. And after that, Grot has said -- it's requested that the directives be in writing, right?

A. Correct.

Q. And -- and they didn't do that, did they? The COTR never put it in writing to Grot?

A. I can't say for a fact that he didn't.

Q. Okay.

A. All I know is that he told them that was part of the contract, and that he had to do it.

Q. Let's take, for example, the smoke detectors in the elevator shafts. That was a big, principal issue as to whether it was a part of the documents -- part of the project?

A. I believe so, but I'm not really all that into the technical part of the contract.

Q. Okay. But with all due respect, Mr. Mraz, you terminated this project, didn't you?

Now as I told you, I'm not a technical expert, but I don't see how somebody could not know -- how somebody could be that wrong.

2:46P Q. You're convinced it's a design-build project, aren't you?

A. On the evidence that was furnished to me, correct.

Q. Now I asked you earlier if you responded -- you responded to Mr. Grot in writing to his show cause letter.

A. Uh-huh.

Q. You indicated that you thought you had, --

A. Uh-huh.

Q. -- but are you sure that you did?

A. I don't remember for sure.

(Deposition Exhibit No. 4 marked.)

BY MR. KILPATRICK:

Q. I hand you a document marked as Exhibit 4.

(Documents handed to witness.)

A. Uh-huh.

Q. Do you recognize that document?

2:47P A. Yes, I do.

Q. Did you draft that document?

A. The fact that after 19 months, less than 60 percent of the contract had been completed.

After that letter in September where he agreed to perform in accordance with the plans and specs, he was still fighting with the COTR over everything.

Q. We're going to get into those. But what made you think he was not going to complete the project?

2:56P A. The time it had taken him to complete 59 percent of the contract.

Q. Before you contracted with Grot, did you do any investigation into Mr. Grot's -- or Grot's history?

A. Yes.

Q. What did you do?

A. Charles Ballard, the engineer -- well, we had a responsibility check meeting with him on the phone, and engineers were able to ask him questions to make sure that he was confident. And they did some research, and they found out from other Government agencies that he had a history of asking for change orders after he had signed the contract, claiming that there was work outside the contract that he should be compensated for.

Q. Is that unusual in this business?
A. I don't know. I would hope not.
Q. So what did that tell you?
2:57P A. That told us that we might have problems.
Q. Did anyone ever tell you that Mr. Grot had never completed the job?
A. No.
Q. Did anyone tell you that they had had to default Mr. Grot's company?
A. No.
Q. Did you realize that Mr. Grot was a GSA schedule contractor?
A. Yes.
Q. At the time that you contracted with him?
A. Uh-huh.
Q. Didn't that tell you something about his capability of performing work?
A. Not really. It's not that hard to get a GSA contract. However, I never doubted that he was competent to complete the contract, if he was willing to do it.
Q. As a matter of fact, your COTR told you that the on-site people were very competent, didn't

he?

A. The on-site people?

Q. Yeah. The people working for Grot on site.

A. You mean Seimens?

Q. Siemens and Grot's personnel.

A. No, not exactly. There was a dispute between Mr. Grot and Seimens, that Grot had called me up and he wanted me to discharge Siemens. So I don't know what the problem was there.

That may have been responsible for some of the delays when there were only two people, and sometimes he was one person working on the projects.

2:59P Q. Have y'all ever had any problems with Siemens on any projects, "y'all" being the VA?

A. This is the only time I've worked with them.

Q. How about Mr. Kirk or Mr. Ballard?

A. That, I don't know.

Q. Prior to issuing the termination, did you take into account that the payments to Grot were behind schedule?

A. Yes. I admit that some of the payments were behind schedule, but they had been paid. We had three outstanding invoices for about $300,000

Q. In part, it says, "...based on your failure to provide adequate fire alarm protection for Buildings 1, 2, 3, 24, and 29," right?

3:18P A. Correct.

Q. But you never gave any further information as to why the fire alarm system was inadequate, right?

A. In this letter?

Q. Yes.

A. No. I --

Q. Or any -- sorry.

A. No, I didn't.

Q. I didn't mean to step on you.

A. I thought it was understood. They failed the inspection.

Q. And you say "...the failure to provide adequate fire alarm protection for Buildings 1, 2, 3, 24, and 29 at the Sam Rayburn Veterans Memorial Center, Bonham, Texas as directed in my letter of July 17, 2003," which we've already said related only to Building 1 and the fire alarm pull station issue, right?

A. I believe we did say it related to 1. I don't know if it was just pull.

3:19P Q. Then the second issue for termination,

Q. Okay.

A. It was decided that that's who we'd probably go with, to mitigate the costs.

Q. All right. So with that in mind, then there was no way prior to the issue of the termination letter that you could have taken into consideration the time necessary to reprocure construction -- reprocure completion of the project, right?

A. Repeat that question again.

Q. At the time of the termination letter, since you had not talked with Siemens, --

A. Uh-huh.

Q. -- there was no way that you could take into account the time to reprocure for completion of the project, was there?

A. Yes, there was.

Q. How?

A. Because we knew that we were going to go with Siemens.

Q. But how did that tell you how long it was going to take for you to reprocure the project?

A. Because we weren't going to put it out for bid.

Q. You were going to sole source it?

"Our informant told us that Grot requested two cost proposals from the subcontractor, Siemens."

Is that a Seimens informant?

A. Yes, it was.

Q. Who is it?

A. I don't know. I was told this by my technical people.

Q. They didn't tell you who they were talking to?

A. No.

Q. So someone within your organization was already talking to Siemens, right?

A. Someone from our organization had always been talking to Siemens, because they were on the job.

Q. Why did you use the phrase "informant"? Why didn't you put the name of the person that told you that?

3:29P A. Because it wasn't told to me, I wasn't at liberty.

Q. Are you telling me that your people did not tell you who told you -- who told them this information?

A. Correct.

Q. And you didn't ask?

you, "Oh, yeah, it's a desi n-build project," right?

A. Correct.

Q. And this secti n right here that's from your specifications --

A. Uh-huh.

Q. -- that's the standard specification for the VA on design-build projects?

A. I believe it is.

3:46P MR. KILPATRICK: Let's mark this one.

BY MR. KILPATRICK:

Q. Let me ask you, Mr. Mraz, do you know Roger George?

A. No, I don't.

Q. Do you know any of the Contracting Officers from over in Lexington?

A. No, I don't.

Q. How about Angie Napier? Do you happen to know her?

A. No.

(Deposition Exhibit No. 8 marked.)

BY MR. KILPATRICK:

Q. Let me show you a document we've marked as Exhibit 8.

(Documents handed to witness.)

A. That, I don't know.

Q. And in fact, Mr. Mraz, isn't it a fact that that second -- that third sentence, "The referenced spec sections and paragraphs refer to the submittal process, specifically the shop drawings, that would be prepared and submitted by the contractor for review and approval" is exactly what Siemens and Grot was telling you when you were directing them to design-build this project, wasn't it?

A. No.

Q. That's not what they told you?

A. No.

Q. What -- what is your understanding of what a design-build project is?

3:49P A. Design-build, they're supposed to provide the design and build it according to the design that they provide.

Q. The contractor designs it and builds it, right?

A. Yes.

Q. Now where -- where in -- in the amendment -- I mean, the solicitation for construction --

A. Uh-huh.

Q. -- that you issued, where does it ask for any qualifications on the contractor's ability to design, and basically engineer a project?

A. I don't know. I don't have that in front of me. And it may not be in there. I don't know.

Q. It doesn't require or doesn't request any information regarding their capability of engineering a project, does it?

A. In the solicitation?

Q. Yes.

A. Yeah. The specs were part of the solicitation.

Q. So we're relying on those two paragraphs again, then, right?

3:50P A. We could be relying on more. You'll have to check with the COTR.

Q. I will. But as far as you're concerned, you're relying on those two sections right there. That's your letter, isn't it, Mr. Mraz?

A. Yes. That's my letter.

Q. And based on this letter, you directed Grot to redesign this project, right?

A. Based on the information before I wrote

the letter --

Q. Okay.

A. -- that I received from the COTR and the A/E and everybody else in engineering.

Q. All right. That's okay. But that's why he redesigned the project, is because you told him to, right?

A. Yes.

Q. All right. Now, --

A. Gee, this says --

MR. KILPATRICK: Let's mark this, please, ma'am.

3:52P A. Can I ask a quick question?

BY MR. KILPATRICK:

Q. One of the beauties of a deposition is I get to ask questions.

A. I can't ask questions, right. All right. All right.

(Deposition Exhibit No. 9 marked.)

BY MR. KILPATRICK:

Q. Let me show you what we've marked as Exhibit 9.

(Documents handed to witness.)

I went on the VA website. Have you ever seen this document before, Mr. Mraz?

(Documents handed to witness.)

A. No, I don't believe I've seen this before. "Request For Proposal To Design-Build."

3:53P Q. Do you see the Paragraph A2, it says "Definitions"?

A. Uh-huh.

Q. "Design-build as defined by the Department of Veterans Affairs." That's y'all, right?

A. Correct.

Q. What this is, is the suggested proposal for design-build projects under VA construction, isn't it?

A. Uh-huh.

Q. Isn't it?

A. Yes.

Q. And you didn't use this form in anything that you submitted to Fratto or anything that you submitted to the contractor, did you?

A. No, I don't believe I used this form.

(Deposition Exhibit No. 10 marked.)

3:54P BY MR. KILPATRICK:

Q. Let me show you another exhibit we've marked as Exhibit 10, and ask you if you've ever reviewed that FAR.

(Documents handed to witness.)

Did you consult that FAR to determine whether or not this was a design-build project, and whether you had complied with the requirements of FAR for a design-build project?

A. I can't say for sure if I did. I don't remember if I did.

Q. Well, if you had, Mr. Mraz, you would have recognized the fact that you did not solicit construction of this project as a design-build project in accordance with that FAR, would you not?

3:55P A. Please repeat the question.

MR. KILPATRICK: I'm not sure I can. Would you do that for me, please.

(Previous question read.)

A. I still don't understand the question.

BY MR. KILPATRICK:

Q. You didn't comply with that FAR to solicit a design-build project, did you?

A. No, I didn't. I don't remember.

Q. And you never looked at that FAR in determining whether or not this was a design-build project, did you?

A. Did I ever look at this section of FAR 36?

Q. Right.
A. No. I don't think so. I don't remember.
Q. Well, I mean, you've already told me that you relied on Rickey Kirk, Charles Ballard, and Fratto, the engineer who designed this project, to tell you this was a design-build project, right?
3:56P A. Correct.
Q. You didn't rely on your own VA documents or the FARs?
A. No. I don't remember looking that up.
MR. KILPATRICK: Let's mark that one. Let's start at the beginning.
(Deposition Exhibit No. 11 marked.)
BY MR. KILPATRICK:
Q. Let me hand you this document, Mr. Mraz, we've marked as Exhibit 11, I believe.
(Documents handed to witness.)
Do you recognize that document?
A. It looks like a CBD notice that I posted.
3:57P Q. Did you draft that Exhibit 11?
A. Yes.
Q. What is this soliciting?
A. We were wishing to procure A/E services

to replace the existing fire system at Sam Rayburn Memorial Hospital.

Q. All right. Is there anywhere in this document that it refers to this project as being a design-build project?

58P A. No, it doesn't identify it as that.

Q. Okay. Reading from Exhibit 9 -- well, strike that.

You are soliciting Architect/Engineer services. If we use the phrase "A/E" -- can we use that?

A. Yes.

Q. You're soliciting A/E services to replace the existing fire alarm system at Rayburn, right?

A. Correct.

Q. It says "The A/E shall provide fully developed working drawings and specifications, as well as construction period services," correct?

A. Correct.

Q. Nowhere in here does it say that the A/E is responsible in any way for construction, does it?

A. No. I don't see where it says that.

Q. Okay. Looking back at Exhibit 9,

read -- read the definition for a design-build project. It's right up here at A1, I think.

3:59P A. A1, when it says "Contracting Officer"?

Q. No.

A. You said A1.

Q. Definition A2. I'm sorry. "Design-build as defined by the Department of Veterans Affairs," read that paragraph into the record.

A. "Design-build as defined by the Department of Veterans Affairs is the procurement by the Government, under one contract, with one firm or joint venture for both design and construction services for a specific project."

Q. Okay.

A. "Design-build Contract...refers to the Contract to perform the design and construction of the project."

Q. Right. So were procuring A/E services?

A. Uh-huh.

Q. And then you were going to set a contract out for the contractor to build it.

That's not in compliance with what the VA defines as a design-build project, is it?

A. Say that again.

Q. This is a Request For Proposals For A/E --

A. Uh-huh.

4:00P

Q. -- on the Rayburn fire alarm system.

A. That's correct.

Q. They're not going to do any construction, are they?

A. No. They were an A/E firm.

Q. That's right. And you were going to contract with a contractor to do the construction, right?

A. Construction and design.

Q. Okay. We're going to get to the design part.

Look at Exhibit -- on Exhibit 11, paragraph (b), subparagraph (b) in the middle of the page, is one of the requirements for consideration is the "Ability to design within budget construction cost limitations and prepare an accurate construction cost estimate"?

Did they prepare a construction cost estimate?

A. Yes, they did.

MS. WILLIAMS: Who is "they"?

MR. KILPATRICK: "They" is

Fratto.

A. Yes.

BY MR. KILPATRICK:

Q. How could they prepare a construction cost estimate if they weren't going to design the project?

4:01P A. Because they did design the project. And who else was supposed to design the project? Grot was supposed to design the project. They couldn't design the project in its entirety.

Q. Why not?

A. Only the contractor could do that.

Q. Okay. You -- well, then why did you hire an engineer?

A. You know, I have asked that same question, "Why did we hire an engineer?" We were always hiring engineers for work where we didn't need to. Everything we do, we hire an A/E engineer.

If we were to replace the tile on the floor in this room, they would hire an A/E engineer.

