IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GROT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1951C |
| | ) | (Judge Baskir) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

CONSOLIDATED STATEMENT OF UNCONTROVERTED FACTS

Pursuant to paragraphs 11 and 12 of the Court's Special Procedures Order, dated October 29, 2003, and Rule 56 of the Rules of the United States Court of Federal Claims, the parties jointly submit this Consolidated Statement of Uncontroverted Facts.

The statements are organized according to the attached table of contents. Pursuant to the Special Procedures Order, the originating parties for each statement and objection are identified as follows: "[P]" for Plaintiff and "[D]" for Defendant.

**1. [P] This case arises out of a contract between the Department of Veterans Affairs ("VA") awarded to Grot, Inc. ("Grot") which was contract number V549P-609-2 (the "Contract") for performance of the work generally described as Campus-Wide Fire Alarm, Project No. 099-108 at the Sam Rayburn Memorial Veterans**

**Center, East Ninth and Lipscomb Streets, Bonham, Texas (the "Project"). This Project was initially released for bid as Solicitation IFB 549-64-01. Plaintiff's Appendix("Pl.'s App.") at 1.**

**A. <u>The First Solicitation</u>**

**2. [P] The Government's electronic release inviting bids on the project and the Instructions, Conditions and Notices to Offerors provided with the information to bidders, described the work to be performed as follows:**

> **The contractor shall furnish all labor, equipment, materials and supervision to replace the "Fire Alarm System" at the Sam Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX in accordance with the contract drawings and specifications. The project shall involve general construction, demolition, alterations, grading, electrical and mechanical work. Contract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the city, county, state and Federal Government. The period of performance is ninety (90) calendar days.**

**Pl.'s App. at 1, 3, & 5.**

**3. [P] The original contract completion time was ninety (90) days. The contract completion time was increased to two hundred**

**seventy (270) days by Amendment Two. Pl.'s App. at 6 & 7.**

**4. [P] The original bid date was July 11, 2001, but was extended until July 31, 2001, to accommodate prospective bidders that had not received copies of the plans and specifications. Pl.'s App. at 8 & 9.**

**5. [P] Included in the contracting officer's transmittal extending the bid opening date were answers to certain questions ~~that had been raised by prospective bidders concerning interpretation of the plans, specifications and drawings. None of the questions addressed design of the Project~~. Pl.'s App. at 10.**

**Objection [D]:** Defendant objects to Grot's characterization of the document; the document is the best evidence of its contents. Further, the contracting officer stated that he was attaching "a list of 'Questions & Answers' that are relevant to the project." Pl's App. at 8. The contracting officer did not reveal the source of the questions and answers. Id.

**6. [P] The contracting officer noticed a pre-bid conference for July 20, 2001. Pl.'s App. at 11. By amendment dated July 27, 2001, the amended bid date was again extended, this time until August 28, 2001. Pl.'s App. at 12.**

**7. [P] ~~Subsequent to the pre-bid conference~~ and prior to the date scheduled for the opening of bids, personnel from Siemens Cerebus Division, a division of Siemens Building Technologies, Inc. ("Siemens") were aware that Chris Forner and Mel Harrison, representatives of the VA who were not present at the pre-bid conference, ~~had information relative to the performance of the work on the Project that was not disclosed in the plans and specifications for the Project or at the pre-bid conference~~. Pl.'s App. at 186-188.**

**<u>Objection [D]:</u>** Defendant objects to Grot's interpretation of Scott McCauley's testimony, to which Grot cites as support for its contention. Mr. McCauley testified he participated in a walk-through of the VA's Bonham facility with Mr. Harrison and Mr. Forner, prior to submitting Siemens bid for the first solicitation of this project, Pl's App. at 188. Mr. McCauley could not recall exactly when that walk-through took place. Mr. McCauley testified that he spoke with Mr. Forner and Mr. Harrison about "sprinkler stuff and a McCullough thing that needed to be removed in Building 1." Pl's App. at 189. Mr. McCauley testified that Siemens personnel knew that "when we walked it and talking with [Mr. Harrison and Mr. Forner] and everybody concerned, that they wanted additional devices to – in areas

that needed coverage that weren't necessarily designed on the drawings." Def's App. at 67, lns 6-10 (emphasis added). Further, Mr. McCauley testified that prospective bidders could have obtained the same information if they had conducted a walk-through of the VA's Bonham facility or if they were intimate with the site. Pl's App. at 191, lns 16-25. Grot cannot rely upon Mr. McCauley's testimony regarding what was or was not disclosed during the pre-bid conference, as Mr. McCauley was not present at the pre-bid conference. Def's App. at 16, lns 22-24.

**8. [P] Representatives of Siemens met with Mr. Forner and Mr. Harrison at the Project and ~~discussed in detail the specifics of what they wanted to be installed on the Project~~. ~~These disclosures indicated to Siemens that they wanted considerably more fire protection devices and other equipment than was reflected on the plans and specifications for the Project~~. Pl.'s App. at 177, lines 6-10 & 19-22.**

**<u>Objection [D]:</u>** Defendant objects to this contention because it is irrelevant what Mr. Harrison and Mr. Forner "wanted" to be included in the fire alarm system; the requirements of the system were set forth in the contract. Def's App. at 10-16.

Further objects to Grot's interpretation of Mr. McCauley's testimony. Mr. McCauley did not testify that Mr. Harrison and Mr. Forner discussed or disclosed to him that the VA wanted considerably more fire protection devices and other equipment than was reflected on the plans and specifications. Specifically, Mr. McCauley testified that in walking the project and in talking with Mr. Harrison, Mr. Forner "and everybody concerned, that they wanted additional devices to – in areas that needed coverage that weren't necessarily <u>designed on the drawings</u>." Pl's App. at

177, lns 6-10 (emphasis added). Then, Mr. McCauley answered in the affirmative when asked if he was aware of the fact that the VA was looking for more than the devices that were shown on Fratto's drawings. Pl's App. at 177, lns 17-24. Mr. McCauley further stated that the devices that Mr. Harrison and Mr. Forner referred to were in "certain areas that were really not depicted well on the drawings." Pl's App. at 192. When asked if Mr. Harrison and Mr. Forner wanted items that were "not a requirement of NFPA 101 and 72 to meet code," Mr. McCauley responded, "I don't know about that."

**9. [P] ~~Neither VA personnel nor Siemens disclosed the information provided by Mr. Forner and Mr. Harrison to any other bidder prior to bid opening.~~**

**Objection [D]:** Defendant objects to this contention because Grot provides no supporting citation. Further, objects to this contention because it is irrelevant what Mr. Harrison and Mr. Forner "wanted" to be included in the fire alarm system; the requirements of the system were set forth in the contract. Def's App. at 10-16.

**10. [P] ~~At the initial bid opening, ADT Security Services, Inc. ("ADT") was determined to be the lowest bidder for the Project at $864,791.00. However, ADT's price was submitted in error and the correction raised the ADT's price to $969,656.00. Pl.'s App. at 21. The contracting officer accepted the change and determined to award the Contract to ADT.~~**

**<u>Objection [D]:</u>** Defendant objects because Grot provides no supporting citation for this contention. Additionally, to clarify, the error in ADT's initial bid was that it failed to include the three alternate deducts in its base bid, which would have changed its bid from $864,791 to $969,656. Pl's App. at 21.

**11. [P] Grot's bid was $1,039,591; $69,935.00 or 7% over the "low" bid. Pl.'s App. at 22; The bid of Siemens was $1,299,711.00; $330,055.00 or 34% above the "low" bid. Pl.'s App. at 23.**

**12. [P] Grot immediately protested the award of the Contract to ADT in claiming that, among other things, the contracting officer had allowed ADT to increase its bid price ~~to the detriment of other bidders~~. Pl.'s App. at 24. 13. Following the filing of Grot's protest, the VA cancelled the solicitation due to what the VA determined were "inadequate specifications". Pl.'s App. at 26-28.**

**Objection [D]:** Agrees with clarification. In a letter from the VA's General Counsel, Phillip L. Anderson, to the Senior Associate General Counsel for the General Accounting Office, Anthony Gamboa, stated that the VA had determined that the "fire alarm system specification needs to be revised because it does not reflect the VA's recent decision to issue a fire alarm system specification that contains more performance characteristics in its design. VA has also determined that the basis for award, which includes the accumulation of four bid items must be clarified." Pl's App. at 26.

**13. [P] ~~At no time during the solicitation process did the VA ever indicate that design of the fire alarm system was the responsibility of the contractor~~. Pl.'s App. at 28.**

**<u>Objection</u> <u>[D]:</u>** Defendant objects because Grot cites to a page in its appendix that in no way supports its contention; page 28 of its appendix is a letter from the contracting officer to Grot, dated October 29, 2001, stating that the contract award to ADT Security was canceled and that the VA would provide a new solicitation to Grot when it became available.

Further, defendant objects to all contentions contained in this section (number 1-13) because they are not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system. These contentions concern the first solicitation, which did not result in the award of the contract to Grot. As such, they have no bearing upon Grot's contract, the interpretation of that contract, or the Government's motion.

**B. The Second Solicitation And Contract Award**

**14. [P] On January 8, 2002, the VA received bids on IFB 549-23-02, the second solicitation for this project, which replaced IFB 549-64-01, the first solicitation for this project. The second solicitation described the description of the work and, again, stated as follows:**

> **The contractor shall furnish all labor, equipment, materials and supervision to replace the "Fire Alarm System" at the Sam Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX in accordance with the contract drawings and specifications. The project shall involve general construction, demolition, alterations, grading, electrical and mechanical work. Contract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the city, county, state and Federal Government. The period of performance is 270 calendar days.**

**Pl.'s App. at 29.**

**15. [P] The only difference between the original description of the work and that contained in the second solicitation was the period of contract performance. Pl.'s App. at 1, 3, 5, & 29.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**16. [P] The only changes in the specifications prior to the second bid were the deletion of the alternate bids and the addition of money for training VA personnel on the operation of the system. Pl.'s App. at 145, lines 4-10.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**17. [P] At the second bid opening, Grot was determined to be the lowest bidder at $934,310.00; Simplex was second low bid at $969,249.00; or 3% over Grot's bid; and Siemens was the third low bid at $984,657.00. Siemens second bid was only 5% over Grot's bid and $315,000.00 lower than its initial bid. Pl.'s App. at 32-33.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**18. [P] When Siemens submitted its price for the re-bid, it disregarded the information provided by Mr. Harrison and Mr. Forner and submitted its bid on the plans ~~and specifications~~ for the Project. Pl.'s App. at 190, lines 23-25 & 191, line 1.**

**Objection [D]:** Defendant objects to Grot's interpretation of Mr. McCauley's testimony. Mr. McCauley actually testified that Siemens "priced [the bid for the second solicitation] per what was basically on the drawings." Pl's App. at 190, ln 25; 191, ln1. Additionally, while Siemens' bid for the second solicitation was based upon the drawings, the initial proposal it subsequently submitted to Grot as a subcontractor was not based solely upon the bid drawings. Def's App. at 65, lns 7-11, 16-21.

