# In the United States Court of Federal Claims

Case No. 03-1951C (Consolidated)
(Filed: May 15, 2006)
NOT TO BE PUBLISHED

* * * * * * * * * * * * * * * * * * * * * * * * * * * *
**GROT INCORPORATED,**
*Plaintiff,*

v.

**THE UNITED STATES OF AMERICA,**
*Defendant.*
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

***Andrew J. Kilpatrick, Jr.,*** Gore, Kilpatrick & Dambrino, Ridgeland, Mississippi, attorney of record for Plaintiff.

***Lindsay Williams***, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for Defendant. With her on the briefs were ***David M. Cohen***, Director, ***Franklin E. White, Jr.***, Assistant Director, and ***Peter D. Keisler***, Assistant Attorney General.

***Sarah Leigh Martin***, law clerk.

## ORDER/OPINION

**Baskir, Judge.**

Pursuant to the Contract Disputes Act, Plaintiff brings a breach of contract claim alleging that the Veterans Administration wrongfully terminated its contract for default. The Defendant contends in support of its Motion for Partial Summary Judgment that Plaintiff was required under the contract to "incorporate the bid drawings, the contract specifications, and the relevant fire codes to create or design a fire alarm system, and then to install that system." Def. Rep. at 3. Plaintiff counters that the contract only required it to install a fire alarm system that was already designed pursuant to a separate design contract with another party.

The Court concludes that the contract contained clear requirements that Grot was to incorporate the bid drawings and all contract specifications, and install the system in compliance with relevant fire alarm codes. Therefore, **the Defendant's interpretation of the contract is correct, and its Motion for Partial Summary Judgment is granted**.

## BACKGROUND

The present motion involves the interpretation of a contract between Grot, Inc. ("Grot") and the Department of Veterans Affairs ("VA") at the Sam Rayburn Memorial Veterans Center for the Campus-Wide Fire Alarm, Project No. 099-108 (the "Project"). Consequently, except for the quoted provisions of the contract, the following recitation, essentially undisputed, is offered to set the legal issues in context.

After an initial bidding round during July 2001, the VA initially awarded the contract to a company that bid lower than Grot. However, on October 29, 2001, the VA cancelled this contract due to "inadequate specifications." Pl. App. at 28.

### I. Contract Provisions

On January 8, 2002, the VA received bids on their second solicitation for the Project, IFB 549-23-02. Just as in the first solicitation, this solicitation for bids described the work as follows:

> The contractor shall furnish all labor, tools, equipment, materials and supervision to replace the "Fire Alarm System" at the Sam Rayburn Memorial Veterans Center . . . in accordance with the contract drawings and specifications. The project shall involve general construction, demolition, alterations, grading, electrical and mechanical work. Contract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the city, county, state and Federal Government. The period of performance is 270 days.

IFB (Grot) at 1, Pl. App. at 29.

The solicitation included bid drawings and specifications prepared by Fratto Engineering, Inc. ("Fratto"). Fratto had entered into a separate contract with the VA to "provide fully developed working drawings and specifications, as well as construction period services." IFB (Fratto) at 1, Pl. App. at 97. The contract with Fratto required Fratto to design "all buildings, structures, etc." to "conform to the codes specified in the various Veterans Administration Construction Standards," Contract SP 18(a), Pl. App. at 101, and to check the contractor's (here, Grot's) drawings, descriptions, and schedules, Contract SP 28(a), Pl. App. at 102.

The VA-Grot contract contains a number of provisions relevant to the parties' dispute. The bid drawings and specifications were described in contract specification section 13850, paragraph 1.1(A):

> This section of the specifications includes: the furnishing, installation, and connection of fire alarm equipment to form a complete multi-building analog addressable-device fire alarm and emergency notification system; testing and placing the new system into operation; training of the owner's personnel; and removal of the old system. The new system shall include, but not be limited to, alarm initiating devices, alarm notification appliances, control units, fire safety control devices and interfaces, annunciators, power supplies, remote alarm interfaces, and wiring as shown on the drawings and as specified. All devices and accessories necessary for a complete operating system shall be included even though each item is not specifically mentioned or described herein.

Def. App. at 10.

The contract requires specific supervision and fire code compliance in paragraph 1.1(B) of section 13850:

> The fire alarm system shall comply with requirements of NFPA [National Fire Protection Association] 101 and NFPA 72. The system design, system layout, submittal documents preparation, and supervision of installation and testing shall be provided by a technician that is certified NICET [National Institute for Certification in Engineering Technologies] level III or a registered fire protection engineer.

