IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GROT, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-1951C<br>(Judge Baskir) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED
FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(1), of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of its motion for summary judgment upon the claims transferred from the VABCA and on the issue of whether the termination of the contract for default was proper.

A. Contract Award

1. On February 1, 2002, Grot was awarded a contract by the Department of Veterans Affairs ("VA") for the project generally described as Campus-Wide Fire Alarm, Project No. 099-108, at the Sam Rayburn Memorial Veterans Center in Bonham, Texas, for the amount of $943,310. Grot, Inc. v. United States, No. 03-1951C (Fed. Cl. May 15, 2006)(order granting partial summary judgment) ("Grot Order"), page 2;

Appendix ("App.") at 1[1]. Prior to submitting its bid upon the contract, Grot did not inquire into the meaning of any of the now disputed terms and conditions stated in the specifications or drawings. Grot Order at 4; App. at 39-40.

2. On February 1, 2002, Grot received the Notice to Proceed that established November 10, 2002, as the contract completion date, 270 calendar days later. Grot Order at 5; App. at 2. Also on February 1, 2002, Grot entered into a subcontract with Siemens Cerberus Division ("Siemens"), to "supply submittals for equipment[,] submit drawing of system (wiring layout)[,] supply all devices as per drawings and specs[,] install panels and get all communicating with each other to be done by Siemens[,] install temporary fire alarm system in buildings needed[,] install devices and trim out (entire job)[,] install UPS system[, and] provide three year warranty." Grot Order at 5; App. at 3-4.

3. Grot did not have the contract work "substantially completed" by the original contract deadline, of November 10, 2002, or by the extended deadline of June 23, 2003. App. at 39, 44, 52.

---

[1]The Government previously filed an appendix with its motion for partial summary judgment, pages 1-94. Current references to "Appendix" or "App." refer to this document, and to the documents in the supplemental appendix which will be numbered starting with page 95.

B. The Contracting Officer's Reasonable Belief That Grot Would Not Complete The Contract

4. The contracting officer issued a letter to Grot, dated August 23, 2002, directing it to comply with the COTR's findings, which set forth the VA's position that Grot was to design and install the fire alarm system based upon the drawings, specifications and relevant codes. Grot Order at 7; App. at 28-29. The COTR stated:

> After careful review I, Rickey Kirk, the COTR have concluded that this is a design and installation project and that Grot Inc. must design and install a complete fire alarm system in accordance with contract plans and specifications as well as the NFPA Codes. Furthermore, I request that the contractor, Grot, Inc., resubmit all previous drawings. The resubmitted drawings shall include everything contained on the original drawings as well as any additional devices required by NFPA Codes that did not appear on the original submittals. In addition, the contractor shall provide all information and drawings requested in the specifications, paying particular attention to the requirements of spec. section 13850, paragraph 1.4, submittals.

Grot Order at 7; App. at 29.

5. On September 5, 2002, Grot responded to the contracting officer's August 23, 2002 directive, again protesting the VA's determination that Grot had to redesign and resubmit its original shop drawings, so that they contained all of the items shown on the bid drawings, as well as those

items required by the relevant fire safety codes, which were required by the specifications. Grot Order at 7; App. at 30-31.

6. In its September 5, 2002 letter, Grot set forth its interpretation of the various contract provisions, coming to the conclusion that it was not required to design the fire alarm system. Id.

7. By letter/cure notice of September 17, 2002, the contracting officer responded to Grot's September 5, 2002 letter, again directing Grot, pursuant to contract specification section 13850, paragraphs 1.1.A and 1.2.B, to design and install a fire alarm system. Grot Order at 7; App. at 32-33.

8. In a September 18, 2002 letter, Grot's president, Jerry Grot, stated that Grot would begin the "process of designing a cure to the deficiencies contained in the plans and specifications designed by the government's Consultant." Grot Order at 7; App. at 34.

9. On September 25, 2002, Mr. Grot sent another letter to the contracting officer stating,

> There is no indication in the plans and specifications that we are to design the project. The "design" language relied upon by the VA to attempt to justify its position is generic and not a specific directive to design the project. Our consultant and we took the engineer's design and applied the

> products that were available to our consultant to
> meet the intent of the design.

