the best value to the VA for the additional cost incurred..

**ADDITIONAL COST INCURRED AS A RESULT OF THE CONTRACTING OFFICER'S DIRECTIVE TO PROCEED WITH A "FIRE WATCH"**

During construction of the Project, the VA agreed for Grot to install temporary fire alarm equipment when working on the existing fire alarm system in a building that could not be changed over and working at the end of the work day. Among the types of temporary fire alarm equipment were temporary pull stations The purpose of the temporary pull stations is to provide additional fire alarm capability when portions of the system are deactivated. The temporary systems are removed when construction is complete for that portion of the building. However, the fact that the temporary pull stations may not have been installed does not mean that there is no fire protection for that building.

On July 17, 2003, Grot inadvertently failed to install temporary pull stations while working in Building 1. As a result, the contracting officer issued a cure notice to Grot to cure the deficiency and to establish a fire watch for the building until the temporary pull stations were installed. A copy of the contracting officer's letter of July 17, 2003 is attached hereto as Exhibit "26". While Grot disputed the contracting officer's conclusion that the building was "without fire protection", Grot immediately acknowledged the inadvertent mistake with respect to the temporary pull stations and conducted the fire watch as directed. The temporary pull stations were installed before completion of work on that same day. A copy of Grot's letter of July 17, 2003 is attached hereto as Exhibit "27".

By letter of July 17th, the COTR issued a directive to maintain a fire watch in

Building 29 due to what the COTR determined was "inadequate fire safety coverage". However, the COTR never defined what he considered to be "inadequate fire safety coverage" or the basis for compelling the fire watch. A copy of the COTR's letter of July 17, 2003 is attached as Exhibit "28".

Further, an issue had arisen between Grot and the VA regarding the installation of corridor smoke detectors in Building 29. The VA had requested the installation of additional smoke detectors. By letter of April 29, 2003, Grot pointed out that the smoke detectors were not a requirement under NFPA 101, 1997 Edition, and requested a meeting to clarify the issues between Grot and the VA. As was the case throughout the Project, the VA did not respond. A copy of Grot's letter of April 29, 2003 is attached hereto as Exhibit "29".

By letter of May 27, 2003, Grot again raised the issue of the additional smoke detectors and pointed out to the contracting officer that various specifications upon which the contracting officer's representatives were relying were not a part of the 1997 Edition of the NFPA 101. A copy of Grot's letter of May 27, 2003 is attached hereto as Exhibit "30". Again Grot asked for direction and none was forthcoming.

Instead the COTR issued the July 17th fire watch notice. By letter of July 18th, Grot reminded the contracting officer of Grot's repeated request for direction and a meeting. Again no response was forthcoming. It was not until after the termination that Grot was advised that the contracting officer was relying on the 2000 Edition of NFPA 101 and not the 1997 Edition as required by the specifications.

Then, three days later, on July 20th, the contracting officer issued a directive to initiate a fire watch for buildings 1, 2, 3, 24 and 29; the entire Project. The sole basis for

the directive was that he had determined that there was "inadequate fire safety coverage". There were no specifics given. It is not to be forgotten that, with the exception of the inadvertent failure to install the temporary pull stations in Building 29, the VA had not raised an issue as to the adequacy of fire protection in the other buildings. Notwithstanding, and with no guidance as to the alleged deficiencies, the VA ordered the fire watch. A copy of the contracting officer's letter of July 20, 2003 is attached as Exhibit "31".

The institution of a campus wide fire watch was going to be a significant cost to Grot and Grot immediately asked for a meeting with the contracting officer to review the concerns and misunderstandings which seemed to be prevalent on the Project. A copy of Grot's letter of July 20th, 2003 is attached hereto as Exhibit "32". When no response was forthcoming, Grot issue another request for a meeting. A copy of Grot's letter of July 22, 2003 is attached hereto as Exhibit "33".

