# INSTRUCTIONS, CONDITIONS AND NOTICES TO OFFERORS

## DESCRIPTION OF WORK

## COST RANGE: BETWEEN $500,00 and $1,000,000

**Project # B01-114, Replace Fire Alarm System, Sam Rayburn Memorial Veterans Center, Bonham, TX**

The contractor shall furnish all labor, tools, equipment, materials and supervision to replace the "Fire Alarm System" at the S Rayburn Memorial Veterans Center, 12012 E. Ninth Street, Bonham, TX in accordance with the contract drawings and specifications. The project shall involve general construction, demolition, alterations, grading, electrical and mechanical wor Contract work shall be performed in compliance with the most up-to-date industry standards and codes as required by the c county, state and Federal Government. The period of performance is 270 days.

---

**BASIS OF CONTRACTOR SELECTION:**

The Government reserves the right to reject any or all offers; to award a contract to other than the bidder submitting the lowest total price; and to award a contract to the bidder submitting the proposal determined by the VA to be most advantageous to the Government, price and other price related factors considered, such as past performance, previous experience and quality.

**2.1 52.236-27 SITE VISIT (Construction) (FEB 1995)**

(a) The clauses at 52.236-2, Differing Site Conditions, and 52.236-3, Site Investigations and Conditions Affecting the Work, will be included in any contract awarded as a result of this solicitation. Accordingly, offerors or quoters are urged and expected to inspect the site where the work will be performed.

G- 001750

(b) Site visits may be arranged during normal duty hours by contacting:

Name: ______________________________ Telephone: ______________________________

Address: ______________________________
______________________________
______________________________

(End of Provision)

**2.2 52.211-1 AVAILABILITY OF SPECIFICATIONS LISTED IN THE GSA INDEX OF FEDERAL SPECIFICATIONS, STANDARDS AND COMMERCIAL ITEM DESCRIPTIONS, FPMR PART 101-29 (AUG 1998)**

(a) The GSA Index of Federal Specifications, Standards and Commercial Item Descriptions, FPMR Part 101-29, and copies of specifications, standards, and commercial item descriptions cited in this solicitation may be obtained for a fee by submitting a request to--GSA Federal Supply Service, Specifications Section, Suite 8100, 470 East L'Enfant Plaza, SW, Washington, DC 20407, Telephone (202) 619-8925, Facsimile (202) 619-8978.

(b) If the General Services Administration, Department of Agriculture, or Department of Veterans Affairs issued this solicitation, a single copy of specifications, standards, and commercial item descriptions cited in this solicitation may be obtained free of charge by submitting a request to the addressee in paragraph (a) of this provision. Additional copies will be issued for a fee.

(End of Provision)

**2.3 52.211-2 AVAILABILITY OF SPECIFICATIONS LISTED IN THE DOD INDEX OF SPECIFICATIONS AND STANDARDS (DODISS) AND DESCRIPTIONS LISTED IN THE ACQUISITION MANAGEMENT SYSTEMS AND DATA REQUIREMENTS CONTROL LIST, DOD 5010.12-L (DEC 1999)**

Copies of specifications, standards, and data item descriptions cited in this solicitation may be obtained--

(a) From the ASSIST database via the Internet at http://assist.daps.mil; or
(b) By submitting a request to the Department of Defense Single Stock Point (DoDSSP), Building 4, Section D, 700 Robbins Avenue, Philadelphia, PA 19111-5094, Telephone (215) 697-2667/2179, Facsimile (215) 697-1462.

**INSTRUCTIONS, CONDITIONS AND OTHER STATEMENTS TO BIDDERS/OFFERORS**

**2.1 52.236-27 SITE VISIT (Construction) (FEB 1995)**

(a) The clauses at 52.236-2, Differing Site Conditions, and 52.236-3, Site Investigations and Conditions Affecting the Work, will be included in any contract awarded as a result of this solicitation. Accordingly, offerors or quoters are urged and expected to inspect the site where the work will be performed.

(b) If a stop-work order issued under this clause is canceled either before or after a final decision in the protest, the Contractor shall resume work. Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing, accordingly, if -

(1) The stop-work order results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract; and

(2) The Contractor asserts its right to an adjustment within 30 days after the end of the period of work stoppage; provided, that if the Contracting Officer decides the facts justify the action, the Contracting Officer may receive and act upon a proposal submitted at any time before final payment under this contract.

