CC: «cc1»



July 29, 2003

July 29, 3:54 P.M.

**Mraz, John P.**

**From:** Jerry Grot [grot12@grotinc.com]

**Sent:** Tuesday, July 29, 2003 3:54 PM

**To:** Andy Kilpatrick (E-mail); Scott McCauley (E-mail); Cojean Sprouse (E-mail); jerry grot (E-mail); John P Mraz (E-mail); Jon C. Evans (E-mail); jon (E-mail); McCauley Scott (E-mail); Ramond (E-mail); Rick Kirk (E-mail)

**Subject:** Reply letter Please make changes and or input

3:54

1 of 2

To: VA North Texas Health Care System Date: 7/29/2003
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216
Doc No.: Corr-14
Project: Bonham Tx.-VA
Attn: John Mraz 2002.006
Subject: Response to Letter dated July 28, 2003 Sam Rayburn Memorial
East Ninth
Bonham, Tx 75418

Dear John Mraz:

The intent of this letter is to address your letter of July 28, 2003 that directs Grot Inc. to have the Bonham fire alarm system "fully operational" by 8:00 am CST. Please be advised that I have confirmed with our consultant that the system is "fully operational" in the respect that all six of the main fire alarm panels are operational, they are monitoring the devices that are connected to the system, the Network Control Computer is functioning, and personnel on site will be alerted if any device connected is activated. We are working diligently to address the deficiency list so that we can continue with the completion of the project. Also we have a temporary system installed in building 1 that can not be completed by July 30, 2003 8:00 am CST, due to over half of my crew on watch, what we consider unnecessary, per the direction of the VA. If there is some aspect of the system that is not operating, please advise.

However there are several issues outstanding that must be addressed prior to the project being completed. We have made several requests for information from the VA, which is critical to completion of construction. This information has also been addressed with the COTRs but we are still in need of direction. For example, consider the following request:

1. Letter dated October 18, 2002 letter requesting needed items, (Building occupancy and classification, mechanical drawings, fire protection/sprinkler drawings).
2. Email dated January 22, 2003 as to the contaminated water in countered in the manholes.
3. Letter dated April 29, 2003 as to contaminated water in manholes.
4. Letter dated May 27, 2003 as to the redesign of Building 29 and requested smoke detectors in hall walls.

It is this type of information that is critical to final completion of the project. We cannot finish the work completely until these issues are addressed.

In addition, the contaminated water issue is still something that needs to be addressed. As you know, our employees experienced some discomfort from the conditions. Has a determination been made as to the content of the water?

EXHIBIT 21

July 29, 2002
2012
3:54

Grot Inc.
Page #2

As you are probably aware, the COTRs have directed us to install additional devices that are not shown on either the original drawings by Fratto or the approved construction drawings prepared by our NICET Level III technician and approved by Fratto. An issue has apparently developed due to our request that directives adding or deleting these types of devices be in writing. I am sure you understand that we can not change approved drawings without a written directive from the VA, especially in view of the fact that we could not start construction without approved drawings and to add the devices would constitute a change to these drawings. We will certainly honor the directive when it is received and look forward to completing this project.

I trust that this letter responds adequately to your letter. We are in the process of preparing a response to your letter of July 23rd for delivery by Friday, August 1st.

Sincerely,
Grot, Incorporated

*Jerry N. Grot*

Jerry Grot
President

cc: Andrew J. Kilpatrick, Gore, Kilpatrick, Purdy & Metz
Scott McCauley, Siemens- Texas



7/30/03

**Kirk, Rickey L.**

**From:** Jon C. Evans [jon@grotinc.com]
**Sent:** Thursday, July 31, 2003 12:58 AM
**To:** Jerry N. Grot
**Cc:** Rick Kirk; Clyde Bell; Andy Kilpatrick
**Subject:** Daily report ( VA/Pre test )

At 8am this morning after arriving on site I went to speak with Rick and Mel to see if I would be allowed to test the six deficiencies for our own purposes. Mel said that we could perform our own test, and that he would give us ample time to test the system for the listed deficiencies items. Shortly after we started the test with Rick and Mel present in the Penthouse of building 24. We started testing the duct detectors to verify shutdown of the AHU, when Mel said they would be in the building if we needed them for anything and left us to our test. We tested Air Handler's, Doors, Flow and Tamper switches, and Elevator recall.

At 3pm Rick contacted me and ask me to have everyone meet in the front lobby of building 24. At the lobby Mel told me that we have had ample time to test, and correct our deficiencies, and that the Pre Test would now begin.

The following paragraphs are from my notes taken during the Pre Test on 7/30/03

We started the Pre Test in the Penthouse of C wing to verify HVAC shutdown. Mel said that the HVAC test failed due to inadequate installation of the duct detectors. He stated that the sampling tubes did not penetrate all the way through the duct work. Next he tested the Inspectors Test Valve for flow, and the tamper switch, and we moved on.

