**Cause No. 03-1951C**
**(Judge Baskir)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**GROT, INCORPORATED,**

**Plaintiff,**

**vs.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON THE CLAIMS TRANSFERRED FROM THE VABCA AND UPON THE ISSUE OF WHETHER THE TERMINATION OF THE CONTRACT FOR DEFAULT WAS PROPER

---

**GROT, INCORPORATED**

**Andrew J. Kilpatrick, Jr., ID#656**
**Gore, Kilpatrick & Dambrino, PLLC**
**Post Office Drawer 2900**
**Ridgeland, Mississippi 39158**
**Tele: 601.957.1595**
**Fax: 601.957.1790**
**akilpatrick@gorekilpatrick.com**
**MSB#3763**

**Dated: April 2, 2007**

**Counsel for Plaintiff**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-vi

I. STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. STATE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Contract Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Grot Begins to Construct the Project . . . . . . . . . . . . . . . . . . . . . 6

III. The VA Directs Grot to Redesign the Project . . . . . . . . . . . . . . . 7

IV. The Government Terminates Grot's Contract . . . . . . . . . . . . 14

V. Siemens Negotiates the Completion Contract But
But Cannot Complete the Project Either . . . . . . . . . . . . . . . . 15

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I. Reply to Defendant's Point 1: Appropriateness of
Summary Judgment and Review of the Contracting
Officer's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II. Reply to Defendant's Point II (A) & (B): The VA's
Termination of the Contract Was Wrongful . . . . . . . . . . . . . . . 23

(a) Grot's system design met the plans, specifications,
drawings and system design requirements at the time
Grot was terminated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

(b) The VA's failure to answer questions and improper

directives effected Grot's ability to complete the Project by June 23, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

(c) Time was never of the essence to the Contract and Grot never indicated an intention not to complete the Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

(d) The Cure Notice failed to provide Grot with the information it needed to attempt to cure any deficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

(e) Grot does not contend that the VA's improper payment caused Grot to miss the revised completion date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(f) The plans and specifications provided by the VA were ambiguous and subject to more than one reasonable interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(g) Grot performed as directed while reserving its rights under the Contract Disputes Act but the VA no longer wanted to do business with Grot . . . . . . . . . . . . . . . 40

V. Reply to Defendant's Point III: Even If the VA was Correct In Its Decision to Default Terminate Grot, Which is Disputed, the Termination Itself Does Not Forfeit an Otherwise Valid Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VI. Reply to Defendant's Point III (A): Grot's Claim For Design Cost Encompasses More than Simply Designing the System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VII. Reply to Defendant's Point III (B): Grot is Entitle to the Prompt Payment Penalties as Well as Other Damages for Failure to Include the Prompt Payment Penalties at the Time of Payment . . . . . . . . . . . . . . . . . . . . . . 42

VIII. Reply to Defendant's Point III(C): Grot's Entitlement to

Unpaid Progress Payment is Not Controlled by Whether the VA Properly Terminated the Contract for Default . . . . . . . . 43

IX. Reply to Defendant's Point III(D): Defendant's Argument With Respect to Retainage is Misplaced . . . . . . . . . . . . . . . . . 45

X. Reply to Defendant's Point III (E): Grot is Entitled to Compensation for the Differing Site Conditions Encountered on the Project . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

XI. Reply to Defendant's Point III (F): Grot's Bonding Capacity was Adversely Affected by the VA's Wrongful Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# TABLE OF AUTHORITIES

Case Authority:

*American Ship Building Co. v. The United States,*
228 Ct.Cl. 225, 654 F2d 75, 79 (1981) . . . . . . . . . . . . . . . . . . . . . . . 28

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 247-48, 91 L.Ed. 2nd 202,
106 S.Ct. 2505 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,22

*Argo Technology, Inc.*,
ASBCA No. 30522, 88-1 BCA ¶ 20,381 at 103,063 . . . . . . . . . . . . . 34

*Becho, Inc. v. The United States,*
47 Fed. Cl. 595, 599 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 21,22,23

*Big Chief Drilling Company v. United States*,
26 Cl. Ct. 1276, 1293 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Blinderman Constr. Co. v. United States*,
39 Fed. Cl. 529, 539 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Clay Bernard Systems, International, LTD v. The United States,*
22 Cl. Ct. 804, 811 (Ct. Cl. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Darwin Construction Co. v. The United States,*
811 F2d 593, 598 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 23,41

*Delcon Construction Corporation v. The United States*,
27 Fed. Cl. 634, 637 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Dynalectron Corp. v. The United States,*
518 F2d 594, 604 (Ct. Cl. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Erickson Shaver Contracting Corp. v. The United States*,
9 Cl. Ct. 302, 304 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Fry Communications v. United States*,
22 Cl. Ct. 497, 503 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hannon Elec. Co. v. The United States,*
31 Fed. Cl. 135, 147 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Hardeman-Monier-Hutcherson v. The United States,*
198 Ct. Cl. 472, 487, 458 F2d 1364, 1371 (1972) . . . . . . . . . . . . . . 29

*IMS Services, Inc. v. United* States,
33 Fed. Cl. 167, 185 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*International Verbatim Reporters,*
9 Cl. Ct. 710, 721 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*J.A. Jones Construction Co. v. The United States,*
182 Ct.Cl. 615, 390 F2d 886 (1968) . . . . . . . . . . . . . . . . . . . . . . . . 28

*J.D. Hedin Constr. Co. v. The United States,*
187 Ct.Cl. 45, 408 F2d 424, 431 (Ct.Cl. 1969) . . . . . . . . . . . . . . . . 23

*Kenneth Reed Construction Corp. v. The United States*,
475 F.2d. 583 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*McDonald Douglas Corporation, et al. v. The United States,*
50 Fed. Cl. 311, 315 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 30,31

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
47 U.S. 574, 587, 89 L.Ed. 2nd 538, 106 S.Ct. 1348 (1986) . . . . . . 22

*Neal & Co. v. United States*,
19 Cl. Ct. 463, 467-68 (1990),
aff'd 945 F. 2d 835 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 34

*NVT Technologies v. United States*,
370 F. 3d 1153, 1159 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 39

*P.J. Maffei Bldg. Wrecking Corp. v. The United States*,
732 F.2d 913, 916 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 47

*P.R. Burke Corp. v. United States*,
47 Fed. Cl. 340, 351 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Peter Vicari, General Contractor, Inc. v. United States,*
47 Fed. Cl. 353, 359 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Record Steel and Construction, Inc. v. The United States*,
62 Fed. Cl. 508 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37,38

*Renda Marine, Inc. v. United States,*
66 Fed.Cl. 639, 647 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Santa Fe Engineers, Inc.,*
ASBCA No. 17,325, 75-2 BCA ¶11,570 . . . . . . . . . . . . . . . . . . . . . . 28

*Servidone Construction Corp. v. The United States*,
19 Ct. Cl. 346, 360 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Stuyvesant Dredging Co. v. The United States*,
834 F.2d 1576, 1581 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 47

*United Pacific Insurance Co. v. United States*,
204 Ct.Cl. 686, 49 F2d 1402 (1974) . . . . . . . . . . . . . . . . . . . . . . . . 34

*WPC Enterprises, Inc. v. The United States,*
163 Ct. Cl. 1, 323 F2d 874, 877 (1964) . . . . . . . . . . . . . . . . . . . . . . 34

Statutes and Regulations:

FAR 52.236-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

FAR 52.236-21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **GROT, INCORPORATED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 03-1951C** |
| | ) | **(Judge Baskir)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON THE CLAIMS TRANSFERRED FROM THE VABCA AND UPON THE ISSUE OF WHETHER THE TERMINATION OF THE CONTRACT FOR DEFAULT WAS PROPER**

COMES NOW Grot, Incorporated ("Grot"), plaintiff, and submits this its response to defendant's motion for summary judgment on the claims transferred from the Department of Veterans Affairs, Board of Contract Appeals ("VABCA") and upon the issue of whether the termination of Grot's contract was proper. Contrary to defendant's argument, it is respectfully submitted that there are significant genuine issues of material fact which prevent the grant of summary judgement on the issue of whether the contract was properly terminated for default. If defendant fails on that motion then the remainder of the motion must fail because Grot's claims from the VABCA are directly tied to the propriety of the contracting officer's

decision to terminate for default. Should defendant prevail on its motion, Grot is still not precluded from bringing an otherwise valid claim.

