**28. [P] By letter of September 25, 2002, Grot, facing termination, immediately protested the contracting officer's directive. But, ~~consistent with its obligations under the Contract~~, Grot began to perform in compliance with the directive. Notwithstanding, there were a substantial number of questions to be resolved and Grot requested a meeting with the contracting officer to begin the process of redesigning the Project. Pl. App. at 50-51. The requested meeting was denied.**

**Objection [D]:** Objects to the redlined portion of this contention because it is Grot's characterization of its actions and is a legal conclusion, not a factual contention that Grot was acting in compliance with its obligations under the contract.

Further objects because Grot did not begin to perform in compliance with the VA's September 18, 2002 directive. Instead, Grot requested that the VA indicate on Grot's submittal drawings the "location of each deficiency and the location of each device the VA contends is missing from [Grot's] drawings." Pl's App. at 50. Essentially, Grot asked that the VA perform the work that Grot was contracted to perform. Further, Grot made its ability to progress conditional upon the VA's furnishment of the

requested information. Id. Additionally, Grot informed the VA that "pursuant to NFPA 101 & 72 [Grot] can and shall remove devices that are shown on the VA drawings[.]" Pl's App. at 51. Grot finally stated that it assumed that the VA would not oppose Grot's removal of devices that are shown on the VA bid drawings if they were not required by NFPA 101 & 72. Id. Grot made this statement despite the language contained in section 16050, "Basic Methods And Requirements (Electrical)," paragraph 1.2.A, "Minimum Requirements," which explicitly states that references to NFPA codes are "minimum installation requirement standards," and paragraph 1.2.B, provides "[d]rawings and other specification sections shall govern in those instances where requirements are greater than those specified in the [NFPA] standards." Def's App. at 14.

**29. [D] On September 25, 2002, Mr. Grot sent another letter to the contracting officer stating,**

> **There is no indication in the plans and specifications that we are to design the project. The "design" language relied upon by the VA to attempt to justify its position is generic and not a specific directive to design the project. Our consultant and we took the engineer's design and applied the products that were available to our consultant to meet the intent of the design.**

~~**Mr. Grot also, erroneously, stated that it was not until July 2002, that the VA questioned whether the drawings met the "VA interpretation of the specification."**~~ Grot Order at 7; App. at 37.

**<u>Objection [P]:</u>** Plaintiff objects to this contention in that the Court's order makes no finding that Grot "erroneously, stated that it was not until July 2002, that the VA questioned whether the drawings met the 'VA interpretation of the specification' ". Grot further objects in that Defendant offers no further citation that Grot's statement was erroneous.

**30. [D] Grot also informed the VA that "pursuant to NFPA 101 & 72 we can and shall remove devices that are shown on the VA drawings[.]" Grot Order at 7; App. at 38. Grot made no mention of contract specification section 16050, "Basic Methods And Requirements (Electrical)," paragraph 1.2.A, "Minimum Requirements," which explicitly states that references to NFPA codes are "minimum installation requirement standards," and paragraph 1.2.B, which provides that "[d]rawings and other specification sections shall govern in those instances where requirements are greater than those specified in the [NFPA] standards." App. 14, 37-38.**

**31. [D] ~~Grot's understanding of the contract is reflected in the deposition testimony of Clyde Bell~~:**

~~**Q. So what is your understanding now of your requirements under the contract?**~~
~~**A. Well, when we bid the job –**~~
~~**Q. Uh-huh.**~~
~~**A. – you know, it was not a design-build job.**~~
~~**Q. Okay.**~~
~~**A. You know, we bid it as a – if it was a design-build job from the get-go, we would have threw it in the trash. We don't do that.**~~
~~**Q. Okay.**~~
~~**A. Period. We don't.**~~

~~**App. at 200-201; Deposition of Clyde Bell, 74:19-75:4**~~.

**Objection [P]:** Plaintiff objects to this contention in that the cited testimony is not found at the referenced pages of Defendant's appendix. Plaintiff further objects to the conclusion that Clyde Bell can speak as to Grot's understanding of the contract. The cited testimony goes only to the fact that Grot does not perform "design/build" contracts.

**Defendant's Response:** The quoted testimony appears at pages 202-203 of Defendant's Supplemental Appendix.

**32. [P] By letter of October 18, 2002, Grot again reiterated the need for a meeting. In that letter, Grot spelled out seven (7) issues it needed addressed in order to design the system. Among those items were building occupancy and classification, mechanical drawings, electrical drawings, fire protection/sprinkler drawings and room descriptions and utilization. Pl. Supp. App. at 253. The requested meeting was denied.**

**33. [P] Throughout the redesign process Grot repeatedly requested meetings with and direction from the contracting officer. Not one time would the contracting officer meet with Grot despite the fact that Grot was trying to design a project pursuant to the contracting officer's directive. Pl. App. at 243, ¶ 10 and 244, ¶11.**

**<u>Objection [D]:</u>** Defendant objects to Grot's characterization of a "redesign process." The Government has never contended that the contract required Grot to "re-design" anything. The contract required Grot to incorporate the bid drawings, the contract specifications, and the relevant fire codes to create or design a fire alarm system and then to install that system. App. 10-16.

**34. [D] In a November 4, 2002 letter, the contracting officer stated that he did not believe that Grot would meet the November 10, 2002 contract completion date and directed Grot to provide a revised work schedule with a new anticipated contract completion date. Additionally, the contracting officer clearly stated that, in granting an extension, the VA was not relinquishing its right to seek compensatory damages for any costs it incurred resulting from Grot's inexcusable delay, nor was it relinquishing its right to terminate the contract for default should Grot fail to meet the new contract completion date. Grot Order at 7; App. at 39.**

**35. [D] On March 18, 2003, ~~over three months later~~, Grot submitted its revised schedule that indicated a completion date of June 23, 2003. Grot Order at 7; App. at 40.**

**Objection [P]:** Plaintiff objects to this contention in that the Court's order does not contain the statement "over three months later".

**36. [D] The contracting officer issued contract modification number three, which extended the contract completion date from November 10, 2002 to June 23, 2003. App. at 19.**

**37. [D] On June 10, 2003, the COTR responded to an inquiry from the contracting officer as to whether the VA should terminate Grot for default. Grot Order at 8; App. at 41-43.**