Q. Nowhere in here does it say "design-build," does it?

A. Nowhere in where?

Q. In Exhibit 1 -- or Exhibit 11.

A. No. And it probably shouldn't. I

would guess that the A/E understood that the contractor would have to be responsible for the design, too.

4:02P Q. How is he supposed to understand that?

A. He's an A/E. He should know that. If he doesn't understand that, then he shouldn't have submitted a bid for the contract.

Q. So basically, we've hired an engineer to develop a set of plans --

A. Uh-huh.

Q. -- which you then required Grot to go back and totally redesign, right?

A. No. The plans that were supplied -- furnished by the A/E weren't specific. They couldn't be.

Q. Well, according to what you've asked for -- you've asked for "fully developed working drawings and specifications."

So what we're saying now is that the fully developed working drawings are really incomplete working drawings, correct?

A. Correct.

Q. Let's look back at Exhibit 9, second page, Paragraph 6. Tell me what the term "A/E," as defined by the Veterans Administration, means in a

design-build project.

4:04P A. A6?

Q. At the top of the page.

A. "This term, as used herein, refers to the Architect-Engineer firm that are a part of the DB team, also referred to as the DB/AE."

Q. There was no A/E for the DB in this project, was there?

A. There was no A/E for the DB.

Q. The design-build team -- there's no design-build team. You hired Grot as a contractor to build this project, right?

A. To design and install.

Q. Now I realize that your argument is that you hired him to design and build.

A. Correct.

Q. But Grot's a contractor, right?

A. Yes.

Q. There's no "A/E" after his name, is there? There's no "PE" after Grot's company name, is there?

A. No. Does there have to be?

(Deposition Exhibit No. 12 marked.)

(Documents handed to witness.)

4:05P BY MR. KILPATRICK:

Q. I've handed you what we've marked as Exhibit 12. Tell me if you recognize that document.

A. It's -- it's a memo I wrote to the file.

Q. All right. And what does that memo reflect?

A. The meetings we held with the A/E to decide who we were going to select.

Q. And you selected who?

A. Fratto.

Q. Fratto Engineering?

A. Yes.

Q. And it says that you selected -- that the meeting was held for the purpose of selecting an A/E firm to design a new fire alarm system, right?

A. Correct.

Q. It doesn't say anything about selecting them to design-build, does it?

A. No.

Q. Now one of the reasons you selected Fratto was that they had designed the current fire alarm system, right?

4:07P A. Correct.

Q. Did they do that as a design-build?

A. I don't know. They did it about ten

years ago, and the VA was pleased with their work. That's not the only reason they hired them, but they were familiar with the layout.

4:08P Q. When Grot started construction of the project, he gave you a schedule of values, didn't he?

A. Yes, I believe he did.

Q. And that's the basis by which Mr. Kirk and you determined the appropriateness of payments, at least in part, right?

A. Uh-huh.

Q. Did it ever strike you as odd that in his schedule of values, there was no allocation for engineering and design?

A. No.

Q. You -- according to you, at the beginning of this job, you knew this was a design-build project, right?

A. Correct.

Q. It didn't bother you that he didn't have any costs in it for design?

A. No.

(Deposition Exhibit No. 13 marked.)

BY MR. KILPATRICK:

Q. Okay. This is what we've marked as

Exhibit 13.

(Documents handed to witness.)

Let me ask you to look at that, please, sir, and ask you if you can identify it.

A. Now what would you like to know?

Q. Take a look at what we've marked as -- I'm sorry. I said "Exhibit 9." It's actually 13.

4:09P

A. Okay.

Q. Do you recognize that document and the documents following it?

A. Yes, I do.

Q. What is that?

A. It's a contract that went to Fratto.

Q. Is there any reference anywhere in this contract that this project is a design-build project?

A. Well, I'll have to reread it. I'll take your word for it that there isn't.

Q. As a matter of fact, that document goes into significant detail about what is expected of the A/E during the -- during the design stage and during construction, right?

4:11P

A. Correct.

Q. Look at SP 15, "Shop Drawings, Submittals, Etc.," SP 28. Do you see that?

A. It doesn't say anything in that paragraph.

Q. As a matter of fact, nowhere in this document does it say anything about the A/E being responsible for anything related to the design of this project by a contractor, does it?

A. Well, as I said, I would have to reread it.

Q. Okay. But if it does -- I guess it speaks for itself, doesn't it?

A. I don't know. I can't speak for something that speaks for itself.

Q. Okay. What was the time -- the contract time or performance for Fratto to do its working drawings?

A. I don't remember. Six months? Well, 90 days. Contract performance time is 90 days.

Q. And just for the record, what is this contract for in Paragraph 6 of the first -- or the second page? The first page of the contract award. What's the scope of work for this contract?

4:13P A. "Provide A/E services for developing working drawings and specifications, investigative services, site visits, and construction period duties for the fire alarm system design project."

Q. So it's a proposal to extend the contract completion date, right, for the A/E contract?

A. Well, let's see. Yes, I guess it is. He's asking for additional time.

Q. It's dated January 18, 2001, correct?

A. Yes.

4:28P Q. The last amendment to the contract was on November 4th. That was the previous Exhibit 16, correct?

A. No. That was dated 8/16.

Q. I'm sorry. The contract completion date per 16 was November 4th. Look on the first page.

A. Okay.

Q. All right. So now this project is 60-something days past due, and they're proposing an extension from January 18th to finish this contract of another 50 days, right?

A. Uh-huh. Correct.

Q. And this was granted, right?

A. Correct.

Q. So the project now is 174 days past the original date for the completion, right?

4:29P A. I'll take your word on the mouth.

Q. Well, --
A. The original solicitation was cancelled.
Q. The original solicitation was cancelled, but the only change to the specifications following the original solicitation was that you deleted the alternates, right?
A. That, and we added money for training.
Q. Those are the only two changes?
A. Correct.
Q. That has nothing to do with the fire protection design manual, does it?
A. I didn't think so.
Q. Okay.
(Deposition Exhibit No. 19 marked.)
4:34P BY MR. KILPATRICK:
Q. Well, this is Exhibit 19, which is an e-mail dated July 23rd, 2003.
(Documents handed to witness.)
At or about the time that you're terminating Grot's contract, this issue of a fire protection manual comes up again, right?
A. Yes. There was a dispute about whether the latest manual was being quoted.
Q. That has to do with the fire protection

manual that VA -- I mean, that Fratto used to design the project. Read on down in the letter.

A. "I understand there are plans to have" -- okay.

Q. Did it ever occur to you that this could have been the source of some of the dispute between Mr. Kirk and Mr. Grot, because Mr. Kirk was relying on a fire protection manual that was totally contrary to what Fratto had used to design the job?

4:35P A. I had discussed that with them, and they said they were the same.

Q. I'm not talking about -- we're not talking about NFPA '97 and 2000, we're talking about the VA's fire protection manual?

A. Correct.

Q. And they didn't use the right one, did they? Fratto did not use the right one to design this job?

A. You mean when they first --

Q. Correct.

A. According to our legal counsel, he didn't. However, there's a reason for that.

Q. There's a reason that he didn't?

A. There's a reason that -- Grot filed a protest. The truth of the matter is, that I don't

A. Yeah, I would say it is.

Q. Okay.

A. Yes.

Q. We talked yesterday about interpretation, your interpretation of what is a design-build project based on Mr. Kirk's representations to you, right? 09:36

A. Are we talking about 13580?

Q. Yeah.

A. Yeah.

MS. WILLIAMS: 13850. 09:36

Q. (BY MR. KILPATRICK) 13850.

A. Yeah.

Q. And I asked you if you discussed the interpretation of 13850 with any other contracting officers, and I believe your answer was no; am I right? 09:37

A. Correct.

Q. And we discussed also the interpretation of the 13850 by the contracting officer in Lexington, right?

A. Correct. 09:37

Q. I just happen to have a copy of a *Replace Fire Alarm Systems Manual*, Specifications for Department of Veterans Affairs in Salt Lake City. I ask you to look at the highlighted portion of 13850, paragraph C. 09:37

several telephone calls to you, didn't he?
A. Yes, he did.
Q. And in those telephone calls he asked to meet to discuss this alleged deficiency that caused this fire watch, right? 09:50
A. Probably. I don't know if he called for those. I got a lot of calls from him.
Q. The first fire watch was the result of the pull-station issue on Building 1, right?
A. Correct. 09:50
Q. That was cured, we've already seen, that same day, right?
A. Uh-huh.
Q. And then immediately the next day Mr. Kirk issues this fire watch for the other buildings, right? 09:50
A. Right.
Q. Without any further discussion of deficiencies whatsoever, he just told Grot to conduct a fire watch, right?
A. In his opinion, a fire watch was needed. 09:50
After they -- after Building 1, they inspected those other buildings; and they found all kinds of deficiencies.
Q. And you told Mr. Grot what all those deficiencies were, right? Is that your testimony? 09:50

A. No, that's not my testimony.
Q. Well, the VA would need to act in good faith, would they not?
A. I don't know if the VA would need to or not.
Q. Well, is it your testimony then that the Government can see something that the contractor is doing wrong that constitutes a deficiency, not tell the contractor, and then subsequently rely on that deficiency as a grounds for termination? 09:51
A. I think the contractor was aware of the deficiencies. 09:51
Q. Okay. But the only way he would have been aware of deficiencies is if the Government, in this case the VA, told him, right?
A. Uh-huh. 09:51
Q. Are you with me?
A. Yes, I'm with you.
MR. KILPATRICK: Let's mark that one.
(EXHIBIT NO. 23 IDENTIFIED.)
Q. (BY MR. KILPATRICK) I ask you to look at this, please, sir. 09:52
A. Okay.
Q. Next to the bottom appears to be an e-mail from Charles Ballard to, among others, yourself.
A. Uh-huh. 09:52

Q. See that? It states, "This meeting has been canceled, but Mr. Grot still wants to meet." Who canceled the meeting?
A. I'm not sure which meeting he's talking about. I know we were supposed to meet, I believe it was the end of July or the first day of August. And that meeting was canceled because Mr. Grot's daughter was sick. 09:52
Q. That's right. Having surgery.
A. Right. 09:53
Q. He asked that it be rescheduled is what happened, right?
A. Right. Right.
Q. Mr. Ballard goes on to say two lines down, "We can give him a list as to what needs to be done. Rick and Mel, I need your input." You see that? 09:53
A. Uh-huh.
Q. Then in the next e-mail up from Mr. Harrison to Mr. Ballard, "Charles, I suggest we give them some of the defiance but not all of them. They are determined that they are in code compliance in all the other buildings. So they, along with VA personnel, should conduct a pretest of the buildings as mentioned in the contract under test," et cetera. See that? 09:53
A. Uh-huh. 09:53

Q. And the next one up from Rickey -- I'm sorry, Mr. Kirk says, "Charles means deficiencies, not defiance. I agree with Mel's statement." In the first sentence of Mr. Harrison's e-mail he's suggesting that you not tell Grot all of the deficiencies, isn't he? 09:54

A. Yes, that's correct.

Q. Is that the VA's version of good faith, Mr. Mraz?

A. Yes. Charles wanted a show of good faith by the contractor, and he didn't want to hit him with all 09:54 kinds of deficiencies. He figured if he took care of those six, that would be proof enough that he was interested in completing the contract.

Q. That's what your interpretation of that is?

A. Uh-huh. That's what I remember. 09:54

Q. Did you ever give him a list of the deficiencies before you terminated him, other than those six that you keep talking about?

A. No. I issued a show cause. I didn't have to. 09:55

Q. You didn't have to give them to him?

A. Uh-huh.

Q. Why?

A. It was -- I issued a show cause, not a cure notice. 09:55

Q. Well then, what you're saying is that, if I understand you, that it wouldn't have mattered whether he cured those deficiencies or not. You were telling him to show cause. That meant nothing toward the termination then. Is that what you're saying? 09:55

A. Show cause why the contract shouldn't be terminated.

Q. For what reason?

A. Nonperformance.

Q. But you couldn't -- but you never told him what that nonperformance was, did you? 09:55

A. The contract period had been doubled from eight months to 17 months.

Q. The contract period for Grot to design and install per your design-bid interpretation -- build interpretation, right? 09:55

A. Correct.

Q. Okay. The truth of the matter is, Mr. Mraz, before terminating Grot, the VA never told Grot what the deficiencies were with his performance other than not completing within the contract time; isn't that right? 09:56

A. No. Rickey was in contact with representatives from Grot, and he was telling them daily what the problems were, and they fought back and 09:56

of the termination, right?

A. No, we didn't. We called and told them that there was work that needed to be done, and we told them that we were going to do it.

Q. You didn't -- so have you released the surety from its obligations on its bond? 10:00

A. No.

Q. But you didn't comply with the requirements for the surety on the bond in making any type of demand on them, did you? 10:00

A. No.

Q. Why would you not ask the surety to come on the project and complete the project?

A. The reason is because generally the surety will hire the default contractor. It saves a lot of money. And the VA was not going to accept Grot to complete the contract by the surety. 10:00

Q. Why?

A. Because of the history of the contract. Nineteen months and there was -- the contract still wasn't complete. 10:01

Q. Did you believe Grot was a capable contractor and capable of completing the job at the time you terminated them?

A. Yes. 10:01

it say that this project shall involve design or design- build, does it?

A. No. It doesn't.

Q. Well, if it's a design-build project, Mr. Mraz, why didn't it say so in this notice to the contractor? 10:13

A. Because the Government assumed that anybody that read the specs would know that it was design-install.

Q. Really? Well, you testified yesterday that you didn't know until August of 2002, when Fratto told you their interpretation, that it was a design-build. So how is the contractor supposed to know? 10:13

A. I believe in -- what is it? -- 13850 there's a mention that this is a design-install contract. 10:13

Q. Well, hand me 13850. Okay, Mr. Mraz, show me in 13850 where it says, this is a design-install and uses the phrase, design-install or design-build project. Show me where it says that phrase.