Defendant further objects to this contention because it is not material to the determination of whether the contract at issue in this case required Grot to design and install a fire alarm system.

**19. [P] Siemens would make up the difference ~~in what was shown on the plans and what was wanted by Mr. Harrison and Mr. Forner~~ through change orders. Pl.'s App. at 194, lines 2 -6. This was reflected in Siemens proposal where it excepted out "Final VA Code Approval Per Field Inspection (Added Devices). Pl.'s App. at 78.**

**<u>Objection [D]:</u>** Defendant objects to Grot's interpretation of Mr. McCauley's testimony. Mr. McCauley was asked a hypothetical question, which was, if Siemens knew, at the time it submitted its bid for the first solicitation, what Mr. Harrison and Mr. Forner were expecting or wanting, how was Siemens going to make up the difference if its lower bid for the second solicitation was accepted. Pl's App. at 193, lns 9-13. Mr. McCauley initially responded, "I don't know." <u>Id.</u> at ln 14. He then added that Siemens would have asked for change orders, had discussions regarding what was needed, and submitted drawings and obtained an approved set from which to work. <u>Id.</u> at lns 14-15. Mr. McCauley did not testify that he would "make up the difference" between the items contained on the plans and the items the VA personnel wanted. Further, it is not clear that Siemens' proposal, to which Grot cites, supports such a contention; "Added Devices" could mean what it normally means, devices

required that were outside of the scope of the contract.

Defendant further objects to this contention because Siemens' hypothetical reaction to a hypothetical situation is not material to the determination of whether contract at issue in this case required Grot to design and install a fire alarm system.

**20. [P] ~~The contracting officer accepted Siemens' proposal at the second bid opening without objection.~~**

**Objection [D]:** Objects to this contention because Grot provides no supporting citation.

**21. [D/P] On February 1, 2002, Grot was awarded a contract by the Department of Veterans Affairs ("VA") for the project generally described as Campus-Wide Fire Alarm, Project No. 099-108, at the Sam Rayburn Memorial Veterans Center in Bonham, Texas, for the amount of $943,310. Defendant's Appendix ("Def's App.") at 1.**

**22. [D] Prior to submitting its bid upon the contract, Grot did not inquire into the meaning of any of the now disputed terms and conditions stated in the specifications or drawings. Def's App at 35.**

**<u>Objection [P]</u>:** Objects to the conclusion of Defendant in that the citation in support of this statement is a letter from the contracting officer to Grot regarding Grot's protest of the contracting officer's directive that Grot redesign the Project. The citation states the contacting officer's conclusion that a non-drafting party must "seek clarification of an ambiguity" before bidding. The contracting officer's conclusion fails to consider that latent ambiguities in the contract documents are not subject to the requirement of pre-bid clarification. While Grot did not seek clarification of the now disputed terms, it did not do so because it did not know that its interpretation differed from that of the VA prior to submitting shop drawings. Pl.'s App. at 243, ¶8.

**23. [D/P] Also, on February 1, 2002, Grot received the Notice to Proceed that established November 10, 2002, as the contract completion date, 270 calendar days later. Def's App. at 2.**

**24. [P] ~~After award of the Contract, Grot began the process of issuing subcontracts and vendor purchase orders one of which was to Siemens. Siemens was to provide technical assistance, equipment and working drawings based upon the plans and specifications provided by the VA upon which Grot based its pricing for the Contract.~~**

**Objection [D]:** Objects because Grot provides no supporting citation for this contention.

**25. [D] Thus, on February 1, 2002, Grot entered into a subcontract with Siemens to "supply submittals for equipment[,] submit drawing of system (wiring layout)[,] supply all devices as per drawings and specs[,] install panels and get all communicating with each other to be done by Siemens[,] install temporary fire alarm system in buildings needed[,] install devices and trim out (entire job)[,] install UPS system[, and] provide three year warranty." Def's App. at 3-4.**

**26. [P] At all times during the bid process, Grot relied upon the ~~plans, specifications~~ and drawings provided by the VA to develop its price and to schedule work for the Project. Pl.'s App. at 242, ¶ 2.**

**Objection [D]:** Objects to Grot's characterization of its actions. There is evidence that Grot requested that Siemens rely solely upon the bid drawings, provided by the VA, when creating its cost proposal for the subcontract, and that Grot relied solely upon the bid drawings when it created its submittal drawings that it submitted to the VA for review and approval. Def's App. at 20; 22; 65, lns 18-25; 66, lns 15-25; 68, lns 13-21; 75, lns 16-22, 25; 76, lns 1-3, 9-12; 77, lns 6-15. Grot provides no explanation as to why it would rely upon the plans, specifications and drawings to create its bid for the project, but then rely solely upon the drawings once it was awarded the contract.

**27. [P] ~~The plans, specifications and drawings were prepared by Fratto Engineering, Inc. ("Fratto").~~**

**<u>Objection [D]:</u>** Objects to the use of the terms "plans" and "drawings" upon the grounds that they are vague. Defendant does not know if Grot is referring to only the bid drawings, or bid drawings and some other document; it is unclear. Also objects because Grot provides no supporting citation for this contention. Fratto Engineering, Inc. prepared the bid drawings and specifications upon which bidders and the awardee were to rely when creating their bids and performing the work required by the contract. Defendant's Supplemental Appendix ("Def's Supp. App.") at 1, lns 16-25, 2, lns 1-2; Pl's App. at 99.

**B. Relevant Contract Provisions**

**28. [D] Contract specification 13850, paragraph1.1.A, provides:**

> **This section of the specifications includes: the furnishing, installation, and connection of fire alarm equipment to form a complete multi-building analog addressable-device fire alarm and emergency notification system; testing and placing the new system into operation; training of the owner's personnel; and removal of the old system. The new system shall include, but not be limited to, alarm initiating devices, alarm notification appliances, control units, fire safety control devices and interfaces, annunciators, power supplies, remote alarm interfaces, and wiring as shown on the drawings and as specified. All devices and accessories necessary for a complete operating system shall be included even though each item is not specifically mentioned or described herein.**

**Def's App. at 10, (emphasis added).**

**29. [D] Contract specification 13850, paragraph 1.2.B, entitled "Scope," provides:**

> **A new fire alarm system shall be designed and installed in accordance with the specifications and drawings. Device location and wiring runs show on the drawings are for reference only unless specifically dimensioned. Actual locations shall be in accordance with [National Fire Protection Association ("NFPA)" Code] 72**

**and this specification.**

**Def's App. at 11, (emphasis added).**

**30. [D] Contract specification 13850, "Fire Alarm System," paragraph 1.1.B, "Description," provides in relevant part:**

> **The fire alarm system <u>shall comply with</u> requirements of <u>NFPA 101 and NFPA 72</u>. The system <u>design</u>, system <u>layout</u>, submittal documents preparation, and supervision of installation and testing shall be provided by a technician that is certified [National Institute for Certification in Engineering Technologies ("NICET")] level III or a registered fire protection engineer. The NICET certified technician shall be on site for the supervision and testing of the system. Equipment manufacturer factory engineers thoroughly familiar and knowledgeable with all equipment utilized, shall provide additional technical support at the site as required by the Contracting Officer or his authorized representative. Installers shall have a minimum of five years experience installing fire alarm systems.**

**Def's App. at 10, (emphasis added).**

**31. [D] Contract specification 01001, paragraph 1.1.D provides:**

> **In some instances it may have been impracticable to detail all items in specifications or on drawings because of variances in manufacturer's methods of achieving specified**

> **results. In such instances the contractor will be required to furnish all labor, materials, drawings, services and connections necessary to produce systems or equipment which are completely installed, functional, and ready for operation by facility personnel in accordance with their use.**

**Def's App. at 12, (emphasis added).**

**32. [D] Specifications, referring to the submission of shop drawings, provide that the "contractor shall be responsible for verifying all critical dimensions shown on the drawings provided by the VA," and that the contractor shall "provide locations of all devices, . . . appliances, panels, equipment, junction/terminal cabinets/boxes, risers, electrical power connections, individual circuits and raceway routing, system zoning; number, size, and type of raceways and conductors in each raceway; conduit fill calculations with cross section area percent fill for each type and size of conductor and raceway. . . ." Section 13850, ¶¶ 1.4.B.1 and 2, Def's App. at 13.**

**33. [D] Section 16050, "Basic Methods And Requirements (Electrical)," paragraph 1.2.A, "Minimum Requirements," ~~explicitly~~ states that references to NFPA codes are "minimum installation**

**requirement standards," and paragraph 1.2.B, provides "[d]rawings and other specification sections shall govern in those instances where requirements are greater than those specified in the [NFPA] standards."[1] Def's App. at 14.**

**<u>Objection [P]</u>:** Objects to Defendant's inclusion of the word "explicitly" as being Defendant's interpretation of the cited section and is therefore argumentative.

---

[1] **Contract specification section 16050, though titled "Electrical," applies to section13850, which contains the specifications that govern the fire alarm system. Section 16050, ¶ 1.1.A.**

**34. [D] Additionally, the contract incorporated FAR 52.236-21, which provides that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between the drawings and specifications, the specifications shall govern." 48 C.F.R. § 52.236-21, Def's App. at 9.**

**35. [D] General note 5 on Drawing EF00 01 provides:**

> **These drawings are GENERIC with respect to any particular manufacturers equipment. Quantities of FATC and spacing dependent on devices may vary with the system equipment manufacturer.**

**Def's App. at 16.**

**Objection [P]:** Objects to Defendant's characterization of contentions 28-35, as being the only relevant contract provisions necessary for determination of this matter. Grot also objects to reference within those contentions to "emphasis added" as being argumentative.