Def. App. at 10. The scope of the Project is also set forth in section 13850:

> A new fire alarm system shall be designed and installed in accordance with the specifications and drawings. Device location and wiring runs shown on the drawings are for reference only unless specifically dimensioned. Actual locations shall be in accordance with NFPA 72 and this specification.

§ 13850 ¶ 1.2(B) Def. App. at 11.

The General Conditions section, in the Special Notes subsection, section 01001 paragraph 1.1(c), states:

> When approval is given for a system component having functional physical characteristics different from those indicated or specified, it is the responsibility of the contractor to furnish and install related components with characteristics and capacities compatible with the approved substitute component as required for systems to function as noted on drawings and specifications. There shall be no additional cost to the Government.

Def. App. at 12. And under subsection (d), the contract explains what the contractor should do if details are missing in the specifications:

> In some instances it may have been impracticable to detail all items in specifications or on drawings because of variances in manufacturers' methods of achieving specified results. In such instances the contractor will be required to furnish all labor, materials, drawings, services and connections necessary to produce systems or equipment which are completely installed, functional, and ready for operation by facility personnel in accordance with their use.

§ 01001 ¶ 1.1 (d), Def. App. at 12. Also in the Special Notes Section, in the Submittals subsection, section 01001 paragraphs 1.4(B)(1) and (2), the contract expands on the contractor's responsibilities:

> The contractor shall be responsible for verifying all critical dimensions shown on the drawings provided by the VA . . . [and shall] provide locations of all devices . . . , appliances, panels, equipment, junction/terminal cabinets/boxes, risers, electrical power connections, individual circuits and raceway routing, system zoning; number, size, and type of raceways and conductors in each raceway; conduit fill calculations with cross section area percent fill for each type and size of conductor and raceway.

Def. App. at 13.

The minimum installation requirements are set forth in the Basic Methods and Requirements (Electrical) section, section 16050 paragraphs 1.2.A and B. "[The NFPA codes] are minimum installation requirement standards," and "[d]rawings and other specification sections shall govern in those instances where requirements are greater than those specified in the [NFPA] standards." Def. App. at 14.

The contract also incorporates FAR clause 52.236-21, which provides:

> Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern.

48 C.F.R. § 52.236-21(a), Def. App. at 9.

## II. Contract Performance

Grot was the lowest bidder in the second solicitation at $934,310.00. Grot did not inquire into the meaning of the now disputed terms and conditions stated in the

specifications or drawings. On February 1, 2002, Grot was awarded the Project. Later that day, Grot received a Notice to Proceed stating that Grot's offer to "furnish and install" the fire alarm system had been accepted. The letter established November 10, 2002, as the completion date. Grot then entered into a subcontract, also on February 1, 2002, with Siemens Cerberus Division ("Siemens") to:

> supply submittals for equipment[,] submit drawing of system (wiring layout)[,] supply all devices as per drawings and specs[,] install panels and get all communicating with each other to be done by Siemens[,] install temporary fire alarm system in buildings needed[,] install devices and trim out (entire job)[,] install UPS system[, and] provide three year warranty.

Grot-Siemens Subcontract, Def. App. at 3-4.

On February 25, 2002, representatives of the VA, Grot, Siemens, and others attended a Project meeting. At the meeting, there was a discussion about submittals and the installation of the approved submittals. According to his meeting notes, Rickey Kirk, the Contracting Officer's Technical Representative ("COTR"), clarified that all submittals must contain a cover page referring to the specification section and paragraph under which they were being submitted, and that all work had to meet the requirements of NFPA 101 and 72. Pl. App. at 35-36.

Grot gave the drawings provided by VA to Siemens so that Siemens could create field installation drawings. In performing the subcontract, Siemens initially provided a proposal to Grot with additional devices not on the original Fratto bid drawings and specifications. Grot rejected this proposal. Siemens then submitted another cost proposal that was based only on the devices as they appeared in the Fratto bid drawings, which Grot accepted. Deposition of Scott McCauley at 13-19, 68-71, Def. App. at 64-70, 75-78.