Grot Order at 7; App. at 37. Mr. Grot also, erroneously, stated that it was not until July 2002, that the VA questioned whether the drawings met the "VA interpretation of the specification." Id.

10. Mr. Grot also informed the VA that "pursuant to NFPA 101 & 72 we can and shall remove devices that are shown on the VA drawings[.]" Grot Order at 7; App. at 38. Mr. Grot made no mention of contract specification section 16050, "Basic Methods And Requirements (Electrical)," paragraph 1.2.A, "Minimum Requirements," which explicitly states that references to NFPA codes are "minimum installation requirement standards," and paragraph 1.2.B, which provides that "[d]rawings and other specification sections shall govern in those instances where requirements are greater than those specified in the [NFPA] standards." App. 14, 37-38.

Grot's understanding of the contract is reflected in the deposition testimony of Clyde Bell:

> Q. So what is your understanding now of your requirements under the contract?
> A. Well, when we bid the job –
> Q. Uh-huh.
> A. – you know, it was not a design-build job.

Q. Okay.
A. You know, we bid it as a – if it was a design-build job from the get-go, we would have threw it in the trash. We don't do that.
Q. Okay.
A. Period. We don't.

App. at 200-201; Deposition of Clyde Bell, 74:19-75:4.

11. In a November 4, 2002 letter, the contracting officer stated that he did not believe that Grot would meet the November 10, 2002 contract completion date and directed Grot to provide a revised work schedule with a new anticipated contract completion date. Grot Order at 7; App. at 39. Additionally, the contracting officer clearly stated that, in granting an extension, the VA was not relinquishing its right to seek compensatory damages for any costs it incurred resulting from Grot's inexcusable delay, nor was it relinquishing its right to terminate the contract for default should Grot fail to meet the new contract completion date. Id.

12. On March 18, 2003, over three months later, Grot submitted its revised schedule that indicated a completion date of June 23, 2003. Grot Order at 7; App. at 40.

13. The contracting officer issued contract modification number three, which extended the contract completion date from November 10, 2002 to June 23, 2003. App. at 19.

14. On June 10, 2003, the COTR responded to an inquiry from the contracting officer as to whether the VA should terminate Grot for default. Grot Order at 8; App. at 41-43.

15. The COTR did not recommend termination as he believed it would further delay the project and add expense to the contract. App. at 41. He noted, however, that his main concern was Grot's continued failure to comply with the specifications and to submit redesign drawings. Grot Order at 8; App. at 42-43.

16. The contracting officer, based upon the COTR's opinion, allowed Grot to continue beyond the June 23, 2003 contract completion date, but issued a show cause notice one month later. Grot Order at 8; App. at 44-45.

17. In a July 31, 2003 letter from Jerry Grot to the contracting officer, which responded to the VA's issuance of the July 23, 2003 show cause notice, Grot again disputed the VA's determination that Grot was responsible for the design of the fire alarm system, and that Grot would seek the cost and expense allegedly incurred as a result of that decision. Grot Order at 8; App. at 46-52.

18. The COTR provided his comments to the contracting officer on

August 3, 2003. Grot Order at 8; App. at 53-58. On August 7, 2003, almost nine months past the original completion date, the contracting officer terminated the contract for default. Grot Order at 8; App. at 59-60. On August 9, 2003, the contracting officer set forth his rationale for the termination in an internal memorandum. App. at 61. Among the reasons listed was "failure to perform in compliance with the technical requirements of the contract." Id.

19. On August 12, 2003, Grot responded to the termination for default and requested that the contracting officer rescind the termination by noon on Friday, August 15, 2003. App. at 62-63.

20. Grot was obligated under the contract to design the fire alarm system incorporating the bid drawings, the contract specifications, and the relevant fire codes to create or design a fire alarm system and then to install that system. Grot Order at 3-4, 15.

21. Grot never produced design drawings that incorporated the contract specifications and the fire code requirements. Grot Order, at 10-11, 15.

22. Grot attempted to install the system exactly as shown on the bid drawings, ignoring the requirements of the specifications, and without

the benefit of a NICET level III fire protection engineer to assist in ensuring compliance with the applicable fire code as Grot was also obligated to do. Grot Order at 10-11.