Instead of addressing Grot's concerns the contracting officer stated that he, "not the contractor" would determine the need for a meeting. A copy of the contracting officer's letter of July 23, 2003 is reflected on Exhibit "33". This position was taken even when the contracting officer knew there were substantial disagreements over the interpretation of the plans and specifications for the Project. This refusal to meet and address the issues involved in this Project had a direct impact on the completion of the Contract.

On July 23rd, Grot reaffirmed that it was conducting the mandated fire watch but was doing so under protest with the intent to pursue all cost and expense incurred by Grot in performing per the contracting officer's directive. A copy of Grot's letter of July

23, 2003 is attached hereto as Exhibit "34". Then, almost immediately by Mraz's e-mail of July 23, 2002 (sic), the VA issued its "Show Cause Letter" to Grot in which the VA stated that Grot had 10 days after receipt of the Show Cause Letter to provide a schedule to complete the Contract. A copy of Mraz's e-mail of July 23, 2003 is attached hereto as Exhibit "35". By e-mail of July 31, 2003 Grot responded and fully addressed all of the issues raised in the Show Cause Letter and further provided to VA a completion date of October 3, 2003 **assuming that the VA provided answers to outstanding questions by August 11th**. A copy of Grot 's letter of July 31, 2003 letter is attached hereto as Exhibit "36".

Without further comment or challenge to Grot 's July 31, 2003 letter and without addressing the issues raised in the letter or providing answers to questions contained in Grot's letter or letters previously provided by Grot, by Mraz's letter of August 7, 2003, the VA wrongfully terminated the Contract for default; the alleged basis of the default was that Mraz had determined that Grot:

a) had failed to provide adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29 as directed in Mraz's letter of July, 17, 2003; and

b) had failed to perform in compliance with the technical requirements of the contract; and

c) had failed to complete the Contract by the extended completion date of June 23, 2003; and

d) had failed in Grot's letter of July 31, 2003 to "Show Cause" to the Mraz's "Show Cause Notification Letter of July 23, 2003.

A copy of VA's Termination for Default letter of August 7, 2003 is attached hereto as Exhibit "37". At all times from July 22nd until August 8th, Grot maintained the fire

watch mandated by the contracting officer and kept working to complete the project.

As the direct result of the contracting officer's directive to conduct the unnecessary fire watch and his refusal to even meet with Grot to discus the necessity or cost of same, Grot incurred additional cost and expense in maintaining the mandated fire watch. The total cost to Grot was $74,250.11. A copy of the recapitulation of cost associated with maintaining the fire watch is attached as Exhibit "38".

**FAILURE TO MAKE PROMPT PAYMENT**

Throughout the course of the Project, the VA failed to make payments in a timely manner. The initial application from Grot in March and April of 2002 requested payment for materials stored on-site. The applications did not contain the invoices for the materials which was backup documentation requested by the contracting officer. It took Grot several weeks to provide the requested information which delayed payment of the first two applications. Grot does not question the requirement for the back-up although the contracting officer could have payed that portion of the request which was not in dispute.

However, beginning with the May 2002 application, all subsequent applications contained the requisite backup. Notwithstanding, payments were intolerably delayed some running behind as long as one hundred five (105) days. In a series of e-mails Grot repeatedly inquired about the status of payment without any response. By e-mail of March 11, 2003, Grot inquired as to the status of the December 2002 pay request which was received by the VA via fax on December 20, 2002 and the January 2003 pay request which was received by the VA via fax on January 22, 2003. The contracting officer failed to respond and by e-mail of March 18th, Grot again inquired as to the status

of the December and January payments. The contracting officer apparently forwarded Grot's inquiry to the COTR who provided a most unusual response. A copy of the e-mail series is attached as Exhibit "39".

It was the COTR's position that since the first pay application was late two (2) months being paid due to the fault of Grot, that every pay application would be two (2) months late. This position is totally without any basis in the FAR's or the law and makes absolutely no sense. Even if you accepted this novel theory, the fact remains that the failure to make payment timely often exceeded the two (2) month "float" that the COTR thought he was entitled to receive.