(c) If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, the Contracting Officer shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

(d) If a stop-work order is not canceled and the work covered by the order is terminated for default, the Contracting Officer shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

(e) Government's rights to terminate this contract at any time are not affected by action taken under this clause.

(f) If, as the result of the Contractor's intentional or negligent misstatement, misrepresentation, or miscertification, a protest related to this contract is sustained, and the Government pays costs, as provided in FAR 33.102(b)(2) or 33.104(h)(1), the Government may require the Contractor to reimburse the Government the amount of such costs. In addition to any other remedy available, and pursuant to the requirements of Subpart 32.6, the Government may collect this debt by offsetting the amount against any payment due the Contractor under any contract between the Contractor and the Government.

(End of Clause)

**52.236-1 PERFORMANCE OF WORK BY THE CONTRACTOR (APR 1984**

The Contractor shall perform on the site, and with its own organization, work equivalent to at least percent of the total amount of work to be performed under the contract. This percentage may be reduced by a supplemental agreement to this contract if, during performing the work, the Contractor requests a reduction and the Contracting Officer determines that the reduction would be to the advantage of the Government.

(End of Clause)

**52.236-2 DIFFERING SITE CONDITIONS (APR 1984**

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) Contracting Officer shall investigate site conditions promptly after receiving notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

(End of Clause)

**52.236-3 SITE INVESTIGATION & CONDITIONS AFFECTING THE WORK (APR 1984)**

(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.

(b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

(End of Clause)

**52.236-4 PHYSICAL DATA (APR 1984**

Data and information furnished or referred to below is for Contractor's information. The Government shall not be responsible for any interpretation of or conclusion drawn from data or information by Contractor.

(a) The indications of physical conditions on the drawings and in the specifications are the result of site investigations by:

(b) Weather Conditions:

(c) Transportation Facilities

(d) Other Physical Data

(End of Clause)

**52.236-5 MATERIAL AND WORKMANSHIP (APR 1984)**

(a) All equipment, material, and articles incorporated into the work covered by this contract shall be new and of the most suitable grade for the purpose intended, unless otherwise specifically provided in this contract. References in the specifications to equipment, material, articles, or patented processes by trade name, make, or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition. The Contractor may, at its option, use any equipment, material, article, or process that, in the judgment of the Contracting Officer is equal to that named in the specifications, unless otherwise specifically provided in this contract.

(b) The Contractor shall obtain the Contracting Officer's approval of the machinery and mechanical and other equipment to be incorporated into the work. When requesting approval, the Contractor shall furnish to the

Q. Mr. Kirk, there came a time during the construction of this project where an issue arose as to exactly what Grot's responsibility was with respect to the design of the fire alarm system, right?

A. Yes.

Q. Grot at that point in time had been issuing plans through Siemens, or actually Siemens through Grot to Fratto, for approval and subsequently to you to be stamped and approved, right?

A. Yes.

Q. And you had in fact stamped and approved drawings prior to this dispute arising, did you not?

A. Yes.

Q. Okay. What brought the issue of the design-build question to a head?

A. I had been asking Mr. Evans up to about May when they would be coming out to walk the site for the design process of this job. I believe it was in May I asked Scott Steed when he planned on walking the site for the design, and he said they had no intention of walking the site.

Q. It's very important. Scott Steed told you they had no intention of walking the site, correct?

A. Yes.

Q. Okay. Go ahead.

A. Okay.

Q. Okay. Let's start with the first one. It's a provision from the FAR, from the Federal Acquisition Regulations, 52.236-27, Site Visit. You'll see that the subparagraph A involved, it says -- well, let's see the whole thing. The clauses at 52.236-2, differing site conditions, and 52.236-3, site investigations and conditions affecting the work, will be included in any contract awarded as a result of this solicitation. Accordingly, offerors or quoters are urged and expected to inspect the site where the work will be performed.

Okay. Do you recall why the VA was citing to this provision during this meeting?