Mel said that the door holder test failed because the doors all closed on a general alarm. Mel asked if I had installed a smoke detector in the elevator shaft between B, and C wing, and I told him no. Mel said that the elevator recall test had failed due to no elevator shaft smoke detector. Mel asked if the ITV's ( Inspectors Test Valve ) were annotated on our drawings, and Scott Steed said they were not. Mel said that they should be shown on the drawings. We then went to the B wing Penthouse to test, and discovered that the sampling tubes had not been installed in the duct detectors of B wing. Rick took pictures of the duct detectors, and then we tested the ITV, and the tamper switch. After leaving the B wing Penthouse Mel asked me if there were any smoke detectors installed in any of the elevator shafts, and I told him no. Mel said the elevator recall tests fail, and noted that the elevator recall did work on the previous test with the exception of the north elevator recalling when the south elevator was tested. We then went on to test flow, and tamper switches throughout the building.

It is unsure how some of the sprinkler piping has been ran in relation to the flow switches, and not all of the flow switches could be tested to send an alarm. There are possibly other ITV's that need to be found in the building to test all of the flow switches.

I was then asked to sign Rick's notes that stated there are no smoke detectors in any of the elevator shafts in any of the buildings. I said that there were no smoke detectors installed in any of the elevator shafts, and Mel said that all elevator recall tests failed. I was also asked to sign a statement that said there were no duct detectors having sampling tubes that penetrated through both sides of the duct work. Both statements were true, and I signed my name to them. Mel then referenced the spec, and corrected himself that the sampling tubes did not have to penetrate both sides of the duct work, but did have to extend the full width of the duct as stated in section 13850 2.8-F that states the sampling tubes shall extend across the full width of the duct, ( wall to wall ).

The Pre Test ended at 4:25pm and will start again in the morning at 8am. Mel told me that I could work on the items found during the Pre Test before we begin testing again in the morning. I had Siemens install the sampling tube's in B wing Penthouse per 13850 2.8-F, then we left for the day.

**SUBJ:** Replace Fire Alarm System
Contract #V549C-599-1
Project #B01-114
Grot Incorporated, Contractor

Aug. 1, 2003?

**TO:** John Mraz
Contracting Officer

1 of 2 Aug 1, 2003

**FROM:** Rickey L. Kirk
Contracting Officer's Technical Representative

John,

A pre-test of Buildings 1, 2, 3, 24, and 29 was held starting on July 30, 2003 beginning at 3:20p.m. Their time limit was set at 8am July 30th. We allowed them extra time to test their system and make any needed changes. By 3p.m. it was decided they had had plenty of time and we stopped their testing to run ours.

The following persons were in attendance:

- Rickey L. Kirk, C.O.T.R.
- Mel Harrison, VA Representative
- Jon Evans, Grot on-site Supervisor
- Monty Worley, NICET Level III Certified Technician
- Scott Stead, Siemens
- Don Eichthaler, Siemens

The inspection concentrated only on the six (6) items listed in the sent to Grot Inc on July 28, 2003.

The following deficiencies were note:

Building 24

C Wing Penthouse

Sampling tubes, in both supply and return ducts, do not span wall to wall in duct as required by Specification section 13850, paragraph 2.8, sub-paragraph F.
Sampling tube hole not sealed after removal of old sampling tube.
New sampling tubes installed backwards in both supply and return ducts.

C Wing 2nd Floor

Flow Switch in Stairwell #5 does not meet Specification section 13850, paragraph 2.8, sub-paragraph D, sub-sub-paragraph 3. 52 seconds.
Tamper switch in Room 2C-108 I.D.s as by 109.

EXHIBIT 24

B Wing Penthouse

No sampling tube in Supply duct unable to test.
No sampling tube in Return duct unable to test.
Sampling tube hole not sealed after removal of old sampling tube.
No Smoke Detector at the top of Elevator Shaft. Could not test for recall.

B Wing 2nd Floor

Tamper Switch outside Room 2B-108 I.D.s as Rm. 139 electrical room.

B Wing 1st Floor

spent hours showing and telling this contractor over and over to what you agreed to by signing the contract. I grow weary of constantly repeating myself to this company.

Please respond to Contractor's email as you see fit.

Aug 1 2007

10/2

I Am,

Rickey L. Kirk

Rickey L. Kirk
C.O.T.R.