**PLAINTIFF'S BRIEF**

**STATEMENT OF THE ISSUES**

I. Whether the contracting officer wrongfully terminated the contract for default.

II. Whether, assuming that the termination was proper, Grot is precluded from recovering upon any of its claims for money damages.

III. Whether Grot is precluded from recovering any damages for the additional work Grot performed to "re-design" the fire alarm system.

IV. Whether Grot is precluded from recovering any damages resulting from its loss of bonding capacity.

V. Whether Grot is precluded from recovering any damages resulting from the differing site conditions.

VI. Whether Grot is precluded from recovering any damages resulting from the fire watch.

**STATEMENT OF THE CASE**

I. Nature of the Case

Grot has filed this appeal being aggrieved by the final decision of a

contracting officer wrongfully terminating Grot for default under a contract between Grot and the Department of Veterans Affairs ("VA"). Grot bases its appeal and dispute of the termination on several issues. In addressing defendant's first motion for partial summary judgment, this Court has determined that it was Grot's responsibility to design and install a fire alarm system. Grot contends that it was doing just that at the time the contracting officer terminated the contract for default. Thus, notwithstanding the Court's opinion, the issue still remains as to whether the contracting officer's decision to terminate Grot was justified and/or accomplished in accordance with the applicable contract provisions.

Genuine issues of material fact exist as to, among other things, whether or not Grot was performing in accordance with the plans and specifications for the project at the time of termination, whether the plans and specifications were deficient and whether the contracting officer acted pursuant to the applicable FAR's at the time the termination was issued.

## STATEMENT OF FACTS

### I. Contract Award

On February 1, 2002, the VA awarded to Grot contract number V549P-609-2 (the "Contract") for performance of the work generally

described as Campus-Wide Fire Alarm, Project No. 099-108 at the Sam Rayburn Memorial Veterans Center, East Ninth and Lipscomb Streets, Bonham, Texas (the "Project").

This Project was initially released for bid as Solicitation IFB 549-64-01. Plaintiff's Appendix ("Pl. App.") at 1. The original contract completion time was ninety (90) days but subsequently increased to two hundred seventy (270) days by Amendment Two. Pl. App. at 6,7.

The original bid date was July 11, 2001 but was extended until July 31, 2001. Pl. App. at 8,9. Subsequent thereto, the contracting officer noticed a pre-bid conference for July 20, 2001. Pl. App. at 11. By amendment dated July 27, 2001, the amended bid date was again extended, this time until August 28, 2001. Pl. App. at 12.

After the pre-bid conference but prior to the date scheduled for the opening of bids, personnel from Siemens Cerebus Division, a division of Siemens Building Technologies, Inc. ("Siemens") were aware that Chris Forner and Mel Harrison, representatives of the VA who were not present at the pre-bid conference, had knowledge relative to the work on the Project that was not disclosed in the plans and specifications for the Project or at the pre-bid conference. Pl. App. at 186-188.

Representatives of Siemens met with Mr. Forner and Mr. Harrison at the Project and discussed in detail the specifics of what they wanted to be installed on the Project. These disclosures indicated to Siemens that the VA wanted considerably more fire protection devices and other equipment than was reflected on the plans and specifications for the Project. Pl. App. at 177, lines 6-10 & 19-22. That information was never disclosed to any other bidder prior to bid opening.

At the initial bid opening, ADT Security Services, Inc. ("ADT") was determined to be the lowest bidder for the Project. Pl. App. at 23. Grot protested the award of the Contract to ADT in that the contracting officer had allowed ADT to increase its bid price to the detriment of other bidders. Pl. App. at 24. Following the filing of Grot's protest, the VA cancelled the solicitation due to what the VA determined were "**inadequate specifications**". Pl. App. at 26-28.

On January 8, 2002, the VA received bids on IFB 549-23-02 which replaced IFB 549-64-01. The only difference between the original description of the work and that contained in the rebid was the period of contract performance. In addition, there was no changes to the drawings or specifications for the Project.

At the second bid opening, Grot was determined to be the lowest bidder and as previously noted on February 1, 2002, the VA awarded the Contract to Grot. The Contract provided that the Project was to be completed within two hundred seventy (270) days following receipt of the Notice to Proceed. The Notice to Proceed was received by Grot on February 1, 2002, with work to begin within ten (10) days thereby making November 10, 2002, the original Contract completion date for the Project. Pl. App. at 34.

II. Grot Begins to Construct the Project

After award of the Contract, Grot began the process of issuing subcontracts and vendor purchase orders one of which was to Siemens. Siemens was to provide technical assistance, equipment and working drawings based upon the plans and specifications provided by the VA. Pl. Supp. App. at 254, ¶ 3.[1] The plans, specifications and drawings were prepared by Fratto Engineering, Inc. ("Fratto").

Grot took the plans, specifications and drawings provided by the VA and requested Siemens to provide field installation drawings in accordance with the VA's bid documents. Siemens provided the requested drawings

[1] "Pl. Supp. App." refers to "Plaintiff's Supplemental Appendix" filed contemporaneously herewith.

which were submitted to the VA for review and approval. Pl. App. at 242, ¶ 3. The VA delivered the drawings to Fratto for review and approval. After review by Fratto, the drawings were returned by the VA stamped as "approved" or "approved as corrected". In some instances the VA determined unilaterally that it wanted additional devices that were not shown on the original drawings provided by the VA and prepared by Fratto. Pl. App. at 243, ¶ 7. **By the end of March 2002, Grot had drawings approved by the VA and Fratto for all of the buildings involved in the Project and had begun installation of the new fire alarm system.** Pl. App. at 243, ¶ 8.

III. <u>The VA Directs Grot to Redesign the Project</u>

After Siemens and Grot submitted the drawings and the VA and Fratto made modifications and changes thereto and then approved the drawings for construction, the VA determined that it was Grot's responsibility to "design" the Project. This determination was first made in writing to Grot on or about June 24, 2002; four months and fourteen days after the issuance of the Notice to Proceed and after Grot had performed extensive work on the Project **based upon the VA and Fratto approved drawings.** Pl. App. at 38-39.

Grot protested the directive of the VA advising that the specifications do not state that the Project is a design/build project nor was Grot contracted to "design" the Project. Pl. App. at 38-39. Grot repeatedly asked for meetings with the contracting officer to review the directive. With the exception of one time, July 22, 2002, the contracting officer refused to have "any" meetings with Grot to discuss the directive or any other issue on the Project for that matter. The issue was not resolved.

Instead, by letter of August 23, 2002, over a month later and after research by the contracting officer's technical representative, the contracting officer, again without meeting with Grot, directed Grot to design the fire alarm Project. Pl. App. at 40-41. Grot immediately responded by letter of that same date and by letter of September 5th, Grot protested the directive of the VA and requested a meeting with the contracting officer to try and come to an understanding as to the each party's position. Pl. App. at 42-43. By letter of September 17th, the contracting officer rejected Grot's request for a meeting. Pl. App. at 44-45.