A. Scope on 1.2B. "A new fire alarm system shall be designed and installed in accordance with the specifications" -- 10:14

Q. Stop right there. A new fire alarm system, right?

A. Uh-huh. 10:14

A. Correct.

Q. So the contractor now was to design and build this project in the same period of time that you originally gave the A/E to design it.

A. That was a mistake. The solicitation was amended and changed from 90 days to -- 10:16

Q. 270 days.

A. Right.

Q. How long did you give the A/E to design the job? 10:16

A. How long did we give them? Let's see. Thirty -- we had it out here yesterday. Ninety days?

Q. Originally.

A. Uh-huh.

Q. How long was it ultimately given? 10:16

A. Let's see. Could we have extended it 55 days?

Q. You extended it -- you extended it 174 days. The original contract completion time was 90. So that's 264 days that you gave the A/E firm to design 10:17 the project. You gave this contractor 270 days to design it and build it, right?

A. Correct. I don't know why we extended the contract. It may have been as a -- it probably was a courtesy to the A/E. We were under no pressure to have 10:17

Q. So the contractor now was going to get 270 days to produce nongeneric drawings, design this project, produce nongeneric drawings and construct according to those nongeneric drawings in a period of time that was within 10 days of the original generic drawings design period. 10:27
Did that seem like a fair-enough time for them to do that work?
A. Yes. 270 days, nine months. Nobody complained. Nobody said that that wasn't enough time. 10:27 They said 90 days wasn't enough time.
Q. They said 90 days was not enough time to construct the project. No one ever questioned you about whether this was a design-build project, did they, Mr. Mraz? 10:27
A. No.
Q. Never was a question raised?
A. No.
Q. Until June of 2002, correct?
A. Correct. 10:27
Q. So you don't know what these other bidders thought when they were bidding on this job, do you?
A. I can only assume that they thought they were bidding on a design-install.
Q. So if Siemens tells you that they bid this 10:27

job thinking it was a construction project and not a design-build project, then your assumption would be incorrect, wouldn't it?

A. Correct.

Q. And in fact, at the time of this amendment, this solicitation, you weren't even considering this was a design-build project, were you? 10:28

A. Me personally?

Q. Yes, sir.

A. The truth, whole truth, nothing but the truth? 10:28

Q. So help you God.

A. All right. I really didn't know that it was design-install at first.

Q. If it had been and had you known it to be a design-build, you would have followed the VA's requirements for a design-build project, wouldn't you? 10:28

A. Yes.

(EXHIBIT NO. 30 IDENTIFIED.)

Q. (BY MR. KILPATRICK) Okay. Mr. Mraz, I hand you what's been marked Exhibit 30. 10:29

A. Uh-huh.

Q. That document changes the bid opening date to August 28, 2001, right?

A. Correct. 10:29

Q. So from the original release of the documents on June 1st, which was -- strike that. Well, let me rephrase that.

On the date of the initial solicitation, on June 1st, which would have been the earliest, if I'm not mistaken, that someone could have requested plans and specifications from the Government, right? 10:29

A. Correct.

Q. They had 88 days to bid the project, correct?

A. Correct. 10:30

Q. Now, in order to do what you have contended is the basis of this contract, that is, design and build, in order to actually bid the project, the contractor would have had to have at least designed what he's going to install before bid date so he would know how much to price for it, wouldn't he? 10:30

A. No, I don't think so.

Q. Why not? Why do you not think so?

A. Because the A/E provided a plan that the contractor, whoever that was, was supposed to add to, depending on the room. 10:30

Q. Okay. So the contractor was going to have to walk the project in order to determine what was in the room then, right?

A. Correct. 10:31

A. Nobody but -- nobody said that they didn't know that it was design-build.

Q. Eighty-eight days for them to prepare a bid based on generic drawings, which ultimately meant to Mr. Kirk that you could count on installing the devices shown on those generic drawings. Yet you were going to have to add the others, according to Mr. Kirk, right? 10:33

A. Uh-huh. Right. If it was a hospital room, the requirements for that room would be different than if it was, say, a television room. 10:34

Q. And the only way to know that would be to walk that entire project.

A. To visit the site, make a site visit before bidding.

Q. Do you believe that the site investigation clause of the FAR's requires a contractor under this document to conduct that type of site investigation before bidding this job? 10:34

A. I don't see how they could bid it without making a site visit first. 10:34

Q. Because they wouldn't know what to put in, would they?

A. No. I guess they would have to make a site visit to determine that this room is this; this room is that; this room is this. 10:34

A. Correct. We signed it. We both signed it on the 1st of February.

Q. So the start date for the contract or the contract date is February 1st.

A. Plus 10. I believe it was 10 days after the 10:41
notice to proceed.

Q. Okay. When you reissued the solicitation, it was open for anyone to bid, not just the companies that bid it the first time, right?

A. Correct. 10:42

Q. May I see this one?

A. (Hands to counsel.)

Q. You issued this solicitation on December 6th of '01, I believe is the date of it, right?

A. Correct. 10:43

Q. And the bid opening date was what?

A. Let's see. January 4th.

Q. So a new bidder to this job would have had even less time to walk the job and design it and bid it
than the individual -- than the companies bidding back 10:43
in August, wouldn't they?

A. Yes, they would have.

Q. Were there any -- were there any bidders on the second solicitation who didn't bid it the first
time? 10:43

Q. (BY MR. KILPATRICK) I want to hand you back the specifications for the project, Mr. Mraz.

A. Uh-huh.

Q. I want to direct your attention to 1.2A of section 01010. Read that for me, please, sir. 11:09

A. "Item one, General Construction."

Q. No, sir, just 1.2A.

A. Oh. Statement of Bid Items.

Q. Right.

A. And you want me to read what's underneath it? 11:09

Q. Yeah. Read it into the record for me.

A. Okay. "Statement of Bid Items, A, item one, General Construction. Work includes general construction, alterations, grading, fire alarm, mechanical and electrical work." 11:10

Q. Nowhere in that statement of bid items does it mention design, does it?

A. No, it doesn't, because the contract was designed by the A/E.

Q. I'll read it to you. It might be easier. 11:10 And I'll ask you to look at it.

A. Okay.

Q. This is still under section 01010, General Requirements, 1.1, General Intention (sic). A, "Contractor shall completely prepare site for building 11:10

operations, including demolition and removal of existing structures, and furnish labor and materials and perform work for installation of new fire alarm system as required by drawings and specifications." And that's the drawings and specifications you've just referenced designed by the A/E, right? 11:11

A. What was it? 1.3 that you just read?

Q. No, sir. 1.1A.

A. 1.1, okay. And what was your question again?

Q. That is construction in accordance with the drawings and specifications, which you just testified were designed by the A/E, right? 11:11

A. Yes.

Q. Reading from section 01001, General Conditions, 1.1, Special Notes, A, "Signing of the bid shall be deemed to be a certification by the bidder that, one, bidder is a construction contractor who owns, operates or maintains a place of business regularly engaged in construction, alteration or repair of buildings, structures, communication facilities, or other engineering projects, including furnishing and installing new, if necessary, equipment." You see that? 11:12 11:12

A. Uh-huh.

Q. Did I read that correctly? 11:12

A. You want me to read 1.1?

Q. Did I read this --

A. Yes.

Q. -- paragraph one correctly?

A. Yes, you did. 11:12

Q. And nowhere in this definition of a bidder does it say a construction contractor who is capable of designing the project, does it?

A. No, it doesn't, because the project was designed by the A/E. 11:13

Q. Mr. Mraz, during the course of construction of project -- construction of the project, an issue arose with respect to the contamination of one of Grot's workers performing work in a manhole. Do you remember that? 11:15

A. Yes, I do.

Q. And water samples were taken from that manhole as a result of that contamination, weren't they?

A. No, they weren't. 11:15

Q. Do you know what happened to the employee that was subjected to the contaminated water?

A. No, I don't.

Q. Do you know what he experienced in the way of burns or rashes or any other issues? 11:15

made to change that specification, you would have to give a change order to that effect, wouldn't you?

A. You mean if it was in the contract?

Q. Yes, sir.

A. If it was in there, yeah, we'd have to, if it was in part of the contract. 11:22

Q. Did the VA notify OSHA of the contamination?

A. I don't know that for a fact. I don't know.

Q. Isn't that a requirement of the VA under the FAR's in the event that they have a situation that results in the contamination or injury of a worker on that project? 11:22

A. I don't know that either. I don't know if the worker was contaminated by the water in the manhole either. I don't know why he went down there without protective clothing in the first place. 11:23

Q. What would have told him to go down there with protective clothing in the first place?

A. If he thought the water was contaminated.

Q. We discussed briefly yesterday, Mr. Mraz, the issue of payment. 11:23

A. Uh-huh.

Q. And I told you that the issue was raised about Grot being 60 or 90 days, a period of time, behind in receiving payment. Remember that? 11:25

contractor would know what kind of equipment he was going to use.

Q. Not necessarily. You could have spec'ed ADT as the sole source procurement on this, couldn't you?

A. No. What would -- 11:51

Q. You wouldn't know because you never checked, did you?

A. Yeah. What would the justification have been?

Q. I'm not asking you that. If you could 11:51 justify it, you could sole source it, couldn't you?

A. If I could justify it. If we could justify it.

Q. The fact of the matter is, Mr. Mraz, as Fratto started designing this project, they could not 11:52 complete the design that the VA wanted within the confines of the VA's projected budget, could they?

A. Let's see. I believe our budget was $700,000. And the project was going to cost around 900,000 or a million. So we had to come up with extra 11:52 money.

Q. Going back to the paragraph I just quoted you at the top of Page 2, what Mr. Grot is saying there is that NFPA 101 and 72 may not require all of the devices shown on Fratto's drawings to comply with recent codes, 11:52

second paragraph in the bold print, "The contractor must submit redesign drawings, which would include all items originally shown on plans plus any new items required by code or manufacturer's requirements."

A. Correct. 11:56

Q. So if he had designed it to NFPA 72 and 101, it didn't really matter, did it, because he wanted everything that was shown on Fratto's drawings also right?

A. Yes. 11:57

Q. Now, show me in the specifications, Mr. Mraz, if it is our obligation to design it, where it says that we will design it and then include everything that's shown on these generic drawings as a part of it.

A. I told you it was the A/E's responsibility to design. 11:57

Q. Where in the contract drawings does it tell us to fill in the missing pieces with everything that's shown -- that's not shown on the Fratto drawings? Where does it show that, say that? 11:57

A. Where does it show that in the contract?

Q. Right.

A. Supposed to be understood.

Q. You told him to design it for NFPA 72 and 101, right? 11:57

A. Yes. He was appointed by engineering to be the COTR for this project.

Q. The appointment was by you, right?

A. I didn't select him. Our Engineering -- our Engineering Department selects who the COTR was going to be. 12:00

Q. You didn't question engineering about whether he had the capability to be making these decisions, did you?

A. No. 12:00

Q. You didn't even question Mr. Kirk as to whether he had the requisite education and training to make these decisions, did you?

A. No. I felt if he was appointed at COTR by engineering, then he must be qualified. 12:00

Q. Do you know whether or not Fratto's original drawings met NFPA 101 and 72?

A. No, I don't.

Q. And if they did meet NFPA 101 and 72, what would be the purpose of Grot filling in the -- 12:00

A. Missing pieces?

Q. -- missing pieces?

A. My understanding with them was that there were missing pieces after the contract was designed by Fratto. 12:01

Q. Was it after the contract was awarded to Grot that you had this understanding?
A. Yes.
Q. But Grot, through the exercise of the clairvoyance that we've been talking about, was to 12:01 ascertain these missing pieces just from a review of the plans and specifications and a trip out to the project.
A. Correct.
Q. And in the meantime you actually increased 12:01 the cost, the price, that you paid Fratto for the design, didn't you?
A. From $67,000?
Q. Yes, sir.
A. I don't remember. 12:01
MR. KILPATRICK: Can we take about a five-minute break?
MS. WILLIAMS: Uh-huh.
(Recess.)
Q. (BY MR. KILPATRICK) Mr. Mraz, during the 12:07 course of the construction of the project, an issue arose about the PIV valves, right? Do you remember that?
A. No, I don't.
Q. You don't recall that the PIV valves were 12:08

and flows on the project?
A. I don't remember.
Q. Don't remember? Do you know whether Fratto's blueprints indicated where tampers and flows were located? 12:10
A. Do I know?
Q. Yes, sir.
A. Did I know?
Q. Yes, sir.
A. No. 12:10
Q. Okay. If I represent to you, Mr. Mraz, that T and F's are located above the ceiling -- I ask you to just accept that fact. Okay?
A. Okay.
Q. In order for the contractor to bid the project, in your theory about how this project bid, in order to locate all the T and F's, he would have had to have gone above the ceiling in every room in every building on this campus in less than 88 days, wouldn't he? 12:10 12:10
A. I don't know.
Q. Okay. Have you given Siemens any change order -- well, you don't know whether you've given change orders or not. Strike that.
At the time that this contract was 12:12

terminated, Mr. Mraz, how much money was left in the contract?

A. I would say about $370,000. Less than 400,000.

Q. What was the contract price awarded to Siemens for the reprocurement? 12:12

A. I don't remember the exact price. Do you want a ballpark figure?

MR. KILPATRICK: Let's mark this, please. 12:13

(EXHIBIT 40 IDENTIFIED.)

Q. (BY MR. KILPATRICK) Let me hand you -- look at what's been marked as Exhibit 40.

I'm sorry, Lindsay. That's the only copy I have. 12:14

MS. WILLIAMS: That's all right.

Q. (BY MR. KILPATRICK) Do you recognize that document?

A. Yes.

Q. What is that? 12:14

A. It's the contract between the VA and Siemens.

Q. Now, what is the contract price?

A. $461,952.

Q. Now, has that contract price reflected by Exhibit 40 increased since the work on this project 12:15

started?

A. I don't know. I don't remember -- I don't remember if I issued a change order increasing the price.

Q. Now, the scope of work contained in that never mentions that this is a design-build project, does it? 12:15

A. No.

Q. Even though there's been a running dispute now for some 18 months about whether or not it is, right? 12:15

A. No. I thought the A/E designed the contract.

MR. KILPATRICK: That's all I have.