**C. <u>The Dispute Regarding Interpretation Of The Contract</u>**

**36. [P] A review of the notes from the pre-construction conference which was held on February 25, 2002 indicates that there was a discussion about "submittals" and installation of the approved submittals. ~~Nowhere in the meeting notes does it reflect that the VA advised Grot that it was responsible for design of the Project~~. Pl.'s App. at 35-37.**

**<u>Objection [D]:</u>** Objects to Grot's characterization of this document; the document is the best evidence of its contents. The notes from the meeting indicate that the contracting officer's technical representative ("COTR"), Rickey Kirk, informed Grot personnel, Clyde Bell and Jon Evans, that "[a]ll submittals must have a cover sheet stating under what spec section and paragraph[ ] they were being submitted." Pl's App. at 35. Additionally, the notes reflect that Darrell Brewer, the VA Safety Specialist, stated that all work was to meet NFPA 101 and 72 standards." Thus, the VA informed Grot personnel during the February 25, 2002 meeting that they were to refer to both the specifications and the NFPA codes, and not solely the bid drawings, when performing the project.

**37. [P] Grot took the ~~plans, specifications~~ and drawings provided by the VA and requested Siemens to provide field installation drawings in accordance with the VA's ~~bid documents~~. Siemens provided the requested drawings which were submitted to the VA for review and approval. Pl.'s App. at 242, ¶ 3.**

**Objection [D]:** Defendant objects to this contention because Grot requested that Siemens rely solely upon the bid drawings when creating the submittal drawings it later submitted to the VA for review and approval. Def's App. at 65, lns 18-25; 66, lns 15-25; 68, lns 13-21. Siemens complied with this request. Id.

**38. [P] The VA delivered the drawings to Fratto for review and ~~approval~~ and the drawings were returned to Grot by the VA stamped as "approved" or "approved as corrected" or, in some instances, the VA determined unilaterally that it wanted ~~additional devices~~ that were not shown on the original drawings provided by the VA and prepared by Fratto. Pl.'s App. at 243, ¶ 7.**

**Objection [D]:** Objects to the redlined portion of the first sentence of this contention because, pursuant to Fratto Engineering's contract with the VA, it did not possess the authority to make any decisions or approve any of Grot's work. Pl.'s App. at 102.

Agrees with remaining portions of this contention with clarification. The contract required Grot to submit the drawings to the VA and Fratto Engineering, Inc. for review. Def's App. at 13. Once the submittal drawings had been reviewed, the VA and Fratto Engineering, Inc. stamped and initialed the drawings. Def's App. at 15. The contract ~~clearly~~ provides that not all necessary devices were detailed in the bid drawings. Contract specification 13850, paragraph1.1.A, provides, "[a]ll devices and accessories necessary for a complete operating system shall be included even though each item is not specifically mentioned or described herein.

Def’s App. at 10.

Contract specification 13850, paragraph 1.2.B, entitled “Scope,” provides: “Device location and wiring runs show on the drawings are for reference only unless specifically dimensioned. Actual locations shall be in accordance with [National Fire Protection Association (“NFPA)” Code] 72 and this specification.” Def’s App. at 11.

Contract specification 01001, paragraph 1.1.D provides, “[i]n some instances it may have been impracticable to detail all items in specifications or on drawings because of variances in manufacturer's methods of achieving specified results.” Def’s App. at 12.

Additionally, the contract incorporated FAR 52.236-21, which provides: "Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between the drawings and specifications, the specifications shall govern." 48 C.F.R. § 52.236-21, Def’s App. at 9.

General note 5 on Drawing EF00 01 provides, “These drawings are GENERIC with respect to any particular manufacturers equipment. Quantities of FATC and spacing dependent on devices may vary with the

system equipment manufacturer." Def's App. at 16.

The contract also expressly required the contractor to incorporate the bid drawings, specifications, and relevant code requirements. Def's App. at 9, 10, 11, 14. Thus, Grot's use of the term "additional devices" is misleading. Pursuant to these contract provision, the VA had the right to require Grot to include devices not shown on the bid drawings.

**39. [P] By the end of March 2002, Grot had drawings ~~approved~~ by the VA and Fratto for all of the buildings involved in the Project and had begun installation of the new fire alarm system. Pl.'s App. at 243, ¶ 8.**

**<u>Objection [D]:</u>** Objects to the redlined portion of this contention, as pursuant to Fratto Engineering's contract with the VA, it did not possess the authority to make any decisions or approve any of Grot's work. Pl.'s App. at 102. Further objects to this contention because, as of June 24, 2002, the VA had approved <u>with corrections</u> the plans Grot had submitted. Def's App. at 22, 23-24. The VA, however, informed Grot numerous times that the VA was concerned that the submittal drawings were virtually identical to the bid drawings. Def's App. at 20, 22. The VA emphasized that the bid drawings were for general layout purposes only and that they did not relieve Grot of the responsibility of ensuring that all relevant codes and requirements were satisfied. Def's App. at 20, 22. Additionally, the VA informed Grot that "[i]f installation is made and it is found that device locations are not to code then what work that has been done will have to be redone at contractor[']s expense. It has already been found that some of the locations shown for Fire Alarm Control Panel location [have] not been

verified[,] then this leaves me to suspect all device locations." Def's App. at 22. The VA notified Grot that it was "very concerned" about the submittal drawings. Def's App. at 22.

Further, on August 23, 2002, the VA directed Grot to resubmit all of its submittal drawings, revised to include "everything contained on the original drawings as well as any additional devices required by the NFPA codes that did not appear on the original submittals. In addition, the contractor shall provide all information and drawings requested in the specifications, paying particular attention to the requirements of spec. section 13850, paragraph 1.4, submittals." Def's App. at 29.

**40. [D] The COTR's stamp on all approved drawings contained the following language:**

> **Approved for general arrangement only. No responsibility assumed for quantities or dimensions. <u>Contractor required to comply with contract document, plans, and specifications</u>. Contractor is responsible for field verification of quantities and dimensions; fabrication process and techniques of construction; coordination of work with other trades and satisfactory performance of his work.**

**15, (emphasis added).**

**41. [D] Fratto Engineering reviewed and stamped all drawings with the following language:**

> **Approval is only for <u>conformance with the design concept of the project and with the information given in the Contract Documents</u>; this approval does not extend to accuracy of quantities or dimensions, designs by contract shop fabrication processes, field construction techniques and safety, or coordination of trades and their work. . . Review/approval neither extends nor alters any contractual obligations of the Architect or Contractor. Review/approval is based on the assumption that the submittal was reviewed and coordinated as required by the general conditions and that the contractor assumes the responsibilities required therein. <u>Checking of shop drawings shall not relieve contractor of responsibility for deviation from requirements of contract documents nor errors or omissions in shop drawings</u>.**

**<u>Id.</u> (emphasis added).**

**<u>Objection [P]</u>:** Objects to this contention in that it is not a complete recitation of the stamp applied by Fratto Engineering in that the stamp also authorizes fabrication and installation of the devices shown on the drawing and, based upon such authorization, Grot began installation of the fire alarm system approved by Fratto.

**42. [P] ~~At no time during the solicitation process, the award or the preconstruction conference, nor the initial production of construction drawings, did the VA ever indicate that re-design of the Project for the fire alarm system was the responsibility of the contractor.~~**

**<u>Objection [D]:</u>** Objects to this contention because Grot provides no supporting citation. Further, objects to this contention because the Government has never contended that the contract required Grot to "re-design" anything. The contract required Grot to incorporate the bid drawings, the contract specifications, and the relevant fire codes to create or design a fire alarm system, and then to install that system. Def's App. 10-16.

**43. [P] ~~After Siemens and Grot submitted the drawings and the VA and Fratto made modifications and changes thereto and then approved the drawings for construction, the VA determined that it was Grot's responsibility to "design" the Project.~~**

**Objection [D]:** Objects to this contention because Grot provides no supporting citation. Further, objects to this contention because the contract provisions clearly required Grot to incorporate the bid drawings, specifications, and relevant codes. Def's App. at 10-16. Additionally, the VA made the modifications and changes to Grot's submittals based upon these contract requirements. Def's App. at 20, 22, 23-24. The VA repeatedly notified Grot that its reliance upon the bid drawings as blue prints was not in compliance with the contract provisions. Def's App. at 20, 22. The VA approved with corrections the plans Grot had submitted. Def's App. at 22, 23-24. The VA emphasized that the bid drawings were for general layout purposes only and that they did not relieve Grot of the responsibility of ensuring that all relevant code requirements were satisfied. Def's App. at 20, 22. Additionally, the VA informed Grot that "[i]f installation is made and it is found that device locations are not to code then what work that has been done will have to be redone at contractor[']s expense. It has

already been found that some of the locations shown for Fire Alarm Control Panel location [have] not been verified then this leaves me to suspect all device locations." Def's App. at 22. The VA notified Grot that it "very concerned" about the submittal drawings. Def's App. at 22.

Further, on August 23, 2002, after Grot had refused to comply with the contract provisions, Def's App. at 23-24, 28-29, the VA directed Grot to resubmit all of its submittal drawings, revised to include "everything contained on the original drawings as well as any additional devices required by the NFPA codes that did not appear on the original submittals. In addition, the contractor shall provide all information and drawings requested in the specifications, paying particular attention to the requirements of spec. section 13850, paragraph 1.4, submittals." Def's App. at 29.

**44. [D] On May 5, 2002, the VA met with Fratto Engineering and Grot employees to discuss the project. In his minutes from the meeting, David Morrison, an engineer with Fratto, noted:**

> **Reminded Grot/Siemens that they are responsible for compliance with applicable codes. The drawings are for defining the scope of work. It seems that, with few exception, the submittals are the same as the project drawings.**

**Def's App. at 20-21.**

**45. [D] On June 24, 2002, the COTR, Rickey Kirk, sent an email to Grot's project manager, Clyde Bell, expressing some concerns about the project. Def's App. at 22. His first concern was that the project was not supervised by a Certified NICET Level III Technician or a Registered Fire Protection Engineer, as required by specification section 13850, paragraph 1.1.B. Id. Secondly, he also expressed concern that Grot's submittals to date did not appear to meet the applicable codes as required by the specifications. Id. He specifically noted that "[a]ll plans Siemens has submitted have been virtually the same plans produced by Fratto [Engineering]." Id. Mr. Kirk further stated:**

> **We have approved with corrections what plans have been submitted. This approval is for general layout only and does not relieve Grot of the responsibility of assuring that all codes are met. If installation is made and it is found that device locations are not to code then what work that has been done will have to be redone at the contractors expense.**

**Id.**

**Objection [P]:** Objects to this contention to the extent that the first sentence thereof is Defendant's interpretation of the basis of the letter and is therefore argumentative. Plaintiff further objects to this contention to the

extent that the conclusions were formulated by Rickey Kirk in that Mr. Kirk is not a Certified NICET Level III Technician, nor a registered fire protection engineer and is not qualified to determine whether or not submittal drawings meet the plans and specifications for the project for providing proper fire protection.