Grot submitted the Siemens drawings to the VA and Fratto for review. The drawings were subsequently returned stamped with "Approved" or "Approved as Corrected." Def. App. at 15. The stamped drawings also had the provision "[a]pproved for general arrangement only . . . [and the contractor is] required to comply with contract document, plans, and specifications." *Id.* Fratto also stamped the following on the approved and approved as corrected plans:

> Fabrication / Installation may be undertaken . . . Approval is only for conformance with the design concept of the project and with the information given in the Contract Documents; this approval does not extend to accuracy of quantities or dimensions, designs by contract shop fabrication processes, field construction techniques and safety, or coordination of trades and their work.
>
> . . . Review / Approval neither extends nor alters any contractual obligations of the Architect or Contractor. Review / Approval is based on the assumption that the submittal was reviewed and coordinated as required by the general conditions and that the contractor assumes the

> responsibilities required therein. Checking of shop drawings shall not relieve contractor of responsibility for deviation from requirements of contract documents nor errors or omissions in shop drawings.

*Id.* In March 2002, Grot began installation of the new fire alarm system pursuant to the stamped plans.

**III. The Dispute**

On May 5, 2002, the VA met with officials from Fratto and Grot. VA officials informed Grot that they were concerned that the submittal drawings were virtually identical to the bid drawings. According to a Fratto official's meeting notes, the VA reminded Grot at the meeting that they must comply with the codes and that the "drawings are for defining the scope of work." Def. App. at 20.

On June 24, in an email from the COTR to Grot's project manager, the VA again stated its concerns over the virtually identical plans, adding that the approved corrected plans were "for general layout only and [do] not relieve Grot of the responsibility of assuring that all codes are met." Def. App. at 22. In the same communication, the VA noted: "If installation is made and it is found that device locations are not to code then what work that has been done will have to be redone at contractors [sic] expense," pointing out some offenses Grot had already committed. *Id.* The communication also expressed concern that the Project was not being supervised by the required NICET level III technician or registered fire protection engineer.

On June 25, 2002, in an email from Grot's project manager to the COTR, Grot responded:

> The fire protection system shall be installed as designed by Fratto Engineering, Inc. in accordance with the specifications. To provide a set of plans for the project that meets all codes is not a requirement of the contractual documents. It is the responsibility of the Engineering firm for the project to design a workable system which meets all applicable codes. . . .
>
> . . . Grot, Inc. was not contracted with to design the project. The design was the responsibility of the Owner's engineers, Fratto Engineering Inc. . . It is not the responsibility of Grot Inc. to redesign the project.

Def. App. at 23-24.

Grot and VA representatives met on July 22, 2002, to discuss "whether the work for the Bonham Fire was to be installed in accordance with the contract specifications and the NFPA Codes or installed using only the prints as a generic guideline." Letter

from contracting officer to Jerry Grot (Aug. 23, 2002), Def. App. at 28. The discussion ended without a resolution. However, Grot and the VA decided that the COTR would review the plans and specifications.

On August 23, the COTR directed Grot to resubmit all of its submittal drawings, revised to include "everything contained on the original drawings as well as any additional devices required by the NFPA codes that did not appear on the original submittals. In addition, the contractor shall provide all information and drawings requested in the specifications . . . ." *Id.*, Def. App. at 29. Furthermore, the COTR concluded that the Project is a "design and installation project and that Grot Inc. must design and install a complete fire alarm system in accordance with contract plans and specifications as well as the NFPA codes." *Id.* Grot responded by email on September 5, explaining Grot's interpretation that the contract does not require a redesign of the Project and requesting a meeting with the contracting officer to attempt to reach a mutual understanding.

The contracting officer rejected Grot's request for a meeting on September 17, directing that Grot "design/install" the fire alarm system for the VA under its contractual obligations. Letter from contracting officer to Jerry Grot (Sept. 17, 2002), Def. App. at 32. By letter, Grot's president stated that Grot would begin "designing a cure to the deficiencies contained in the plans and specifications designed by the government's Consultant. . .," and that the matter had been turned over to counsel. Letter from Jerry Grot to contracting officer (Sept. 17, 2002), Def. App. at 34. Grot stood by its contention that the requested work was outside the scope of the Project. The contracting officer responded the same day, again refusing to meet with Grot and standing by VA's position that the contractor "shall provide a design/install fire alarm system." Letter from contracting officer to Jerry Grot (Sept. 18, 2002), Def. App. at 36.