C. Relevant Contract Provisions

23. The clause below can be found on page 3-65 through 3-67 of Grot's contract.

> VAAR 852.236-82 Payments Under Fixed -Price Construction Contracts
> (1) The contracting officer may retain funds:
> (i) Where performance under the contract has been determined to be deficient or the contractor has performed in an unsatisfactory manner in the past; or
> (ii) As the contract nears completion, to ensure that deficiencies will be corrected and that completion is timely.
> (2) Examples of deficient performance justifying a retention of funds include, but are not restricted to, the following:
> (i) Unsatisfactory progress as determined by the contracting officer;
> (ii) Failure to meet schedule in Schedule of Work Progress;
> (iii) Failure to present submittals in a timely manner; or
> (iv) Failure to comply in good faith with approved subcontracting plans, certifications or contract requirements.

App. at 98-100.

24. The clause below can be found on page 3-37 of Grot's contract.

> 52.232-27 Prompt Payment For Construction Contracts
> * * *

(A) The due date for making such payments shall be 30 days after receipt of payment request by the designated billing office. If the designated billing office fails to annotate the payment request with the actual date of the Contractor's payment request with the actual date of receipt at the time of receipt, the payment due date shall be the 30th day after the date of the Contractor's payment request, provided a proper payment request is received and there is no disagreement over quantity, quality, or Contractor compliance with contract requirements.

App. at 97.

25. The clauses below can be found on page 3-48 through 3-49 of Grot's contract.

52.236-2 Differing Site Conditions

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in the work of the character provided for in this contract.

52.236-3 Site Investigation & Conditions Affecting the Work

(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work, or its cost, including but not limited to . . . (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of

surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from in inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.

(b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor . . . unless that understanding or representation is expressly stated in this contract.

App. at 101-102.

26. The clause below can be found at page 3-33 of Grot's contract.

52.228.15 Performance and Payment Bonds - Construction

(b) Amount of required bonds. Unless the resulting contract price is $100,000 or less, the successful offeror shall furnish performance and payment bonds to the Contracting Officer as follows:

(1) Performance bonds (Standard Form 25). The penal amount of performance bonds at the time of contract award shall be 100 percent of the total dollar amount of task orders in process.

(2) Payment bonds (Standard Form 25-A). The penal amount of payment bonds at the time of contract award shall be 100 percent of the total dollar amount of task orders in process.

App. at 95-96.

27. The clause below can be found at page 13850-2 of the Project

Manual Including Specifications incorporated into Grot's contract.

Specification Section 13850 Fire Alarm System

Part 1 General
1.1 Description

* * *

E. The Contractor shall provide a dedicated fire watch person all times any normally protected area is disconnected from a fire alarm system as a result of the project work, except during normal day shift non-holiday VA work hours. The fire watch person shall have no duties other than fire watch. Contractor personnel assigned to fire watch shall have VA fire watch training prior to assuming fire watch duties. The training shall be during normal day shift hours. Individuals shall be instructed by VA personnel for VA alarm notification procedures. Coordinate with the COTR for this training.

F. Fire alarm system outages must be coordinated with the COTR not less than 2 weeks in advance.

App. at 103-104.

28. The following clause can be found at page 13850-9 of the Project Manual Including Specifications, incorporated into Grot's contract.

Specification Section 13850 Fire Alarm System
Part 2 Products
2.2 Conduit, Boxes, Wire and Circuits
A. Conduit shall be in accordance with Section 16111, CONDUIT SYSTEMS and as follows:
1. All new and reused conduit shall be installed in accordance with NFPA 70.
2. Conduit fill shall not exceed 40 percent of interior

cross-sectional area.

3. All new conduit shall be 3/4 inch minimum.

4. Use of existing spare raceways and spare stub-outs is not permitted.

App. at 105.

29. The following clause can be found at page 16111-1 of the Project Manual Including Specifications, incorporated into Grot's contract.

> Section 16111 – Conduit Systems
>
> Part 1 General
> 1.1 Description
>
> A. This section specifies the furnishing, installation, and connection of conduit, fittings, and boxes to form complete, coordinated, grounded raceway systems. Raceways are required for all wiring unless shown or specified otherwise.
>
> B. Definitions: The term conduit, as used in this specification, shall mean any or all of the raceway types specified.

App. at 107-118.