The FAR's clearly address the time frame for payment under government contracts. Pursuant to the General Conditions of the Contract, Section 01001 ¶1.23(a)(1)(i)(A), Prompt Payment for Construction Contracts (FAR 52.232-27)(June 1997), payment by the VA was due within thirty (30) days after receipt of the payment request. Despite the delay in payment, the VA never included interest under the prompt payment provisions of the contract. If payment is not received within that time period, an interest penalty is payable **automatically**.

By letter and e-mail of May 19, 2003, counsel for Grot made specific demand upon the contracting officer for payment of the prompt payment penalties. A copy of Grot's counsel's letter of May 19, 2003 is attached hereto as Exhibit "40". Not only was the prompt payment penalties not forthcoming, the contracting officer did not even acknowledge the letter.

The failure to make payment of the interest provided by Section 01001, General Conditions ¶1.23(a)(4) within time frames provided therein entitles Grot to payment of

an additional penalty pursuant to Section 01001, General Conditions ¶1.23(a)(6)(iii) in an amount equal to 100% of the original late payment penalty.

The total on unpaid pay applications at the time of the termination is $195,331.68. Attached hereto as Exhibit "41" is a list of pay applications, the date submitted and the date of payment. The applicable interest rates under the Prompt Payment Act for the periods in question are as follows:

07/01/02 - 12/30/02 5.25%

01/01/03 - 06/30/03 4.25%

07/01/03 - 12/31/03 3.125%

01/01/04 - 6/30/04 4.00%

07/01/04 - 12/30/04 5.50%

1/01/05 - 06/30/05 4.25%

The following is the calculation of interest owing on the payments.

| Invoice Amount Due | Received | Paid | Days of Interest | Interest Due |
|---|---|---|---|---|
| $81,322.85 | 5/23/02 | 7/31/02 | 39 | $456.36 |
| $33,329.23 | 6/25/02 | 8/9/02 | 9 | $71.85 |
| $17,447.28 | 7/22/02 | 9/17/02 | 27 | $67.50 |
| $18,630.00 | 8/21/02 | 10/9/02 | 19 | $50.73 |
| $102,712.00 | 9/22/02 | 11/8/02 | 16 | $236.32 |
| $9,856.98 | 10/22/02 | 4/7/03 | 82 | $104.80 |
| $17,137.98 | 12/20/02 | 4/7/03 | 67 | $153.87 |
| $48,331,71 | ½2/03 | 4/28/03 | 67 | $377.99 |
| $74,492.91 | 3/31/03 | 6/19/03 | 50 | $434.10 |

| | | | | |
|---|---|---|---|---|
| $114,062.99 | 5/1/03 | 3/31/05[1] | 670 | $9,178.23 |
| $51,994.89 | 5/30/03 | 3/31/05 | 641 | $3,983.77 |
| $35,505.95 | 6/30/03 | 3/31/05 | 610 | $2,746.81 |
| $25,767.85 | 7/21/03 | 5/31/04 | 589 | $1,947.26 |
| $38,219.62 | 3/18/04 | 3/31/05[2] | 375 | $1,972.44 |
| Total Prompt Payment Interest Due | | | | $21,782.03 |

In addition, and as a result of the contracting officer's failure to pay the prompt payment interest as it became due, Grot is entitled to the maximum additional penalty in the amount equal to 100% of the original late payment penalty not to exceed $5,000.00 on any one payment. Thus, Grot is entitled to a penalty in the amount of $21,782.03.

Finally, at the time of termination, Grot was owed the sum of $84,938.97 in retainage. No interest has been calculated on the retainage as the application for retainage was not issued. A copy of Application Number 19 for retainage is attached as Exhibit "42".