A. Well, I recall that it was the discrepancy on the design-build, what it really meant.

Q. Okay. And to you why would they -- why would they direct you to this particular provision?

A. Well, from what I read now, it's, you know, like the site-visit thing.

Q. Preaward?

A. Preaward.

Q. Okay.

A. Site visit.

Q. And what would be the purpose of that site visit?

A. To see something that's not right on the drawings.

Q. And looking back to the fact that the drawings you received from Fratto didn't have any dimensions or occupancy or labeling the rooms as to what their use was for, does that make sense that you would need to do a site visit? 16:41

A. No, not -- you can't always do a site visit. I mean -- I mean it's always better. But I mean you can't put that much time in the job if you don't get it. 16:42

Q. Okay.

A. You know.

Q. Is that why Grot decided not to do a site visit in this case? 16:42

A. No, not necessarily.

Q. Do you know --

A. I can't say why we didn't do a site visit.

Q. Okay. Let's move to the second one.

A. You know. 16:42

Q. All right. It says, The contractors -- I'm sorry. This is 52.236-21, Specifications and --

THE REPORTER: I'm sorry. I can't hear you. Please speak up.

Q. (BY MS. WILLIAMS) 52.236-21, Specifications 16:42

Q. Which would be NFPA?
A. Which would be -- and use that -- yes, NFPA but --
Q. I'm sorry. Go ahead.
A. But the Fratto drawings was a guideline -- 09:55
Q. Okay, but Siemens --
A. -- to be used.
Q. But Siemens was your subcontractor.
A. Yes.
Q. So if it was Siemens' responsibility to 09:55 provide drawings that met the codes, then in reality that's Grot's responsibility to provide drawings that meet the codes, because the contract was with Grot, correct?
A. Yes. 09:55
Q. So are you saying now that you disagree with what you stated in No. 3?
A. Yes.
Q. Okay. So what is your understanding now of your requirements under the contract? 09:56
A. Well, when we bid the job --
Q. Uh-huh.
A. -- you know, it was not a design-build job.
Q. Okay.
A. You know, we bid it as a -- if it was a 09:56

design-build job from the get-go, we would have threw it in the trash. We don't do that.

Q. Okay.

A. Period. We don't.

Q. Okay. So what was your understanding of your requirements under the contract? 09:56

A. To put the job in according to specs and the drawings that Fratto supplied.

Q. Okay.

A. From the start. 09:56

Q. And were you required to meet NFPA codes as well?

A. Yes.

Q. Okay. So that's --

A. Meet the goals. 09:57

Q. So that's three things. So we've got the drawings; we've got the specifications; and we've got the NFPA codes. Okay. Did you design -- did you -- excuse me. I won't use "design" because I know you don't like that word. 09:57

Did you -- did you base your bid on Fratto's drawings?

A. Yes.

Q. Did you incorporate the requirements of the specifications into that? 09:57

A. That is telling me that in reference to the systems manufacturer, that these are generic plans to only the systems manufacturer, that they do not want to, the owner did not want to -- excuse me -- to qualify under the FAR sole source and a manufacturer to be installed on this site. 12:13

Q. Okay. So to you that refers to the fact that this -- that they made it clear this was not a sole source.

A. Correct. 12:13

Q. Okay. Let's go back to Exhibit 84, please. Okay. So we've just looked at the provision regarding the site visit, and you stated that Grot did not attend the site visit prior to bidding on the contract.

Did Grot ever call and reschedule a site visit prior to bidding on the contract? 12:14

A. No. We never -- we never did a site visit prior to award.

Q. I'm sorry. I already asked you that. You're correct. Okay. So then the next provision that John Mraz refers to from the minutes of this meeting is FAR provision 52.236-21, Specifications and Drawings For Construction. And we'll look at subparagraph A, which says, "The contractor shall keep on the work site a copy of the drawings and specifications and shall at 12:14

Q. At this point had the VA made it clear to you that they felt this was a design-and-install contract?
A. At this point in time in September of 2002, yes.
Q. Okay. At this point in time had the VA sent you a letter citing the provision of the FAR clause that encourages and states that the VA expects contractors to walk the site prior to award? 13:20
A. Yes. However though, from the information we received and looking at the drawings, the consultant took 271 days to do -- and the VA's term is nonused drawings. How is the contractor supposed to fit 270 days into one day of granted site visitation? 13:21
Q. I don't know the answer to that question. Perhaps that's a question that should have been asked. But my question to you was simply, had the VA sent you a letter stating that they expected you to have walked the site prior to award? 13:21
A. No. They --
Q. Had they sent you a letter citing you to a provision of the FAR that states that contractors are urged and expected to walk the site before an award? 13:21
A. They cited that 256 too, that the contractors are allowed to visit the site prior to awards, yes.
Q. The actual wording is "urged and expected 13:22

that there was someone after Scott Steed but before Monty Worley that was NICET level --