**Kirk, Rickey L.**

---

**From:** Jon C. Evans [jon@grotinc.com]
**Sent:** Friday, August 01, 2003 11:59 PM
**To:** Jerry N. Grot
**Cc:** Rick Kirk; Clyde Bell; Andy Kilpatrick
**Subject:** Daily report ( Testing 8/1/03 )

Today we completed the testing in buildings 2,1, and 29. We started in the basement of building 2 testing tamper, and flow switches. Then we went on to building 1 which is still on a temporary fire alarm system. Mel asked if we had done any work in building 1 on the six listed deficiencies items, and I told him no because I had focused on the other buildings that were online. Building one was failed over all. We then went on to building 29 to test, and started in the patient wings testing flow switches. We found the first ITV and tested for flow, and then went searching for other ITV's in each hallway. Mel looked in patient rooms, and Monty and Myself looked outside for test drain outlets, and found nothing. To my understanding there is no as built drawings for the sprinkler system in building 29, and it is anybody's guess where the ITV's might be. We tested both wings at the ITV that was easily located, and then moved on to the sprinkler riser room.

The temper's tested ok with the exception of one that was tied to the wrong address, and Monty repaired it before we left the room. I told Rick and Mel that I had checked the AHU's for shutdown with Landis yesterday, and all of the fire alarm system controlling the unit shutdown worked properly. I also told him that there was problems with the VFD's on some of the units that did not allow the fans to shut down, and that I was told there were plans to replace some of them. Mel said that we would not test the units due to the malfunctioning VFD's.

After the test was completed we broke for lunch, and I then Met with Siemens to discuss what we needed to do to complete the job, and also had Scott Steed take care of some programming errors.

Aug 1, 2003

Aug 1, 2003

**DATE:** August 1, 2003

**SUBJ:** Replace Fire Alarm System
Contract #V549C-599-1
Project #B01-114
Grot Incorporated, Contractor

**TO:** Mr. Jon Evans
Contractor's On-site Supervisor

**FROM:** Rickey L. Kirk
Contracting Officer's Technical Representative

Mr. Evans,

After the pre-test of July 30, 2003 through August 1, 2003 it has been determined that the existing new installation of fire alarm equipment and the temporary fire alarm system, in Buildings 1, 2, 3, 24 and 29, is still inadequate fire safety coverage at the Sam Rayburn Memorial Veterans Center, as per NFPA 101, chapters 18.1 thru 18.7.9.2 and 9.6.1 thru 9.7.6.2, and our letter to your home office dated August 23, 2002. This inadequate coverage we believe poses a threat to life and limb of the occupants of said Medical Center.

Therefore, upon my authority as Contracting Officer's Technical Representative, I do hereby direct you to:

> Set up a fire watch within Buildings 1, 2, 3, 24 and 29, that will be maintained during all non-duty hours, "4:30pm to 8 am" weekdays and 24 hours a day weekends and holidays, until said systems meet the requirements of NFPA 72 and 101 and the contract specifications.
>
> This fire watch will consist of personnel on foot patrol throughout buildings listed above and every floor of said buildings during every two-hour period. A written log will be maintained and given to the C.O.T.R. at the beginning of each business day.

Fire watch will continue to use instructions given under previous directives.

Rickey L. Kirk

Rickey L. Kirk
Contracting Officer's Technical Representative.

EXHIBIT 23

Grot, Incorporated
324 Henry Street
Lexington, Kentucky 40508
859-254-3848 Fax 859-254-3847

To: VA North Texas Health Care System
4500 S. Lancaster Road, Bldg. 8
Dallas, Texas 75216

Attn: John Mraz

Subject: Deficiencies List Addressed
Fire Watch Removal.

Date: 8/1/2003

Doc No.: Corr-16
Project: Bonham Tx.-VA
2002.006

Sam Rayburn Memorial
East Ninth
Bonham, Tx 75418

Dear John Mraz:

We have addressed the deficiencies list provided to Grot Inc. with the six items listed, which the VA contends necessitates a fire watch. This project as directed by the VA was designed by Grot Inc/Siemens to comply with NFPA 101. While there are disputes over whether certain devices are to be additionally installed, the fact that disputes exist due to demands for additional devices and/or equipment, does not constitute a fire watch remain in the buildings.

The fact remains the project was designed per NFPA 101 and installed. Accordingly the fire watch is not any longer necessary. In respect to the specifications, I draw you attention to section 13850-2 paragraph 1.1 section E. which states **(The contractor shall provide a dedicated fire watch person all times any normally protected area is disconnected from a fire alarm system as a result of the project work, except during normal day shift non-holiday VA work hours).** I specifically refer you to the words **"The contractor shall provide a dedicated fire watch person all times any normally protected area is disconnected from a fire alarm system."** Not when the VA wishes or desires one to be in place. This is to notify you that the all areas are protected by a fire alarm system per our drawings, thus the need no longer exists and did not exist to began with according to the VA's specifications.

Unless Jon Evans, cell number (903.227.2922) my project manager, receives notice from you or a VA representative on or before 7:00 pm CST, the fire watch will cease as of August 1, 2003.