Grot responded by letter of September 18th reserving its rights to dispute the decision made by the contracting officer. Pl. App. at 46. At that point, Grot had acknowledged the VA's directive, reserved its rights under

the Contract Disputes Act and proceeded to perform in accordance with the directive of the VA. The contracting officer responded by letter of that same day, again refusing to meet with Grot. Pl. App. at 47-48.

Later that same day, again without meeting with Grot despite repeated request to do so, the VA issued a cure notice directing Grot to "cure" "failures . . . . . . endangering performance of the contract". The contracting officer's cure letter fails to meet the requirements of the FARs in that it does not specify at all what the "failures" are that Grot must cure. It is totally devoid of any substantive information with respect to what Grot must "cure". Pl. App. at 49.

By letter of September 25, 2002, Grot, facing termination, immediately protested the contracting officer's directive. But, consistent with its obligations under the Contract, Grot began to perform in compliance with the directive. Notwithstanding, there were a substantial number of questions to be resolved and Grot requested a meeting with the contracting officer to begin the process of redesigning the Project. Pl. App. at 50-51. The requested meeting was denied.

By letter of October 18, 2002, Grot again reiterated the need for a meeting. In that letter, Grot spelled out seven (7) issues it needed

addressed in order to design the system. Among those items were building occupancy and classification, mechanical drawings, electrical drawings, fire protection/sprinkler drawings and room descriptions and utilization. Pl. Supp. App. at 253. The requested meeting was denied.

In fact, throughout the redesign process Grot repeatedly requested meetings with and direction from the contracting officer. **Not one time would the contracting officer meet with Grot despite the fact that Grot was trying to design a project pursuant to the contracting officer's directive.** Pl. App. at 243, ¶ 10 and 244, ¶11.

As construction progressed, the VA agreed for Grot to install temporary fire alarm equipment when working on the existing fire alarm system in a building that could not be changed over. Included in the equipment were temporary pull stations. Temporary pull stations provide additional fire alarm capability when portions of the system are deactivated. The temporary systems are removed when construction is complete for that portion of the building. However, the fact that the temporary pull stations may not have been installed does not mean that there is no fire protection for that building. Pl. App. at 244, ¶¶ 13-15 & 245, ¶16.

On July 17, 2003, Grot inadvertently failed to install temporary pull

stations while working in Building 1. As a result, the contracting officer issued a cure notice to Grot to cure the deficiency and to establish a fire watch for the building until the temporary pull stations were installed. Pl. App. at 52. While Grot disputed the contracting officer's conclusion that the building was "without fire protection", Grot immediately acknowledged the inadvertent mistake with respect to the temporary pull stations and conducted the fire watch as directed. The temporary pull stations were installed before completion of work on that same day. Pl. App. at 53.

By letter of July 17th, the COTR issued a directive to maintain a fire watch in Building 29 due to what the COTR determined was "inadequate fire safety coverage". However, as admitted by the contracting officer, the COTR never defined what he considered to be "inadequate fire safety coverage" or the basis for compelling the fire watch. Pl. App. at 55 & 108, lines 5-19 & 109, lines 1-2.

Further, an issue had arisen between Grot and the VA regarding the installation of additional corridor smoke detectors in Building 29. By letter of April 29, 2003, Grot pointed out that the smoke detectors were not a requirement under NFPA 101, 1997 Edition, and requested a meeting to clarify the issues between Grot and the VA. Pl. App. at 56. As was the

case throughout the Project; the VA did not respond.

By letter of May 27, 2003, Grot again raised the issue of the additional smoke detectors and pointed out to the contracting officer that various specifications upon which the contracting officer's representatives were relying were not a part of the 1997 Edition of the NFPA 101. Pl. App. at 57. Again Grot asked for direction and none was forthcoming.

Instead the COTR issued the July 17th fire watch notice. By letter of July 18th, Grot reminded the contracting officer of Grot's repeated request for direction and a meeting. Again no response was forthcoming. It was ultimately determined that the contracting officer was relying on the **2000 Edition** of NFPA 101 and not the 1997 Edition as required by the specifications. Also, the VA was not even using the correct VA fire protection manual. Pl. App. at 145, lines 20-24 & 146, lines5-22.

Then, three days later, on July 20th, the contracting officer issued a directive to initiate a fire watch for buildings 1, 2, 3, 24 and 29; the entire Project. The sole basis for the directive was that the contracting officer had determined that there was "inadequate fire safety coverage". Pl. App. at 58. As can be seen by the directive, there were no specifics given. With the exception of the inadvertent failure to install the temporary pull stations in

Building 1, which was cured before the close of the day, the VA had not raised an issue as to the adequacy of fire protection in the other buildings.

The institution of a campus wide fire watch was going to be a significant cost to Grot and Grot immediately asked for a meeting with the contracting officer to review the concerns and misunderstandings which seemed to be prevalent on the Project. When the VA did not respond, Grot issued another request for a meeting. Pl. App. at 59.

Instead of addressing Grot's concerns the contracting officer stated that he, "not the contractor" would determine the need for a meeting. Pl. App. at 60-61. This position was taken even when the contracting officer knew there were substantial disagreements over the interpretation of the plans and specifications for the Project. This refusal to meet and address the issues involved in this Project had a direct impact on the completion of the Contract.

On July 23rd, Grot reaffirmed that it was conducting the mandated fire watch. Pl. App. at 62,63,64. As previously stated, Grot had continually requested a list of the alleged deficiencies. Apparently it would not have mattered if a list had been given. The contracting officer had already determined that if a list of deficiencies was given, it would not be complete.

Pl. App. at 61. There was no way for Grot to succeed.

IV. The Government Terminates Grot's Contract

Then, almost immediately, by e-mail of July 23, 2002 (sic), the VA issued its "Show Cause Notice" to Grot stating that Grot had 10 days after receipt to provide a schedule to complete the Contract. Pl. App. at 65-66. By e-mail of July 31, 2003, Grot responded and fully addressed all of the issues raised in the Show Cause Notice and further provided a completion date of October 3, 2003 **assuming that the VA provided answers to outstanding questions by August 11th**. Pl. App. at 67-74.

Without further comment or challenge to Grot 's July 31, 2003, letter and without addressing the issues raised in the letter or providing answers to questions contained in Grot's letter or letters previously provided by Grot, by letter of August 7, 2003, the VA wrongfully terminated the Contract for default. The basis for the alleged default was that Grot:

a) had failed to provide adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29 as directed in Mr. Mraz's letter of July, 17, 2003; and

b) had failed to perform in compliance with the technical requirements of the contract; and

c) had failed to complete the Contract by the extended completion date of June 23, 2003; and

d) had failed in Grot's letter of July 31, 2003 to "Show Cause" to the Mr. Mraz's "Show Cause Notification Letter of July 23, 2003. Pl. App. at 75-76.

At all times from July 22nd until August 8th, Grot maintained the fire watch mandated by the contracting officer and kept working to complete the Project. In his deposition, the contracting officer admitted that it was not fair not to tell Grot where Grot's system failed to meet the requirements of NFPA 101. The alleged deficiencies were never reduced to writing by the contracting officer. Pl. App. at 110, lines 2-14.

V. Siemens Negotiates the Completion Contract But Can Not Complete the Project Either.

Subsequent to Grot's termination, Siemens negotiated a contract with the VA for completion of the Project. Pl. Supp. App. at 254, ¶ 7. Siemens project completion time was one hundred eighty (180) calendar days with an original completion date of November 6, 2004. Pl. Supp. App. at 260.

Almost immediately, the contracting officer extended the contract completion date for Siemens by fifteen (15) days through Modification One (1). Pl. Supp. App. at 261. Interestingly, the scope of work under this modification included raising PIVs located at Buildings 1 and 11. Pl. Supp. App. at 262. This issue will be addressed later in Modification Three (3).