MS. WILLIAMS: Why don't we break for lunch. And then if I have any clarifying questions for him, we'll do it in five minutes after lunch; and then we'll -- 12:20

MR. KILPATRICK: That's good. Do you want to say 1:30?

MS. WILLIAMS: Yeah. 12:20

(Recess for lunch.)

MR. KILPATRICK: We're back on the record. And while we were taking a lunch break, Counsel for the Government and myself discussed Exhibit No. 20, which, during the course of testimony, was 13:27

CAUSE NO. 03-1951C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GROT INCORPORATED,
*Plaintiff,*

VS.

THE UNITED STATES OF AMERICA,
*Defendant.*

---

ORAL DEPOSITION OF
SCOTT McCAULEY
February 3, 2005

---

oOo

*In Dallas/Fort Worth ...*

MBA REPORTING SERVICES INC.

*Court Reporters & Videographers*

*801 East Campbell Road, Suite 180 * Richardson, Texas 75081*

*972.530.6400 Fax 972.530.3307 800.283.8923*



EXHIBITS IN SEPARATE BINDER

COPY

Q. Okay. And is that currently what you do?
A. I am currently the fire and security operations manager for North Texas and Oklahoma. We just had a reorganization in October.
Q. So from 2001 until -- 13:28
A. Till this past October.
Q. Okay. So you've already said that you're NICET Level 3 -- 4?
A. Four.
Q. I'm sorry. NICET level 4 certified? 13:28
A. Correct.
Q. Have you had any specific training in government contracts or in bidding on government contracts?
A. I've had an "interwise" training as far as how we do business on the GSA contracts that we won, I guess, or that we're a part of. We got a GSA contract, and I've had training on that. 13:29
Q. Okay. Are you familiar with the Federal Acquisition Regulations? 13:29
A. Couldn't say that I am.
Q. Are you familiar with the proposal solicitation and bid award process with government contracts?
A. Uh-huh. 13:29

A. I think we actually contacted Grot because when we did win the bid, I think we contacted them to see if there was anything we could -- we could do to try to work with them. And what was the question again? 13:32
Q. What was your understanding of what your obligations would be when you subcontracted with Grot?
A. Oh. To provide the fire alarm equipment and the engineering and the -- I think we actually decided we were going to have our crew install the devices; and 13:32 we'd be doing final terminations, testing, certification and all the drawings.
Q. Did you submit a cost proposal to Grot prior to entering into a contract with them?
A. Uh-huh. 13:32
Q. And what was that cost proposal based on? What scope of work was that based on?
A. It was based on the plans, the devices shown on the plans and the specifications that were out there. But we were supposed to install devices that 13:33 were shown by the Fratto-engineered design drawings.
Q. And when you say "the plan," you're referring to the Fratto drawings.
A. Correct.
Q. Okay. Let me go back and make my question a 13:33

subcontractor, Siemens, one install only and two design-install."

A. Okay.

Q. Does that sound familiar to you at all? Do you have any idea what that's referring to? 13:38

A. Huh-uh.

Q. So Siemens only produced one cost proposal to Grot at the beginning of this contract.

A. No. I would have to say that we submitted a proposal to Grot that had additional devices not shown 13:38 on the drawings.

Q. Can you clarify that for me, please? And when you say "drawings," because we're talking about a lot of drawings. We have Fratto's drawings. We have Siemens' drawings. Just clarify. 13:38

A. The contract drawings, that had additional devices on the contract drawings.

Q. Okay. And again, I'm sorry, but I'm trying to understand what you're saying. So your proposal to Grot included devices that were not included on 13:38 Fratto's drawings.

A. Our initial proposal.

Q. Okay. And what happened with that proposal?

A. That proposal was not accepted.

Q. And why not? 13:39

A. Because we were going to bid on the devices that were shown on the drawings and provide a, a system that was designed by Fratto.

Q. Did Grot direct you to resubmit a cost proposal based solely on the devices shown on Fratto's drawings? 13:39

A. That -- I don't know if they directed me to. But after discussions, we decided that was what we were going to do.

Q. Did Grot convey to you that that's what they wanted you to do? 13:39

A. That's what they wanted me to do? I don't know if I could say "wanted" or not, if that's the case. I can't --

Q. Well, after your discussions with Grot, what was it about your discussions with Grot that led you to believe that you needed to resubmit a cost proposal based solely on the devices shown on the Fratto drawings? 13:39

A. Because I guess we did -- we did that because once we reviewed the specifications and reviewed the documents, we decided that we were going to provide a system that was designed by the engineer. He wasn't looking for us to do the design, as far as that, because the system was already designed. 13:39 13:40

Q. Okay. Let's go back for a minute to your original cost proposal. Why did you include additional devices that weren't shown on the contract drawings in your original proposal?
A. Well, because -- and this goes back to the first bid. We were intimate with the project. We knew that, that when we walked it and talking with Mel and Chris and everybody concerned, that they wanted additional devices to -- in areas that needed coverage that weren't necessarily designed on the drawings. 13:40
Q. So from --
A. And that's -- well, okay. Go ahead.
Q. No. That's fine, if you have more.
A. I was just going to say, that's why, when we put our first bid out when they first did the solicitation, we were at $1.3 million. 13:40
Q. So based upon your, your prebid walk-through, your prebid site visit that you did before the first bid, you were aware of the fact that the VA was looking for more than the devices that were shown on Fratto's drawings? 13:41
A. In discussion with Mel and Chris, yeah. I don't know if that was brought out in -- I didn't attend the, the prebid meeting. I know there was a bunch of questions brought up that Lee said. I know 13:41

there was some questions and answers about clarifying, you know, how many people were going to be trained and who was paying for training and things like that.

But, yeah, we knew that, that if we were going to design it, that it would take, you know, more than what's shown on those drawings. 13:41

Q. And knowing that and based upon that knowledge, that's why you included additional devices in your first cost proposal to Grot?

A. Uh-huh. 13:41

Q. I'm sorry. You have to say "yes" or "no."

A. Yes. Yes. Yes.

Q. And when you met with Grot, how did you first know that that cost proposal was not acceptable to them? 13:42

A. When, when we started discussing what was -- what the specifications and what was shown on the plans and that it -- that we weren't going to design the system because it was already designed, and we were going to provide a bid per the plans and specifications specifically. 13:42

Q. So in that meeting Grot, officials from Grot and Siemens sat down and read through the specifications. And based upon --

A. I think we did it over the phone but -- 13:42

Q. Okay. So sat down in your individual offices --

A. Right.

Q. -- and read through the specifications and determined that the contract did not require you to do anything other than install what was shown on the Fratto drawings. 13:42

A. Yeah. That's what we decided, yes.

Q. Okay. And did you notify or inform Grot that at one point in time the VA had led you to believe that that was not what they wanted from the contract? 13:43

A. I probably said that, yeah. I said that. I could have said that what Mel and -- what Mel and Chris are looking for is, you know, a fully, you know, every nook and cranny covered. 13:43

But after discussions like I've said earlier, when we discussed the documentation that was given to us and that it was stamped and approved by an engineer, then we decided that, yeah, this is a -- this is already in a design system; and we will provide -- 13:43 you know, per the contract documents, we will provide an application system. We'll apply our system to what's shown on the drawings.

Q. And when you informed representatives of Grot that Mel and Chris had made this clear to you -- 13:44

A. Uh-huh.

Q. -- and that that was why you had created your cost proposal in the way that you created it, what was their response?

A. That it was -- it was not a design project, that it was a plans-and-specifications project is what they informed me and what we discussed. And, you know, I think in reviewing the documents, you know, whenever -- and I've been in this situation before where an engineer will put a design out and had to deal with the Texas -- what is it? Texas Board of Engineers. I don't know if that's exactly what they're called. 13:44 13:44

But I've got a -- I've got a statement in there that when an engineer puts a design on a set of drawings, he's responsible for the design, not the people that are contracted to do the work. We're supposed to follow the plans. If he puts one device on there, then it's his design. 13:44

Q. Did Fratto Engineering have a stamp that they would put on their drawings? 13:45

A. Uh-huh.

Q. Do you recall whether or not that stamp stated that the contractor was responsible for creating the plans, for installing the system exactly as -- 13:45

drawings, I don't believe. I don't know. But I'd have to get my CAD guy in here.

Q. Okay. And when you state that you missed some devices, do you mean that you missed some devices that were on Fratto's original drawings or missed some devices that were required for some other reason? 13:59

A. We missed some devices that were required, that were shown on Fratto's drawings; and then a couple of devices were shown by Fratto that weren't originally on the contract drawings. In the discussions with Jerry, we said we'll go ahead and put those devices on our drawings since Fratto -- since it's not that many devices. 13:59

Q. Approximately when was it that -- let me ask you this. Did Grot accept your second cost proposal? 14:00

A. Yeah.

Q. And approximately at what point was it that Siemens officially became Grot's subcontractor? You can give me month.

A. What? February or something? 14:00

Q. If the contract began on February 1st, 2002.

A. Oh, that's when Grot got their PO?

Q. Uh-huh. That's when they got their next --

A. I'm going to say probably March or no later than April, I wouldn't think. I'm not -- I'm not sure. 14:00

A. Have I -- yeah, I'm sure I have.

Q. Do you know what it is?

A. It's a proposal.

Q. Okay. For what?

A. It's a pricing proposal for adding and deleting devices in a, in a design. Looks like they're deleting quite a few smoke detectors, and they're adding heats and ducts and adding a bunch of speaker -- or strobes, one-horn strobes and some speaker strobes and some monitor modules. 14:19 14:19

Q. Okay. Do you know why this cost proposal was submitted in June of 2003?

A. Sure. This was when we went back, and there was issues coming up out at the VA Bonham, and we were told to redesign the system per NFPA 101 minimum code. 14:20

Q. And when you say, "We were told to redesign the system per NFPA 101 minimum code," who told you?

A. Grot. I mean we were -- that's what the -- that's what -- since there couldn't -- we couldn't find a way to make progress, then we decided -- you know, I probably was in on the conversations with Jerry and decided to put out a design that would meet minimum code, life safety 101 code, because we had already had an approved set of drawings stamped by Fratto saying we, we had met the intent, because it said accepted 14:20 14:20

except for a couple of "accepted as noted."

And then we did the second design. And when we did the second design, it was going to cost us more engineering time. You know, our second set of drawings was going to cost us more engineering time. 14:20 And there was going to be a cost impact to Siemens to go through the process of researching, putting devices on there, reshowing all the wiring and regenerating drawings and re -- putting together another proposal. I mean another submittal. 14:21

Q. So at this point where it states, "Proposal: We propose to furnish and install a Siemens Building Technologies redesign of the fire alarm system to meet the NFPA codes" --

A. Uh-huh. 14:21

Q. So at this point were the specifications at all incorporated into this redesign, or was this only on NFPA codes?

A. I would say it would only be on looking at NFPA codes. That was a bad transformer. 14:21

MS. WILLIAMS: This is Exhibit 119. Wait. Let me see what I gave you. That's not right. We can go off the record a second.

(Off the record.)

Q. (BY MS. WILLIAMS) All right. Go back on. 14:24

that --

THE WITNESS: Well, it had to do with detectors down the corridors, I believe, and probably pull stations, seems like to me.

Q. (BY MS. WILLIAMS) okay. And what was the issue with the pull stations and the smoke detectors? 14:27

A. I believe that when Raymond did the design, that he -- I think he -- he -- he had no smoke detectors or pull stations shown, I believe. In fact, is that the X building? I can't remember. 14:28

Q. The Building 29.

A. I think it's shaped like an X. And I think there was an issue with detectors down the corridors and pull stations. I know -- I can't remember if that was a temporary system at one time. We had to -- they 14:28 put in a temporary system; and there was some, some issues with that. There was definitely several issues, whether it was temporary system or the final design.

Q. Okay. But here the issue in the letter seems to be that Grot believes that Building 29 does not fall 14:28 within the new health care occupancy --

A. Right.

Q. -- category.

A. And they're saying that it should fall in the category of existing health care occupancy. 14:28

Q. Okay. And Grot has stated that they relied upon Siemens to make this determination.
A. Right.
Q. Is that correct?
A. Yeah. 14:28
Q. But you weren't the one that made this determination.
A. No. It was -- Raymond was doing the redesign. I mean I, I think he showed me the -- showed me the existing chapter and showed me why he was doing 14:28 what he was doing. Where it said the building was fully sprinklered, he didn't have to put smoke detectors down the corridor.
Q. Okay, because you agreed with him that Building 29 did not constitute a new health care 14:29 occupancy.
A. Yeah. I mean we, we went underneath the whole -- the whole facility was existing. I mean the whole campus, we didn't build any new buildings out there. 14:29
Q. And in your opinion, that's what constitutes a new health care facility is whether the whole building existed already or not?
A. I would have to say at that time, yes.
Q. Okay. 14:29

Engineering's, stamp on it, correct?

A. On the drawings that we -- that we got returned from Fratto, yes.

Q. Okay.

A. Now, when we submitted them, it would only have the NICET 3 person that put the system together. And then when we get a returned set, it would have had a Fratto stamp and probably a Grot stamp and a VA -- I don't know if it had a VA stamp. I don't know which stamps it had on it. But I know there was a -- there was definitely something that said "approved as noted" from Fratto. 14:40 14:40

Q. Okay. Let's go back to the beginning of time in this matter when the request -- the invitation for bids came out from the Government the first time. 14:41

A. Okay.

Q. Siemens was working on the project at that time down at the VA Dallas, correct?

A. Still working down there.

Q. Still working. And was Mr. Harrison and Mr. Forner working down there with Siemens? 14:41

A. Uh-huh.

Q. And isn't it a fact that, that while y'all were working in that same location, there were discussions between Siemens and, and Mr. Forner and Mr. 14:41

Harrison about the upcoming Bonham project?
A. Yeah.
Q. And they --
A. I know that it was brought to my attention, I think, by Bob Sleifert that it was coming up. 14:41
Q. And let me get you to look, if you would, in that notebook --
A. This?
Q. -- at Tab 44.
A. Okay. It says Exhibit 44? 14:42
Q. Correct.
A. Plaintiff's exhibit?
Q. And that is the minutes from the prebid conference. You weren't present at the prebid conference, were you? 14:42
A. No.
Q. Mr. Bledsoe from Siemens, I believe, appeared.
A. Correct.
Q. Neither Mr. Harrison nor Mr. Forner are 14:42 present or reflected as being present at the prebid conference, are they?
MS. WILLIAMS: Can we clarify which prebid conference? I'm sorry. The first or second bid? 14:42

MR. KILPATRICK: July 20, 2001, the first prebid conference.