**46. [P] ~~The VA's determination that it was Grot's responsibility to design the Project was first made in writing to Grot on or about June 24, 2002; four months and fourteen days after the issuance of the Notice to Proceed and after Grot had performed extensive work on the Project based upon the VA and Fratto approved drawings~~. Pl.'s App. at 38-39.**

**<u>Objection [D]:</u>** Objects to this contention because the contract provisions clearly required Grot to incorporate the bid drawings, specifications, and relevant codes. Def's App. at 10-16. Further objects to this contention because there is evidence that, as early as May 5, 2002, the VA notified Grot that it was concerned that Grot's submittal drawings were identical to the bid drawings and that Grot did not comprehend that it was responsible for compliance with applicable codes. Def's App. at 20. Additionally, the VA had approved some of Grot's submittal drawings with corrections, because Grot was not adhering to the specifications and code requirements. Def's App. at 22. Finally, the VA warned Grot that it would have to duplicate work if the device locations, once installed, did not meet code requirements. Def's App. at 22.

**47. [D] In an email dated June 25, 2002, Grot's project manager responded to the VA's June 24 email, stating:**

> **The fire protection system shall be installed <u>as designed by Fratto Engineering, Inc.</u> in accordance with the specifications. To provide a set of plans for the project that meets all codes is not a requirement of the contractual documents. It is the responsibility of the Engineering firm for the project to design a workable system which meets all applicable codes. . . . <u>Grot, Inc. was not contracted with to design the project. The design was the responsibility of the Owner's engineers, Fratto, Engineering, Inc.</u>**

**Def's App. at 23-24, (emphasis added).**

**48. [P] In the same email, Grot protested the directive of the VA, advising that the specifications do not state that the Project is a design/build project nor was Grot contracted to "design" the Project. Pl.'s App. at 38-39.**

**49. [D] On July 2, 2002, Grot personnel and VA personnel met to discuss various issues concerning the project. Def's App. at 25-27. The contracting officer's notes from that meeting indicate that the two groups discussed the role of the bid drawings and specifications. Id. The contracting officer cited to both FAR provision 52.236-21, "Site Visits," and 52.236-21, "Specifications and Drawings for Construction." Id.**

**Objection [P]:** Objects to Defendant's characterization of the meeting and that the contracting officer "cited" to 52.236-21 during the meeting. It is admitted that the referenced FAR was a part of the memo but the meeting notes do not indicate that the FAR ~~was~~ discussed.

**50. [P] ~~Grot repeatedly asked for meetings with the contracting officer to review the directive but, with the exception of one time, July 22, 2002, the contracting officer refused to have "any " meetings with Grot to discuss the directive or any other issue on the Project for that matter. The July 22nd meeting was for the purpose of discussing the dispute as to Grot's responsibility for design of the Project. The issue was not resolved.~~**

**<u>Objection [D]:</u>** Objects to this contention because Grot has provided no supporting citation. Further objects because the VA met with Grot on July 2, 2002. Def's App. at 25.

**51. [D] At the meeting on July 22, 2002, the parties again discussed, without resolution, the issue of whether the contract required Grot to rely upon and adhere to the specifications and the NFPA codes or whether Grot could rely solely upon the bid drawings prepared for the VA by Fratto Engineering. Def's App. at 28.**

**Objection [P]:** Objects to the characterization used by Defendant this contention to describe the meeting of July 22, 2002 in that the question presented was "whether the work for the Bonham Fire was to be installed in accordance with the contract specifications and the NFPA Codes or installed using only the prints as a generic guideline." Grot has never contended that it relied "solely" upon the bid drawings in that each manufacturer's equipment is different and the final shop drawings may show devices in locations other than those shown on the shop drawings.

**52. [P] By letter of August 23, 2002, the contracting officer, without meeting with Grot, ~~directed Grot to design the fire alarm Project~~. Pl.'s App. at 40-41.**

**<u>Objection [D]:</u>** On August 23, 2002, after Grot had refused to comply with the contract provisions, Def's App. at 23-24, 28-29, the VA directed Grot to resubmit all of its submittal drawings, revised to include "everything contained on the original drawings as well as any additional devices required by the NFPA codes that did not appear on the original submittals. In addition, the contractor shall provide all information and drawings requested in the specifications, paying particular attention to the requirements of spec. section 13850, paragraph 1.4, submittals." Def's App. at 29. Additionally, the VA emphasized the order of precedence clause, FAR 52.236-21, which was incorporated into the contract and which provided that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern." Def's App. at 28. The VA also referred Grot to General Note 5, specification section 01001, paragraph 1.1.D, specification

section 13850, paragraph 1.1.A, and specification section 13850, paragraph 1.2.B. Def's App. at 29-30. All of these contract provisions clearly required Grot to incorporate the bid drawings, specifications, and relevant codes.

**53. [D] The August 23, 2002 letter from the contracting officer to Grot, directing it to comply with the COTR's findings, which set forth the VA's position that Grot was to <u>design</u> <u>and</u> <u>install</u> the fire alarm system based upon the drawings, specifications and relevant codes. Def's App. at 28-29. The COTR stated:**

> **After careful review I, Ricky Kirk, the COTR have concluded that this is a design and installation project and that Grot Inc. must design and install a complete fire alarm system in accordance with contract plans and specifications as well as the NFPA Codes. Furthermore, I request that the contractor, Grot, Inc., resubmit all previous drawings. The resubmitted drawings shall include everything contained on the original drawings as well as any additional devices required by NFPA Codes that did not appear on the original submittals. In addition, the contractor shall provide all information and drawings requested in the specifications, paying particular attention to the requirements of spec. section 13850, paragraph 1.4, submittals.**

**Def's App. at 29.**

**<u>Objection [P]:</u>** Objects to this contention to the extent that the conclusions were formulated by Rickey Kirk in that Mr. Kirk is not a Certified NICET Level III Technician, nor a registered fire protection engineer and is not qualified to determine whether or not submittal

drawings meet the plans and specifications for the project for providing proper fire protection nor is he qualified to interpret contract documents.

**54. [P] Grot immediately responded by letter of that same date and by letter of September 5th, protesting the direction of the VA ~~clearly pointing out the fallacy of the rational used to make the determination~~. Grot requested a meeting with the contracting officer to try and come to an understanding as to the respective parties' position. Pl.'s App. at 42-43.**

**Objection [D]:** Objects to Grot's contention that it responded to the VA's August 23, 2002 directive with a letter of that same date because it provides no supporting citation for this contention. Objects further to Grot's characterization of its September 5, 2002 letter; the document is the best evidence of its contents.

**55. [D] In Grot's September 5, 2002 response to the contracting officer's August 23, 2002 directive, it again protested the VA's determination that Grot had to redesign and resubmit its original shop drawings, so that they contained all of the items shown on the bid drawings, as well as those items required by the relevant fire safety codes, which were required by the specifications. Def's App. at 30-31.**

**<u>Objection [P]:</u>** Objects to Defendant's characterization in this contention of Plaintiff's letter of September 5, 2002, in that the letter is a written instrument and is the best evidence of the matters and facts contained therein.

**56. [D] In its September 5, 2002 letter, Grot set forth its interpretation of the various contract provisions, coming to the conclusion that it was not required to design the fire alarm system. Id. Grot first alleged that the language contained in General Note 5 on bid drawing EF00.01 that the drawings are "generic" was "only to assure that there is no misinterpretation that the drawings may dictate a sole source procurement." Def's App. at 30. Grot next alleged that specification section 01001, paragraph 1.1.D, which states that it may have been impractical to detail all items in the specifications, did not make the specifications "design specifications." Id. Grot determined that the purpose of the shop drawings was to detail installation procedure for the devices shown on the bid drawings. Id. Grot alleged also that section 13850, paragraph 1.1.A, which states that the final fire alarm system not be limited to the items contained in the bid drawings and specifications, did not imply that Grot was responsible for design, but that Grot would provide all of the incidental equipment necessary to make the items listed in the specifications and drawings function. Id. Finally, Grot reasoned that if the contract required Grot to design the fire**

**alarm system, then the VA would not have issued specifications for the fire alarm system and would not have referenced any fire alarm information on the bid drawings. Def's App. at 30-31. Ultimately, Grot determined that it was never the intent of the specifications to require it to design any portion of the fire alarm system. Def's App. at 31.**

**Objection [P]:** Objects to the last sentence of this contention in that it is Defendant's interpretation of Grot's letter of September 5, 2002 that Grot was not required to "design any portion of the fire alarm system" in that it is not a factually accurate statement and is therefore argumentative.

**57. [P] By letter of September 17th, the contracting officer rejected Grot's request for a meeting and then directed that Grot furnish the VA with the "design/install" fire alarm system. Pl.'s App. at 44-45.**

**<u>Objection [D]:</u>** Agrees with clarification. In this letter, the contracting officer referred to an earlier letter of August 23, 2002, Def's App. at 28-29, and stated: "In my letter I requested that Grot meet their contractual obligations when I declared that Grot design and install the fire alarm system in compliance with the contract specifications. I did not request a cardinal or constructive change to Contract V5495-609-2 and in no way will furnishing the design/install fire alarm system called for in the contract specifications alter the contract[']s intent." Def's App. at 33.

**58. [D] In the letter/cure notice of September 17, 2002, the contracting officer responded to Grot's September 5, 2002 letter, again directing Grot, pursuant to contract specification section 13850, paragraphs 1.1.A and 1.2.B, to design and install a fire alarm system. Def's App. at 32-33.**

**59. [P] Nowhere in the Instructions, Conditions and Notices to Offerors, the Solicitation, Offer and Award, the specifications or any published notice of the Project is the phrase ~~“design/install”~~ found. Pl.’s App. at 44-45.**

**Objection [D]:** The contract provisions clearly state the contractor is to design and install the fire alarm system. Contract specification 13850, paragraph 1.2.B, entitled “Scope,” provides:

> A new fire alarm system shall be designed and installed in accordance with the specifications and drawings. Device location and wiring runs show on the drawings are for reference only unless specifically dimensioned. Actual locations shall be in accordance with [National Fire Protection Association (“NFPA)” Code] 72 and this specification.

Def’s App. at 11, (emphasis added).

**60. [D] In a September 18, 2002 letter, Grot's president, Jerry Grot, stated that Grot would begin the "process of designing a cure to the deficiencies contained in the plans and specifications designed by the government's Consultant." Def's App. at 34. Mr. Grot also stated in this letter that the "plans and specifications are, at best, ambiguous," and that Grot would stand by the position it articulated in its August 23, 2002 letter, that the VA's request that Grot incorporate the bid drawings, specifications and relevant codes to form a complete fire alarm system was outside of the scope of work for the contract. Id.**

**Objection [P]:** Objects to Defendants characterization in this contention of Grot's position in its August 23, 2002 letter, in that the letter of September 18, 2002 states only that the work requested by the contracting officer is "outside the scope of Grot's contract and as such is, among other things, a different site condition and thus any and all cost, expense, delays and other damages incurred by Grot, Inc. shall be accrued and a claim shall be made against the owner". The characterization assigned by Defendant to the August 23, 2002 letter is argumentative.