Sometime after the VA directed Grot to rebsubmit drawings that met the contract requirements, Grot directed Siemens, its subcontractor, to "value engineer" the Project. According to deposition testimony of a Siemens official, this meant that Siemens was to redesign the shop drawings to meet only the minimum requirements of the NFPA codes, ignoring the contract specifications. Def. App. at 71-74, 79.

On September 25, 2002, Grot sent a letter protesting the contracting officer's directive, requesting that the VA indicate on Grot's submittal drawings the "location of each deficiency and the location of each device the VA contends is missing from [Grot's] drawings." Letter from Jerry Grot to contracting officer (Sept. 25, 2002), Def. App. at 37.

In a November 4 letter, the contracting officer stated that he did not believe Grot would meet the November 10, 2002 contract completion date. The officer directed Grot to provide a revised work schedule with a new completion date. The officer noted that in extending the completion date, the VA was relinquishing neither its right to seek compensatory damages for any costs incurred from inexcusable delay nor its right to terminate the contract for default on the new completion date. Grot submitted its revised schedule on March 18, 2003, extending the contract through June 23, 2003.

Throughout the Project, Grot and the VA ran into various additional problems, including Grot's failure to install temporary pull stations, improper installation of smoke detectors, and multiple unheeded requests by Grot for direction from the VA.

By letter to the contracting officer, the COTR responded on June 10, 2003, to an inquiry from the contracting officer as to whether the VA should hold Grot in default. The COTR did not recommend this action but noted that Grot had failed to comply with specifications and failed to submit redesign drawings.

On July 23, 2003, the revised completion date, the contracting officer issued a show cause notice by email to Grot for failure to make progress and repairs to the fire alarm system. Grot responded to the contracting officer by letter on July 31, disputing VA's determination of Grot's responsibility for design of the fire alarm system. Grot again noted that it would seek the cost and expenses allegedly incurred. Grot also anticipated an October 3, 2003 completion date. On August 3, 2003, the COTR sent the contracting officer his response to Grot's July 31 letter, addressing the various reasons Grot gave in response to the show cause order.

Shortly thereafter, on August 7, 2003, the contracting officer terminated the contract for default for: (1) failure to provide adequate fire alarm protection, (2) failure to perform in compliance with the technical requirements of the contract, (3) failure to complete the contract by the extended deadline, and (4) failure to show cause. Letter from contracting officer to Jerry Grot (Aug. 7, 2003), Def. App. at 59-61.

Grot filed its Complaint in this Court on August 19, 2003, and Defendant filed its Answer on December 19, 2003. On November 2, 2005, Defendant filed its Motion for Partial Summary Judgment on interpretation of the contract. Briefing on the Motion was completed on February 22, 2006, and the Court held an Oral Argument on the matter on April 4, 2006.

On March 31, 2005, Plaintiff submitted "Requests for Additional Compensation," to the contracting officer. After the contracting officer denied the claims, Plaintiff appealed to the Department of Veterans Affairs Board of Contract Appeals ("VABCA") on September 13, 2005. In those claims, VABCA appeal numbers 7438, 7439, 7440, 7441, 7442, 7443, and 7444, the Plaintiff seeks money damages for suspensions, delays, and other interference to the contract performance, all of which are allegedly the fault of the VA. On November 16, 2005, this Court granted the Defendant's unopposed motion to transfer those claims from the VABCA to this Court and consolidate them with this case because the claims all involve overlapping factual and legal issues. The appeals were filed with this Court on April 7, 2006. On May 11, 2006, the appeals were assigned individual case numbers 03-19510, 03-19511, 03-19512, 03-19513, 03-19514, 03-19515, and 03-19516, and were consolidated with this case.

## DISCUSSION

### I. Jurisdiction

The Complaint is based upon a contract between Plaintiff and the United States. Plaintiff challenges a final decision of a contracting officer. The Tucker Act, 28 U.S.C. § 1491(a)(2), and the Contract Disputes Act, 41 U.S.C. § 609(a)(1), combine to give the Court of Federal Claims jurisdiction over such contract disputes. *Tex. Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 899 & n.1 (Fed. Cir. 2005).