D. Payment History

30. The contract was terminated for default on August 7, 2003. Grot Order at 8; App. at 59.

31. Grot protested the termination, and the contracting officer issued a final decision in which he stated his conclusion that 59% of the work had been completed, based upon the contract payment history. App. at 88. Therefore, the contracting officer authorized 59% of the contract

amount to be paid. Id.

1. Prompt Payment Interest

32. At the time of default, the VA had been late in paying some of Grot's payment requests as follows:

| Invoice Amount Due | Received | **Paid** | Days of Interest | Interest Due |
|---|---|---|---|---|
| $81,322.85 | 5/23/02 | **7/31/02** | 39 | $ 456.36 |
| $33,329.23 | 6/25/02 | **8/9/02** | 9 | $ 71.85 |
| $17,447.28 | 7/22/02 | **9/17/02** | 27 | $ 67.50 |
| $18,630.00 | 8/21/02 | **10/9/02** | 19 | $ 50.73 |
| $102,712.00 | 9/22/02 | **11/8/02** | 16 | $ 236.32 |
| $9,856.98 | 10/22/02 | **4/7/03** | 82 | $ 104.80 |
| $17,137.98 | 12/20/02 | **4/7/03** | 67 | $ 153.87 |
| $48,331.71 | 12/2/03 | **4/28/03** | 67 | $ 377.99 |
| $74,492.91 | 3/31/03 | **6/19/03** | 50 | $ 433.10 |

App. at 184-185; 193.

33. The amount of interest owed on the first thirteen payment requests totals $1,953.52. Id.

34. Grot also submitted requests for payment on May 1, 2003, May 30, 2003, June 30, 2003, July 21, 2003, and March 18, 2004. App. 185,

193. These requests were not paid by the VA because the COTR did not certify that the work had been completed. Id.

2. Retainage

35. As the VA paid progress payments, it retained 10 percent of the total value of the work that had been completed through the period for which the payment was being made as follows:

| Period Ending | Earned To Date | Retainage |
|---|---|---|
| 5/15/02 | $ 40,895.60 | $ 4,089.56 |
| 7/22/02 | $131,254.32 | $13,125.43 |
| 7/30/02 | $168,286.80 | $16,828.68 |
| 8/31/02 | $187,706.00 | $18,770.60 |
| 9/30/02 | $208,406.00 | $20,840.60 |
| 10/30/02 | $322,531.40 | $32,253.15 |
| 1/28/03 | $366,193.70 | $36,619.37 |
| 3/17/03 | $385,235.90 | $17,137.98 |
| 4/9/03 | $438,937.80 | $43,893.78 |
| 5/1/03 | $471,562.80 | $47,156.28 |
| 6/4/03 | $554,332.70 | $55,433.27 |

App. at 119, 122, 126,129,133, 137, 140, 146, 149, 152, 156.

D. Grot's Failure To Make A Pre-Bid Site Visit

36. Grot did not make pre-bid inspection of the VA facility in Bonham. App. at 200-201, 204; Bell Dep. 50:2-51:18; Deposition of Jerry Grot, 36:15-18

37. The solicitation document clearly contained the FAR provision that states that contractors are "urged and expected" to walk the site prior to submitting bids. App. at 195-196.

38. Grot was aware of this, and Clyde Bell, Grot's contract supervisor, agreed that it is always better to do a site visit. App. at 204, 201; Grot Dep. 71:20-24 and Bell Dep. 51:18.

39. Moreover, the VA specifically encouraged Grot to make a site visit. App. at 199, 206; Kirk Dep. 25:16-21; Evans Dep. 70:16-25. Nevertheless, Grot elected not to visit the site prior to submitting a bid. App. at 204; Grot Dep, 36:15-18.

E. Fire Watch

40. On July 17, 2003, the VA discovered that Grot had disarmed the fire alarm system in Building No. 1 but had not notified the VA as required by the contract. App. at 212.

41. The contract required Grot to provide a dedicated fire watch

person all times "all times any normally protected area is disconnected from a fire alarm system as a result of the project work." App. at 103.

42. Grot acknowledged that it had not installed temporary pull stations in Building 1 as should have been done, and agreed to institute a fire watch. App. at 214, 216.

43. On July 17, 2003, the contracting officer directed Grot to correct the problem and to post a fire watch until the fire alarm system was activated. App. at 212.