**GROT WAS SEVERALLY CRIPPLED BY LOSS OF BONDING CAPACITY**

Immediately following the termination, Grot was advised that its bonding capacity was being placed on hold pending final resolution of the dispute with the VA. As a result, Grot was unable to obtain performance and payment bonds for future projects

---

[1] All invoices from this point forward remain unpaid. Interest was computed through the date of certification of the claim, March 31, 2005.

[2] This invoice represents the work completed by Grot from the date of application number 17 through the date of termination, August 7, 2003. The application was not sent until March 18, 2004. Prompt payment interest is computed from the date the application was issued to the VA.

and its ability to bid and obtain significant government work was virtually extinguished. The impact of the loss of bonding capacity had a catastrophic impact on Grot's operating cost. In fact, as the direct result of the termination and resulting loss of bonding capacity, Grot incurred operating losses in the amount of $933,635.30 as of March 31st.

This loss is calculated by taking the average operating cost for the last five (5) years which was $75,598.00 per month. Grot bonds 90% of its work and has not been able to acquire a bond due to the wrongful termination. Allowing an additional discount of 25% due to economic conditions and other variables, Grot has lost operating cost of $49,138.70 per month. As of the certification of this claim, Grot has been without bonding capacity of any significance for nineteen (19) months for a total impact of $933,635.30.

**RECAPITULATION**

| | |
|---|---|
| Unpaid Progress Payments | $195,331.68 |
| Retainage | 84,938.97 |
| Prompt Payment Interest | 21,782.03 |
| Prompt Payment Penalties | 21,782.03 |
| Additional Cost Associated With the Redesign of the Project | 308,009.72. |
| Additional Cost Associated With the Lack of Conduit in the Manholes | 44,990.02 |
| Additional Cost Associated With the Fire Watch | 74,250.11 |
| Lost Operating Cost Sept. 2003-March 2005 | 933,635.30 |

Total Request for Equitable Adjustment $1,684,719.86

**THE VA WARRANTS THE ADEQUACY OF PLANS AND SPECIFICATIONS**

The government has the obligation to prepare specifications and drawings that reasonably communicate the scope of the contractor's obligations. The contractor is entitled to rely on the accuracy of the information and the requirements contained in government documents. *WPC Enterprises, Inc. V. United States*, 163 Ct.Cl. 1, 323 F2d 874, 877 (1964); *XPLO Corp. DOTBCA No. 1251*, 86-2, BCA ¶ 18,863. The warranty relieves contractors of any obligation to check and verify the correctness, adequacy, or feasibility of the government documents. *Argo Technology, Inc., ASBCA No. 30522*, 88-1 BCA ¶ 20,381 at 103,063. When specifications are of a "design" type, the government must accept the responsibility for any errors or defects therein. *Air Tech Remsel Corp., ASBCA No. 19,948,* 76-2 BCA ¶ 11,919 at 57,130. This includes the duty to insure that the specifications are not susceptible to more than one reasonable interpretation. *United Pacific Insurance Co. V. United States*, 204 Ct.Cl. 686, 49 F2d 1402 (1974).

In the instant case, the VA's solicitation never advised Grot, or the other contractors, of the VA's interpretation that the successful bidder was to "design" the project. This was clearly evident by the spread between the competing bidders. With the exception of Siemens, all of the other bidders were in the same general range indicating that they were all bidding on plans and specifications. As testified to by Scott McCauley in his deposition of February 3, 2005, Siemens bid not upon the plans and specifications but upon what was conveyed to Siemens by Mel Harrison and Chris Forner. Exhibit "43", page 59, line 6-9. The devices that Mr. Harrison and Mr. Forner

were requesting were not disclosed in the bid document nor was their any way for any of the other bidders to have known about what would be required absent each bidder having the same information that was specially provided to Siemens. Exhibit "43", page 62, line 14-19.