A. I believe that person was.

Q. Okay. The second paragraph says, We informed Grot and Siemens at the beginning of the project that it was necessary for them to walk the center and produce a set of plans for our project that would fully meet all codes. When Mr. Steed was informed of the need to walk the center and produce a set of plans that would meet all codes, as required by -- that's supposed to be section 13850, paragraph 1.4, subparagraph B, Mr. Steed stated that Siemens had no intention of walking the center and verifying what was needed for this project. Do you recall that? 11:26 11:26

A. I don't know what you're asking me. 11:26

Q. Do you recall -- do you recall anyone from the VA telling you in any point that Grot needed to walk the site?

A. Yes.

Q. Okay. Can you just tell me what you remember about that? 11:26

A. I remember every time that the issue would come up about additional devices or room locations, that they would state that we were supposed to walk the site and look everywhere and design the system. 11:27

REPLACE FIRE ALARM
BONHAM, VAMC

DATE: July 20, 2001

SUBJECT: Pre-Bid Conference

PRESENT: Rickey Kirk, VA C.O.T.R.
Larry Waldrop, Engineering Technician
John Mraz, Contracting Officer
David Morrison, FRATTO Engineering
Daniel Raap, Honeywell
Tom Backham, Alpha Burglar & Fire Alarm Systems
Johnny Stacy, Alpha Burglar & Fire Alarm Systems
Bobby Harper, Alpha Burglar & Fire Alarm Systems
Lee Bledsoe, Siemens
Chuck Roy, Westfire
Bill Black, Raven Construction Supply
Sarah Permenter, Raven Construction Supply

DISCUSSION:

A) Contractor: Inquired as to whether or not dampers are tied into the system and also noted that all dampers are not indicated on drawings.

David Morrison: Stated that the existing equipment has dampers and smoke detectors that should be incorporated with this campus-wide fire alarm system

Rick Kirk: Will get total number of dampers throughout the facility and submit to contractors as soon as possible. *Including stairwells.

B) Contractor: Stated that all old copper valves will have to be cut back and replaced with new flow and tamper switches.

David Morrison: Confirmed that this will be the contractors responsibility to replace copper valves as necessary.

C) Contractor: Asked for clarification of statement requesting that panel be equipped to provide 100% spare capacity (add additional equipment, double speakers, strobes, etc).

David Morrison: Intent is to provide the enclosure so that the space could be utilized at a later date if needed.

Rick Kirk: Will provide Letter of Intent sometime next week.

PLAINTIFF'S EXHIBIT 44

G- 002996

D) Contractor: Requested drawings that indicate exact square footage of each floor noted in project.

Rick Kirk: Will provide contractor with square footage of each floor.

E) Rick Kirk: VA will provide space to set-up trailer. Contractor will be required to supply trailer and all storage needed to complete project.

F) Contractor: Inquired as to whether or not all existing conduit will have to be removed.

David Morrison: Contractor will be required to remove all accessible conduit.

G) Contractor: Expressed concerns for changes taking place at facility not noted in drawings. Such as: Room being converted from a patient area to waiting room area, missed strobes, device layouts, etc.

Rick Kirk: Instructed contractor to notify him of any changes that need to be noted on drawings and he will do an addendum to the project.

H) Contractor: Inquired as to whether or not graphics and building floor plans will be needed at main work station located in central plant.

David Morrison: Informed contractor that this project requires Text only and that graphics and building floor plans will not be necessary.

I) Contractor: Inquired as to their accountability to train VA employees on new system.

Rick Kirk: Contractor will provide training to 4 VA employees at the level of manufactures technicians. This training will take place at the alarm system provider's central office. The VA will be responsible for providing employees transportation, food & lodging expenses.

J) Contractor: Noted that section 13850, page 8, item no. 3, states "5 year warranty" as opposed to "3 year warranty".

Rick Kirk: Will correct typing error in contract to state 3 year warranty.

K) Contractor: Inquired as to whether or not Building 6 has a FACU.

Rick Kirk: Will provide FACU for Building 6.

David Morrison: Commented that the control unit in Building 3 will pick up Buildings 4, 5 & 6.

G- 002997

Contractor: Commented that drawing for Building 6 indicates that a fire alarm control unit exist.

David Morrison: Stated that this is not correct and that Building 6 should only indicate having a terminal cabinet. He commented that he will clarify this information.

L) Contractor: Inquired as to whether or not there is existing circuitry that will be used to report back or will it be necessary to bury more conduit between buildings.