Sincerely,
Grot, Incorporated

Jerry Grot
President

cc:
Andrew J. Kilpatrick, Gore, Kilpatrick, Purdy & Metz
Scott McCauley, Siemens- Texas
Rickey Kirk, VA- Bonham, Texas



G- 0027

Q. And do you remember exactly -- not exactly. But do you remember roughly when Monty Worley -- when Grot or Siemens hired Monty Worley?
A. I don't remember at this time, no.
Q. Not even the month? 11:50
A. No.
Q. Okay. It's been a long time. I understand. All right. Let's talk about, since we're talking about the temporary system, I think that there was an issue with that with Building 1. 11:50
A. Yes.
Q. Right? Can you tell me what happened with Building 1?
A. They installed the temporary system, but they didn't install any temporary pull stations. 11:50
Q. And what does that mean? What's a pull station?
A. The actual device you would pull by hand to set the alarm off manually.
Q. Okay. So like those I remember from when I was in school, you pull the handle down -- 11:50
A. Right. Yes.
Q. -- and then that alarm goes off, right?
A. Yes.
Q. Okay. So what does it mean that they didn't 11:51

install any temporary pull stations?

A. Meaning that nobody could manually set the system off.

Q. Okay. Were you aware that they had done that? 11:51

A. Not at first, no.

Q. When did you become aware of it?

A. The VA brought it to my attention.

Q. And when did they bring it to your attention?

A. I don't remember the exact date. I was there 11:51 working in the building, and they pointed it out to me.

Q. And what was your reaction?

A. I told them I didn't know that they weren't there to start with.

Q. Was it your responsibility to track what 11:52 Monty Worley was doing, or was he -- was it your responsibility to supervise Monty Worley?

A. My responsibility was to schedule him to do the buildings. I wasn't aware that the temporaries didn't get put in in that particular instance. 11:52

Q. I'm sorry. Say that again.

A. I wasn't aware that those pull stations hadn't been installed in that instance.

MS. WILLIAMS: Eighty-six.

(EXHIBIT NO. 86 IDENTIFIED.) 11:52

Q. (BY MS. WILLIAMS) Do you recognize that as an e-mail from you to Jerry Grot, an entry in your daily log, dated July 23rd, 2003?
A. Yes.
Q. Is that the list of six deficiencies that you had to remedy before the fire watch could be removed? 15:18
A. Yes.
Q. So does that clear up the issue of whether or not Grot received that list of six deficiencies on July 23rd? 15:18
A. What was the issue?
Q. Does that clarify to you that they did receive notice of the six deficiencies on July 23rd?
A. Yes.
MS. WILLIAMS: Okay. And then the last thing, this can be 103. 15:18
(EXHIBIT NO. 103 IDENTIFIED.)
Q. (BY MS. WILLIAMS) Okay, take a look at that. This is a marketing update dated February 28th, 2001, subject is MXL wiring specifications. Do you recognize this as the Marketing Update that was at issue in this project? 15:20
A. I believe so, yes.
Q. Okay. And you recognize that that was issued in 2001? 15:20

A. They failed us.
Q. I'm sorry? What?
A. They failed us on the test.
Q. Okay. Let's just -- we won't go through all of it. Let's just go through some of them just to see 13:43 if you can remember. The first thing says, A wing south, first lobby elevator re-call to second. No re-call to first. Primary not work. Elevator equipment room SM okay. Do you know what any of that means? 13:44
A. Yes. It's referring to a two-level building and the elevator. What, what they wanted the elevator to do is the smoke detector near the elevator door in the hallway to send the elevators to the other floor if that smoke detector went off and vice versa on the 13:44 first floor, to send it to the second. And it didn't do that.
Q. And what was your response to that?
A. I agreed with them. It didn't work correctly. It was a programming error. 13:44
Q. And by "a programming error" what do you mean?
A. It was something the Siemens tech would have to program in to tell that device to send the elevator.
Q. Okay. The next thing is a latch broke on SM 13:44

he's referring to in this letter?

A. I believe so, yes.

Q. Okay. And do you recall that, receiving this letter?

A. This letter? 14:26

Q. Uh-huh.

A. I'm sure I did.

Q. Okay. And had you already established a fire watch at this point?

A. Yes. 14:27

Q. So basically this was just a continuation of the fire watch?

A. Yes. It was ongoing.

Q. And did you comply with this directive?

A. On the fire watch? 14:27

Q. Uh-huh.

A. Yes.

Q. Okay. And were you taking steps at this point to remedy the problems that you found in the pretest? 14:27

A. Yes.

(EXHIBIT NO. 99 IDENTIFIED.)

Q. (BY MS. WILLIAMS) Okay. This is a letter written from Rickey Kirk to you dated August 7, 2003. Do you recognize this letter? 14:28