On May 23, 2004, the contracting officer issued Modification Two (2)

extending the completion date to January 4, 2005, forty-five (45) additional days. Pl. Supp. App. at 263. Thus, fifteen days into the contract, Siemens had change orders increasing the completion time to two hundred forty (240) days; thirty (30) days short of Grot's original contract time.

In addition to the time extension, Modification Two (2) also included an additional sixty-nine (69) smoke detectors and sixty-nine (69) audible bases into Siemens scope of work. If Siemens was to design the Project as Grot was instructed to do, why would Siemens be receiving an increase in the number of smoke detectors and audible bases which should have been a part of Siemens' design responsibilities and in its original scope of work?

Modification Three (3) was issued by the contracting officer on September 23, 2004 and again addressed the issue of PIV s, this time in Building 10. It contained an increase in the contract price of $51,500.00 to remove and relocate the PIV for Building 10. Pl. Supp. App. at 265. This is important in that during the course of Grot's contract, the contracting officer had informed Grot that raising the PIVs were a part of Grot's scope of work. Grot had specifically addressed the PIV for Building 10 in e-mails in March 2003 and a letter from Grot on April 14, 2003. Pl. Supp. App. at 269-271.

Grot's letter confirms that the contracting officer was taking the position that Grot was to replace or modify the devices. Grot protested the determination and stated that if this was the intent, the specification should have read "furnish and install". Pl. Supp. App. at 271. Grot protested the contracting officer's determination but would have proceeded to raise the PIV's under protest. Pl. Supp. App. at 331-332, ¶¶4 & 5. The contracting officer never responded to Grot's letter. However, Grot was right and seventeen (17) months later the contracting officer admitted his error and issued the change order extending the contract time and price. But that was not to be the end of Siemens' time extensions.

The failure of Siemens to complete the Project within its original contract completion time supports Grot's position that the plans and specifications were deficient and that the VA was not properly administering the contract. Between May 7, 2004, the date of Siemens' contract, and October 10, 2006, Siemens received nine (9) modifications to the contract which extended the contract completion date to February 28, 2007. Pl. Supp. App. at 272-275. This would make the total contract time for Siemens 1,027 days. This to complete a project that the VA conceded was fifty-nine (59%) percent complete at Grot's termination. Pl. Supp. App.

at 311.

Clear evidence of the continued inability of the VA to interpret its own plans and specifications can be found in the exchange between Siemens and the VA beginning in August, 2006. By letter of August 17, 2006, three (3) years and ten (10) days after Grot's termination, the contracting officer advised Siemens that "Domiciliary is considered a health occupancy and as such the smoke detectors must comply with Specification Section 13850, paragraph 2.8, subparagraph B. Pl. Supp. App. at 276. He goes on to state that if Siemens is not in agreement with the interpretation to "contact me as soon as possible to resolve any difference". Again, the very type of meeting that Grot had requested.

Siemens responded by letter of August 29, 2006. Pl. Supp. App. at 277. Siemens contested the VA's interpretation of the specification and pointed out that Fratto's drawings reflected the same interpretation by Siemens and that the VA had approved all of Siemens' submissions both under the context of Siemens' contract and under the contract between Grot and the VA. Siemens' letter indicates that it had not seen any information relating to staffing patterns that supported the VA's interpretation and requested that the VA provide that information. Pl. Supp.

App. at 278. Again, Siemens' argument is consistent with the type of information that Grot was not provided. Finally, Siemens' letter requested a time extension claiming that it had been unduly prejudiced by the VA's failure to timely raise the issue. Pl. Supp. App. at 278.

By letter of September 11, 2006, the contracting officer responded to Siemens' protest. The contracting officer rejected Siemens' position and directed Siemens to replace the existing smoke detectors located in Building 24 Sleeping Rooms. Despite the fact that the contracting officer determined that Siemens' interpretation of the drawings was incorrect, the contracting officer afforded Siemens an opportunity to request an extension to the contract completion time. Pl. Supp. App. at 280.

By letter of October 10, 2006, the contracting officer granted Siemens' request for a contract extension until February 28, 2007 but conditioned the extension on Siemens providing additional consideration in the form of training for VA personnel and extending the Guarantee Period Services. Pl. Supp. App. at 273. In addition, Siemens requested a meeting with the contracting officer to discuss the cost of labor and materials that Siemens would incur by doing the additional work. Pl. Supp. App. at 281. Contrary to the VA's position regarding meetings with Grot, the contracting

officer did not reject Siemens' request for a meeting in his correspondence.

Throughout the course of Siemens' contract, the contracting officer repeatedly extended the contract completion date. In almost every instance, the contracting officer requested Siemens to provide a completion date that Siemens could meet. Pl. Supp. App. at 282-294. The contracting officer even volunteered to participate and expedite matters. Pl. Supp. App. at 287. Again something that was never afforded to Grot.

The longest contract extension was issued by Modification Seven (7) on February 13, 2006. This extension changed the contract completion date from May 10, 2005 until May 1, 2006 or 356 days. At no time during this period did the VA threaten to terminate. Pl. Supp. at 292.

By letter of July 21, 2006, the VA did issue a cure notice to Siemens. Pl. Supp. App. at 295. In that cure notice, the VA listed contract deficiencies although contending that the list was by no means "all inclusive". Notwithstanding, the list of deficiencies are far more than what was provided to Grot prior to termination.

Siemens responded to the cure notice by letter of July 28, 2006. Pl. Supp. App. at 299. Siemens did not address the deficiencies in the contract performance but simply provided a schedule for completion of the Project.

Regardless, the contracting officer extended the contract time another two (2) months. Pl. Supp. App. at 306.

As confirmed by Siemens' counsel on March 29, 2007, Siemens still has not received substantial completion. Pl. Supp. App. at 308.

## ARGUMENT

### I. Reply to Defendant's Point 1: Appropriateness of Summary Judgment and Review of the Contracting Officer's Decision.

Summary Judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 91 L.Ed. 2nd 202, 106 S.Ct. 2505 (1986). Disputes over facts that are not outcome-determinative under the governing law will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, the evidence is such that a reasonable [trier of fact] could return a verdict for the non-moving party. *Id*. See also, *Becho, Inc. v. The United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, a judge's function is not to weigh the evidence, but to determine whether there is a

genuine issue for trial. *Anderson*, 477 U.S. at 249; *Becho*, 47 Fed. Cl. at 599. Generally, a trial court cannot grant summary judgment based on its assessment of the credibility of the evidence presented. The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one sided that one party must prevail as a matter of law. In doing this, all facts must be construed in a light most favorable to the non-moving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Becho*, 47 Fed. Cl. at 599; see also, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2nd 538, 106 S. Ct. 1348 (1986).

This Court reviews the decisions of a contracting officer *de novo*. *Peter Vicari, General Contractor, Inc. v. United States*, 47 Fed. Cl. 353, 359 (2000). The findings of fact in a contracting officer's decision are not binding on the parties or entitled to any deference. *De novo* review precludes reliance on the presumed correctness. *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 647 (2005)

It is well settled that a "default termination is a drastic sanction...., which should be imposed (or sustained) only for good grounds and on solid

evidence". *Becho*, 47 Fed. Cl. at 600; see also, *J.D. Hedin Constr. Co. v. The United States*, 187 Ct.Cl. 45, 408 F2d 424, 431 (Ct.Cl. 1969). The initial burden in a termination for default case is on the government to establish that the contractor was in default. *Becho*, 47 Fed. Cl. at 600. A contracting officer's decision to terminate a contract for default will be set aside if it is "arbitrary and capricious," or "represents an abuse of his discretion." *Darwin Construction Co. v. The United States*, 811 F2d 593, 598 (Fed. Cir. 1987).