Q. (BY MR. KILPATRICK) They're not reflected as being present either, are they?

A. I don't see them on the list. 14:42

Q. Okay. Now, subsequent to this prebid conference, you talked about walking, or Siemens walking the project with Mr. Harrison and Mr. Forner; is that right?

A. Yeah. I'm trying to think July, if we walked 14:42 it before or after. I mean I definitely was on a walk-through at the Bonham project before we bid it.

Q. You were personally there.

A. (Nods affirmatively.)

Q. Is that correct? 14:43

A. I -- to my recollection, I was there with Lee Bledsoe looking at it before we ever put out a number. I know.

Q. And during that walk-through with, with Mr. Forner and Mr. Harrison, didn't they point out to you 14:43 different things that they wanted to see in this project?

A. They were -- they were -- and I'm -- I've only been up there a couple of times. I mean there was mention, I remember -- there was talk of a McCullough. 14:43

You know, we were looking for sprinkler stuff and a McCullough thing that needed to be removed in Building 1. And, yeah, there was -- there was things we were, I believe, that when we walked through that we, we definitely talked about that needed to be done, yeah, 14:43
because I know that when Lee and I put the -- Lee put the first bid together, there was a lot more equipment and costs that we had in the -- in the project to, to meet what we had discussed.

Q. Okay. And that's what I'm getting to. 14:44
Siemens' initial bid was at 1,300,000, right?

A. Some -- yeah, a million three something.

Q. Do you remember in the first bid what the low bid was submitted by ADT?

A. Eight sixty or eight eighty maybe, I think, 14:44
roughly. Somewhere in the eight hundreds.

Q. Well, rough eight hundred and sixty, $870,000.

A. Okay.

Q. That would be roughly a half a million 14:44
dollars less than what Siemens priced, right?

A. Correct.

Q. And then the next bid, the next low bid, was by ADT. Do you remember that being under a million dollars? 14:44

A. Yeah. I thought ADT was the low bidder, but maybe I was mistaken.

Q. Oh, I'm sorry. ADT. It was Simplex.

A. I thought it was right -- I thought it was right around a million or something, seemed like to me. 14:45

Q. And Grot was at 1,055,000, thereabouts.

A. Okay.

Q. So there was a $300,000 swing between Siemens' bid and Grot's bid, correct?

A. Yeah. 14:45

Q. Now, when you saw that, what did that tell you?

A. Told me we weren't all bidding apples to apples as far as what I'm -- what I'm used to seeing in the bid process when there's that big a spread. 14:45

Q. So without going through the litany of things that happened for the rebid, the project was subsequently rebid --

A. Uh-huh.

Q. -- right? And Siemens submitted a price for this job in the rebid, correct? 14:45

A. Right.

Q. How did you price the job the second time you bid it?

A. We priced it per what was basically on the 14:45

drawings. I mean mostly what's on the drawings.

Q. Did the fact that there was that spread in the first bids tell you that the other bidders were bidding per plans and specifications and not what Mr. Forner and Mr. Harrison had relayed to Siemens they really wanted on the job? 14:46

A. Yeah, I believe so, because it seems like on that second bid we were also asking about why wasn't there a prebid meeting and why weren't -- were we supposed to take into account the notes from the first 14:46 prebid meeting. And I think we were told not -- to disregard the notes or the meeting minutes from the -- from the -- from first prebid meeting. Seems like that was the direction, you know, without pulling out the paperwork. 14:46

Q. And in the first bid, the only way that bidders could have bid apples to apples would have been if Mr. Harrison and Mr. Forner had pointed out to each bidder exactly the same thing they pointed out to you, isn't it? 14:46

A. I guess so. I mean you could have gone and walked it and seen a lot of the stuff, I mean in a prebid. But, yeah, if you -- if you weren't intimate with that site, then I don't know if you could have got it by just reading the plans and specifications. 14:47

Q. But a lot of the things that Mr. Harrison and Mr. Forner wanted on this project were not a requirement of NFPA 101 and 72 to meet code, were they?

A. I don't know about that. I mean as far as they -- you know, they -- there was devices that -- you know, I don't know. I think the McCullough loop stuff, I think that was -- some of that was in the specifications. But you wouldn't really know it. 14:47

But where they were looking for devices was, you know, certain areas that were really not depicted well on the drawings, like I said. You can't -- you know, there weren't enough speakers. There weren't enough strobes. 14:47

Q. Okay. But there was no way to know from a review of the plans and specifications what was in Mr. Forner's and Mr. Harrison's head about what they wanted, was there? 14:47

A. There's no way to do that, no, unless you went and talked to them.

Q. And they weren't at the prebid conference per those notes, right? 14:47

A. Yeah. I wasn't -- I wasn't there either, so I don't know if they were there or not.

Q. And would you agree with me that everything that Mr. Forner or Mr. Harrison might have relayed to 14:48

you during y'all's walk-through could have been put in writing and put in front of each bidder so that everybody would have known what the VA wanted?

A. I guess it could have been, you know.

Q. Just to clarify again, Siemens didn't price Grot during the bid process. They provided a proposal after Grot was awarded the job, right? 14:48

A. Correct.

Q. If you knew -- you being Siemens, okay? If Siemens knew at the time it bid the first job what Mr. Harrison and Mr. Forner were expecting or wanting, how was Siemens going to make up the difference if it got the job on the second bid if Siemens was low? 14:49

A. I don't know. It would have been -- it would have been a challenge, I guess, if we -- if we got stuck in that, we probably would have been asking for some change orders. I knew that -- what was it? One thing that was out there was Building nine -- is it 19? I don't know. The garage wasn't really shown on the drawings, I don't believe. It had a few devices. 14:49 14:50

But I mean there would have been definitely discussions about, about what was needed or not. We probably would have, you know, submitted our drawings and hopefully got an approved set, which would have led us to do the installation for what we got 14:50

approved.

Q. Okay. It would have had to have been through change order to make up the $300,000 difference in your first bid, wouldn't it?

A. It -- yeah. I guess if -- if we would have gotten into probably the same situation, well, yes. 14:50

Q. When Siemens entered into a contract with Grot to provide its system and started preparing the drawings that were submitted and approved for construction, did the drawings submitted by Siemens prior to the directive to redesign the job in September 2002 meet the plans, specification and code requirements for this project? 14:51

A. They, they met the -- what was shown on the drawings is what those drawings submitted did. 14:51

Q. And did -- and those drawings then were submitted pursuant to NFPA 101 and 72 also, right?

A. Well, they were submitted to -- well, life safety -- I mean there was definitely devices that weren't shown on those drawings that were -- that you would have to put in if you were going to meet 101, which ... 14:51

Q. And did you show those on those drawings?

A. No.

Q. Look, if you would, at -- well, you'll have 14:51

handed to Grot were exact replicas of Fratto's original drawings with your -- with your devices plugged in.

A. Yeah.

Q. Correct?

A. As close as -- like I said, as close as possible. Seemed like we missed a couple. And then there was a couple added. I mean there was -- that was the intent anyway. 14:57

Q. And Siemens did not take into account NFPA codes at that point in time. 14:57

A. I would say we designed it with the devices that were shown on the drawings.

Q. And Siemens did not take into account the requirements of the specifications at that time. Let me rephrase that. 14:58

Siemens assumed that the Fratto drawings had incorporated the specification requirements at that time, correct?

A. Yeah. I believe they took into account some of the -- I mean there were certain things I thought we had -- I'd have to look at the drawings. But I don't know. I think in the spec, or was it on the drawing, that it said something about removing a McCullough transmitter. And we may have had a note or two about that. It may have been in the spec. I can't really 14:58 14:58

remember.

I mean there was a lot, lot of discussion about, about how it was going. I'd have to pull the drawings out and look at them and compare them to tell you exactly. 14:58

Q. Okay. But per your testimony today, you stated that the people that actually designed the drawing --

A. They probably just looked at the drawings, yes. 14:58

Q. And probably did not read the specifications, correct?

A. Well, they read the specifications; but I don't know how, how much, if they applied the specifications -- 14:58

Q. Okay.

A. -- exactly.

Q. And then when you were contracted -- when Grot contracted with you to do the redesign of the project, you based your redesign solely on the basic 14:59 requirements of NFPA codes 101 and 72. Okay?

A. Existing buildings, yeah.

Q. Not just with the Building No. 29 but overall.

A. Yeah. It would have been under the existing 14:59

building health care standard out of 1997 NFPA 101.

Q. And that was solely what your redesign was based upon.

A. I believe so. I believe that's what Raymond redesigned to and what we talked about. 14:59

Q. So in -- as far as Siemens was concerned, what constituted additional devices on this project?

A. What constituted additional devices?

Q. Correct.

A. With respect to, to the redesign? With respect to the -- I mean in what respect? 14:59

Q. Break it down any way you want. If I just say to you the term, additional devices, what does that mean to you with respect to this project? What --

A. That would be -- that would be a device that we had not, not included in our cost estimate to provide. It would be an additional device. Or it could have been an additional device -- could be a device that was, was -- we were told that we needed to add by Fratto. Or I mean there's a lot of definitions of an additional device. 15:00 15:00

Q. So if I say an additional device is one that was not included on the drawings you submitted, would that be a correct definition?

A. That's one correct definition of an 15:00

CAUSE NO. 03-1951C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GROT INCORPORATED,
*Plaintiff,*

VS.

THE UNITED STATES OF AMERICA,
*Defendant.*

ORAL DEPOSITION OF
RICKEY L. KIRK
October 13 and 14, 2004

oOo

*In Dallas/Fort Worth ...*

MBA REPORTING SERVICES INC.

*Court Reporters & Videographers*

*801 East Campbell Road, Suite 180 * Richardson, Texas 75081*

*972.530.6400 Fax 972.530.3307 800.283.8923*

EXHIBITS IN SEPARATE BINDER



ORIGINAL

A. It's just mainly safety.

Q. But nothing specifically directed at the installation of a fire protection system.

A. No.

Q. Do you have any NICET-level certifications? 13:52

A. No.

Q. Let me hand you, Mr. Kirk, a document that we've marked as Plaintiff's Exhibit 6. And let me get you to look at that for a moment. Looking at the fourth paragraph -- I mean strike that -- the third 13:53 paragraph from the bottom, it begins, "Our informant told us that Grot," et cetera. Do you know who the individual is that's the informant?

A. Yes.

Q. Who is it? 13:53

A. A gentlemen by the name of Scott Steed.

Q. Who was talking to Scott?

A. I believe it was Mel Harrison, Chris Forner, myself.

Q. Why were y'all having conversations with 13:54 Scott?

A. We was discussing the fire system and the general situation that was going on at that time towards the end of the project.

Q. What type of general situation? 13:54

Q. How long have you known Mr. Harrison?
A. Well, since, I guess, about six months before this project started.
Q. Okay. This is -- this e-mail, this Exhibit 6, is dated September of 2002. That was about the time the issue was coming to a head as to whether or not this was a design-build project, right? 13:56
A. 2002?
Q. Yes, sir.
A. Well, the head, design -- yeah. This was after it had been determined that this was a design-install project. 13:56
Q. When you were talking with Mr. Steed about the information that's contained in this statement, okay, did you ask Mr. Steed what Grot had asked to be quoted? 13:57
A. No.
Q. Did he just volunteer it?
A. No. Mel Harrison and Chris had been talking to him about how the project was done. 13:57
Q. Okay. Did you ever talk to Mr. Steed about any of this information?
A. No, not about that particular item.
Q. What else did Mr. Steed tell Mel or Chris?
A. They were discussing the wiring on the panels 13:57

about 21 years or so. In that time between 15 and 20, I guess.

Q. How many of those were fire alarm projects?

A. None of them.

Q. Is this your first fire alarm project to do? 14:01

A. Yes.

Q. In those 15 or 20 projects that you were COTR, were any other contractors terminated?

A. One.

Q. Is that the water tower -- 14:02

A. Yes.

Q. -- contract? At the time of this project, Mr. Kirk, how many buildings on the campus that were under this contract did not have an active fire alarm system? 14:02

A. Didn't have an active one? I believe one.

Q. Which one was that?

A. Building 5, I believe.

Q. What type of building is that?

A. It started out as the home of the director of 14:02 the hospital. It sat empty for a good while. When we integrated with Dallas and they were changing it to bedrooms for domiciliary patients is the reason we included this one.

Would it be possible to ask Ms. Williams 14:04

Q. Mr. Kirk, there came a time during the construction of this project where an issue arose as to exactly what Grot's responsibility was with respect to the design of the fire alarm system, right?

A. Yes. 14:16

Q. Grot at that point in time had been issuing plans through Siemens, or actually Siemens through Grot to Fratto, for approval and subsequently to you to be stamped and approved, right?

A. Yes. 14:16

Q. And you had in fact stamped and approved drawings prior to this dispute arising, did you not?

A. Yes.

Q. Okay. What brought the issue of the design-build question to a head? 14:17

A. I had been asking Mr. Evans up to about May when they would be coming out to walk the site for the design process of this job. I believe it was in May I asked Scott Steed when he planned on walking the site for the design, and he said they had no intention of 14:17 walking the site.