**61. [P] Grot's letter of September 18th indicated that Grot was proceeding to redesign the project by curing the deficiencies in the original plans and specifications. At all times Grot reserved its rights to dispute the decision made by the contracting officer. Pl.'s App. at 46.**

**Objection [D]:** Agrees with clarification. Agree that Grot wrote a letter on September 18, 2002, stating that it believed there were deficiencies in the original plans and specifications, and that it would direct its firm to begin the process of "designing a cure" to these alleged deficiencies. We do not agree, however, that there were deficiencies in the original plans and specifications.

**62. [D] On September 18, 2002, the contracting officer responded to Mr. Grot's letter of the same date. Def's App. at 35-36. The contracting officer cited FAR 52.236-21, ~~stated that the contract was not ambiguous, and assuming it were ambiguous, it was a patent ambiguity about which Grot should have inquired prior to bidding.~~ <u>Id.</u>**

**<u>Objection [P]</u>:** Objects to the extent that the conclusions of the contracting officer are legal conclusions that if there was an ambiguity in the contract documents, it was Grot's duty to point out the ambiguity during the bid process.

**63. [P] In that same letter, the contracting officer once again refused to meet with Grot.**

**64. [P] The contracting officer asserted that the specifications "clearly state that the contractor shall provide a design/install fire alarm system". The contracting officer has never pointed to where in the specifications the phrase "design/install" is found. Pl.'s App. at 47-48.**

**<u>Objection [D]:</u>** In letters dated August 23, 2002, and September 17, 2002, the contracting officer quoted specification 13850, paragraph 1.2.B, entitled "Scope," which provides:

> A new fire alarm system shall be <u>designed and installed</u> <u>in accordance with the specifications and drawings</u>. Device location and wiring runs show on the drawings are for reference only unless specifically dimensioned. Actual locations shall be in accordance with [National Fire Protection Association ("NFPA)" Code] 72 and this specification.

Def's App. at 11, (emphasis added). Additionally, the contracting officer, in both letters, quoted specification 13850, paragraph 1.1.B, which provides in part, "[t]he system <u>design</u>, system <u>layout</u>, submittal documents preparation, and supervision of <u>installation</u> and testing shall be provided by a technician that is certified [National Institute for Certification in Engineering Technologies ("NICET")] level III or a registered fire protection engineer." Def's App. at 10.

Beyond the fact that it is not the contracting officer's responsibility to refer the contractor to relevant and binding contract provisions, the contracting officer clearly notified Grot as to which contract provisions contained the words "design" and "install." The fact that the words do not have a hyphen separating them in the contract provision does not change the provision's meaning.

**65. [P] Later that same day, again without meeting with Grot despite repeated request to do so, the VA issued a cure notice directing Grot to "cure" "failures . . . . . . endangering performance of the contract". ~~The contracting officer's cure letter fails to meet the requirements of the FARs in that it does not specify at all what the "failures" are that Grot must cure and is totally devoid of any substantive information with respect to what Grot must "cure".~~ Pl.'s App. at 49.**

**Objection [D]:** Objects to Grot's characterization of the letter; the letter is the best evidence of its contents. Further objects because the issue of whether the cure notice satisfied FAR requirements is not a factual contention, but an issue of law. Defendant also objects because this contention is irrelevant to the determination of defendant's motion for partial summary judgment. Our motion for partial summary judgment does not address the propriety of the termination for default, but only a narrow issue of contract interpretation. Thus, the fact that the VA issued a cure notice and the issue of whether the cure notice satisfied the requirements of the FAR are unrelated to the Court's interpretation of the contract requirements.

**66. [P] By letter of September 25, 2002, Grot, facing termination, immediately protested the contracting officer's directive but, consistent with its obligations under the Contract, Grot began to perform in compliance with the directive. Notwithstanding, there were a substantial number of questions to be resolved and Grot requested a meeting with the contracting officer to begin the process of redesigning the Project. Pl.'s App. at 50-51.**

**Objection [D]:** Objects to the redlined portion of this contention because it is Grot's characterization of its actions and is a legal conclusion, not a factual contention that Grot was acting in compliance with its obligations under the contract.

Further objects because Grot did not begin to perform in compliance with the VA's September 18, 2002 directive. Instead, Grot requested that the VA indicate on Grot's submittal drawings the "location of each deficiency and the location of each device the VA contends is missing from [Grot's] drawings." Pl's App. at 50. Essentially, Grot asked that the VA perform the work that Grot was contracted to perform. Further, Grot made its ability to progress conditional upon the VA's furnishment of the requested information. Id. Additionally, Grot informed the VA that

"pursuant to NFPA 101 & 72 [Grot] can and shall remove devices that are shown on the VA drawings[.]" Pl's App. at 51. Grot finally stated that it assumed that the VA would not oppose Grot's removal of devices that are shown on the VA bid drawings if they were not required by NFPA 101 & 72. Id. Grot made this statement despite the language contained in section 16050, "Basic Methods And Requirements (Electrical)," paragraph 1.2.A, "Minimum Requirements," which explicitly states that references to NFPA codes are "minimum installation requirement standards," and paragraph 1.2.B, provides "[d]rawings and other specification sections shall govern in those instances where requirements are greater than those specified in the [NFPA] standards." Def's App. at 14.

Defendant further objects to this contention because it is immaterial to the Government's motion for partial summary judgment and the determination of the narrow issue of contract interpretation presented in that motion.

**67. [D] In the September 25, 2002 letter to the contracting officer, Mr. Grot stated,**

> **There is no indication in the plans and specifications that we are to design the project. The "design" language relied upon by the VA to attempt to justify its position is generic and not a specific directive to design the project. Our consultant and we took the engineer's design and applied the products that were available to our consultant to meet the intent of the design.**

**Def's App. at 37. Mr. Grot also, ~~erroneously~~, stated that it was not until July 2002, that the VA questioned whether the drawings met the "VA interpretation of the specification." Id. Mr. Grot also informed the VA that "pursuant to NFPA 101 & 72 we can and shall remove devices that are shown on the VA drawings[.]" Def's App. at 38. Mr. Grot made no mention of contract specification section 16050, "Basic Methods And Requirements (Electrical)," paragraph 1.2.A, "Minimum Requirements," which ~~explicitly~~ states that references to NFPA codes are "minimum installation requirement standards," and paragraph 1.2.B, which provides that "[d]rawings and other specification sections shall govern in those instances where requirements are greater than those specified in the [NFPA] standards."**

**Objection [P]**: Objects to Defendants use of the words "erroneously" and "explicitly" in that they are argumentative. Grot further objects to Defendant's characterization of Grot's intention to remove certain devices in that Grot pointed out to the contracting officer that pursuant to NFPA 101 and 72 certain devices shown on the drawings are not required to meet the referenced codes and clearly stated that Grot assumed the "VA will not be opposed" to the removal.

**68. [P] The meeting Grot requested in its September 25, 2002 letter was denied and, in fact, throughout the ~~redesign~~ process Grot repeatedly requested meetings with and direction from the contracting officer. Not one time would the contracting officer meet with ~~Grot~~ despite the fact that Grot ~~was trying to redesign a project pursuant to the contracting officer's directive~~. Pl.'s App. at 243, ¶ 10 and 244, ¶11.**

**Objection [D]:** Objects to Grot's characterization of its actions. Grot requested that the VA indicate on Grot's submittal drawings the "location of each deficiency and the location of each device the VA contends is missing from [Grot's] drawings." Pl's App. at 50. Essentially, Grot asked that the VA perform the work that Grot was contracted to perform. Further, Grot made its ability to progress conditional upon the VA's furnishment of the requested information. Id. Additionally, Grot informed the VA that "pursuant to NFPA 101 & 72 [Grot] can and shall remove devices that are shown on the VA drawings[.]" Pl's App. at 51. Grot finally stated that it assumed that the VA would not oppose Grot's removal of devices that are shown on the VA bid drawings if they were not required by NFPA 101 & 72. Id. Grot made this statement despite the

language contained in section 16050, "Basic Methods And Requirements (Electrical)," paragraph 1.2.A, "Minimum Requirements," which explicitly states that references to NFPA codes are "minimum installation requirement standards," and paragraph 1.2.B, provides "[d]rawings and other specification sections shall govern in those instances where requirements are greater than those specified in the [NFPA] standards." Def's App. at 14.

As of June 10, 2003, there is evidence that Grot continued to remain out of compliance with the contract requirements. Def's App. at 42. In a memo to the contracting officer, the COTR stated,

> Now we are continuing to argue whether or not [Grot] need[s] to put more smoke detectors in Building 29. Laying aside the NFPA code requirements at this time. I believe our letter to Grot, dated August 23, 2002, is quite clear and no interpretation is needed. It clearly states that the contractor must submit redesigned drawings which would include all items originally shown on plans plus any new items required by code or manufacturer's requirements. The original drawings show at least four smoke detectors in each corridor of the nursing home. On the resubmitted drawings all smoke detectors were removed from the corridors.

Def's App. at 42.

In fact, Grot expressly instructed Siemens to "value engineer" the

project, or to rely solely upon the minimum requirements of the NFPA code, when creating the resubmittal drawings. Def's App. at 71, lns 1-7, 23; 72, lns 15; 73, lns 11-25; 74, lns 1-20; 79, 1-15.

Defendant further objects to this contention because it is immaterial to the Government's motion for partial summary judgment and the determination of the narrow issue of contract interpretation presented in that motion.

**69. [D] In a November 4, 2002 letter, the contracting officer stated that he did not believe that Grot would meet the November 10, 2002 contract completion date and directed Grot to provide a revised work schedule with a new anticipated contract completion date. Def's App. at 39. Additionally, the contracting officer clearly stated that in granting an extension, the VA was not relinquishing its right to seek compensatory damages for any costs it incurred resulting from Grot's inexcusable delay, nor was it relinquishing its right to terminate the contract for default should Grot fail to meet the new contract completion date. Id.**

**70. [D] On March 18, 2003, over three months later, Grot submitted its revised schedule that indicated a completion date of June 23, 2003. Def's App. at 40.**

**Objection [P]:** Objects to Defendant's reference of "over three months later" as being argumentative. Grot was delayed in responding to the contracting officer's request because Grot could not give a completion schedule until Grot knew when it would have answers to certain questions and approved drawings from the redesign.