### II. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Partial summary judgment is used to resolve portions of a plaintiff's claims. *See San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997). Contract interpretation is a question of law. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

### III. Interpretation of the Contract

In interpreting a contract, the reviewing court must look to the plain language of the document itself, considering the document as a whole and giving meaning to all of its parts. *Id.*; *see also United Pac. Ins. Co. v. United States*, 497 F.2d 1402, 1405 (Ct. Cl. 1974) ("[A]ll provisions of a contract are to be given effect and no provision is to be rendered meaningless.") (citing *Jamsar, Inc. v. United States*, 422 F.2d 930 (Ct. Cl. 1971)). Although useful for understanding the circumstances surrounding the parties' differing positions on the meaning of a contract provision, their conduct during contract performance is not relevant to the interpretive process.

A contract provision is ambiguous if reasonable minds could differ in its interpretation. *NVT*, 370 F.3d at 1159. To be ambiguous, competing interpretations of the provision in question must fall within a "zone of reasonableness." *Id.* (quoting *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)). If an ambiguity exists, the court must then determine whether that ambiguity is patent or latent. *NVT*, 370 F.3d at 1162.

Patent ambiguities are "so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them," *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed. Cir. 1997) (quoting *Beacon Constr. Co. v. United States*, 314 F.2d 501, 504 (Ct. Cl. 1963)), or are "obvious, gross, [or] glaring," *H&M Moving, Inc. v. United States*, 499 F.2d 660, 671 (Ct. Cl. 1974). A patent ambiguity is an exception to the general rule that ambiguous contract provisions should be construed against the

drafter. *Triax*, 130 F.3d at 1474. When a patent ambiguity exists, the contractor has a duty to inquire about the true meaning of the provision, and failure to do so will result in the provision being construed against the contractor. *Id.* at 1474-75.

In contrast, contract ambiguities are "latent" when they are not glaring, substantial, or obvious. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n.2 (Fed. Cir. 2000) (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996)). Latent ambiguities are construed against the government. *Jowett*, 234 F.3d at 1368.

A. Defendant's Interpretation

The Defendant argues in its Motion that Grot was required "to design, or incorporate the bid drawings, specifications and fire safety codes, and install a complete fire alarm system." Def. Br. at 29. Defendant cites several contract provisions to support its interpretation that Grot had to do more than simply install the fire alarm system exactly as shown on the drawings provided by Fratto.

The contract language supports Defendant's interpretation that Grot was required to incorporate both the bid drawings and the specifications to create a complete system. For instance, The Scope section of the contract explicitly states: "A new fire alarm system shall be designed and installed in accordance with the specifications and drawings." § 13850 ¶ 1.2(B), Def. App. at 11. The general description of the required fire alarm system specifies that all components must be installed –

> as shown on the drawings *and as specified*. All devices and accessories necessary for a complete operating system shall be included even though each item is not specifically mentioned or described herein.

§13850 ¶ 1.1(A), Def. App. at 10 (emphasis added). The contract included FAR clause 52.236-21, stating,

> Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern.

48 C.F.R. § 52.236-21(a), Def. App. at 9. These provisions make it clear that Grot was not at liberty to ignore the specifications and merely install the system exactly as shown in the drawings, as it apparently attempted to do. *See* Def. Br. at 17 (deposition testimony of Siemens official confirms that Grot would not accept Siemens' cost proposal that contained devices in addition to those shown on the bid drawings).

Other contract language supports Defendant's interpretation that Grot was required to ensure that the system complied with applicable fire codes. Section 13850 states simply, "The fire alarm system shall comply with requirements of NFPA 101 and NFPA 72," § 13850 ¶ 1.1(B), Def. App. at 10, which are "minimum installation requirement standards," § 16050 ¶ 1.2.A, Def. App. at 14.

The design and installation of the Project must be approved by a NICET level III or other registered fire protection engineer. § 13850 ¶ 1.1(B), Def. App. at 10. Fire protection engineers are generally responsible for "the design, installation and maintenance of fire detection and suppression and communication systems." Excerpt from Society of Fire Protection Engineers website, Def. App. at 94. Fire protection engineers are to be distinguished from "Installers," who are mentioned separately in the contract and must have a minimum of five years of experience installing fire alarm systems. § 13850 ¶ 1.1(B), Def. App. at 10.