44. Also on July 17, 2003, the COTR determined that there was inadequate fire safety coverage in Building 29. App. at 215.

45. On July 20, 2003, the VA Safety Manager, the COTR, and others from the VAMC Facilities Management Service conducted an inspection of Building Nos. 1,2,3,24, and 29. App. at 217-219.

46. The July 20, 2003 inspection revealed 42 deficiencies in 3 buildings, including that the elevator recall functions were not operating, the smoke doors did not function in all areas, and no tamper and flow switches were connected to the system. App. at 218-219.

47. As a result of that inspection, the contracting officer directed Grot, on July 22, 2003, to establish a fire watch for Building Nos. 1,2,3, 24,

and 19. App. at 220-222.

48. On July 23, 2003, the VA faxed a list of six deficiencies to Siemens that needed to be corrected before the fire watch could be lifted. App. at 224-225.

49. On July 24, 2003, Grot notified the contracting officer that the fire alarm system was fully activated with the exception of Building No. 1. App. at 223.

50. Siemens acknowledged receiving the deficiency notice and, on July 24, 2003, informed Grot that the deficiencies were "being worked on." App. at 226.

51. On July 28, 2003, the contracting officer directed Grot that the fire alarm system should be "fully operational" instead of merely "fully activated." App. at 227-228. "Fully operational" was defined as "'All major fire systems in Buildings 1,2,3, 24, and 29 must be in full operation and provide complete protection for our patients and employees in accordance with the requirements of Contract V549C-609-2 and the NFPA." Id.

52. The contracting officer also directed Grot to correct six additional deficiencies that had been identified with the fire alarm system. Id., and App. at 225.

53. On July 29, 2003, Grot sent a letter to the contracting officer representing that the fire alarm system was "fully operational" but also acknowledging that Grot was "working diligently to address the deficiency list," thereby indicating that Grot had not resolved all issues identified by the VA. App. at 229-230.

54. The VAMC performed a pre-test on the system from July 30 to August 1, 2003. App. at 231-234.

55. The pre-test revealed that the Heating Ventilation and Air Conditioning ("HVAC") system did not shut down properly because the duct detectors had not been installed properly, and that sampling tubes had not been installed in the duct detectors. App. at 234.

56. Additionally, all the elevator recall tests failed, smoke detectors had not been installed in any of the elevator shafts, and some flow switches could not be tested to send an alarm owing to confusion about the sprinkler piping. Id. and App. at 232.

57. These items were acknowledged by Grot. App. at 229, 223, 240. (Deposition of Jon C. Evans, 111:4-20 ("I agreed with them. It didn't work correctly.")). Additionally, Building No. 1 was still on a temporary fire alarm system. App. at 234.

58. Based upon the results of the pre-test, the COTR directed Grot to setup a fire watch in Building Nos. 1, 2, 3, 24, and 29. App. at 235.

59. Grot responded that it would stop the fire watch as of August 1, 2003, based on Grot's opinion that it was no longer necessary. App. at 236.

60. On August 7, 2003, the contracting officer terminated the contract for default for: (1) failure to provide adequate fire alarm protection, (2) failure to perform in compliance with the technical requirements of the contract, (3) failure to complete the contract by the extended deadline, and (4) failure to show cause. Grot Order at 8; App. at 59.

61. Grot filed this lawsuit on August 19, 2003. On November 2, 2005, the Government filed a motion for partial summary judgment to establish that Grot was required to design and install the fire alarm system, as opposed to merely installing it. This motion was granted by the Court on May 15, 2006. Additionally, Grot subsequently submitted several claims for money damages to the Department of Veterans Affairs Board of Contract Appeals. These claims were ordered to be transferred to this court and consolidated with the instant case on November 16, 2005, and the transfer and consolidation were completed on April 28, 2006.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ Joan M. Stentiford
JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Phone: (202) 616-0341
Fax: (202) 514-8624

March 2, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 2nd day of March, 2007, I caused to be served electronically a copy of "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS" to:

ANDREW KILPATRICK, JR.
Gore, Kilpatrick, Purdie, Metz & Adcock, PLLC
P.O. Drawer 2000
Ridgeland, Mississippi 39158

_____/s/ Joan M. Stentiford___________