The VA has consistently argued that if Grot had "walked the site" it would have known what the specifications required. Grot was not at the pre-bid conference and walkthrough; that is not disputed. However, it would not have mattered if Grot had been there because neither Mr. Harrison nor Mr. Forner were at the walkthrough either. They were the only ones who knew exactly what the VA wanted as evidenced by their private revelations to Siemens. That revelation resulted in Siemen's bid being over $300,000.00 above Grot's bid which at the time of the first bid was third lowest. As testified to by Mr. McCauley, it was clear to him that Siemens was not bidding "apples to apples" with the other bidders. Exhibit "43", page 60, line 11-15. In fact, when Siemens submitted its price for the re-bid, it disregarded the information provided by Mr. Harrison and Mr. Forner and submitted its bid on the plans and specifications for the Project. Exhibit "43", page 60, line 25 - page 61 line 1. Siemens would make up the difference in what was shown on the plans and what was wanted by Mr. Harrison and Mr. Forner through change orders. Exhibit "43", page 64, line 2 -6.

The government also warrants that if the contractor follows the specifications and drawings, a satisfactory product will result. The leading case establishing this warranty is *United States v. Spearin*, 248 US 132 (1918). The Spearin Doctrine provides as follows:

"If the contractor is bound to build according to plans and specifications

> prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.......This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans and to inform themselves of the requirements of the work...." (248 US at 136).

Here, Grot was following the plans and specifications provided by the government. Grot was providing drawings and submittal data based upon the plans and specifications prepared by Fratto and in compliance with those plans and specifications. Grot was told to redesign the project only when it was determined that the VA was not getting what Mr. Harrison and Mr. Forner wanted. Had the VA provided the information in writing which was verbally provided to Siemens by Mr. Harrison and Mr. Forner, then this project would not have gone in the direction that it did. Instead, the VA withheld this information and then sought to impose this additional cost on Grot by determining that it was Grot's responsibility to "design" the project.

Interestingly, during the deposition of Mark Fratto, the principal engineer for the Project, he continually asserted that the plans and specifications were prepared so that the bid process would be "apples to apples". Exhibit "44", page 23, line 11 -14. Clearly that did not happen as indicated by the bids and confirmed by Mr. McCauley. As drafted, there was no way the plans and specifications could be interpreted the same by all bidders without the exact same information being provided by the same VA personnel to all bidders. This was never available.

**<u>CONCLUSION</u>**

Grot, Incorporated request a total equitable adjustment to the contract price in the amount of $1,684,719.86 together with interest thereon pursuant to the Contract Disputes Act of 1978 from the date of certification until paid and its reasonable

attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C.A. §2412. Further, Grot, Incorporated hereby requests a contracting officer's final decision on this request for equitable adjustment.

Grot Claim Revised 033105

June 29, 2005

North Texas Veterans Health Care System
Dallas Veterans Medical Center
4500 S. Lancaster Road
Dallas, TX 75216

RECEIVED
JUL - 1 2005

**VIA Federal Express**
Gore, Kilpatrick, Purdue, Metz & Adcock
Attorneys At Law
400 Legacy Park, Suite B/39157
Post Office Drawer 2900
Ridgeland, MS 39158

Subject: **Contracting Officer's Final Decision**
On Request For Equitable Adjustment
Contract V549P-609-2
Project No. BO1-114
Replace Bonham Fire Alarm System

Dear Mr. Kilpatrick:

I am writing in response to your letter dated 31 March, 2005, submitted by your firm on behalf of Grot, Incorporated in which you requested a Contracting Officer's Final Decision on your request for an equitable adjustment under Contract Number V549P-609-2 to replace the fire alarm system at the Sam Rayburn Memorial Veterans Center, Bonham, TX. Pursuant to 41 U.S.C. 605 (c) (2), this letter shall serve as the Contracting Officers' "Final Decision" to your request for a "total equitable adjustment to the contract price in the amount of $1,684,719.86".

I will begin by addressing your statement as to whether the original specifications were inadequate. Then answer your question: "If the contractor was responsible for the design of the system as the VA subsequently determined, how could the specifications be inadequate?" And finally, counter your claim that "the Contracting Officer has never pointed to where in the specifications the phrase design/install is found."