David Morrison: Stated that the Site Plan Drawing indicates spare conduits that were installed approximately 2-3 years ago. Spare 4" conduit runs from Building 24 to Building 4 to Building 6. He commented that the conduit also routes thru the interior of the buildings and that most are tied together thru corridors, walkways, etc.

M) Contractor: Inquired as to whether or not contractor will be expected to dig trenches to lay spare conduit.

David Morrison: Contractor will be required to use existing conduit for project as opposed to digging trenches to lay new conduit.

N) Contractor: Inquired as to the City of Bonham's involvement in project, such as, local permits, etc.

David Morrison: None

Larry Waldrop: Inquired as to whether or not a Bid Bond would be required by contractor.

John Mraz: First responded with "yes", but upon discussion decided that this would not be necessary. However, he did state that a Performance & Payment Bond will be required.

O) John Mraz: Informed contractor that the Bid Opening has been scheduled for July 31st at 1:30 p.m. at the Dallas VAMC. Upon discussion, it was decided that a 2 week extension would be added to the solicitation date of project. John stated that he will make this amendment. John also explained the Bid Opening Procedure in detail to contractor.

P) Contractor: Inquired as to whether or not all wiring will be required to be in conduit. If so, what is the contractors responsibility to repairing walls and ceiling that may be damaged while gaining accessibility to conduit.

G- 002998

David Morrison: Contractor will be expected to make all necessary repairs to walls and ceilings that are damaged during the course of this project.

Q) Contractor: Will existing fire alarm panel in Building 8 be moved prior to the beginning of this project.

Rick Kirk: Stated that we will move panels prior to project.

R) John Mraz: Commented that he will send out e-mail messages announcing the selected contractor as soon as possible following the Bid Opening.

REPLACE FIRE ALARM
PRE-BID CONFERENCE
JULY 20, 2001

PHONE LISTING OF ATTENDEES:

1) DAVID MORRISON, FRATTO Engineering / (817) 461-2337

2) DANIEL RAAP, Honeywell / Office: (720) 344-9034 Fax: (720) 344-9035
E-Mail Address: daniel.raap@honeywell.com

3) TOM BECKHAM, Alpha Burglar & Fire Alarm Systems / Office: (903) 892-0555 Fax: (903) 892-9710

4) JOHNNY STACY, Alpha Burglar & Fire Alarm Systems / Office: (903) 892-0555 Fax: (903) 892-9710

5) BOBBY HARPER, Alpha Burglar & Fire Alarm Systems / Office: (903) 892-0555 Fax: (903) 892-9710

6) LEE BLEDSOE, Siemens / Office: (972) 812-5602 Fax: (972) 915-3896

7) CHUCK ROY, Westfire / Office: (214) 340-1700 Fax: (214) 344-0017

8) BILL BLACK, Raven Construction & Supply / Office: (903) 870-9325 Fax: (903) 870-9827

9) SARAH PERMENTER, Raven Construction & Supply / Office: (903) 870-9325
Cell Phone: (903) 815-7126 Fax: (903)870-9827

10) Rickey Kirk, VANTHCS / (903) 583-6494

11) Larry Waldrop, VANTHCS / (903) 583-6492

12) John Mraz, VANTHCS / (214) 857-0021

G- 003000

**DEPARTMENT OF VETERANS AFFAIRS**
**DALLAS VETERANS MEDICAL CENTER**
**4500 S. LANCASTER ROAD**
**DALLAS, TX, 75216**
**JOHN MRAZ, CONTRACTING OFFICER 90C**
**TEL; 214-857-0021**
**FAX: 214-857-0027**
**E-MAIL:** john.mraz@med.va.gov

Grot, Incorporated
688 Grot Drive
Lexington, KY 40505-3835

July 17, 2003

Re: Contract V549P-609-02
Bonham Fire Alarm System

Subject: Disarmed Fire Alarm System, Bldg 1, at the Bonham, VA

Dear Mr. Jerry Grot:

I was informed this day by Charles Ballard, Chief of Engineering for the Bonham and Dallas Veterans Medical Centers, that Grot, Inc. has "disarmed the fire alarm system in Building 1, Sam Rayburn Medical Center, Bonham, TX without informing the VA as required by Contract V549P-609-02. Building 1 did not have fire alarm protection last night, July 16, 2003 and does not have fire alarm protection as of this minute."