Upon *de novo* review and when viewed in the light the performance by Grot and Siemens both before and after being directed to redesign, the VA's own interpretation of the specifications and Siemens' difficulty in completing the Contract, this Court will come to the inescapable conclusion that genuine issues of material fact exits which preclude the grant of summary judgment.

**II. Reply to Defendant's Point II (A) & (B): The VA's Termination of the Contract Was Wrongful.**

(a) Grot's system design met the plans, specifications, drawings and system design requirements at the time Grot was terminated.

First, contrary to defendant's argument, Grot has never denied its responsibility to provide a "system" which met the specifications and

drawings for the Project. It is also undisputed that Grot did not agree with the contracting officer's technical representative's interpretation of the Contract and, as repeatedly argued by defendant, vigorously denied the COTR's interpretation. However, it is disingenuous at best for defendant to argue that only Grot was misinterpreting the intent of the Contract when the contracting officer himself testified that he did not know it was a "design/install" project at first. In fact, he did not come to that conclusion until August 2002, some six months after the Project started and only then based upon the opinion of Mr. Kirk. App. at 154, lines10-12. Further, up until that point both the COTR and Fratto had approved Grot and Siemens' design. Thus, until August of 2002, Grot, the contracting officer, the COTR and Fratto were interpreting the contract in the same way. Regardless, when directed by the contracting officer to redesign the Project, Grot proceeded to do so.

Scott McCauley was employed by Siemens during construction of the Project. Pl. Supp. App. at 254, ¶ 2. Mr. McCauley's affidavit confirms that at the time Grot was terminated by the VA, Grot had provided a fire alarm system design for the Project that was in **full compliance with the technical requirements** of the Contract including the plans, specifications,

drawings and system design requirements including compliance with Chapter 13, NFPA 101(1997Edition) and 72 (1996 Edition). Pl. Supp. App. at 254, ¶ 5. Also, at the time Grot was terminated by the VA, Grot, through Siemens, was providing adequate fire alarm protection for buildings 1, 2, 3, 24 and 29. Pl. Supp. App. at 254, ¶ 6. Mr. McCauley's affidavit is important because at the time of the construction of the Project by Grot, Mr. McCauley was a NICET Level III Certified Fire Alarm Technician. He is now a NICET Level IV Certified Fire Alarm Technician. Mr. McCauley alone is fully competent to testify to the adequacy of the design of the system and to testify that the system as designed met the plans, specifications, drawings and system design requirements including compliance with NFPA 101 and 72. Pl. Supp. App. at 255, ¶ 8.

Reiterating, Mr. McCauley was a NICET Level III Certified Fire Alarm Technician and is now a NICET Level IV. To date, defendant has not provided a single individual within the contracting officer's technical staff that was a NICET Level III Certified Fire Alarm Technician or a registered fire protection engineer. Defendant cannot refute Mr. McCauley's affidavit that the system being installed at the time of termination met the plans, specifications, drawings and system design requirements including all

requisite codes.

The adequacy of the fire alarm system is evidenced by other actions of the VA. Remember that the fire watch had been implemented due to allegedly inadequate coverage posing a threat to the occupants of the building. Pl. App. at 58. Grot proceeded with the fire watch Pl. App. at 62. When the contract was terminated two weeks later, the fire watch ceased by Grot. Further, the VA then took nine (9) months to enter into the contract with Siemens. If the fire alarm protection was so inadequate as to constitute a threat to the occupants of the building, why did the VA wait so long in securing the completion contract? Why did it not just allow Grot to continue with the fire watch?

Thus, for the purposes of defendant's motion there is only one issue for consideration by the Court with respect to the default termination: completion within the contract time.

(b) The VA's failure to answer questions and improper directives effected Grot's ability to complete the Project by June 23, 2003.

In order to design the Project, Grot had to have information that was solely within the knowledge of the defendant. As early as October 18, 2002, immediately after being directed to design the Project, Grot outlined seven (7) critical items it needed to complete the design. None were

provided. Pl. Supp. App. at 253 & 331, ¶ 2. As outlined in the statement of facts, throughout the course of Grot's involvement on the Project it repeatedly asked for meetings with the contracting officer to discuss exactly what defendant wanted with respect to the Project. Grot repeatedly advised the contracting officer that there were outstanding questions that had to be addressed before the Project could be completed.

One of the clearest examples of this problem is related to the tampers and flows in the system. When the contracting officer's technical representatives performed their "inspection" on July 23, 2003, one of the issues addressed was the testing of tampers and flows. Mr. Kirk raised a question about certain tampers that were not shown on any of the drawings provided by Grot. In addition, there was a problem finding the inspector's test valves to test the flows. Grot had no knowledge of these issues until that point. However, when the issue came up Mr. Kirk produced a set of drawings which had the tampers and flows shown on them. These were drawings that were never made available to Grot. This was among the type of information that Grot had requested in its October 18, 2002, letter. Pl. Supp. App. at 253; Pl. App. at 71.

Defendant had this information which it knew was of benefit to Grot

and never produced it except to use it to the attempt to justify a test failure despite the fact that Grot had previously requested the information. It is long settled case law that if the government possesses material knowledge regarding the performance of a contract which it knows the contractor does not possess, it is under a duty to disclose its superior knowledge. *J.A. Jones Construction Co. v. The United States*, 182 Ct.Cl. 615, 390 F2d 886 (1968). It cannot use that superior knowledge or fail to disclose that knowledge to ambush a contractor. Superior knowledge means that the VA knows some information not known or available to Grot, that Grot cannot obtain these facts from sources outside of the VA and the VA withholds the facts from Grot. *Santa Fe Engineers, Inc.* ASBCA No. 17,325, 75-2 BCA ¶11,570. That is exactly what happened with respect to the tampers and flows and this is just one item.

When the government possesses material information which would affect a contractor's performance and fails to disclose that information even though the government has no reason to believe that the contractor could obtain it from another source, such non-disclosure may constitute a breach of contract. *American Ship Building Co. v. The United States*, 228 Ct.Cl. 225, 654 F2d 75, 79 (1981); *Hardeman-Monier-Hutcherson v. The United*

*States*, 198 Ct. Cl. 472, 487, 458 F. 2d 1364, 1371 (1972).

In addition, the VA would give Grot directives using the wrong edition of the NFPA. One example is pointed out in Grot's response to the Show Cause Notice with respect to Building 29. The VA quoted sections out of the NFPA 101, **2000 edition**. The specifications require utilizing NFPA 101, 1997 edition. Another example was the VA's letter of July 17, 2003, in which Grot was advised that Building 29 had inadequate fire protection as per NFPA Chapters 4 and 18. Grot pointed out that Chapter 4 referred to "Classification of Occupancy and Hazard of Content" and Chapter 18 was applicable to "New Apartment Buildings". This was addressed to the VA in Grot's letter of May 27, 2003, to which the VA did not respond. In a subsequent letter of July 20, 2003, the VA referred agin to the same Chapter 18 again and also referenced 9.6.1 through 9.7.6.2. Neither 9.6.1 through 9.7.6.2. exist in the 1997 edition. Pl. App. at 68.

(c) Time was never of the essence to the Contract and Grot never indicated an intention not to complete the Contract.

When a due date has passed and the contract has not been terminated for default within a reasonable time, the inference is created that time is no longer of the essence so long as the constructive election not to terminate continues and the contractor proceeds with performance.