Q. It's very important. Scott Steed told you they had no intention of walking the site, correct?

A. Yes.

Q. Okay. Go ahead. 14:17

A. No. They're based here in Dallas.
Q. So the drawings would come to you, go to Fratto, back to you, to Chris and Mel, back to you and sent on to Grot to construct, right?
A. Once I received them, yes. 14:23
Q. So assuming that Mel and Chris are NICET Level 3 certified, a NICET Level 3 technician within the VA approved the drawings, right?
A. They approved what was there.
Q. Okay. Doesn't that tell you then that the drawings were meeting the code? 14:24
A. They were meeting part of it. They weren't complete.
Q. Why not?
A. All the code wasn't being met. 14:24
Q. What do you mean?
A. All that was there was meeting code. But they weren't complete. There was more that needed to be added.
Q. What was that? What needed to be added? 14:24
A. Like smoke detectors in elevator shafts.
Q. Now, we're getting ahead of the game, I think. I think you're talking about smoke detectors in the elevator shafts after Grot was directed to design the project. That's when that issue came up, didn't 14:24

it?
A. That was part of the same issue.
Q. What do you mean "it was part of the same issue"?
A. It's -- the complete design would include showing smoke detectors at the top of elevator shafts. 14:25
Q. Even if they're not required by NFPA 101 or 72?
A. No. They're required.
Q. If the elevator shaft is sprinkled, they're required? 14:25
A. I'm not sure.
Q. Well, in that issue, Mr. Kirk, in fact, Siemens and Grot both provided you the NFPA sections that showed where that wasn't required; and you insisted on them putting it in anyway, didn't you? 14:25
A. Yes.
(EXHIBIT NO. 41 IDENTIFIED.)
Q. (BY MR. KILPATRICK) Let me hand you what's been marked as Exhibit 41. Do you recognize that document? 14:26
A. Yes.
Q. What is it?
A. It's a document I produced in response to Mr. Mraz's e-mail of September 12th. 14:26

Q. Okay. And this is where you're justifying to Mr. Mraz that this is a design-build project, right?
A. Yes.
Q. Now, this is the first instance -- at or about this time was the first instance that Mr. Mraz had any knowledge that this was an issue, right? 14:26
A. No, I don't think so.
Q. When would he have known about it?
A. I believe it was at least back into May.
Q. Looking down, Mr. Kirk, at the paragraph right after the first italicized portion, you make the note, "This note informs me that there are three things I should be concerned with: One, the contract drawings are generic." 14:27
Now, are you saying that they are generic in all respects? 14:27
A. I'm saying they're generic in the sense that they provide enough information that a contractor can provide a proper bid for this project.
Q. Okay. If you read the italicized portion immediately above that, it says, "These drawings are generic with respect to any particular manufacturer's equipment," right? 14:28
A. Uh-huh.
Q. It doesn't speak to the drawings as a whole. 14:28

It only states that, as far as the manufacturer's equipment is concerned, it is not a sole-source procurement. Isn't that what that means?

A. The project was not intended to be a sole-source procurement. 14:28

Q. Correct.

A. Yeah.

Q. And that's what that line says, right? It's generic with respect to any particular manufacturer's equipment. 14:28

A. I don't understand the question.

Q. Okay. Well, let's read on. "Quantities of FATC and spacing-dependent devices may vary with the system equipment manufacturer."

A. Uh-huh. 14:29

Q. Right?

A. Yes.

Q. That means that if one system has a smoke detector that you can put in this room, in the center of the room and cover the room, that's what you put in 14:29 it and put it in the center of the room. But another system may require two smoke detectors on either end of the room, right?

A. That's correct.

Q. Okay. That is system dependent. And that's 14:29

part of the design of the system, right?

A. Yes.

Q. Okay. Now, design of the system to go in the project is different than overall design of the project, right? 14:29

A. Repeat that.

Q. The design of the system, the smoke detectors, is totally different than the total design of the project provided by Fratto, isn't it?

A. I don't understand. 14:29

Q. Okay. Now, on the second page of your memo, Exhibit 41, what you're doing in this entire memo is taking the sections that you rely on to make this a design-build project and trying to justify to Mr. Mraz your interpretation of those sections, right? 14:30

A. Yes.

Q. And in that first paragraph on the second page, the second sentence, it says, "This sounds to me like I'm going to have to really investigate the site and see if the architect hasn't shown anything on the plans that I need to install; or maybe he's showing something I don't need to place," right? 14:30

A. That's correct.

Q. So what you're saying is that the contractor on this job should investigate the site to the same 14:30

extent that the design engineer did in order to be sure that everything shown on these drawings is applicable or if other devices are needed. Is that what you're saying?

A. What I'm saying is, I need to look at the site. I need to study the site and make sure that the drawings I'm provided with include that that is shown, and find out if I need to add anything or if possibly something in the drawings doesn't need to be there. 14:31

Q. All right. You took an estimating course in a training class, right? 14:31

A. Yes.

Q. And in order to properly estimate a project, you basically got to know what you're putting in it, right? 14:31

A. Yes.

Q. Okay. So if he's going to investigate the site and redesign this project like he was directed to do, he's basically going to have to do the same type of investigation that the A/E did in originally designing the job, right? 14:31

A. That's correct.

Q. Okay. Do you know how long the A/E took to design this project?

A. I don't recall how long. 14:32

But how was Grot supposed to know that it was supposed to add 15 to 25 percent to its bid to cover missing devices that may not be shown on Fratto's drawings?

A. As a safety factor.

Q. What type of safety factor? 14:35

A. When I'm estimating something like that, you got to include the unknowns.

Q. How many --

A. And in this instance, codes is going to require something extra. 14:35

Q. How many jobs have you estimated, Mr. Kirk?

A. Oh --

Q. How many fire-alarm jobs have you estimated?

A. Fire alarms? None.

Q. Okay. When Grot first started submitting 14:35 drawings to you at the beginning of this project and Mel and Chris and Fratto were signing off on them, they were based upon Fratto's drawings provided at the beginning of this project and Siemens' devices, right?

A. As far as I know, yes. 14:36

Q. And those drawings were meeting NFPA 101 and 72 or Mel and Chris wouldn't have signed off on them if Fratto wouldn't have signed off on them, would they?

A. Probably not.

Q. How many jobs have you ever estimated for 14:36

Q. And the only way to know about the tampers and flows is to get up above the ceiling, right?

A. Well, not during an actual estimation of the bid. They could have. They were invited to come out and look the site over. Everybody was. 14:49

Q. How long would it have taken them to have gone through every building and looked above all those ceilings and found all those tampers and flows that were up there?

A. It would have taken a while. 14:49

Q. That would have been part of that 88 days that they got to bid the job, right?

A. Yes.

Q. In addition to the time it's going to take them to do their design work, to estimate it, right? 14:49

A. Yes.

Q. Fratto had 266 days and didn't show all the tampers and flows, did they?

A. No, they didn't. But they did in the back of the specifications list, most every one of them. 14:49

Q. Listed all the tampers and flows?

A. Most initiating devices, I believe so.

Q. Siemens is the completion contractor on the project now, right?

A. Yes. 14:50

there was around eight contractors, if I recall correctly.

Q. Okay. Did y'all discuss the design of the project?

A. I don't recall. I'd have to go back to the minutes of that meeting. 15:03

(EXHIBIT NO. 44 IDENTIFIED.)

Q. (BY MR. KILPATRICK) I hand you a document we've marked as Exhibit 44. I ask you if you can identify that document. 15:04

A. I guess this is the minutes from that meeting.

Q. Anywhere in there do you discuss with any of the contractors or is a question raised by any of the contractors regarding their responsibility to design this project? 15:05

A. I don't see any place where it discusses design.

Q. Subsequent to the initial -- or strike that. Did you review Fratto's plans and specifications during the design process? 15:07

A. Yes.

Q. Did anyone else with the VA review them?

A. Yes.

Q. Who? 15:07

construction of this project, Grot expressed extreme concern to Fratto and then back to you about modifications being made to Fratto's drawings? You don't recall that?

A. I don't understand what you're talking about there. 15:14

Q. Okay. We'll get into it tomorrow.

MS. WILLIAMS: Are we at a break point?

MR. KILPATRICK: Sure. Can be.

(Recess.) 15:15

Q. (BY MR. KILPATRICK) I'm going to show you, Mr. Kirk, specifications section 01010, General Requirements, paragraph 1.2, Statement of Bid Items, I believe.

A. Yes. 15:27

Q. Read that statement into the record for me.

A. "Work includes general construction, alterations, grading, fire alarm, mechanical and electrical work."

Q. Nowhere in there does it say that the contractor's scope of work includes design, does it? 15:28

A. No.

Q. And that is the scope of work for the project, right?

A. It's the bid item. 15:28

Q. Well, that's what the contractor's bidding on, right?
A. Yes.
Q. He has the right to rely on the specifications provided by the Government, right? 15:28
A. Yes.
Q. May I have it back, please, sir?
A. (Hands to counsel.)
Q. Now, where in -- is there any other place in these specifications that you rely on, other than what 15:28 you've already referenced in that letter we discussed awhile ago, to determine that this is a design-build project?
A. Those two sections that I quoted are the sections I relied on. 15:29
Q. That's all in this entire book.
A. Yes.
Q. Right?
A. Yes.
Q. I show you 01001, General Conditions, 1.1A1. 15:29 It's the definition of what the bidder is for this job. You see that?
A. Yes.
Q. Nowhere in there does it say that the bidder is an engineer, an architect or a NICET Level 3 15:29

certified designer, does it?

A. No.

Q. It says that the contractor is a builder, right?

A. Yes. 15:30

Q. Now, I'm not arguing with you that Siemens had to provide its system. Okay? And that that system was to be designed by a NICET Level 3 certified technician. That's not the argument. But what has happened -- and correct me if I'm wrong -- is that in 15:30 relying on Fratto's documents, Siemens was preparing drawings and specifications and submitting them for approval based on Fratto's drawings, right, early on in the project?

A. Repeat the question, please. 15:30

Q. Early on in the project Siemens was providing its system design based upon Fratto's drawings, correct?

A. They were submitting some drawings.

Q. Right. And it had their -- it had their 15:31 designs for smoke detectors and whatever else was required by Fratto shown on those drawings and spaced per Siemens' requirements, didn't it?

A. I don't know that.

Q. Well, why wouldn't you know it? You were the 15:31

the right to not provide that smoke detector, right?

A. No, because the specifications state that they have to go by the generic -- generic plans given, which included all that stuff, plus anything else included by code. 15:34

Q. So if Siemens' smoke detector can sit over in the corner of the room where that device is and protect this building pursuant to NFPA 101 and 72, and yet Fratto's drawings showed the smoke detector in the center of the room, you're saying that that smoke 15:35 detector and that smoke detector had to be installed.

A. If this smoke detector is per code also --

Q. No, sir. If this smoke detector is on Fratto's drawings, you wanted it, right?

A. Yes. 15:35

Q. That's what you said.

A. Yes.

Q. You told them, I want everything shown on Fratto's drawings and everything necessary to make this NFPA 101 and 72. And essentially what you were saying 15:35 is, I don't care if it puts two smoke detectors in the same room and it's redundant. That's what you were saying, right?

A. Yes.

Q. So Fratto's drawings weren't generic then, 15:35

Q. Or did you make that decision?
A. Wasn't mine alone.
Q. You are not a NICET Level 3 certified designer, are you?
A. No. 15:42
Q. You're not a fire protection engineer.
A. No.
Q. This was your first-ever fire protection job, right?
A. Correct. 15:42
Q. And you were directing Siemens and Grot and, to a large extent, Fratto in how this project was going to be designed and built; isn't that correct?
A. No.
Q. Well, who was? 15:42
A. I wasn't directing Fratto at anything.
Q. Why did it take Fratto so long to design this project if their drawings were just going to be generic?
A. You'd have to ask them. 15:45
Q. Well, were you not involved in extending the contract completion date for Fratto in the design process?
A. I'd have to go back and look at that paperwork to recall that instance. 15:45

a time on this project when Grot disputed a directive given to them in writing and did not perform the directive?

A. You would have to define "dispute."

Q. Well, let's take this. We are now at September 25th of 2002. And the contracting officer, based upon information provided by you, has directed Grot to proceed with design of this project. Okay? 15:55

A. Okay.

Q. And Grot responded saying, "We're going to do it, but we're going to protest it, and we will try to get our cost for it later." That's what that letter says, isn't it? 15:55

A. I believe so.

Q. And isn't it a fact, Mr. Kirk, whenever Grot disputed a directive given by you or the contracting officer, which was in writing, it would perform pursuant to that directive and reserve its rights to contest it at a later date? Didn't they? 15:55

A. Yes. 15:56

Q. They never once refused to do anything that they were told to do in writing, did they?

A. No. It just took a while sometimes.

Q. Well, and part of that "taking a while sometimes" was Grot asking you or Mr. Mraz to put it in 15:56

writing, wasn't it?
A. I don't understand that.
Q. Well, you'd have conversations with Jon Evans out on the job site, right?
A. Yes. 15:56
Q. And at times you were telling him to install additional devices in certain rooms, right?
A. (Nods affirmatively.)
Q. Yes or no. Okay. And Mr. Evans would tell you, "I can't do anything till you put it in writing," 15:57 wouldn't he?
A. Yes, sometimes.
Q. And the reason for that is that under the Contract Disputes Act or -- let me back up. Under the general conditions of the contract, if you don't put 15:57 that directive in writing to install those additional devices, and he just goes and does it, he's precluded from procuring that cost at a later date, isn't he?
A. I don't understand.
Q. Well, let's take, for example, you've told 15:57 Mr. Evans to install two new smoke detectors in this room. And he says, "They're not needed." And you tell him, "Yes, they are. And I'm telling you to go do it." Right?
A. Yes. 15:57

Q. Okay? And Mr. Evans says, "No, I can't do it until you put it in writing." Now, when you put that in writing to him, he would go and do it, wouldn't he?