**71. [D] The contracting officer issued contract modification number three, which extended the contract completion date from November 10, 2002 to June 23, 2003. Def's App. at 19.**

**72. [D] On June 10, 2003, the COTR responded to an inquiry from the contracting officer as to whether the VA should terminate Grot for default. Def's App. at 41-43. The COTR did not recommend termination, as he believed it would further delay the project and add expense to the contract. Def's App. at 41. He noted, however, that his main concern was Grot's continued failure to comply with the specifications and to submit redesign drawings. Def's App. at 42-43.**

**73. [D] The contracting officer, ~~based upon the COTR's opinion~~, allowed Grot to continue beyond the June 23, 2003 contract completion date, but issued a show cause notice one month later. Def's App. at 44-45.**

**Objection [P]:** Objects to the conclusion that the contracting officer allowed Grot to continue beyond the June 23, 2003 dates based upon the COTR's opinion in that Defendant provides no citation for that alleged fact.

**74. [P] During construction of the Project, the VA agreed for Grot to install temporary fire alarm equipment when working on the existing fire alarm system in a building that ~~could not be changed over and working at the end of the work day~~. Among the types of ~~temporary fire alarm equipment~~ were temporary pull stations The purpose of the temporary pull stations is to provide additional fire alarm capability when portions of the system are deactivated. The temporary systems are removed when construction is complete for that portion of the building. Pl.'s App. at 244, ¶¶ 13-15.**

**Objection [D]:** Defendant objects to the redlined portions of this contention because they are vague. Defendant does not understand what Grot means when it says a building "that could not be changed over and working at the end of the work day." When Grot states, "[a]mong the types of temporary fire alarm equipment were temporary pull stations," defendant does not know whether Grot is referring specifically to the temporary fire alarm equipment it used during this project or to temporary fire alarm equipment in general.

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the

determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**75. [P] ~~The fact that the temporary pull stations may not have been installed does not mean that there is no fire protection for that building~~. Pl.'s App. at 245, ¶16.**

**Objects [D]**: Objects to this contention upon the grounds that it is vague. The veracity of this statement necessarily depends upon the surrounding circumstances, i.e., what other fire protection was in place.

Further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**76. [P] On July 17, 2003, Grot inadvertently failed to install temporary pull stations while working in Building 1. As a result, the contracting officer issued a cure notice to Grot to cure the deficiency and to establish a fire watch for the building until the temporary pull stations were installed. Pl.'s App. at 52.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**77. [P] While Grot disputed the contracting officer's conclusion that the building was "without fire protection", Grot immediately acknowledged the inadvertent mistake with respect to the temporary pull stations and conducted the fire watch as directed. ~~The temporary pull stations were installed before completion of work on that same day~~. Pl.'s App. at 53; 148, Lines 8-12.**

**<u>Objection [D]:</u>** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**78. [P] By letter of July 17th, the COTR issued a directive to maintain a fire watch in Building 29 due to what the COTR determined was "inadequate fire safety coverage". However, as admitted by the contracting officer, ~~the COTR never defined what he considered to be "inadequate fire safety coverage" or the basis for compelling the fire watch~~. Pl.'s App. at 55 & 108, lines 5-19; 109, lines 1, 21-25; 110, lines 1- 14.**

**Objection [D]:** Objects to Grot's characterization of the contracting officer's deposition testimony. The contracting officer, John Mraz, was testifying with regard to whether the COTR or Mr. Harrison stated in a particular e-mail and a particular letter what they considered to be insufficient coverage. Pl's App. at 108, lns 5-19; 109, lns 1-22. The contracting officer did not testify that the COTR "never defined what he considered to be 'inadequate fire safety coverage' or the basis for compelling the fire watch.

Further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**79. [P] During the course of the Project, an issue had arisen between Grot and the VA, regarding the installation of additional corridor smoke detectors in Building 29. By letter of April 29, 2003, Grot had pointed out that the ~~smoke detectors were not a requirement under NFPA 101, 1997 Edition~~, and requested a meeting to clarify the issues between Grot and the VA. Pl.'s App. at 56.**

**Objection [D]:** Objects to Grot's characterization of its April 29, 2003 letter. It is not a factual contention that the smoke detectors at issue "were not a requirement under NFPA 101, 1997 Edition; it is a legal conclusion. Grot further stated in its letter that it would not provide the smoke detectors "unless a modification is provided to Grot, Inc." Pl's App. at 56.

**80. 52. [P] The VA did not respond to Grot's letter of April 29, 2003. Pl.'s App. at 57.**

**Objection [D]:** Objects to this contention because the supporting citation Grot has provided only supports the contention that in a May 27, 2003 letter, Jerry Grot stated that the VA had not responded, as of that date, to Grot's letter of April 29, 2003. Pl's App. at 57.

**81. [P] By letter of May 27, 2003, Grot had again raised the issue of the additional smoke detectors and pointed out to the contracting officer that various specifications upon which the contracting officer's representatives were relying were not a part of the 1997 Edition of the NFPA 101. Pl.'s App. at 57. Again Grot asked for direction and ~~none was forthcoming~~.**

**<u>Objection [D]:</u>** Defendant objects to this contention. In a memorandum from the COTR to the contracting officer, dated June 10, 2003, the COTR reported to the contracting officer that the VA and Grot were "continuing to argue whether or not [Grot] need[s] to put more smoke detectors in Building 29." Def's App. at 42. The COTR further stated that the bid drawings showed at least four smoke detectors in each corridor of the nursing home, but that Grot's drawings showed no smoke detectors in the corridor. Pursuant to the August 23, 2002 directive from the VA to Grot, instructing them to resubmit drawings that contained all devices on the bid drawings and all devices required by the relevant codes, the COTR believed that Grot's submittal drawings should have contained the smoke detectors. <u>Id.</u> Thus, the memorandum evidences that there was discussion between the VA and Grot regarding the VA's belief that the

smoke detectors were required pursuant to the contract; Grot simply disagreed. Def's App. at 42. Thus, there was no further direction for the VA to offer.

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**82. [P] Thus, by letter of July 17th, the COTR issued the fire watch notice for Building 29. Pl.'s App. at 55.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**83. [P] By e-mail of July 22nd, Grot reminded the contracting officer of Grot's repeated request for direction and a meeting. ~~Again no response was forthcoming~~. Pl.'s App. at 63 & 64.**

**<u>Objection [D]:</u>** Defendant objects to the second sentence of this contention, as the contracting officer responded on July 23, 2003, via e-mail, stating that he saw no need to hold a meeting. Pl's App. at 63.

Further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**84. [P] ~~The contracting officer was relying on the 2000 Edition of NFPA 101 and not the 1997 Edition as required by the specifications. Pl.'s App. at 57, 68, & 146. After the termination Grot learned that the contracting officer's technical representative was not relying on the correct VA fire protection manual~~. Pl.'s App. at 145, lines 20-24 & 146, lines5-22.**

**<u>Objection [D]:</u>** Defendant objects to the first sentence of this contention because Grot was aware as early as May 27, 2003, to which edition of the NFPA the VA was referring. Pl's App. at 57. Further, the specifications did not require the VA to rely upon the 1997 edition; the specifications stated that if the NFPA was referenced in the specifications, then the reference was to the 1997 edition. Objects to the second sentence of this contention because the deposition testimony to which Grot cites as supporting this contention is vague. The contracting officer never testified that the COTR relied upon the incorrect VA fire protection manual. Pl's App. at 145, lns 20-24; 146, lns 5-22.

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract

at issue in this case and whether it required Grot to design and install a fire alarm system.

**85. [P] On July 20th, the contracting officer issued a directive to initiate a fire watch for buildings 1, 2, 3, 24 and 29; ~~the entire Project~~. The ~~sole~~ basis for the directive was that the contracting officer had determined that there was "inadequate fire safety coverage". Pl.'s App. at 58.**

**<u>Objection [D]:</u>** Defendant objects to Grot's statement that the fire watch was issued for the entire project; the July 20, 2003 letter clearly states that the fire watch was to be instituted for buildings 1, 2, 3, 24 and 29. Pl.'s App. at 58. Agrees that the basis of the fire watch was the COTR's determination that there was inadequate fire safety coverage, with the clarification that his determination was based upon Grot's noncompliance with the requirements of NFPA 72 and 101 and the contract specifications. <u>Id.</u>

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**86. ~~No specifics were given in the directive letter~~. Pl.'s App. at 124, lines 1- 12.**

**<u>Objection [D]:</u>** Defendant objects to this contention upon the ground that the term "specifics" is vague. The COTR's letter stated that the fire alarm system and temporary alarm system was not in compliance with NFPA codes 72 and 101 or with the contract specifications. Pl.'s App. at 58. Further, the COTR stated in the letter that he would provide an additional letter with specific deficiencies. <u>Id.</u>

Further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**87. [P] ~~With the exception of the inadvertent failure to install the temporary pull stations in Building 29, which was cured before the close of the day, the VA had not raised an issue as to the adequacy of fire protection in the other buildings~~.**

**Objection [D]:** Defendant objects to this contention because Grot has not provided a supporting citation. Further objects because the July 20, 2003 letter from the COTR clearly raises an issue as to the adequacy of fire protection in the other buildings. Pl.'s App. at 58.

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**88. [P] The institution of a campus wide fire watch was going to be a significant cost to Grot and Grot immediately asked for a meeting with the contracting officer to review the concerns and misunderstandings which seemed to be prevalent on the Project. When no response was forthcoming, Grot issue another request for a meeting. Pl.'s App. at 59 & 63-64.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**89. [P] Instead of addressing Grot's concerns the contracting officer stated that he, "not the contractor" would determine the need for a meeting. Pl.'s App. at 60-61. This position was taken even when the contracting officer knew there were substantial disagreements over the interpretation of the plans and specifications for the Project.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**90. [P] On July 23rd, Grot reaffirmed that it was conducting the mandated fire watch but was doing so under protest with the intent to pursue all cost and expense incurred by Grot in performing per the contracting officer's directive. Pl.'s App. at 62,63,64.**

Objection [D]: Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**91. [P] ~~Throughout the Project, Grot continually requested a list of the alleged deficiencies as the contracting officer's letters were totally devoid of content~~. Pl.'s App. at 50, 57, 62 & 67-74.**

**Objection [D]:** Defendant objects to Grot's characterization of the contracting officer's letters (to which letters Grot refers we cannot be sure); the letters are the best evidence of their contents.