Several contract provisions required Grot to create a fully functioning system, even if doing so necessitated components not specifically mentioned in the contract, drawings, or specifications. For example, the first sentence of the contract requires the contractor to furnish, install, and connect "fire alarm equipment to form a complete multi-building analog addressable-device fire alarm and emergency notification system." § 13850 ¶ 1.1(A), Def. App. at 10. The same provision requires the contractor to install a "complete operating system," even if doing so requires accessories not specifically described in the contract. *Id.* Paragraph 1.2(B) of section 13850 clarified that "[d]evice location and wiring runs shown on the drawings are for reference only unless specifically dimensioned." Def. App. at 11. Similarly, the contract notes that the contractor is responsible for furnishing all items necessary "for systems to function as noted on drawings and specifications." § 01001 ¶ 1.1(c), Def. App. at 12. The contractor is responsible for verifying all critical dimensions shown on the drawings. § 01001 ¶¶ 1.4(B)(1), (2), Def. App. at 13. These provisions can lead to no other conclusion but that Grot was responsible for installing a system that was fully functional and met all contract specifications.

It is true, as Plaintiff points out, that the Government provided detailed design drawings that Grot was to incorporate in constructing the fire alarm system. These were created by Fratto Engineering pursuant to its separate design contract. Nevertheless, the VA-Grot contract clarified in numerous places that the Fratto drawings were general in nature and did not relieve the contractor of the obligation to adhere to the contract specifications that may have been absent from the drawings. For example, the Special Notes section of the contract states as follows:

> In some instances it may have been impracticable to detail all items in specifications or on drawings because of variances in manufacturers' methods of achieving specified results. In such instances the contractor will be required to furnish all labor, materials, drawings, service and connections necessary to produce systems or equipment which are completely installed, functional, and ready for operation by facility personnel in accordance with their use.

§ 01001 ¶ 1.1(d), Def. App. at 12. The fact that Fratto provided the design drawings, therefore, does not negate Plaintiff's responsibility to ensure that it installed a fully functioning system.

B. Plaintiff's Rejoinder – Contract Ambiguity

The Plaintiff claims that the contract was ambiguous regarding its duties of performance, insisting that it was only required to install a fire alarm system pursuant to the Government's completed design. Pl. Br. at 34. However, Plaintiff cites no contract provision to support its interpretation of the contract. Instead, Plaintiff attempts to refute the Defendant's interpretation through the use of extrinsic evidence (discussed below) and by arguing that the contract provisions cited by Defendant are insufficient to support Defendant's interpretation. In some instances in its brief and at oral argument, Plaintiff seemed not to dispute Defendant's interpretation of the contract, but only how the contract was applied. As both parties conceded at oral argument, Defendant's Motion does not raise issues of contract administration, and the Court will not address them at this time.

Plaintiff's interpretation of the contract is unreasonable because it renders meaningless entire provisions of the contract. Specifically, Plaintiff does not account for the contract provisions that require Grot to incorporate the drawings and specifications and ensure that the complete, functioning system meets all applicable fire alarm codes. Plaintiff's claim that it was only required to install the system according to the drawings provided by Fratto would render these provisions superfluous. *See NVT*, 370 F.3d at 1159 (a contract interpretation is unreasonable if it renders a contract provision meaningless or superfluous). Plaintiff has not shown that it relied upon a competing interpretation of the contract that is reasonable, so we cannot conclude that the contract is ambiguous.

C. Extrinsic Evidence

The Plaintiff attempts to support its argument that it was not required to design a fire alarm system by citing extrinsic evidence. Grot argues that its interpretation of the contract is reasonable, in part because the other bidders similarly adopted that view. Pl. Br. at 34. In addition, it cites prior solicitations, for both this and other contracts, in support of its argument. *Id.* at 26, 37-39.

The parol evidence rule prevents the Court from considering extrinsic evidence when the contract is clear on its face. *See Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004). An exception to this rule would allow us to do so only if evidence of trade practice or custom were offered to illuminate the context of the parties' agreement or understanding of technical terms. *Metric Constructors*, 169 F.3d at 752. However, the exception can only be invoked if the party makes a showing that it "relied reasonably on a competing interpretation of the words when it entered into the contract." *Id.*

Here, the contract is not ambiguous, and Plaintiff has not offered a reasonable, competing version of the contract. Likewise, Plaintiff has not offered evidence of trade practice that sheds light on any term in the contract, or of the parties' intentions. We look no further than the language in the contract itself to determine its meaning.

D. Plaintiff's Other Arguments

As part of its opposition to the Defendant's interpretation of the contract, the Plaintiff has argued at various times that the Government seeks to have Plaintiff "completely redesign" the Project, that the Government is converting this to a "design/build" or "design/install" contract, and that the *Spearin* doctrine supports Plaintiff's reading of the contract. These arguments are red herrings. We discuss them briefly.