The original solicitation was cancelled not because of inadequate specifications but because it contained the 1995 manual and not the most recent version of the manual, which was the 1997 edition and the latest version of the specifications. The Bonham Fire Alarm System was clearly identified in both specifications as a design/install project and not as an install only project. On page 1.2 of the Specification Scope it clearly states that "A new fire alarm system shall be designed and installed in accordance with the specifications and drawings" and page 13850-2 in General Description b. of the Contract Specifications reads: "The system design layout, submittal documents preparation, and supervision of installation and testing shall be provided by a technician that is certified NICET Level III or a registered fire protection engineer."

EXHIBIT
A

Moreover, your use of the "interpretation against the drafter rule" to further support your claim for $308,009.72 in costs associated with designing the project is misguided. The hierarchy of rules to aid contract interpretation that have been developed over the years in numerous courts and appeals board decisions places the "interpretation against the drafter rule" at the bottom of the hierarchy. "Interpreting a contract against the drafter is the rule of last resort, only to be used when all other rules have been exhausted". When the contract specifications specifically state that the contractor shall both design and install the fire alarm system the cost of design is part of the original contract cost. The owner does not pay twice for the same work!

Furthermore, the *FAR Clause, 52-233-1 DISPUTES, found on page 4-42 of the contract clearly states: "The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer".* However, instead of a commitment of cooperation from Grot Inc. "pending final resolution" the Government received a barrage of correspondence over relatively insignificant matters asking for a response: complaints concerning the motives and requirements of the COTR and his assistants that administered the contract: and even complaints from Grot Inc. about their own subcontractor. All of which resulted in Grot Inc. failure to meet performance deadlines and/or submittal requirements.

You requested in your letter of March 31, 2005 monies in the amount of $44,990.02 for additional labor and material resulting from a differing site condition due to "the lack of capacity or complete absence of conduit in the manholes", which you describe as a textbook Type I condition. You quote *Erickson-Shaver Contracting Corp. v United States, 9 Cl. Ct. 302,304 (1985)* which states: "The underlying issue in a Type I differing site condition claim is whether the contractor reasonably could have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents, its inspection of the site and its general experience as a contractor". Even though *FAR Clause 52.236-27 SITE VISIT*, found on page 2-4 of the contract identifies the Contracting Officer's Technical Representative and lists his phone number, and the cancellation of the original solicitation gave Grot Inc. not one, but two opportunities to visit the site, Grot Inc submitted both of their bids site unseen thus precluding the discovery of differing site conditions. Moreover, your letter of March 31, 2005 is the first time I've heard about the lack of conduits in the manholes. The only mention of manholes that I'm familiar with is that some of the manholes were contaminated during the initial construction period. However, that problem was resolved after an investigation by the VA Safety Officer in which he concluded that contract workers should wear protective clothing while working in suspect manholes. The only problem with conduits is that the Government did not discover the communication conduits that should not have been used by Grot Inc., until it was too late to make changes.

Regarding the additional cost incurred by Grot Inc. of $74,250.11, which resulted from my directive to proceed with a fire watch, my decision was based on information that I received from the VA Safety Officer and the Contracting Officer's Technical Representative (COTR), Ricky Kirk, who was responsible for insuring that Grot Inc. provided campus wide fire alarm protection for the safety of the VA staff and patients during the design and installation of the new fire alarm system. *The COTR's conclusions were based on threats to patient and staff safety and supported by language found on page 13850, paragraph 1.1. Description, sub-paragraph E which states: "The contractor shall provide a dedicated fire watch person all times any normally protected area is disconnected from a fire alarm system as a result of the project work, except during normal day shift non-holiday VAA hours. The fire watch person shall have no duties other than a fire watch". Also, Section 1010 of the contract specifications in paragraph 1.4 FIRE SAFETY, sub paragraph K, EXISTING FIRE PROTECTION reads: "Provide fire watch for impairments more than 4 hours in a 24-hour period." Finally, NFPA 101, 9.6.1.7 states: "where a required fire alarm system is out of service for more than 4 hours in a 24-*

*hour period, the authority having jurisdiction shall notified, and the building shall be evacuated or an approved fire watch shall be provided for all parties left unprotected by the shutdown until the fire alarm system has been returned to service."*

At no time during the fire watch did I ever contemplate second-guessing Mr. Kirk's decision to proceed with the fire watch. Placing the safety of patients and staff in jeopardy is not a risk management issue, let alone an option for a Government Contracting Officer.

With regard to your demand for interest on delinquent invoices I will, for arguments sake, honor your request and make interest payments on the following invoices:

| Invoice Amount Due | Received | Paid | Days of Interest | Interest Due |
|---|---|---|---|---|
| $ 81,322.85 | 5/23/02 | 7/31/02 | 39 | $ 456.36 |
| $ 33,329.23 | 6/25/02 | 8/09/02 | 9 | $ 71.85 |
| $ 17,447.28 | 7/22/02 | 9/17/02 | 27 | $ 67.50 |
| $ 18,630.00 | 8/21/02 | 10/09/02 | 19 | $ 50.73 |
| $102,712.00 | 9/22/02 | 11/08/02 | 16 | $ 236.32 |
| $ 9,856.98 | 10/22/02 | 4/07/03 | 82 | $ 104.80 |
| $ 17,137.98 | 12/20/02 | 4/07/03 | 67 | $ 153.87 |
| $ 48,331.71 | 12/02/03 | 4/28/03 | 67 | $ 377.99 |
| $ 74,492.91 | 3/31/03 | 6/19/03 | 50 | $ 434.10 |
| | | | Grand Total | $1,953.52 |

There is no interest payment due for the invoices listed below since the work was never certified by the COTR as being accomplished and thus, the invoices were never paid.

$114,062.99
$ 51,994.89
$ 35,505.95
$ 25,767.85
$ 38,219.62

Also it was not the government that placed Grot Inc. bonding capacity on hold "pending final resolution of the dispute with the VA." The decision to suspend Grot Inc. bonding capacity was made by the surety, Travelers Casualty and Surety Company of America. I can only assume that Travelers decision was not "arbitrary, capricious or made in bad faith" but based on the their evaluation of Grot Inc. level of risk after conducting an independent investigation to ascertain the merits of the termination for default. Your expectation that the government should pay Grot Inc. in the amount of $933,635.30 for loses resulting from Travelers decision to suspend Grot Inc. bonding capacity is disingenuous and not allowable.

Finally, the work necessary to redesign the fire alarm system for the Sam Rayburn Veterans Center, Bonham, TX was not additional work for which the government is responsible. Nor is the government responsible for Travelers Casualty and Surety of America's conclusion based on their independent investigation to suspend Grot Inc. bonding capacity. However, Grot Inc. is entitled to $551,242,90, which represents 59% of the total contract price of $934,310.00, the amount of work completed as certified by the Contracting Officer in the "Termination for Default Notice". Subtract the $498,869.42 already paid Grot Inc. from the $551,242.90 and that leaves a balance of $52,373.48. Add interest of $785.60 at 4.5% for four months on the $52,373.48 and $1,953.52 in interest payments for delinquent invoices for a grand total amount of $55,112.60.

Therefore, it is hereby found that Grot Inc. is entitled to an equitable adjustment of $55,112.60 on its claim made in their letter dated March 31, 2005. This is the Final Decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000.00 or less. Instead of appealing to the agency board of appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive the decision.

The Department of Veterans Affairs Board of Contract Appeals (VABCA) is the authorized representative of the Secretary for hearing and determining such disputes. The rules of the VABCA are published in section 1.783 of Title 38, Code of Federal Regulations. The address of the Board is 810 Vermont Avenue, N.W., Washington, DC 20420

JOHN MRAZ
CONTRACTING OFFICER