You are hereby directed to correct the problem immediately and you are also responsible for administering a "Fire Watch" until the fire alarm system is activated for Building 1. The unauthorized deactivation of the fire alarm system for Building 1 is totally unacceptable and must be corrected immediately. Any cost incurred by the VA in connection with the deactivation and reactivation of the fire alarm system for Building 1 will be borne by Grot, Inc.

Upon receipt of this letter contact me at 214-857-0021 and Ricky Kirk and Charles Ballard at 903-583-6444.

Sincerely,

John Mraz
Contracting Officer

**Kirk, Rickey L.**

**From:** Mraz, John P.
**Sent:** Thursday, July 17, 2003 11:29 PM
**To:** 'Jon C. Evans'; Mraz, John P.; Kirk, Rickey L.; Ballard, Charles
**Subject:** RE:

Attached is a copy of the letter I sent Grot, Inc. in response to the smoke detectors.

Thanks,

John

-----Original Message-----
**From:** Jon C. Evans [mailto:jon@grotinc.com]
**Sent:** Thursday, July 17, 2003 10:55 PM
**To:** Mraz, John P.
**Subject:** Fw:

----- Original Message -----
**From:** Jon C. Evans
**To:** Jerry N. Grot
**Cc:** Rick Kirk ; Clyde Bell
**Sent:** Thursday, July 17, 2003 11:53 PM

Today Rick Kirk, and Mel Harrison came up to the penthouse where I was working to inspect our progress in building 1. Shortly after we discovered that there were no pull stations installed on the temporary system. I was unaware of the situation myself until this discovery. Rick then told me to stop work in the building, and start a fire watch with 1 man per 2 floors. Soon after I was approached by Charles Ballard, and asked why, and how this had happend, and I told him that we were in the process of correcting the problem. I would like to also state that there was coverage in the building from smoke detectors, and strobes during the time the old system was disconnected, and the temporary system was activated, and at no point was there no coverage. I do appologise for this lack of coverage, and share the VA's concerns of no manual notification on the system. It is an oversite that will not happen again. At around 6pm Rick and Mel came to me about building 29 not having enough smoke coverage in the hallways of each wing. I asked why it was not brought up until this time and Rick said that he had sent several letters to our office about this coverage problem. I told Rick that our office had written letters about the situation to John Mraz over 65 days ago with no responce. I told Rick that I could not do the work without a written directive from him stating what he wanted us to add to building 29, and why. Rick soon after came to me with a letter stating that we had to install smoke detectors in building 29's hallways, or have a fire watch until the coverage he requested was active. We are currently on fire watch until tomorrow when we will install the temporary smoke detectors in the hallways. We are following this directive under protest, and will seek any and all cost's incurred by this directive.

**Kirk, Rickey L.**

**From:** Mraz, John P.
**Sent:** Thursday, July 17, 2003 7:55 PM
**To:** Sprouse, Cojean C.; Dearing, Adam C.; Kirk, Rickey L.; Ballard, Charles
**Subject:** E-mail from Grot

Copy of e-mail I received from Grot.

**From:** Angela Lafferty [mailto:grot04@iglou.com]
**Sent:** Thursday, July 17, 2003 4:20 PM
**To:** John Mraz (E-mail)
**Subject:** RE: Contract #V549P-609-2 Project #B01-114

Dear Mr. Mraz:

This will acknowledge receipt of your letter of July 17, 2003 regarding the disarming of the fire alarm system in Building 1, Sam Rayburn Medical Center, Bonham, Texas. While I do not agree with your letter that Building 1 did not have fire alarm protection, Grot does acknowledge that it appears that temporary pull stations were not installed as they should have been. We apologize for this oversight and assure you that it was not intentional. For your information, this issue will be corrected before Grot leaves the job site today. In addition, we are administering a "fire watch" until the pull station issue is resolved.

In light of these events, procedures are now in place to prevent this from ever happening again. However, I do want to assure you that Building 1 was not without fire alarm protection. Smoke alarms, strobes and other visual fire alarm protection were present. All that was lacking were the pull stations.

For the record, Grot did notify the VA of its intentions to work in Building 1 by e-mail to Ricky Kirk, COTR, last week. We do not know why the VA did not receive notification.

Again, while there was fire alarm protection available, it does not excuse the failure to install the pull stations. We acknowledge this error and are moving to correct it and make sure it does not happen again.

We would appreciate the VA's patience with us on this matter.

Sincerely,

Grot, Inc.

Jerry N. Grot