*McDonald Douglas Corporation, et al. v. The United States*, 50 Fed. Cl. 311, 315 (2001). The initial contract completion date for the Project was November 10, 2002. Due to the dispute between Grot and the defendant as to the interpretation of the Contract, the contracting officer determined that it would extend the contract completion date. The contracting officer asked Grot what it anticipated the completion date to be. Grot responded by saying that it was dependant upon when it received approved drawings and answers to certain questions. Again, this was completely outlined in Grot's July 31, 2003, response to the Show Cause Notice.

In its response to the Show Cause Notice, Grot provided a completion date contingent upon receiving information from the VA. Notwithstanding, the VA terminated the contract. Time was not an issue to the VA and Grot should have been granted an extension no differently than Siemens has now been granted eight hundred forty-seven (847) days of extensions.

Two points clearly establish that time was not of the essence. First, the VA waited nine (9) months to issue the reprocurement contract to Siemens. This is despite having made the determination to use Siemens as the completion contractor **before** terminating Grot's contract. Pl. Supp.

App. at 326. The second is the VA's issuance of Modification Seven (7) extending the contract completion date for Siemens an additional three hundred fifty-six (356) days. That modification was issued February 13, 2006, nine (9) months past the existing contract completion date. Pl. Supp. App. at 292.

A contracting officer may terminate a government contract for default when the contractor has expressed a positive, definite, unconditional, and unequivocal manifestation of intent not to render the promised performance when the time fixed by the contract shall arrive. *McDonald Douglas*, 50 Fed. Cl. at 321. While it was clear in Grot's response to the Show Cause Notice that it had provided a new completion date, it was certainly not going to complete within the revised completion date as that time had already passed. Notwithstanding, **Grot reiterated its intention to complete the Project notwithstanding the dispute over design responsibility.** Pl. App. at 73. In fact, Grot's response to the Show Cause Notice continues to reiterate its intent to finish this project but also reiterates the need for information.

(d) The Cure Notice failed to provide Grot with the information it needed to attempt to cure any deficiencies.

A cure notice is "intended to inform the contractor that it has

failed to meet one or more terms of the contract". *Hannon Elec. Co. v. The United States*, 31 Fed. Cl. 135, 147 (1994); *International Verbatim Reporters*, 9 Cl. Ct. 710, 721 (1986) to do so, it "must list with enough particularity the performance failures which have placed the contract in danger of termination for default." *Hannon Elec.*, 31 Fed. Cl. 148.

In the instant case, the notice issued by the contracting officer is totally devoid of any information regarding the alleged failures other than the issue related to disarming the system in Building 1on July 17, 2003, **which was corrected that same day** and not meeting the June 23, 2003 completion date. Remember, the contracting officer admitted that it was not fair not to tell Grot where Grot's system failed to meet the requirements of NFPA 101. Pl. App. at 110, lines 2-14. As best it could given the total lack of information in the notice, Grot addressed each issue raised by the contracting officer. In addition, Grot again reiterated the need for information in order to complete the Project. Grot also outlined various and sundry delays that it had encountered as a result of not receiving timely return of drawings and the refusal of the contracting officer to meet. Pl. App. at 67-74.

This is also relevant when you consider the decision of the

contracting officer not to advise Grot of all of the deficiencies before conducting a pre-test. Pl. App. at 6. There was no way for Grot to cure the deficiencies if it did not know what the VA perceived deficiencies to be and the VA was not going to give Grot that information. In short, there was no way for Grot to succeed.

(e) Grot does not contended that the VA's improper payment caused Grot to miss the revised completion date.

Defendant argues that Grot's failure to receive prompt payment is not an excuse for the failure to meet the June 23, 2003, completion date. This argument is totally unnecessary. As acknowledged by Defendant in its footnote 5, Grot has never claimed that the failure of the VA to make proper payment created an excusable delay. In fact, the record would show that Grot actually increased manpower in June and July of 2003 as it was trying to comply with the VA's deficient plans and specifications. However, Grot does take exception to Defendants characterization of "modest" delays in payment and will address those issues in reply to Defendants Point III (B).

(f) The plans and specifications provided by the VA were ambiguous and subject to more than one reasonable interpretation.

It is long settled that the government has the obligation to prepare specifications and drawings that reasonably communicate the scope of the

contractor's obligations and the contractor is entitled to rely on the accuracy of the information and the requirements contained in government documents. *WPC Enterprises, Inc. V. United States*, 163 Ct.Cl. 1, 323 F2d 874, 877 (1964). The warranty relieves contractors of any obligation to check and verify the correctness, adequacy, or feasibility of the government documents. *Argo Technology, Inc., ASBCA No. 30522*, 88-1 BCA ¶ 20,381 at 103,063. When specifications are of a design type, the government must accept the responsibility for any errors or defects therein. *Big Chief Drilling Company v. United* States, 26 Cl. Ct. 1276, 1293 (1992); *Neal & Co. V. United States*, 19 Cl. Ct. 463, 467-68 (1990), aff'd 945 F. 2d 835 (Fed. Cir. 1991). This includes the duty to insure that the specifications are not susceptible to more than one reasonable interpretation. *United Pacific Insurance Co. V. United States*, 204 Ct.Cl. 686, 49 F2d 1402 (1974).

Throughout the course of the Project, issues arose regarding interpretation of the plans, specifications and drawings provided by the VA. For example, Grot received verbal directions from VA representatives, who were neither Nicet Level III certified nor fire protection engineers, to add additional devices which were not shown on the approved drawings or the

original plans and specifications. As Grot had provided a design pursuant to NFPA 101 and approved by Fratto, Grot disputed the necessity of the additional devices. Grot advised the VA that Grot did not have the authority to change Fratto approved drawings. In response, VA representatives provided Grot with a copy of FAR 52.236-21. Grot pointed out that the VA's reliance on that FAR was misplaced as it was a general FAR tying the drawings and specifications together. It did not require the installation of devices which are not a part of the scope of work. Further, the FAR applied to **government provided drawings.** The drawings in question were by Siemens/Grot and approved by Fratto. There could be no discrepancy. Pl. App. at 69 -70.

The truth is the plans, specifications and drawings meant very little. The Project was driven by a "wish list" mentality. As testified to by the COTR, regardless of whether NFPA 72 or 101 required a devise in a certain room or location, "if my supervisors and those I am consulting with want it, yes, they will go there". Pl. App. at 237, lines 8-14 . Regardless of redundancy. Pl. Supp. App. at 319-322. How was a contractor to design the system when the location of devises was up to the whim of the COTR? An individual that was not NICET Level III certified.

Another example of the different interpretation is evidenced by the fact that the VA has now directed the deletion of fifty-eight (58) devices and added another three hundred thirty three (333) devices to Grot's approved drawings and has even changed room designations. Pl. Supp. App. at 333, ¶ 11 & 12. Again, these were drawings prepared by a Nicet Level III fire alarm technician and approved by Fratto.

The dispute over the additional devices is no different than the VA's dispute with Siemens over the need for additional smoke detectors in the "Domicillary"; only it occurred over three (3) years after Grot was terminated. Was is it a genuine dispute or just the wish list? Also, why was Siemens given a change order to add sixty-nine (69) smoke detectors and audible bases in May 2004 but directed to install smoke detectors in Building 24 over two (2) years and four (4) months later. It is this type of inconsistency in the interpretation of the Contract that caused Grot's problems also.

The VA has argued that if Grot had "walked the site" it would have known what the specifications required. Grot was not at the pre-bid conference and walkthrough; that is not disputed. However, it would not have mattered if Grot had been there because neither Mr. Harrison nor Mr.

Forner were at the walkthrough either. They were the only ones who knew exactly what "they" wanted as evidenced by their private revelations to Siemens before bidding. "What the specifications required" was not the issue.

If some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted -- unless the parties' intention is otherwise affirmatively revealed. The government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions -- as well as the main risk of a failure to carry that responsibility. *IMS Services, Inc. v. United S*tates, 33 Fed. Cl. 167, 185 (1995).

Interpretation of a contract begins with the text of the instrument. If the language is explicit and unambiguous, the court must give affect to its plain meaning and may not refer to extrinsic evidence as an interpretive guide. *Record Steel and Construction, Inc. v. The United States*, 62 Fed. Cl. 508, 513 (2004). Here the Contract was obviously being interpreted in at least multiple ways not just by Grot, but by the VA and ultimately

Siemens. Unfortunately, the VA's interpretation was mercurial, changing at the whim of the COTR as he determined what else he wanted on the Project. It can not be said that the Contract is explicit or unambiguous given the disputes over its interpretation.

The general rule for choosing between competing interpretations of ambiguous contract language is *contra proferentem*, which requires that ambiguities be construed against the drafter. The essential ingredients of the rule of *contra proferentem* are: (1) that the contract specifications were drawn by the Government; (2) that language was used therein which is susceptible of more than one interpretation; (3) that the intention of the parties does not otherwise appear; and (4) that the contractor actually and reasonably construed the specifications in accordance with one of the meanings of which the language was susceptible. *Record Steel and Construction, Inc. v. The United States*, 62 Fed. Cl. 508, 517 (2004). The doctrine of *contra proferentem* properly puts the risk of latent ambiguity, **lack of clarity**, and absence of proper warning on the drafting party that could have forestalled the controversy. *Fry Communications v. United States*, 22 Cl. Ct. 497, 503 (1991).

A dispute over contract interpretation is a question of law. Whether a

contract is ambiguous, either patent or latent, is also a question of law to be determined on a case by case basis. *NVT Technologies v. United States*, 370 F. 3d 1153, 1159 (Fed. Cir. 2004). A court must first determine whether an ambiguity in the contract exists. An ambiguity is said to exist if the contract is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. A government contractor does not bear the burden of interpreting a contract correctly **only of interpreting it reasonably**. *Delcon Construction Corporation v. The United States*, 27 Fed. Cl. 634, 637 (1993). (Emphasis added). The non-drafter's interpretation must only be reasonable, not necessarily superior to the drafter's (VA's) interpretation. *P.R. Burke Corp. v. United States*, 47 Fed. Cl. 340, 351 (2000); *Blinderman Constr. Co. v. United States*, 39 Fed Cl. 529, 539 (1997).

In resolving a conflict in interpretation, it is a fundamental precept of common law that the intention of the parties to a contract controls its interpretation. *Kenneth Reed Construction Corp. v. The United States*, 475 F.2d. 583, 586 (Ct. Cl. 1973). If the meaning to be attributed to a contract provision is ambiguous or is not manifest from the four corners of the contract and if a reasonable man could reasonably interpret the contract in

different ways, that interpretation will be given the document which is more favorable to the party who did not draw it. *Id.* at 587.

(g) Grot performed as directed while reserving its rights under the Contract Disputes Act but the VA no longer wanted to do business with Grot.

Throughout the course of its brief, defendant refers to Grot's refusal to accept direction from the VA and that Grot was argumentative. But the contracting officer confirmed that when Grot was instructed to do something, Grot did it. His concern was that Grot was disputing the directives of the COTR. Yet, he could not cite one instance where he told Grot to perform a function that Grot did not do it. P. Supp App. at 323-324.

The contracting officer testified that he feared that the surety would use Grot as the replacement contractor despite the fact that Grot was a competent contractor and capable of completing the Project. Pl. Supp. App. at 317-322. This raises a genuine issue as to the motive behind the termination. Especially in light of not advising Grot of all of the alleged deficiencies. Was Grot really in default or did the VA just not want to do business with Grot any longer for fear of a claim or other factor not related to performance? The motive or judgment of the contracting officer is a valid ground for inquiry. If the decision was made to simply rid the VA of having

to deal with Grot, it is arbitrary and capricious and would be overturned. *Darwin v. United States,* 811 F. 2d 593, 597-598 (Fed. Cir. 1987).

Genuine issues of material fact exist over the administration and interpretation of the Contract and the motive of the contracting officer in terminating the Contract.

## V. **Reply to Defendant's Point III: A Termination for Default Does Not Forfeit an Otherwise Valid Claim.**

"A contractor that is not without fault or negligence, and thus is not eligible for a settlement by the convenience termination formula, does not wholly forfeit an otherwise valid claim." *Clay Bernard Systems, International, LTD v. The United States*, 22 Cl. Ct. 804, 811 (Ct. Cl. 1991); *Dynalectron Corp. V. The United States*, 518 F. 2d 594, 604 (Ct. Cl. 1975).

## VI. **Reply to Defendant's Point III(A): Grot's Claim for Design Cost Encompasses More Than Simply Designing the System.**

Defendant lumps all of Grot's claim for additional work associated with design of the Project into one general category. This Court has held that it was Grot's responsibility to "design" a fire alarm system for installation. To the extent that Grot incurred additional engineering cost in associated with providing that design, Grot may well concede that cost. However, the cost of redesign of the Project contains other items.

For example, at the time Grot and Siemens entered into its contract for redesign, Grot and Siemens deleted certain devices from buildings because they were not necessary under NFPA 101 or 72. This was brought to the attention of the VA prior to design drawings being created and requested a meeting to discuss the issues. Pl. App. at 51. The VA never acknowledged to the contrary and Grot and Siemens proceeded to design the Project. It was not until later that the VA decided that it wanted not only the items required by code but also all of the items shown on the original Fratto drawings. This delay in responding prejudiced Grot and caused it to incur cost that it would not have incurred if the VA responded promptly.

It is acknowledged that the cost associated with this item in Grot's claim contains design cost, but it is respectfully argued that material issues of fact exist as to whether all of the cost for which Grot seeks compensation under this item should be denied simply because of this Court's interpretation of the Contract.

## VII. Reply to Defendant's Point III(B): Grot is Entitled to the Prompt Payment Penalties as Well as Other Damages for Failure to Include the Prompt Payment Penalties at the Time of Payment.

It is acknowledged that the contracting officer recognized Grot's

entitlement to $1,953.52 in prompt payment penalties. Despite recognizing Grot's entitlement, the sums have not been paid. Pl. Supp. App. at 335, ¶20. In addition, the contracting officer did not include the penalty with the progress payment. If payment is not received within that time period, an interest penalty is payable automatically. General Conditions of the Contract, Section 01001 ¶1.23(a)(3). The failure to make the payment of the interest entitles Grot to payment of an additional penalty pursuant to Section 01001, General Conditions ¶1.23(a)(6)(iii) in an amount equal to 100% of the original late payment penalty. Thus, Grot is entitled to an additional $1,953.52. The contracting officer also recognized that Grot was entitled to payment of $52,373.48 in unpaid invoices which has not been paid. Pl. Supp. App. at 311; Pl. Supp. App. at 335, ¶ 21.

## VIII. Reply to Defendant's Point III(C): Grot's Entitlement to Unpaid Progress Payments is Not Controlled by Whether the VA Properly Terminated the Contract for Default.

Contrary to Defendant's argument in Point III(C), it is not "undisputed" that the work Grot claimed was complete was deficient and did not function. Mr. McCauley's affidavit effectively refutes that conclusion. In addition, genuine issues of material fact exist as to whether Grot was paid appropriately for the work it had performed. At the time of termination, Grot

had been paid 53% of the contract. By his own admission, the contracting officer determined that Grot had completed 59% of the work and was entitled to payment for the difference between the amount paid and the percentage recognized by the contracting officer. Pl. Supp. App. at 311.

Grot had billed for approximately 89% of the contract. Pl. Supp. App. at 314. Thus, with Mr. McCauley refuting Defendant's blanket conclusion that the work was deficient, genuine issues of material fact exist as to the amount for which Grot was entitled to payment.

In addition, Grot would point out that pursuant to Section 01001, General Conditions ¶1.23(a)(2), if an invoice does not comply with the payment provisions for the Contract, it is to be returned within seven (7) days after the date the designated billing office received the invoice with a statement of the reasons why it was not a proper invoice. In no instance did the contracting officer return Grot's invoices with a statement of why they were not a proper invoice. The contracting officer did not know why the COTR did not return the applications and admitted that the VA was guilty of delayed payments. Pl. Supp. App. at 329-330.

Grot would argue, that by failing to comply with the terms of the General Conditions, the invoices were deemed approved. Regardless,

significant genuine issues of material fact exist with regards to Grot's entitlement to payment for part or all of the unpaid invoices.

## IX. Reply to Defendant's Point III(D): Defendant's Argument With Respect to Retainage is Misplaced.

Defendant's argument with respect to Grot's claim for retainage is misplaced. Grot does not dispute the right of the VA to withhold retainage on the Project. Grot does argue that as Grot was wrongfully terminated, it is entitled to recover the retainage as a part of the cost of the work in place. Further, as seen in reply to Defendant's Point III (C), the contracting officer held payment of invoices long before it ever notified Grot that it considered Grot to be in default. Nor did the contracting officer comply with the notice requirement of any invoice which might not have met the General Conditions of the contract.

## X. Reply to Defendant's Point III(E): Grot is Entitled to Compensation for the Differing Site Conditions Encountered on the Project.

Part of the construction for the Project involved the installation of a continuous network loop around the campus which tied in all of the panels for the system. Pl. Supp. App. at 335, ¶ 25. Contrary to defendant's argument, Fratto's representative at the pre-bid conference, clearly stated that the site plan drawings indicated spare 4" conduits available for

installation and that it would not be necessary for the contractor bury additional conduit. In fact, Fratto went on to say "Contractor will be required to use existing conduit for project as opposed to digging trenches to lay new conduit." Pl. App. at 15, ¶¶ L & M; Pl. App. at 19; Pl. Supp. App. at 335, ¶23.

While the conduit was available in rare instances, in most cases the conduits were being utilized by other services and in some instances it did not exist at all. When Grot determined that the conduits were not as represented in the minutes, Grot advised the contracting officer but the VA never provided any guidance for installation of the network loop outside the conduits. The lack of capacity or complete absence of conduit in the manholes directly impacted Grot's ability to complete the Project by June 23, 2003. Pl. Supp. App. at 336, ¶¶ 24-26.

In order to prevail on a differing site condition claim Grot must prove that the conditions indicated in the contract varied materially from the conditions actually encountered during the performance of the contract. *Stuyvesant Dredging Co. v. United States*, 834 F. 2d 1576, 1581 (Fed. Cir. 1987), *quoting P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F. 2d 913, 916 (Fed. Cir. 1984). In this case the VA can not deny that the

conditions actually encountered were materially different than represented by the Contract drawings and represented at the pre-bid conference.

The differing site conditions encountered by Grot were textbook "Type I" conditions. In other words, the site condition differed from a representation made about the site in the contract. See, e.g., *Servidone Construction Corp. v. United States*, 19 Ct. Cl. 346, 360 (1990). The underlying issue in a Type I differing site condition claim is whether the contractor reasonably could have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents, inspection of the site and general experience as a contractor. *EricksonShaver Contracting Corp. v. United States*, 9 Cl. Ct. 302, 304 (1985). In this case the representation was made by the contracting officer himself. If the differing site condition causes an increase in the contractor's cost or the time required to perform the work, then the contractor is entitled to an equitable adjustment in the contract. FAR 52.236-2.

In this case not only did the site conditions themselves create a problem, the VA's delay in responding to Grot's request for information compounded the problem. Grot would have completed this Contract as it intended but for delays that are solely attributable to the VA.

## XI. <u>Reply to Defendant's Point III(F): Grot's Bonding Capacity was Adversely Affected by the VA's Wrongful Termination.</u>

Grot bonds 90% of its work. There are projects which could have been a negotiated procurement for Grot but because Grot could not provide the agency with a bond for the projects, Grot could not enter into the negotiations. Grot has repeatedly asked the contracting officer to release Grot's performance bond on the Project but the contracting officer has refused to do so and has not given any reason for his refusal. Pl. Supp. App. at 336, ¶¶ 27, 28. This is despite the fact that the contracting officer admitted that he did not make a demand on the bond and did not comply with the terms of the bond because he thought the surety would simply place Grot back on the Project. Pl. Supp App. at 316-319.

While Grot acknowledges the case law cited by defendant, material issues of fact exist as to whether Grot can prove its losses to the extent that they are no longer speculative or remote.

## XII. <u>Reply to Defendant's Point III(G): Material Issues of Fact Exist as to Whether the Fire Watch was Necessary.</u>

Grot does not dispute the continuing assertion by defendant that it did not connect the temporary pull stations when it disconnected the fire alarm system in Building 1. However, that issue was corrected before the

end of the day on which it was discovered. As Grot cured that deficiency, it is not a ground for terminating Contract.

The problem arises with the contracting officer's instruction to conduct a fire watch over the entire Project. Again, as addressed in Mr. McCauley's affidavit, at the time of termination Grot, through Siemens, was providing adequate fire alarm protection for Buildings 1, 2, 3, 24 and 29. Pl. Supp. App. at 254, ¶ 6. These are the very buildings for which the fire watch was mandated. DPFUF ¶47. However, Grot was never provided with a list of the "42 deficiencies" allegedly discovered by the COTR. Pl. Supp. App. at 334, ¶ 14. Grot did receive the six (6) deficiencies referred to by the VA on July 23, 2003. However, in the very information provided by Defendant in its appendix, Mr. McCauley, the NICET Level III Certified Fire Alarm Technician, verified that the deficiencies contained on the VA's list did not impair the fire alarm system from reporting a fire alarm to the VA staff and the building occupants. D. App. 226. Aside from Mr. McCauley's verification, the fact remains that all elevator recall test did not fail. A review of App. 231 shows that the elevator recall test failed because there were no smoke detectors in the shafts. A point of dispute between Grot and the VA. In fact, App. 231 clearly shows that the elevator recall did

work on previous test with the exception of two (2) elevators recalling at the same time. In short, these were issues that would have been cured and corrected as punch list type items and did not affect the operation of the fire alarm system to do what it was suppose to do: report a fire alarm to the VA staff and the building occupants. D. App. at 226.

## CONCLUSION

For the reasons set forth above, this Court should deny defendant's motion for summary judgment.

Respectfully submitted,

GROT, INCORPORATED

s/ Andrew J. Kilpatrick, Jr.
Andrew J. Kilpatrick, Jr. ID#656
Gore, Kilpatrick & Dambrino, PLLC
Post Office Drawer 2900
Ridgeland, Mississippi 39158
akilpatrick@gorekilpatrick.com
Telephone: 601.957.1595
Facsimile: 601.957.1790

April 2, 2007 Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this the 2nd day of April, 2007, I caused to be served electronically a copy of Plaintiff's Response to Defendant's Motion for Summary Judgment Upon the Claims Transferred from

the VABCA and Upon the Issue of Whether the Termination of the Contract for Default was Proper to:

Joan M. Stentiford
Commercial Litigation Branch
Civil Division
United States Department of Justice
Classification Unit
Room 12038
1100 L Street, N.W.
Washington, DC 20530

This 2nd day of April, 2007.

s/ Andrew J. Kilpatrick, Jr.
Andrew J. Kilpatrick, Jr.