A. Yes.

Q. All right. And the reason he asked for it in writing is that under the contract documents, if he performed that work under your oral directive, he may not ever get paid for it because the Government could dispute that it was not done voluntarily, right? 15:57

A. Yes. 15:58

Q. All right. So it wasn't outside of his contractual rights to ask you to put something in writing, was it?

A. No, it wasn't.

Q. Now, this was a -- this design-build issue was a considerable dispute. I'll admit. It took a few weeks for this letter to get written and for this to shake out, right? 15:58

A. Yes.

Q. Once this letter was written, Grot went to doing exactly what the contracting officer told him to do, didn't he? 15:58

A. Yes.

Q. All right. Now, you were provided a copy of this letter by Mr. Mraz? 15:58

and 72 and devices shown on Fratto's drawings were not necessary, why would you require a contractor to install them?

A. There may have been a reason why the architect wanted it there. I don't know. 16:03

Q. Thought you said these were generic drawings.

A. Yeah. They are.

Q. Did you ask the architect if you could remove them, if it was okay for Grot to remove them?

A. I don't recall. I'll have to call Mark Fratto and find out. 16:03

Q. As a matter of fact, Mr. Kirk, following termination of this project, an issue arose over the necessity for smoke detectors in a corridor someplace; and Mr. Fratto told you they're not required by NFPA 101 and 72. But if the VA wants them, they can get them, right? 16:03

A. I don't recall that conversation.

(EXHIBIT NO. 45 IDENTIFIED.)

Q. (BY MR. KILPATRICK) All right. If you would, please, flip to the last page, which is the beginning of the e-mails. Now, that first item you're reading on the last page, which is Page G002801, is a request from Scott McCauley of Siemens regarding whether or not smoke detectors, which are not necessary to meet NFPA 16:05 16:06

A. Seems to be.

Q. Okay. Well, let's look at the next page over, the second -- what would be Page No. 02800. I'm sorry, 002800. Look at the top of that. That is a response from David Morrison, Fratto Engineering. 16:07

"We concur that if an area and/or occupancy does not require smoke detectors per NFPA 101.97, and no smoke detectors were originally installed in the area, then these smoke detectors are not required, even though smoke detectors are shown on 16:08 FEI drawings. However, if the VA personnel choose to have them included, there's no reason not to include them." Do you see that?

A. Yes.

Q. That was to you, right? 16:08

A. Yes.

Q. Those were the same type of devices that Grot was telling you didn't need to be installed in June, July 2002.

A. Uh-huh. 16:08

Q. But you were telling them to install them anyway, weren't you?

A. Yes.

Q. And you never were checking with Fratto to see if it was really necessary to do it. You were 16:08

Okay?

A. Okay.

Q. And you told him, "No, you can't do that," right?

A. Yes. 16:11

Q. You made him install devices regardless of whether they were needed under NFPA 101 and 72, right?

A. It comes down to that, yes.

Q. Yes, sir, it does. Yet when Siemens took over the project and raised the same question, you 16:12 changed your position, didn't you?

A. Once again, I was going by my consultant.

Q. But you never consulted with Fratto when you were addressing Mr. Grot's issues back in June -- September of 2002. You made the unilateral decision 16:12 with Mr. Harrison that you were going to require everything, right?

A. No. No.

Q. Well, how did you make the decision?

A. By going by the plans and specifications and 16:12 those I consulted with. And as for Fratto, I'd have to go through my documentation and speak with Fratto too. I can't remember.

Q. Okay. Mr. Kirk, I'm going to ask you to show me -- and you can do it at a break, if you want to find 16:12

to afford, didn't it?

A. I -- I believe so.

Q. There were a number of devices and a number of items, functions, that you wanted, Mr. Harrison wanted, the VA wanted, that because of budget constraints, Fratto was not going to be able to put in the drawings, was it (sic)? 16:15

A. I'll have to review that documentation. I couldn't say yes or no without seeing it.

Q. You had a number of meetings with Fratto during the design process. But you do not recall discussions regarding the extent of the budget and what could or couldn't be accomplished? 16:15

A. Yes, I remember conversations about the budget stuff. I can't remember exact things from that time period four years ago. 16:15

Q. Now, when Grot started redesigning this job, as they said in their September letter, they were going to remove items not required by NFPA 72 and 101, right?

A. That's what the letter says. 16:16

Q. That's what the letter says. That's what they did. Because you went back and told them to install additional devices, didn't you?

A. Yes.

Q. If it wasn't shown -- if it wasn't in that 16:16

design is what you're saying.
A. Yes.
Q. There's nowhere on those documents does it say this is not a complete set of drawings, does it?
A. I don't understand what you're asking now. 16:30
Q. Well, there's no place on the drawings that were submitted by Fratto that says these drawings are not complete, does it?
A. It says they're generic.
Q. Not on the drawings, does it? 16:31
A. On Fratto's original?
Q. Yes, sir.
A. Bid document drawings --
Q. Does it say --
A. It states they're generic. 16:31
Q. On the face of the drawings?
A. There's a note in the drawings that says they are generic.
Q. Oh, they are generic as to any manufacturer's material, right? 16:31
A. So that would tell you it's not complete.
Q. That tells you it's not complete.
A. Any prospective bidder.
Q. Have you ever bid on a fire alarm project?
A. No. 16:31

Q. You ever bid on a project?
A. No.
Q. Have you ever sat down and done a takeoff on a set of construction drawings in an effort to prepare a bid for a job? 16:31
A. No. We don't bid.
Q. Matter of fact, the directions from the A/E or to the A/E in this Plaintiff's Exhibit 11 says that they will prepare a fully developed set of working drawings, doesn't it? 16:32
A. Yes.
Q. So when did the direction to the A/E change from preparing fully developed working drawings to working drawings with items missing?
A. I'll have to find out what was meant by fully developed working drawings. 16:32
Q. Wouldn't it have been nice to have found that out back in September of 2002 before this contractor got terminated?
A. I don't know how to answer that. 16:32
MR. KILPATRICK: It's a bad question. It's rhetorical, and it's complaining. All right. Lindsay, I'm about to get into those construction issues. It's going to take a while. Rather than getting in it and having to stop in the middle, why 16:33

Q. Yes, you do know; or, yes, they were?
A. As far as I know, they were.
Q. What do you base that understanding on?
A. They have been fire alarm technicians for the Dallas VA for I don't know how long. 09:16
Q. Does that require that you be a factory-trained technician for Siemens in order to be a fire alarm technician?
A. I believe our chief required it.
Q. Okay. With respect to the design of this project, the specifications required the design by a NICET Level 3 certified technician, right? 09:17
A. Yes.
Q. Or designer? It didn't say that the system could be designed by a factory-trained technician, did it? 09:17
A. No.
Q. Now, there were changes made by Mr. Harrison and Mr. Forner to stamped and sealed drawings, sealed by Fratto, stamped by Fratto as approved for construction, weren't they? 09:18
A. There may have been recommendations by them that these additions need to be made.
Q. Well, Mr. Kirk, you testified yesterday that you red-lined in additional devices and changes to the 09:18

drawings at the recommendation or actually direction of either Mr. Harrison or Mr. Forner, didn't you?

A. Yes.

Q. So non-NICET Level 3 technicians were making changes to drawings that had been approved by Fratto and had been drawn by a NICET Level 3 technician, didn't they? 09:18

A. Fratto was aware of all changes indicated. They received copies.

Q. That's not my question. They were making changes to drawings that had been prepared by a NICET Level 3 technician, correct? 09:18

A. Yes.

Q. Under what authority?

A. As factory-trained technicians and more knowledgeable in NFPA codes than I was. 09:19

Q. Were they more knowledgeable in NFPA codes than a NICET Level 3 technician?

A. I don't know.

Q. Were they more knowledgeable than a licensed professional engineer? 09:19

A. I don't know.

Q. How many fire alarm systems had Mr. Harrison and Mr. Forner designed before this time?

A. I doubt if they've designed any. 09:19

Q. So now we've got non-NICET Level 3 technicians who have not designed any fire alarm systems making changes to drawings that were designed by a NICET Level 3 technician and approved by a professional engineer, correct? 09:19

A. Yes.

Q. And what were they basing these changes to these drawings on?

A. NFPA codes.

Q. All right. And where would they cite on the drawings what the code requirements were? 09:20

A. I don't believe any codes were indicated on the drawings.

Q. And in fact, Mr. Kirk, during the course of this construction, Grot repeatedly asked you and Mr. Mraz to tell them where their drawings were deficient as it relates to NFPA 101 and 72, didn't they? 09:20

A. Yes, they asked that question.

Q. And y'all never told them anything other than to install what we've told you to install. Isn't that what you told them? 09:20

A. No.

Q. Okay. When did you tell them where it was deficient? 09:21

A. When did -- repeat the question, please.

Q. When did you tell them what those deficiencies were?

A. (No response.)

Q. Mr. Kirk, the Government never provided Grot with a list of design deficiencies to their drawings, did they? 09:21

A. No.

Q. Let me hand you a document we've marked as Plaintiff's Exhibit 3. That is, I believe it's been testified, Grot's response to the show-cause letter of the termination. See it? 09:22

A. Yes.

Q. Look at the second page. The first sentence, "Your letter states that the work performed does not meet the requirements of NFPA 101." See that? 09:22

A. Yes.

Q. And then in the next -- in that paragraph it asks, and it asks throughout this letter, "Show us where our work does not meet NFPA 101," doesn't it? 09:22

A. I'd have to read it to recall everything that it says.

Q. Well, you saw this letter --

A. Yes.

Q. -- at the time that it was received because 09:23

are in the '97 book (indicating) as stated.

Q. But you didn't point out to him where, did you?

A. I point out 18.1 through 18.7.9.2. And that is in the '97 book. 09:55

Q. Mr. Kirk, you're pointing out in this letter 18.1; and for purposes of this question -- and I'm not saying it's true -- but for the purposes of this question, let's assume that you're quoting from the 2000 edition, okay? 09:55

A. Okay.

Q. You don't say chapter 18.1 in the 2000 edition, which corresponds to chapter 14.2 in the 1997 edition, do you?

A. In this particular memo neither do I say it's 09:55 the 2000.

Q. Okay. Well, which one was it?

A. I'd say it's the '97.

Q. What would you base that on?

A. The date it was sent. 09:56

Q. Okay. Let's look at -- excuse me. I don't mean to be reaching for it. Look at Exhibit 3, and look at the second page to Exhibit 3, the fourth line down. I'm sorry, the fourth paragraph down.

In Grot's response to the show cause 09:57

they are again saying -- you're quoting sections out of NFPA 2000, right?
A. Yes.
Q. And in fact, in the following paragraph it says, "In a subsequent letter of July 20th, the VA refers to the same chapter 18 again and also references 9.6.1 through 9.7.6.2. Neither 9.6.1 through 9.7.6.2 exists in the 1997 edition." See that? 09:58
A. Yes.
Q. Okay. So you weren't using the 1997 edition when you were directing the fire watch being instituted, were you? 09:58
A. I'll have to review my paperwork.
Q. You need to review the code, right?
A. That would be part of it. That's part of the paperwork. 09:58
Q. As a matter of fact, in the preceding paragraph Grot points out what NFPA chapters 4 and 18 refer to, don't they?
A. Yes, they do. 09:59
Q. In fact, now, you've told them that their project is deficient based on a 2000 code. The Government has issued a show-cause letter directing Grot to show cause as to why they should not be terminated, and Grot is asking for guidance on where 09:59

wasn't -- if it was left in that position.

A. Yes.

Q. After substantial completion, right?

A. Yes. Yes.

Q. Do you have any reason to believe that Grot intended to leave those wires in that condition once it made that system fully operational? 10:08

A. Now, repeat that.

Q. Do you have any reason to believe that Grot intended to leave those wires that you talked about as hanging down in that condition once Grot made that system fully operational? 10:08

A. No.

Q. Had they completed a complete -- a building -- the installation in a building 100 percent complete at the time of this show-cause letter? 10:08

A. I couldn't say because we hadn't had a formal inspection on all the buildings.

Q. Well, were there any buildings where the new system was on line and activated? 10:09

A. Yes.

Q. Which buildings were they?

A. Most of them at this time.

Q. At the time of the termination most of the buildings were on the new system and activated. 10:09

A. Yes.

Q. Was Building 1 on the new system and activated?

A. No.

Q. Two? 10:09

A. Yes, I believe so.

Q. So if two was on line and activated, why would you issue a fire watch?

A. Because of these deficiencies, that partial list of deficiencies. 10:09

Q. Was three on line and activated?

A. Yes.

Q. Twenty-four on line and activated?

A. Yes.

Q. Twenty-nine on line and activated? 10:10

A. Yes.

Q. So all of these buildings, if I understand what you just said -- and you correct me. All of the buildings on this project at the time of termination were on line and activated. 10:10

A. Yes.

Q. And yet you certified to the contracting officer that this project was only 59 percent complete, right?

A. Yes. 10:10

Q. That's all right. I'm not trying to be argumentative on that. I just need you to do that.

A. Yes.

Q. Well, if that were the case, Mr. Kirk, why would Fratto show any of the tampers and flows on the drawings? 10:57

A. It's possible they wanted more added, and they showed extras.

Q. Well, wait.

A. And -- 10:57

Q. It's possible?

A. Yeah.

Q. All right. What do you base that decision on?

A. Because that's one possibility. 10:57

Q. You don't know?

A. Of showing --

Q. You don't know why Fratto showed some tampers and flows and not others, correct?

A. That's correct. I wasn't -- I wasn't with them 24 hours a day. 10:57

Q. Could it have been that Fratto just didn't do their job and list all the tampers and flows?

A. I don't know how to answer that.

Q. So now we're guessing at the number of 10:58

tampers and flows that we may have to connect and the number of additional devices we may have to add. That's what we're guessing at when we bid this job, right?

A. It's not totally a guess. 10:58

Q. Well, you couldn't tell me where you came up with 15 to 20 percent other than some training session somewhere.

A. As unknown contingencies.

Q. Mr. Kirk, contingency adds in estimating are based upon overhead, time and other issues. It's not based upon hardware, is it? 10:58

A. I don't understand the question.

Q. Fifteen to 20 percent. Okay. Did you have drawings that showed where all the tampers and flows were? 10:59

A. Prior to the project?

Q. Yes.

A. I can't say they showed where they all were.

Q. You had drawings that showed where tampers and flows were. 10:59

A. Yes. Yes.

Q. You never provided those to Grot, did you?

A. Yes, I did.

Q. When? 10:59

there, you can move what's shown in the center over there.

Q. But if Fratto showed one in the center of this room, you were going to make them install that one also, right? That's what you testified to yesterday. 11:19

A. That's a yes-and-no question.

Q. Well, what's the no part?

A. Okay. If -- if the drawings show five smoke detectors in this room and NFPA says you only need one over there, then if my supervisors want five smoke 11:20 detectors in here, put five smoke detectors in here. But that probably won't happen. It's stupid.

But if these drawings show a smoke detector in a room that NFPA says you don't need one in there, we want it in there because the function can 11:20 change. And the way things are changing up there right now pretty quick, we may need that smoke detector in there.

That's why they said, "We want that smoke detector in there, even though NFPA says don't 11:20 put it there or you don't have to have it there."

Q. Your testimony yesterday was, and your letters that we talked about yesterday say, that Grot will install in accordance to NFPA 101 and 72 and include all devices shown on Fratto's drawings. 11:21

A. That's correct.

Q. It doesn't say anything remotely similar to what you just said, does it?

A. Yes, it does.

Q. Where? 11:21

A. The specs state that they are to go by the plans and specifications and NFPA 101 and 72.

Q. But you testified yesterday and you just got through saying that if NFPA 101 or 72 says, install the smoke detector on this wall, and Fratto shows one in the middle of this room, you want both of them in there. 11:21

A. If my supervisors and those I'm consulting with want it, yes, they will go there.

Q. Can you tell me of one instance prior to Grot's termination where you did not instruct Grot to install the devices shown on Fratto's drawings, regardless of what NFPA said? Can you show me one instance where you didn't do that? 11:21

A. Repeat the question. 11:22

Q. You told Grot to install according to NFPA 101 and 72. Yes?

A. Yes.

Q. You told Grot to install every device shown on Fratto's drawings. Yes? 11:22

A. Yes.

Q. And there's not one instance where you told him to do otherwise, is there?

A. I don't understand what you're --

Q. Did you ever tell Grot that he didn't have to install a device that was not shown on Fratto's drawings? Yes or no. 11:22

A. That he didn't have to install a device on Fratto's drawings? I can't recall telling him he didn't have to install a device. 11:22

Q. In fact, it's just the opposite. The drawings that Grot submitted that had removed devices shown on Fratto's drawings, you made them go back and put those devices in the rooms regardless of whether it was required by NFPA 101 or 72, right? 11:23

A. That's correct.

Q. And you testified yesterday that you did that because Fratto obviously determined that there was a need for that device to be there. Do you remember that? 11:23

A. Say that again.

Q. You did that -- you testified that you did that because, in reviewing the drawings, Fratto obviously had decided that there was a need for that device to be in that location. Do you remember 11:23

testifying to that yesterday?
A. I don't remember my exact words from yesterday.
Q. Will you agree with that? You agree with that statement? 11:23
A. Say the statement again.
Q. Listen very closely to me. Your letters say, "Install what's shown on the drawings and per NFPA 101 and 72" --
A. Yes. 11:24
Q. -- "regardless of whether it's needed or not." And your testimony yesterday was that you did that because if the A/E showed a device in that location or in a location, the A/E obviously determined that there was a need for that device in that location. 11:24 Will you agree with that?
A. No.
Q. So you're -- if that's the way you testified yesterday, what is your testimony today?
A. That's not what I said yesterday. 11:24
Q. Okay. Well, then clarify it.
A. Okay. I'm trying to clarify it. If the plans show a detector here, and NFPA says it can be mounted on this wall, then some leeway is allowed. You can mount it on that wall. But if my supervisors said 11:24

CAUSE NO. 03-1951C

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

GROT, INCORPORATED,
Plaintiff,

VS.

THE UNITED STATES OF AMERICA,
Defendant.

*******************
ORAL DEPOSITION OF
MARK S. FRATTO
DECEMBER 16, 2004
*******************

oOo

*In Dallas/Fort Worth ...*

MBA REPORTING SERVICES INC.

*Court Reporters & Videographers*

*801 East Campbell Road, Suite 180 * Richardson, Texas 75081*

*972.530.6400 Fax 972.530.3307 800.283.8923*

DISK ENCLOSED



EXHIBITS IN SEPARATE BINDER

COPY

services." Correct?
A. Yes, sir.
Q. What is your definition, Fratto's definition, of fully developed working drawings?
A. It's a set of graphic documents, drawings, if you would, and 8 1/2 by 11 specs by which multiple people, multiple contractors, can -- or the intent is that multiple contractors can, then, bid the information in there apples to apples to come up with a price so that the ultimate user, in this case, the VA, can assume that for the price they're getting what's indicated in that document.
Q. Is the contractor supposed to be able to build from these fully developed working drawings?
A. That totally depends on the intent of those drawings.
Q. Go through for me, please, Mr. Fratto, the process by which Fratto would have responded to that request for qualifications.
A. You would fill out at that time, I believe, an SF-254 and 255 and provide it to the VA.
Q. And did Fratto do that in this case?
A. Yes, sir.
Q. And was Fratto subsequently short-listed for interviews with the VA on this project?

**Affidavit of Jerry Grot**

STATE OF KENTUCKY
COUNTY OF Fayette

PERSONALLY CAME AND APPEARED BEFORE ME the undersigned authority in and for the above said county and state the within named Jerry Grot, Affiant, who, being by me first duly sworn on oath, did state as follows to-wit:

1. That Affiant is the president of Grot, Inc. and that he makes this affidavit of his own personal knowledge being fully competent to testify to the matters and facts contained herein; and

2. That at all times during the bid process, Grot relied upon the plans, specifications and drawings provided by the VA to develop its price and to schedule work for the Project; and

3. That Grot took the plans, specifications and drawings provided by the VA and requested Siemens Building Technologies, Inc. ("Siemens") to provide field installation drawings in accordance with the VA's bid documents and that Siemens provided the requested drawings which were submitted to the VA for review and approval; and

4. Grot believed that the devices shown on Fratto's drawings were to be installed as shown; and

5. Pursuant to NFPA specifications, all manufacturers' devices

must cover a ceratin amount of square footage area regardless of manufacturer; and

6. Installation of any system is governed by the usage and square footage of each particular room and Grot was not given the room type on the drawings thereby assuming that the engineer for the project had determined the use of the room and its size; and

7. That the VA delivered the drawings to Fratto Engineering, Inc. ("Fratto") for review and approval and the drawings were returned by the VA stamped as "approved" or "approved as corrected" and in some instances the VA determined unilaterally that it wanted additional devices that were not shown on the original drawings provided by the VA and prepared by Fratto; and

8. Grot had drawings approved by the VA and Fratto for all of the buildings involved in the Project by the end of March 2002 and had begun installation of the new fire alarm system; and

9. Grot did not know that its interpretation differed from that of the VA prior to submitting shop drawings since Grot's shop drawings were being approved for construction by the VA and Fratto; and

10. Throughout the redesign process, Grot repeatedly requested meetings with and direction from the contracting officer: and

11. Not one time would the contracting officer meet with Grot despite the fact that Grot was trying to redesign a project pursuant to the contracting officer's directive; and

12. In section 13850, paragraph 1.1, subparagraph A, the phrase "but not limited to" was not interpreted by Grot that it was responsible for design of the Project but, instead, this section is nothing more than a generic listing of systems which will be included in the fire alarm program and the fact that each item is not specifically mentioned or described means only that Grot was to provide all of the incidental equipment necessary to make the items listed in the specifications and drawings function which Grot fully intended to do; and

13. During construction of the Project, the VA agreed for Grot to install temporary fire alarm equipment when working on the existing fire alarm system when a building could not be changed over and working at the end of the work day; and

14. Among the types of temporary fire alarm equipment were temporary pull stations the purpose of which is to provide additional fire alarm capability when portions of the system are deactivated; and

15. The temporary systems are removed when construction is complete for that portion of the building; and

16. The fact that the temporary pull stations may not have been installed does not mean that there is no fire protection for that building; and

FURTHER AFFIANT SAYETH NOT.

Jerry Grot

SWORN TO AND SUBSCRIBED BEFORE ME this the ____ day of January, 2006.

Notary Public

My Commission Expires: 10-25-2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GROT INCORPORATED,
Plaintiff,

VS.

THE UNITED STATES OF AMERICA,
Defendant.

---

VOLUME 1
ORAL DEPOSITION OF
JOHN P. MRAZ
October 12, 2004

---

oOo

*In Dallas/Fort Worth ...*

MBA REPORTING SERVICES INC.

*Court Reporters & Videographers*

*801 East Campbell Road, Suite 180 * Richardson, Texas 75081*

*972.530.6400 Fax 972.530.3307 800.283.8923*



EXHIBITS IN
SEPARATE BINDER

COPY

you, "Oh, yeah, it's a design-build project," right?
A. Correct.
Q. And this section right here that's from your specifications --
A. Uh-huh.
Q. -- that's the standard specification for the VA on design-build projects?
A. I believe it is.
3:46P MR. KILPATRICK: Let's mark this one.
BY MR. KILPATRICK:
Q. Let me ask you, Mr. Mraz, do you know Roger George?
A. No, I don't.
Q. Do you know any of the Contracting Officers from over in Lexington?
A. No, I don't.
Q. How about Angie Napier? Do you happen to know her?
A. No.
(Deposition Exhibit No. 8 marked.)
BY MR. KILPATRICK:
Q. Let me show you a document we've marked as Exhibit 8.
(Documents handed to witness.)

3:47P I'll represent to you, if you'll look at the second page of that document first, it has a letter from Kerry Russell, who's the Vice President of Grot, to Angie Napier, who's the Contracting Officer of a project in Lexington, Kentucky, surprisingly, that just recently went out for bid.

Take a moment and read that.

A. (Witness reviews documents.)

Q. Now the sections that Ms. Russell is referring to in there are the same sections that we just went over, right, that are part of your letter, Exhibit 7, right?

A. Let me see the numbers.

Q. Well, she says 13950 in the first paragraph. It probably should be 13850, because 13850 is the second paragraph. And that would jive with what's in your original letter, right?

3:48P A. Correct.

Q. And look at the first page. That's Ms. Napier's response to Ms. Russell's question as to whether or not this is a design-build project.

A. Okay.

Q. So obviously, this is not a spec section that's interpreted the same by VA Contracting Officers in different regions, is it?

A. That, I don't know.
Q. And in fact, Mr. Mraz, isn't it a fact that that second -- that third sentence, "The referenced spec sections and paragraphs refer to the submittal process, specifically the shop drawings, that would be prepared and submitted by the contractor for review and approval" is exactly what Siemens and Grot was telling you when you were directing them to design-build this project, wasn't it?
A. No.
Q. That's not what they told you?
A. No.
Q. What -- what is your understanding of what a design-build project is?
3:49P A. Design-build, they're supposed to provide the design and build it according to the design that they provide.
Q. The contractor designs it and builds it, right?
A. Yes.
Q. Now where -- where in -- in the amendment -- I mean, the solicitation for construction --
A. Uh-huh.

A. Yeah, I would say it is.

Q. Okay.

A. Yes.

Q. We talked yesterday about interpretation, your interpretation of what is a design-build project based on Mr. Kirk's representations to you, right? 09:36

A. Are we talking about 13580?

Q. Yeah.

A. Yeah.

MS. WILLIAMS: 13850. 09:36

Q. (BY MR. KILPATRICK) 13850.

A. Yeah.

Q. And I asked you if you discussed the interpretation of 13850 with any other contracting officers, and I believe your answer was no; am I right? 09:37

A. Correct.

Q. And we discussed also the interpretation of the 13850 by the contracting officer in Lexington, right?

A. Correct. 09:37

Q. I just happen to have a copy of a *Replace Fire Alarm Systems Manual*, Specifications for Department of Veterans Affairs in Salt Lake City. I ask you to look at the highlighted portion of 13850, paragraph C. 09:37

You will agree with me that is essentially the same language that is contained in 13850 in this project, right?

A. Can you find that in there?

Q. Oh, yeah. 09:37

MS. WILLIAMS: Just to clarify, did we identify Exhibit 20 as the CMD-4?

MR. KILPATRICK: The water tower project? Yes. Or he said it was.

THE WITNESS: And what is your question? 09:40

Q. (BY MR. KILPATRICK) Those are essentially the same specifications in the Salt Lake City job as they are in this job, right?

A. I don't know if they are or not.

Q. Well, you relied upon language in this specification section that says, "In this case, the design system layout document submittal preparation and supervision of installation and testing shall be provided by a technician that is NICET Level 3." 09:40

A. Uh-huh. 09:40

Q. Et cetera. Essentially the same language that's in your own specifications, right?

A. Yeah. The system design, right.

Q. Would it surprise you to know that the Salt Lake City job is not a design-build project either? 09:41

A. No.

Q. Do you know of another VA region, or whatever you call it, that has interpreted this supervision section the way that Rickey Kirk interpreted it?

A. No, I don't. 09:41

Q. During the -- subsequent to your testimony from yesterday, have you determined who the informant was with Siemens that we discussed?

A. No, I don't know the informant's name.

Q. Do you know what the informant's job position was with Siemens? 09:41

A. No.

Q. During the testimony yesterday, Mr. Mraz, with respect to Exhibit 1 --

A. Uh-huh. 09:43

Q. -- I asked you to tell me what the deficiencies were to Grot's performance that led to the show cause. Do you remember that?

A. Yes, I do.

Q. We discussed that? 09:43

A. Yes.

Q. And you told me that Grot was provided with those deficiencies, correct?

A. I told you that this was a show-cause notice, not a cure notice. Remember you asked me that? And 09:43