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**92. [P] ~~It would not have mattered if a list of deficiencies had been given as the contracting officer had already determined that if a list of deficiencies was given, it would not be complete~~. Pl.'s App. at 61.**

<u>**Objection [D]:**</u> Defendant objects to this contention as it is not a contention of fact, but an opinion. Further objects to the contention that the contracting officer had determined that if a list of deficiencies was given, it would not be complete. The document to which Grot cites as support for this contention is an email string between VA personnel. Pl's App. at 61. Mel Harrison, not the contracting officer, suggested that the VA inform Grot of some of the deficiencies and then conduct a pre-test, per specification 13850, paragraph 2.5.C, in an attempt to convince Grot that it was not in compliance with the code. <u>Id.</u> Charles Ballard, the Chief Engineer, agreed. <u>Id.</u> The contracting officer, however, never stated his opinion and did not indicate that the VA would follow this course of action. <u>Id.</u>

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire

alarm system.

**93. [P] By the contracting officer's e-mail of July 23, 2002 (sic), the VA issued its "Show Cause Letter" to Grot in which the VA stated that Grot had 10 days after receipt of the Show Cause Letter to provide a schedule to complete the Contract. Pl.'s App. at 65-66.**

**Objection [D]:** Agrees with the veracity of this contention with clarification. The show cause letter additionally stated that on July 23, 2003, an inspection of buildings 1, 2, 3, 24 and 29 was conducted by the VA Safety Manager and Engineering. Pl's App. at 65-66. The show cause letter further stated that this inspection determined that the work under this contract was approximately 59 percent complete and did not meet specification 13850, paragraph 1.1.B. Additionally, the contracting officer noted that the contract was awarded on February 1, 2002, with an original contract completion date of November 10, 2002. Id. The completion date was extended to June 23, 2003, but as of the date of the show cause letter, July 23, 2003, the project was still not complete. Id.

Defendant objects to this contention, however, because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire

alarm system.

**94. [D] In a July 31, 2003 letter from Jerry Grot to the contracting officer, which responded to the VA's issuance of the July 23, 2003 show cause notice, Grot again disputed the VA's determination that Grot was responsible for the design of the fire alarm system, and that Grot would seek the cost and expense allegedly incurred as a result of that decision. Def's App. at 46-52.**

**Objection [P]:** Objects to Defendant's limited characterization of Grot's letter in that the letter constitutes a full and complete response to the contracting officer's show cause letter and not just a dispute of the previous directions.

**95. [P] Grot's July 31, 2003 letter responded and ~~fully addressed all of the issues raised in the Show Cause Letter~~ and further provided to VA a completion date of October 3, 2003 assuming that the VA provided answers to outstanding questions by August 11th. Pl.'s App. at 67-74.**

**Objection [D]:** Objects to Grot's contention that the July 31, 2003 letter fully addressed all of the issues raised in the show cause letter; that is not a factual contention, but Grot's opinion.

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**96. [D] The COTR provided his comments to the contracting officer on August 3, 2003. 53-58. On August 7, 2003, almost nine months past the original completion date, the contracting officer terminated the contract for default. Def's App. at 59-60. On August 9, 2003, the contracting officer set forth his rationale for the termination in an internal memorandum. Def's App. at 61. Among the reasons listed was "failure to perform in compliance with the technical requirements of the contract." <u>Id.</u>**

**<u>Objection [P]:</u>** Objects to the first sentence of this contention to the extent that the COTR included within his letter interpretation of the plans, specifications and other contract documents related to the design of the fire alarm system submitted by Grot in that the COTR is not a Certified NICET Level III Technician nor a fire protection engineer, and as such, is not qualified to make those determinations.

**97. [P] ~~Without further comment or challenge to Grot 's July 31, 2003 letter and without addressing the issues raised in the letter or providing answers to questions contained in Grot's letter or letters previously provided by Grot, by letter of August 7, 2003~~, the VA terminated the Contract for default; the alleged basis of the default was that the contracting officer had determined that Grot:**

**a) had failed to provide adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29 as directed in Mr. Mraz's letter of July, 17, 2003; and**

**b) had failed to perform in compliance with the technical requirements of the contract; and**

**c) had failed to complete the Contract by the extended completion date of June 23, 2003; and**

**d) had failed in Grot's letter of July 31, 2003 to "Show Cause" to the Mr. Mraz's "Show Cause Notification Letter of July 23, 2003. Pl.'s App. at 75-76.**

**<u>Objection [D]:</u>** Objects to the redlined portion of this contention because Grot does not provide a supporting citation. Further objects to the redlined portion of this contention because the contracting officer's termination for default letter states that the decision to terminate the contract was made after the contracting officer "evaluated the history of Contract V549P-60-2 in its entirety." Pl.'s App. at 75.

**98. [P] ~~At all times from July 22nd until August 8th, Grot maintained the fire watch mandated by the contracting officer and kept working to complete the project~~.**

**<u>Objection</u> <u>[D]:</u>** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system. Further objects because Grot does not provide a supporting citation.

**99. [D] On August 12, 2003, Grot responded to the termination for default and requested that the contracting officer rescind the termination by noon on Friday, August 15, 2003. Def's App. at 62-63**

**100. [P] ~~The alleged deficiencies were never reduced to writing by the contracting officer and in his deposition, the contracting officer admitted that it was not fair not to tell Grot where Grot's system failed to meet the requirements of NFPA 101.~~ Pl.'s App. at 110, lines 2-14.**

**Objection [D]:** Defendant objects to the contention that the "alleged deficiencies were never reduced to writing by the contracting officer," because Grot does not provide a supporting citation for this contention.

Further objects to Grot's characterization of the contracting officer's deposition testimony, as it is not an accurate summation of that testimony. All the contracting officer said was that it would have been fair to put in writing where Grot's system failed to meet NFPA 101. Pl's App. at 110, lns 7-14. The contracting officer did not say that the VA never informed Grot, in writing or otherwise, of how the fire alarm system failed to meet NFPA 101. In fact, the contracting officer makes reference to another letter that was sent to Grot listing six deficiencies. Pl's App. at 103, lns 3-8.

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the

determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**101. [P] The ~~contracting officer confirmed~~ during his deposition, that the VA defines a design/build project as the "procurement by the Government , under one contract, with one firm or joint venture for both design and construction services for a specific project. Pl.'s App. at 79-96 & 135, lines 6-18.**

**Objection [D]:** Defendant objects to Grot's characterization of the contracting officer's testimony. The contracting officer was simply reading from the generic contract that was introduced as an exhibit by Grot's counsel and is now included at pages 79-96 of plaintiff's appendix. Pl.'s App. at 135.

**102. [P] The contracting officer did not utilize the VA's form or comply with the applicable FAR for a design/build project in this solicitation. Pl.'s App. at 132, lines 2-25 & 133 lines 9-11.**

**103. [P] The reprocurement contract with Siemens did not reference the Project as design/build because ~~the contracting officer "thought the A/E designed the project"~~. Pl.'s App. at 171, lines 5-12.**

**<u>Objection [D]:</u>** The reprocurement contract with Siemens did not reference the Project as design/build because it was not a design/build project. Def's Reply Brief at 2-3. The Government has never argued that Grot's contract or Siemens' follow-on contract were "design/build" contracts.

**104. [P] The solicitation for architectural and engineering (A/E) services for the Project sets out that the A/E shall provide "fully developed working drawings and specifications, as well as construction period services". Pl.'s App. at 97-98. ~~This same language is contained in the contract ultimately entered into by the VA and Fratto for design services~~. Pl.'s App. at 98-99.**

**Objection [D]:** Objects to the second sentence of this contention because the language in the actual contract between Fratto and the VA differs from the language in the solicitation. The contract language reads, "[p]rovide A/E Services for developing working drawings and specifications, investigative services, site visits and construction period duties fo the 'Fire Alarm System Design Project, Sam Rayburn VA, Bonham, TX.'" Pl's App. at 99.

**105. [P] The A/E contract required Fratto to design "all buildings, structures, etc." to "conform to all codes specified in the various Veterans Administration Construction Standards . . . ." Pl.'s App. at 101.**

**106. [P] The A/E contract required Fratto, as part of its construction period services, to "check the contractor's shop drawings and detailed drawings, schedules, descriptive literature and samples . . . ." Pl.'s App. at 102.**

**107. [P] The A/E contract required Fratto to check Grot's submittals for conformity with the contract documents but the A/E contract said nothing about checking the contractor's design of the Project. Pl.'s App. at 102**.

**Objection [D]:** Defendant objects to this contention because the difference between the A/E checking Grot's submittals for conformity with the contract documents and checking the contractor's design of the project is unclear.

**108. [P] ~~Neither of the VA's solicitations advised Grot or the other contractors of the VA's interpretation that the successful bidder was to "design" the Project~~. Pl.'s App. at 1-2, 29-31.**

**<u>Objection [D]:</u>** Defendant objects to Grot's characterization of the solicitations; the documents are the best evidence of their contents. Further objects because the bidders had access to the specifications and bid drawings prior to submitting their bids, and these documents notified the bidders that they would be required to design and install the fire alarm system. Def's App. at 10-16.

**109. [P] ~~Nowhere in the VA's electronic notice is any contractor put on notice that the contractor will be responsible for "design" of the Project nor is the word "design" contained in any notice form the VA.~~ Pl.'s App. at 3-4.**

**<u>Objection [D]:</u>** Defendant objects because the bidders had access to the specifications and bid drawings prior to submitting their bids, and these documents notified the bidders that they would be required to design and install the fire alarm system. Def's App. at 10-16.

Further objects to the redlined portion of this contention because it is a legal conclusion, not a contention of fact. Further objects because the solicitation, which the contractor received prior to submitting its bid for the contract contained the word "design." Def's App. at 10, 11.

**D. Relevant Deposition Testimony**

**110. [D] During discovery, Scott McCauley, a fire and security operations manager for Siemens, which was Grot's subcontractor on this project, testified that Siemens initially submitted a cost proposal to Grot that included devices that were in addition to the devices shown on the bid drawings. Def's App. at 64-78. Mr. McCauley testified that Grot rejected this proposal and requested that Siemens submit a cost proposal that was based only on the devices that were shown on the bid drawings. Def's App. at 65-66. Mr. McCauley stated that Siemens originally provided a proposal that included devices in addition to the ones shown on the bid drawings because Siemens knew that the VA wanted devices that were not included on the bid drawings. Def's App. at 67-68. Mr. McCauley testified that Siemens notified Grot that the VA did not want the contractor to simply install what was shown on the drawings. Def's App. at 69-70. Grot's response was that the contract was not a design project. Def's App. at 66. Thus, Mr. McCauley testified, that the first set of shop drawings that Grot accepted from Siemens was based solely upon the bid drawings. Def's App. at 75.**

**Objection [P]:** Objects to the second sentence of this contention in that it does not correctly represent the testimony of Mr. McCauley. Mr. McCauley testified that he did not know if Grot "directed" him to submit a proposal based solely on the devices shown on Fratto's drawings but, rather, that after discussions, Siemens decided that the engineer had already designed the system and that Siemens would apply its fire alarm system to the engineer's design. Def's App. at 66, lines 7-25 & at 69, lines 16-23.

As for the third sentence of this contention, object in that it is vague and unclear as to whether Defendant is referring to Siemen's original bid for the project or its initial pricing to Grot.

As for the fourth sentence of this contention , object in that Mr. McCauley actually testified that he "probably" said that but could have said that "what Mel and Chris are looking for . . . ." as opposed to the VA. Mr. McCauley went on to reiterate that after reviewing the documentation which had been stamped by an engineer, that Siemens determined that the system was already designed and that Siemens would apply its "system to what's shown on the drawings". Def's App. at 69, lines 9-23.

Grot further objects to the fifth sentence of this contention in that the

language referenced is not found in Defendant's appendix at page 66.

**111. [D] Mr. McCauley also testified that after the VA instructed Grot to redraw and resubmit its shop drawings to incorporate the bid drawings, specifications and codes, Grot directed the Siemens to "value engineer" the project, meaning to design the project to meet the minimum code requirements. Def's App. at 71-72. Mr. McCauley testified that when Siemens redesigned the shop drawings they only looked at the minimum requirements of the NFPA codes and not at the specifications. Def's App. at 73.**

**Objection [P]:** Objects to the characterization of Mr. McCauley's testimony in the first sentence of this contention, in that Mr. McCauley actually testified that he "probably was in on the conversation with Jerry and decided to put out a design that would meet the minimum code, life safety 101 code, because we already had an approved set of drawings stamped by Fratto saying we, we had met the intent, because it said accepted or except for a couple of 'accepted as noted' ". Def's App. at 73, lines 20-25 and at 74, line 1.

**112. [D] Jerry Grot, President of Grot, Inc., also testified that when the VA directed Grot to redraw and resubmit their shop drawings, Grot directed Siemens to provide a design that met the minimum standards of NFPA 101 and 72. Def's App. at 79.**

**<u>Objection [P]:</u>** Plaintiff objects to Defendant's characterization in this contention as to what the phrase "value engineer" means in that Mr. Grot testified that to value engineer means to give "the best installation at the lowest cost to the owner". Def's App. at 79.

**113. [P] Mr. McCauley of Siemens testified that after reviewing the specifications, Siemens came to the conclusion that the engineer was not "looking for us to do the design". Pl.'s App. at 176, lines 20-25 & 179, lines 16-23.**

**<u>Objection [D]:</u>** Agrees with clarification. Mr. McCauley also testified that Siemens original cost proposal for the subcontract with Grot was based additional devices not shown on the drawings. Pl.'s App. at 175, lns 7-11. Mr. McCauley testified that this proposal was not accepted by Grot, Pl.'s App. at 175, lns 23-24, and that it was not until after discussing the matter with Grot that Siemens "came to the conclusion" that the engineer was not "looking for us to do the design." Pl.'s App at 176; 180, lns 5-13.

**114. [P] The COTR, testified that regardless of whether NFPA 72 or 101 required a device in a certain room or location, "if my supervisors and those I am consulting with want it, yes, they will go there". Pl.'s App. at 237, lines 8-14 . ~~Regardless of whether it was needed~~.**

__**Objection [D]:**__ Objects to the last sentence of this contention because it is Grot's characterization of Mr. Kirk's testimony and not what Mr. Kirk actually testified.

**115. [P] ~~Mr. McCauley of Siemens testified in his deposition of February 3, 2005, that in the first bid for the Project Siemens bid not upon the plans and specifications but upon what was conveyed to Siemens by Mr. Harrison and Mr. Forner~~. Pl.'s App. at 190, lines 23-25 & 191, lines1-7.**

**<u>Objection [D]:</u>** Defendant objects to Grot's characterization of Mr. McCauley's testimony. Mr. McCauley actually testified that he priced his bid for the second solicitation 'Per what was basically on the drawings." Pl.'s App. at 190, lns 23-25; 191, ln1.

**116. [P] ~~Mr. McCauley of Siemens testified that the devices that Mr. Harrison and Mr. Forner were requesting were not disclosed in the bid documents nor was there any way for any of the other bidders to have known about what would be required absent each bidder having the exact same information from the exact same people that was specially provided to Siemens~~. Pl.'s App. at 191, lines 16-25.**

**Objection [D]:** Defendant objects to Grot's characterization of Mr. McCauley's testimony. Mr. McCauley actually testified that he was not at the pre-bid walk through for the first solicitation, Def.'s App. at 67, lns 22-25; Pl's App. at 192, lns 22-23, thus he has no knowledge as to what information the other bidders received prior to bidding. Second, Mr. McCauley testified that, in his opinion, bidders could have "gone and walked [the site] and seen a lot of the stuff [that was required by the contract]." Def.'s App. at 191, lns 21-23.

**117. [P] ~~The contracting officer did not recognize this as a design/build project until August 2002.~~ Pl.'s App. at 154, lines10-12. ~~Had the contracting officer known it was a design/build project he would have complied with the VA's requirements for a design/build project~~. Pl.'s App. at 157, lines 5-18.**

**<u>Objection [D]:</u>** Defendant objects to the first sentence of this contention because Grot cites to a question asked by its counsel to the contracting officer during his deposition as support. Pl.'s App. at 154, lns 10-12. The contracting officer testified that section 13850, paragraph 1.2.B, contained the words "design" and "install." Pl.'s App. at 154, lns 14-22. Further, objects to the second sentence of this contention because the contracting officer responded in the affirmative to the following hypothetical question, "[i]f it had been and you had known it to be a design-build, you would have followed the VA's requirements for a design-build project, wouldn't you?" Pl's App. at 157, lns 15-18.

**118. [P] The minutes from the pre-bid meeting indicate that a question was raised as to changes at the facility not noted in the drawings such as "rooms being converted from patient area to waiting room area, missed strobes, device layouts, etc." Mr. Kirk, the same individual that issued the opinion that this was a design/install project responded to the contractor to "notify him of any changes that need to be noted on the drawings and he will do an addendum to the project". Pl.'s App. at 14.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**119. [P] It took Fratto 264 days to design the Project. Pl.'s App. at 155, lines 19-23. Fratto ran over the Project design completion date by 176 days and was never terminated.**

**Objection [D]:** Objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**120. [P] ~~According to the VA's interpretation of the Contract, the contractor was going to have 270 days to produce nongeneric drawings, redesign and build the Project according to the nongeneric drawings~~.**

**<u>Objection [D]:</u>** Defendant objects to this contention because Grot does not provide a supporting citation. Further objects because it is Grot's characterization of its case, not a factual contention.

Defendant further objects to this contention because it is not material to the Government's motion for partial summary judgment or the determination of the narrow issue of law – the interpretation of the contract at issue in this case and whether it required Grot to design and install a fire alarm system.

**121. [P] The same specification language contained in Section 13850, Part 1, Paragraphs 1.1(B) and 1.2(B), the language relied upon by the contracting officer in this case, was used in a fire alarm project for the VA in Lexington, Kentucky. Pl.'s App. at 103-104.**

**122. [P] Grot questioned the contracting officer of the Lexington project as to whether the Lexington project was a design build project and the contracting officer, based upon information and direction from her engineering services division, replied as follows:**

> **No, this is not a design/build project. The project documents, drawings and specifications, are a fully developed set of documents for the fire alarm system.**
>
> **The referenced spec sections and paragraphs refer to the submittal process, specifically the shop drawings, that would be prepared and submitted by the contractor for review and approval.**

**Pl.'s App. at 103.**

**123. [P] When questioned about the Lexington contracting officer's interpretation of the section, the contracting officer testified that he did not know if that section is interpreted the same by other**

**regions of the VA. Pl.'s App. at 248, lines 14-25 & 249, line 1.**

**124. [P] The contracting officer was also questioned about a VA fire alarm project in Salt Lake City, Utah where the same language was again included. He testified that it would not surprise him that the VA in Salt Lake City would likewise say that it is not a design/build project. He further testified that he did not know of another VA region that interpreted the section the way he had interpreted it. Pl.'s App. at 251 & 252, lines 1-5.**

### E. Grot's Appeals Before The Veterans Affairs Board Of Contracting Appeals

**125. [D] On March 31, 2005, Grot submitted to the contracting officer a "Request for Additional Compensation" on the contract at issue in this case. Def's App. at 82.**

**126. [D] On June 29, 2005, the contracting officer issued a final decision upon Grot's March 31 claims. Def's App. at 86-89.**

**127. [D] On September 13, 2005, Grot appealed the contracting officer's final decision to the VABCA. See Grot, Inc. v. Dept. of Veterans' Affairs, VABCA Appeal Nos. 7438-7444. Def's App. at 85.**

**128. [D] On October 14, 2005, the Government filed a motion to transfer Grot's VABCA appeals to this Court and consolidate them with this case.**

**129. [D] On October 28, 2005, the parties filed a joint stipulation agreeing to transfer Grot's VABCA appeals to this Court and requesting that the Court consolidate them with this case.**

**130. [D] On November 16, 2005, this Court issued an order transferring the VABCA appeals to this Court and consolidating them with this case. Additionally, the Court temporarily suspended the parties' briefing of defendant's motion for partial summary judgment.**

**131. [D] On December 21, 2005, this Court lifted the suspension of the parties' briefing and ordered Grot to submit its response to defendant's motion for partial summary judgment by January 25, 2006.**

**132. [D] On January 25, 2006, Grot filed its response to defendant's motion for partial summary judgment.**

**133. [D] On February 22, 2006, defendant filed its reply to plaintiff's response to defendant's motion for partial summary judgment.**

Respectfully submitted,

s/ Andrew J. Kilpatrick, Jr.
ANDREW J. KILPATRICK, JR.
Gore, Kilpatrick & Dambrino
Post Office Drawer 2900
Ridgeland, Mississippi 39158
Tel: 601.957.1595
Fax: 601.899.9171

Counsel for Plaintiff

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ Lindsay Williams
LINDSAY WILLIAMS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Fl
1100 L Street NW
Washington, DC 20530
Phone: (202) 353-7995
Fax: (202) 514-8624

March 15, 2006

Attorneys for Defendant