**"Design/install" contract**

Defendant characterizes the issue in its Motion as whether the contract required Grot to design and install a fire alarm system. Def. Br. at 1. In contrast, Plaintiff claims, "Grot has never disputed that it was required to provide a fire alarm system that met the plans and specifications for the project." Pl. Br. at 3. Rather, Plaintiff views the "real issue" in this case as whether the contract required Grot to "completely redesign a project" that had already been designed by Fratto Engineering. *Id.* at 2 (emphasis removed).

In its Reply, the Defendant contends that it never argued that Grot was required to "'redesign' anything," or that this was a "design/build" contract, which is a term of art. Rather, Defendant claims that Grot was required to "incorporate the bid drawings, the contract specifications, and the relevant fire codes to create or design a fire alarm system, and then to install that system." Def. Rep. at 3. In a moment of apparent agreement, Plaintiff responded at oral argument that this is exactly what Grot was attempting to do when the VA halted the Project and imposed additional requirements not found in the contract. OA Tr. at 30-31, 33. As we stated earlier, issues of contract administration are not relevant to the current Motion, and the Plaintiff at oral argument agreed. OA Tr. at 47.

The Plaintiff makes much of the fact that the instant contract was not a "design/build" contract within the meaning of FAR. *See* Pl. Br. at 27. FAR defines a design/build contract as one that combines both design and construction in a single contract. "Design" further means "defining the construction requirement . . . , producing the technical specifications and drawings, and preparing the construction cost estimate." 48 C.F.R. § 36.102. However, even if this contract is "design/build," the Plaintiff has never explained the implications of that designation for the issue currently before the Court.

The Defendant's position is that the contract required Grot to "design and install," a fire alarm system, but that it is not contending this is a "design/install" contract. We do not wish to confuse the issue by using the term "design" casually, when it appears to have both a technical and a colloquial meaning in the context of this litigation. Whether the contract was a "design/install" or a "design/build" contract pursuant to FAR is not the subject of Defendant's Motion for Partial Summary Judgment, and here, too, we do not reach the issue.

**The *Spearin* Doctrine**

______Grot claims that its performance under the contract was protected by the *Spearin* doctrine. At the outset we hasten to observe that whether Grot's performance is protected by a warranty is not the issue now before us. Still, because the Plaintiff raises the issue, we offer a few words on the subject.

In *Spearin*, the Supreme Court held that an implied warranty protects a contractor who relied upon the Government's design specifications by following them precisely. *United States v. Spearin*, 248 U.S. 132, 136-37 (1918). The warranty only applies to design specifications, and not to performance specifications. *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987).

Design specifications "explicitly state how the contract is to be performed and permit no deviations." *Id*. They require the contractor to follow the specifications as if they were a roadmap or blueprint. *Blake Constr. Co. v. United States*, 987 F.2d 743, 745 (Fed. Cir. 1993) (quoting *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 689 (1969)). "Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results." *Stuyvesant*, 834 F.2d at 1582. They "set forth an objective or standard to be achieved." *Blake*, 987 F.2d at 745 (quoting *J.L. Simmons,* 188 Ct. Cl. at 689). They are described in terms of the agency's need rather than the specific methods to be used. John Cibinic & Ralph C. Nash, Formation of Government Contracts, at 351 (3d. ed. 1998).

A contractor who relies upon design specifications is protected if the finished product falls short of the required result or when completion of performance was impossible due to defective design specifications. *See PCL Constr. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 794 (2000) (holding that design specifications protect a contractor when "proper application of those specifications does not result in a satisfactory end product"). In this case, there has been no end product at all because the VA terminated the contract before performance was completed. Moreover, as Plaintiff conceded at oral argument, the current issue before the Court is not the responsibility for a failed contract. The doctrine has no relevance to the issue of contract interpretation before us.

## CONCLUSION

In sum, the unambiguous terms of the contract required the Plaintiff to "incorporate the bid drawings, the contract specifications, and the relevant fire codes to create or design a fire alarm system, and then to install that system."
*See* Def. Rep. at 3.

**For the foregoing reasons, the Defendant's Motion for Partial Summary Judgment is GRANTED. The parties are ORDERED to submit a Joint Status Report no later than June 30, 2006, proposing further proceedings in this case.**

**IT IS SO ORDERED.**

/s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge