# In the United States Court of Federal Claims

Case No. 03-1951C (Consolidated)
(Filed: October 5, 2007)
NOT TO BE PUBLISHED

* * * * * * * * * * * * * * * * * * * * * * * * * * * *
**GROT, INCORPORATED,** *
*Plaintiff,* *
*
v. *
*
**THE UNITED STATES OF AMERICA,** *
*Defendant.* *
*
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

***Andrew J. Kilpatrick, Jr.,*** Gore, Kilpatrick & Dambrino, Ridgeland, Mississippi, attorney of record for Plaintiff.

***Joan M. Stentiford***, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for Defendant. With her on the briefs were ***Jeanne E. Davidson***, Director, ***Franklin E. White, Jr.***, Assistant Director, and ***Peter D. Keisler***, Assistant Attorney General.

***Lauren A. Weeman***, law clerk.

**ORDER/OPINION**

**BASKIR, Judge.**

This case arises from the Government's default termination of a contract between the Department of Veterans Affairs ("VA") and Grot, Inc. ("Grot") for construction of a fire alarm system at the Sam Rayburn Memorial Veterans Center in Bonham, Texas.

We previously granted the Defendant's Motion for Partial Summary Judgment regarding interpretation of the contract. We held that the terms of the contract were unambiguous and required the Plaintiff to "incorporate the bid drawings, the contract specifications, and the relevant fire codes to create or design a fire alarm system, and then to install that system." *Grot, Inc. v. United States*, No. 03-1951C, at 15 (May 15, 2006) ("Grot Order").

After termination of the contract, the Plaintiff made requests for equitable adjustment to the contracting officer which were denied. The Plaintiff appealed the denial to the Department of Veterans Affairs Board of Contract Appeals ("VABCA"). In its appeal, the Plaintiff sought additional compensation in the amount of $1,684,719.86 for unpaid progress payments, retainage, late payments, project redesign, differing site conditions, implementation of a fire watch, and the Plaintiff's loss of bonding capacity. Those claims were transferred to this Court and given separate case numbers which were consolidated with the instant case. Currently before the Court is the Defendant's Motion for Summary Judgment on the issue of whether default termination was proper and on the Plaintiff's claims for money damages transferred from the VABCA. We held oral argument on September 19, 2007.

The Court concludes that because the Plaintiff failed to render acceptable contract performance in a timely manner, default termination was proper. The Court further concludes that, with one exception, the Plaintiff does not have other valid claims for money damages. **The Court therefore GRANTS the Defendant's Motion for Summary Judgment on all claims with the exception of the Plaintiff's claim for late payment penalties (No. 03-19512). The Court DENIES the Defendant's Motion for Summary Judgment in case number 03-19512 and enters judgment in favor of the Plaintiff in the amount of $1,953.52.**

## I. Background

We set forth considerable background relating to this dispute in our May 15, 2006 Order granting the Defendant's Motion for Partial Summary Judgment. *See* Grot Order at 2-8. We therefore recite below only those facts relevant to the Motion for Summary Judgment currently before the Court. Except where otherwise noted, the facts are not in dispute.

### A. Bidding and Award of the Contract

Between July 2001 and January 2002, the VA conducted two solicitations for bids for the Campus-Wide Fire Alarm, Project No. 099-108 (the "Project"), at the Sam Rayburn Memorial Veterans Center. During the solicitation process, all prospective bidders, including Grot, were "urged and expected" to visit the Project site. Consolidated Statement of Uncontroverted Facts ("CSUF") ¶ 75; Deposition of Rickey Kirk at 25: 16-21, Plaintiff's Appendix ("Pl. App.") at 202. Despite being specifically encouraged by the VA to make a site visit, personnel from Grot did not inspect the VA facility prior to submitting a bid. CSUF ¶¶ 74, 77. Grot also did not attend a pre-bid conference held at the Project site on July 20, 2001. Pl. App. at 13. However, personnel from Siemens Cerebus Division ("Siemens"), with which Grot subsequently entered into a subcontract, participated in a walk-through of the Project site and attended the pre-bid conference. *Id.* at 13, 188.

During each solicitation, the VA made available to potential bidders bid drawings and specifications prepared by Fratto Engineering, Inc. ("Fratto"). Fratto had entered into a separate contract with the VA to provide fully "developed working drawings and

specifications." IFB (Fratto) at 1, Pl. App. at 99. These drawings and specifications were to "conform to the codes specified in the various Veterans Administration Construction Standards." Contract SP 18(a), Pl. App. at 101. The VA-Fratto contract also required Fratto to check the contractor's (here, Grot's) drawings, descriptions, and schedules. Contract SP 28(a), Pl. App. at 102.

Grot was the lowest bidder in the second solicitation and was awarded the contract on February 1, 2002. The award was for $934,310.00 and stipulated that the Project was to be completed within 270 days, or by November 10, 2002. On the same day, Grot received a Notice to Proceed, with work to begin within 10 days. CSUF ¶ 9.

B. Contract Performance

After it was awarded the contract, Grot entered into a subcontract with Siemens. Siemens was to provide technical assistance, equipment, and working drawings based on the plans and specifications provided by the VA. *Id.* at ¶ 11. Grot gave the Fratto bid drawings to Siemens so that Siemens could create field installation drawings. *Id.* at ¶ 13. Siemens initially provided a proposal to Grot with additional devices not shown on the Fratto bid drawings and specifications. Grot rejected this proposal. Siemens then submitted another cost proposal that included only the devices as they appeared in the Fratto bid drawings, which Grot accepted. Deposition of Scott McCauley at 13-19, 68-71, Defendant's Appendix ("Def. App.") at 64-70, 75-78.

On February 25, 2002, representatives of the VA, Grot, Siemens, and others attended a Project meeting. At the meeting, there was a discussion about submittals and the installation of approved submittals. According to his meeting notes, Rickey Kirk, the Contracting Officer's Technical Representative ("COTR"), clarified that all work had to meet the requirements of the applicable fire codes, specifically National Fire Protection Association ("NFPA") sections 101 and 72. Pl. App. at 35-36.

Grot then submitted the Siemens drawings to the VA and to Fratto for review. The drawings were subsequently returned to Grot stamped "Approved" or "Approved as Corrected." CSUF ¶ 14. In some instances, the VA determined that it wanted devices that were not shown on the Fratto bid drawings. *Id.* The VA-Grot contract indicated that not all necessary devices were detailed in the bid drawings. Contract Specification § 13850, ¶ 1.1(A), Def. App. at 10. The stamped drawings that were returned to Grot included a provision stating that the drawings were "[a]pproved for general arrangement only . . . [and the contractor is] required to comply with contract document, plans, and specifications." *Id.* at 15.

In March 2002, Grot began installation of the new fire alarm system pursuant to the stamped plans. CSUF ¶ 15.

1. Grot Disputes Contract Interpretation

The VA began experiencing differences with Grot's interpretation of the contract almost immediately. These differences have persisted throughout Grot's involvement

with the contract and, despite the Court's rejection of Grot's reading, persist to this day. *See* Plaintiff's Brief ("Pl. Br.") at 33-40. The first problem that arose involved Grot's submittal drawings. At a meeting on May 5, 2002, VA officials informed Grot of their concern that the submittal drawings were virtually identical to the bid drawings. According to notes of a Fratto employee who also attended the meeting, the VA reminded Grot that the fire alarm system had to comply with the applicable codes and that the "drawings are for defining the scope of work." Def. App. at 20.

The VA again expressed concern about the similarity between the Fratto bid drawings and Grot's submittal drawings on June 24, 2002. On this day, the COTR sent an email to Grot's project manager in which he stated that the approved corrected plans were "for general layout only and [did] not relieve Grot of the responsibility of assuring that all codes [we]re met." *Id.* at 22. The COTR also noted: "If installation is made and it is found that device locations are not to code then what work that has been done will have to be redone at contractors [sic] expense," pointing out some offenses Grot had already committed. *Id.*

On June 25, 2002, Grot's project manager responded by letter to the COTR disputing the suggestion that the contract required Grot "to design the project." *Id.* at 23-24. Grot's project manager wrote:

> The fire protection system shall be installed as designed by Fratto Engineering, Inc. in accordance with the specifications . . . . It is the responsibility of the Engineering firm for the project to design a workable system which meets all applicable codes . . . . It is not the responsibility of Grot Inc. to redesign the project.

*Id.*

Grot continued to dispute its responsibilities under the contract through July 2002. On July 22, 2002, officials from Grot met with VA officials to discuss "whether the work for the Bonham Fire was to be installed in accordance with the contract specifications and the NFPA Codes or installed using only the prints as a generic guideline." Letter from contracting officer to Jerry Grot (Aug. 23, 2002), *id.* at 28. The discussion ended without a resolution. However, Grot and the VA decided that the COTR would review the plans and specifications again.

The contracting officer sent a letter to Grot on August 23, 2002 in which he directed Grot to resubmit all drawings revised to include "everything contained on the original drawings as well as any additional devices required by the NFPA codes that did not appear on the original submittals." *Id.* at 29. In this letter, the contracting officer also relayed the COTR's conclusion that the Project was a "design and installation project and that Grot, Inc. must design and install a complete fire alarm system in accordance with contract plans and specifications as well as the NFPA codes." *Id.*

Grot sent a letter to the contracting officer on September 5 once again disputing whether it was required to re-design the Project. Grot also requested a meeting with the contracting officer to attempt to reach a mutual understanding of its responsibilities under the contract. *Id.* at 30. On September 17, the contracting officer rejected Grot's request for a meeting and directed Grot to "design/install" the fire alarm system for the VA under its contractual obligations. Letter from contracting officer to Jerry Grot (Sept. 17, 2002), *id.* at 32-33.

At the end of September, Grot sent a letter protesting the contracting officer's directive and requesting that the VA indicate on Grot's submittal drawings the "location of each deficiency and the location of each device the VA contends is missing from [Grot's] drawings." Letter from Jerry Grot to contracting officer (Sept. 25, 2002), *id.* at 37. In this letter, Grot suggested that it would take "six to eight weeks to complete th[e] process." *Id.* (emphasis removed). Grot also indicated that it was "committed to completing th[e] project in accordance with [VA] directives" as long as it was told what specific deficiencies needed correction. *Id.* at 38.

In a November 4 letter to Grot, the contracting officer stated that he did not believe Grot would meet the November 10, 2002, completion date. He directed Grot to provide a revised work schedule with a new completion date and noted that, in extending the completion date, the VA was relinquishing neither its right to seek compensatory damages for any costs incurred from inexcusable delay nor its right to terminate the contract for default on the new completion date. *Id.* at 39. Grot finally submitted a revised schedule to the VA on March 18, 2003. Upon receipt, the COTR asked the contracting officer to "issue an inexcusable time extension to [Grot] to extend [the] contract to June 23[, 2003]." *Id.* at 40.

2. Additional Problems Arise

Between March and June 2003, the VA ran into various additional problems with Grot's performance of the contract, including Grot's refusal to install smoke detectors in locations as required by the NFPA code and its refusal to submit redesign drawings. *See* Letter from COTR to contracting officer (June 10, 2003), *id.* at 41-42. Given these difficulties, the contracting officer asked the COTR in June 2003 whether the VA should hold Grot in default and terminate the contract. The COTR did not recommend this action, noting that a new contractor would need time to become familiar with the Project. However, the COTR reiterated his concern that Grot had consistently failed to comply with specifications and to submit redesign drawings as requested. *Id*. at 42. The COTR referred back to the VA's August 23, 2002 letter to Grot which he believed "clearly state[d] that the contractor must submit redesign drawings which would include all items originally shown on plans plus any new items required by code or manufacturer's requirements." *Id.* According to the record, as of June 10, 2003, no such drawings had been submitted by Grot.

On July 17, 2003, the VA discovered that Grot had disarmed the fire alarm system in Building 1 without notifying the VA. CSUF ¶ 78. The contract required Grot to provide a dedicated fire watch person at "all times any normally protected area [wa]s

disconnected from a fire alarm system as a result of the project work, except during normal day shift non-holiday VA work hours." *Id.* at ¶ 79. The VA therefore issued a cure notice and directed Grot to post a fire watch until the fire alarm system was activated. *Id.* at ¶ 81. Grot, acknowledging that it had not installed temporary pull stations in Building 1 as should have been done, agreed to institute a fire watch. *Id.* at ¶ 80.

The COTR also determined that there was inadequate fire safety coverage in Building 29 on July 17. Defendant's Supplemental Appendix ("Def. Supp. App.") at 215. On July 20, the VA Safety Manager, the COTR, and others from the VA Facilities Management Service conducted an inspection of Buildings 1, 2, 3, 24, and 29. CSUF ¶ 83. This inspection revealed that work on the contract was far from complete and did not comply with the terms of the contract. *See* Letter from contracting officer to Jerry Grot (July 23, 2003), Def. App. at 44. Specifically, VA officials found 42 deficiencies in 3 buildings. Def. Supp. App. at 218-19. VA officials concluded that these deficiencies were enough to "constitute an imminent danger to patients and personnel." *Id.* at 219. The contracting officer therefore directed Grot to establish a fire watch for Buildings 1, 2, 3, 24, and 29 on July 22, 2003. CSUF ¶ 85; Def. Supp. App. at 222.

The next day, the COTR faxed to Siemens a list of 6 deficiencies that had to be cured before the fire watch could be lifted. CSUF ¶ 86; Def. Supp. App. at 224-25. The contracting officer then issued a show cause notice to Grot for failure to make progress and repairs to the fire alarm system. In this July 23, 2003 show cause notice, which was issued one month after the revised completion date of June 23, 2003 had passed, the contracting officer indicated that the VA was considering terminating the contract for default. He further stated that, based on the VA's July 20 inspection, work on the contract was only 59% complete and did not comply with contract specification section 13850, paragraph 1.1(B), which states: "The fire alarm system shall comply with requirements of NFPA 101." Def. App. at 44.

On July 28, 2003, the contracting officer directed Grot that the fire alarm system must be "fully operational," rather than "fully activated," in order to lift the fire watch. Def. Supp. App. at 227. "Fully operational" was defined as "[a]ll major fire systems in Buildings 1, 2, 3, 24, and 29 must be in full operation and provide complete protection for [the VA's] patients and employees in accordance with the requirements of Contract V549C-609-2 and the NFPA." CSUF ¶ 89. The following day, Grot sent a letter to the contracting officer representing that the fire alarm system was "fully operational." *Id.* at ¶ 91. Grot also acknowledged in this letter that it was "working diligently to address the deficiency list," thereby indicating that Grot had not yet resolved all deficiencies identified by the VA during the July 20 inspection. *Id*.

The VA performed a pre-test of the fire alarm system from July 30 to August 1, 2003. *Id.* at ¶ 92. This pre-test revealed problems with elevator recall functions and the locations of various smoke detectors. *See id.* at ¶¶ 93-95. In addition, Building 1 was still on a temporary fire alarm system. *Id.* at ¶ 95. Based on the results of the pre-test, the COTR determined that fire safety coverage at the Project site was "still inadequate." Letter from COTR to Jon Evans (Aug. 1, 2003), Def. Supp. App. at 235. The COTR

stated that this inadequate coverage "pose[d] a threat to life and limb of the occupants of [the VA] Medical Center." *Id*. The COTR again directed Grot to establish a fire watch in Buildings 1, 2, 3, 24, and 29. CSUF ¶ 96. In response, Grot indicated that it would stop the fire watch as of August 1 based on Grot's own opinion that "all areas [we]re protected by a fire alarm system per [its] drawings, thus the need [for a fire watch] no longer exist[ed]." Letter from Jerry Grot to contracting officer (Aug. 1, 2003), Def. Supp. App. at 236; *see also* CSUF ¶ 97.

On July 31, 2003, Grot sent a letter to the contracting officer in response to the July 23 show cause notice. In this letter, Grot once again disputed its responsibility for designing the fire alarm system and noted that it would seek the cost and expenses incurred as a result of this work, which it claimed was not required by the contract. In the letter, Grot anticipated an October 3, 2003 completion date. Def. App. at 46-52.

The COTR sent the contracting officer a memo on August 3, 2003, in which he addressed Grot's response to the July 23 show cause notice. *Id.* at 53-58. In this memo, the COTR reiterated his opinion that Grot was only 59% complete with the Project. The COTR explained that this estimation was based in part on the schedules Grot submitted while performing the contract and in part on the results of the July 20 inspection. *Id.* at 57; *see also id.* at 44.

3. Default Termination

On August 7, 2003, the contracting officer sent Grot a Termination for Default Notice ("Termination Notice"). The Termination Notice indicated that the contract was terminated for: (1) failure to provide adequate fire alarm protection, (2) failure to perform in compliance with the technical requirements of the contract, (3) failure to complete the contract by the extended deadline, and (4) failure to show cause. Letter from contracting officer to Jerry Grot (Aug. 7, 2003), *id.* at 59-61. It is undisputed that Grot did not have the contract work "substantially completed" by the original contract deadline of November 10, 2002, or by the extended completion date of June 23, 2003. CSUF ¶ 10.

C. Requests for Equitable Adjustment

On March 31, 2005, the Plaintiff submitted requests for equitable adjustment to the contracting officer. Grot sought a total equitable adjustment to the contract price in the amount of $1,684,719.86, together with interest, as additional compensation. Def. App. at 82, 86. On June 29, 2005, the contracting officer issued a Final Decision on Grot's request. In his Final Decision, the contracting officer certified that Grot was entitled to payments totaling $551,242.90, or 59% of the total contract price of $934,310.00. The Final Decision further indicated that Grot had already received payments totaling $498,869.00 on invoices for work on the fire alarm system that the VA had accepted as complete. *Id.* at 88.

The contracting officer concluded that Grot was entitled to collect $52,373.48, which represented the difference between the amount due for completed work plus late payment interest. However, the contracting officer denied Grot's claim for payment of five submitted invoices totaling $265,551.30, stating that these invoices would not be paid because the work was never certified by the COTR as being accomplished. *Id.* As of the commencement of this proceeding, Grot had billed the VA for approximately 89% of the contract, which it maintains represents completion of the Project as of the termination date. Pl. Br. at 44.

## II. Procedural History

The Plaintiff filed its Complaint in this Court on August 19, 2003. Thereafter, we granted the Defendant's unopposed motion to transfer the VABCA appeals to this Court because the claims involve overlapping legal and factual issues. Once transferred, the appeals were assigned individual case numbers as follows: 03-19510 (Unpaid Progress Payments), 03-19511 (Retainage), 03-19512 (Late Payments), 03-19513 (Project Redesign), 03-19514 (Differing Site Conditions), 03-19515 (Fire Watch), and 03-19516 (Loss of Bonding Capacity). The claims were consolidated with the lead case, No. 03-1951C.

## III. Discussion

### A. Jurisdiction

This case arises from a contract between the Plaintiff and the United States. The Plaintiff challenges a final decision of a contracting officer. The Tucker Act, 28 U.S.C. § 1491(a)(2), and the Contract Disputes Act, 41 U.S.C. § 609(a)(1), combine to give the Court of Federal Claims jurisdiction. *Texas Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 899 (Fed. Cir. 2005).

### B. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The existence of just any factual dispute is not sufficient for a party to survive summary judgment. Rather, the dispute must be material to the legal issue. *Anderson*, 477 U.S. at 248. A dispute of fact is genuine if it would be sufficient for a reasonable jury to render a verdict in favor of the non-moving party. *Id.* The court must resolve all reasonable inferences in favor of the non-moving party. *Champagne v. United States*, 35 Fed. Cl. 198, 206 (1996).

When considering a motion for summary judgment, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Prof'l Servs. Supplier, Inc. v. United States*, 45 Fed. Cl. 808, 809 (2000). The judge must determine whether the evidence presented by the parties is sufficient to require the case be submitted to fact finding, or whether instead the evidence is one-sided and requires

that the presenting party prevail as a matter of law. *Id.* Furthermore, the Federal Circuit has held that conclusory assertions, whether made by an expert or other knowledgeable persons, cannot on their own create a genuine issue of material fact sufficient to defeat summary judgment. *See Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000) ("A party may not overcome a grant of summary judgment by merely offering conclusory statements.").

This Court reviews a contracting officer's decision to terminate for default *de novo*. 41 U.S.C. § 609(a)(3); *McDonnell Douglas Corp. v. United States*, 76 Fed. Cl. 385, 415 (2007).

C. Termination for Default (No. 03-1951)

The Government bears the burden of proving default termination was justified. Once the Government has met this burden, it shifts to the contractor to prove the nonperformance, or delayed performance, was excused. *Lassiter v. United States*, 60 Fed. Cl. 265, 268 (2004). A contracting officer has broad discretion to terminate a contract for default. *Keeter Trading Co. v. United States*, No. 05-243, 2007 U.S. Claims LEXIS 2008 at *27 (Ct. Cl. 2007). However, the exercise of this discretion must be reasonable and based on solid evidence of default. The decision to terminate for default may be overturned if it is arbitrary, capricious, or an abuse of discretion. *See Lanterman v. United States*, 75 Fed. Cl. 731, 733 (2007); *see also Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). Default termination is regarded as a forfeiture and is therefore considered a "drastic sanction . . . which should be imposed (or sustained) only for good grounds and on solid evidence." *McDonnell Douglas Corp.*, 76 Fed. Cl. at 415; *DeVito v. United States*, 188 Ct. Cl. 979, 990 (1969) (noting that default termination is a forfeiture that is disfavored in the law and thus must be strictly construed by the courts).

1. The Legal Standard

The Defendant argues that termination of the contract for default was proper because the decision was based upon the contracting officer's reasonable belief that the Plaintiff would not complete performance on time. Defendant's Brief ("Def. Br.") at 8. The Defendant contends that this belief was reasonable because the Plaintiff did not understand its responsibilities under the contract and would not comply with the contracting officer's directives. *Id.* The Plaintiff counters that any delays or performance problems were the result of ambiguities in the contract, the VA's refusal to answer questions, and improper directives. *See* Pl. Br. at 23-26.

The Parties have cited different legal standards to be applied by the court when reviewing a contracting officer's decision to terminate a contract for default. The Plaintiff argues that a contracting officer may terminate a government contract for default only when the contractor has expressed a "positive, definite, unconditional, and unequivocal manifestation of intent not to render the promised performance when the time fixed by the contract shall arrive." Pl. Br. at 31 (citing *McDonnell Douglas Corp. v. United States*, 50 Fed. Cl. 311, 321 (2001)). However, the authority upon which the Plaintiff relies was

vacated in part by the Federal Circuit and the case remanded to the Court of Federal Claims which had not applied the proper legal standard. *See McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1024 (Fed. Cir. 2003). The Defendant argues that the proper standard is whether the contracting officer had a reasonable belief that there was no likelihood that the contractor would perform the contract within the time remaining for performance. Def. Br. at 8 (citing *Lisbon Contractors, Inc.*, 828 F.2d at 765; *Morganti Nat'l, Inc. v. United States*, 49 Fed. Cl. 110, 129 (2001)).

The Federal Circuit has held that termination for default requires a "'reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance.'" *McDonnell Douglas Corp.*, 323 F.3d at 1016 (quoting *Lisbon Contractors, Inc.*, 828 F.2d at 765). Furthermore, it must be clear that the termination decision was based on tangible, direct evidence that timely completion had been impaired. *Id.*

2. <u>Reasonableness of the Contracting Officer's Decision</u>

The default clause governing this contract is FAR section 52.249-10, Default in Fixed-Price Construction Contracts. Def. App. at 9. Subsection (a) of this provision states, in pertinent part:

> If the Contractor refuses or fails to prosecute the work or any separable part, *with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time,* the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

48 C.F.R. § 52.249-10(a) (1984) (emphasis added).

The parties do not dispute the fact that the Plaintiff did not have the contract work "substantially completed" by the original contract deadline of November 10, 2002, or by the extended deadline of June 23, 2003. CSUF ¶ 10. However, in response to the Defendant's Motion for Summary Judgment, the Plaintiff argues that the VA's failure to answer questions, continued improper directives, and ambiguity in the plans and specifications provided by the VA affected the Plaintiff's ability to complete the Project. Pl. Br. at 26-29, 33-40.

We have already concluded that the terms of the contract were unambiguous and required the Plaintiff to "incorporate the bid drawings, the contract specifications, and the relevant fire codes to create or design a fire alarm system, and then to install that system." Grot Order at 15. Based on this conclusion, the Plaintiff's assertion that its performance was affected by the VA's failure to answer questions or to clarify what it alleged were ambiguous plans and specifications lacks merit. As the Defendant points

out in its brief and reiterated at oral argument, what the VA wanted in terms of performance was clearly spelled out in the contract documents and specifications. Defendant's Reply Brief at 6.

However, despite several discussions with the contracting officer to clarify the scope of the Project, the Plaintiff continued to argue about its responsibilities and repeatedly sought information from the VA that was either provided or that the contract required the Plaintiff to determine on its own. The Plaintiff disputed whether the contract required it to design the fire alarm system as late as July 31, 2003, more than one month after the extended completion date of June 23, 2003, had passed. *See* Grot Order at 8; CSUF ¶ 54; Def. App. at 46-52.

Interestingly, the Plaintiff maintained for the first time at oral argument that it had accepted the VA's interpretation of the contract by late September 2002 and thereafter began complying with that interpretation. This argument was not briefed by the Plaintiff and was therefore raised out of order. *See* Special Procedures Order, *Grot, Inc. v. United States*, No. 03-1951C, at ¶ 13 (Oct. 29, 2003) ("Oral presentations will be limited to arguments and authorities contained in the written submissions."). In fact, the Plaintiff's brief states: "It is also undisputed that Grot did not agree with the [COTR's] interpretation of the Contract and . . . vigorously denied the COTR's interpretation." Pl. Br. at 24. In addition to raising this argument out of order, the Plaintiff was unable to provide any support for it in the record.

To the contrary, the record shows that the Plaintiff failed to comply with the terms of the contract as late as the extended completion date of June 23, 2003. The July 23, 2003 show cause notice indicates that, as of that date, work on the contract was only 59% complete and "d[id] not meet Contract Specification 13850, Paragraph 1.1, sub-paragraph B" which required that the fire alarm system "shall comply with the requirements of NFPA 101." Pl. App. at 65-66. Further, in this show cause notice, the contracting officer stated that the Plaintiff had failed to make progress and repairs to the fire alarm system as directed by a letter from him dated July 17, 2003. *Id.*

This show cause notice is evidence that, shortly before default termination, the Plaintiff had failed to perform in accordance with the unambiguous terms of the contract and had missed both completion dates. These facts provided solid grounds for default termination. As this Court has noted, default termination does not require a finding that it was impossible for the contractor to complete performance within the contract's time limitation. *See Discount Co. v. United States*, 213 Ct. Cl. 567, 575 (1977), *cert. denied*, 434 U.S. 938 (1977). Rather, default termination is appropriate when the contractor has demonstrated a lack of diligence indicating that the Government could not be assured of timely completion. *Id.* Such a lack of diligence may be demonstrated through prior unsatisfactory performance showing that the contractor is not "ready, willing and able to make progress." *Id.* When Grot continued to dispute its responsibilities and failed to meet both completion deadlines, it demonstrated a lack of diligence which provided grounds for default termination.

Furthermore, rather than respond to the show cause notice by assuring the VA that it would complete performance in accordance with the specifications, the Plaintiff replied by letter dated July 31, 2003 in which it once again took issue with the proper interpretation of the contract. Def. App. at 46-52. Although the Plaintiff did indicate in this letter that it anticipated completion by October 3, 2003, the Plaintiff stated that this third completion date assumed there would be "no additional changes to the contract documents" and that the Plaintiff would "receive[] responses to its pending inquiries not later than August 11th." *Id.* at 52. Where a contractor's response to the contracting officer's cure or show cause notice does not indicate the contractor's intent to resolve the contracting officer's concerns, the response fails to provide adequate assurances that the contractor will complete the contract. *See Hannon Elec. Co. v. United States*, 31 Fed. Cl. 135, 143-44 (1994); *McDonnell Douglas Corp.*, 76 Fed. Cl. at 437 (noting that the law does not require the Government to help "fix the contract" when a dispute arises). Without such assurances from the Plaintiff, the contracting officer was justified in finding the Plaintiff in default.

Finally, at oral argument, the Plaintiff declared for the first time that it had, contrary to the Defendant's assertion, submitted proper design drawings for the Project after September 17, 2002. The Plaintiff maintained further that its inability to make progress on the contract was unrelated to its submission of such drawings or any alleged deficiencies with them. Rather, the Plaintiff attributed its performance problems directly to the VA's refusal to answer questions and to provide critical information, as argued in its brief. Pl. Br. at 26-28. The record is devoid of such design drawings and the Plaintiff has not cited to any portion of the record proving that they exist.

3. Application of the Summary Judgment Standard

To overcome the Defendant's Motion for Summary Judgment that default termination was proper, the Plaintiff must put forth specific facts showing evidence that there was no reasonable basis for the VA to terminate the contract. *See Tonya, Inc. v. United States*, 28 Fed. Cl. 727, 730 (1993). However, the Plaintiff has failed to show that a genuine issue of material fact exists about the reasonableness of the contracting officer's decision.

In an attempt to assert such facts, the Plaintiff has argued that termination for default was not proper because the "fire alarm system design for the Project . . . was in full compliance with the technical requirements of the [c]ontract including the plans, specifications, drawings and system design requirements including compliance with Chapter 13, NFPA 101 (1997 Edition) and 72 (1996 Edition)." Pl. Br. at 24-25.

In support, the Plaintiff relies on an affidavit of Scott McCauley, an employee of subcontractor Siemens who worked on the Project. *Id.* In the affidavit, Mr. McCauley states his conclusion that

> at the time Grot was terminated by the VA, the fire alarm system design for the Project was in full compliance with technical requirements of the contract, including the plans, specifications, drawings and system design

requirements including compliance with Chapter 13 of NFPA 101 (1997 Edition) and NFPA 72 (1996 Edition).

Plaintiff's Supplemental Appendix ("Pl. Supp. App.") at 254, ¶ 5.

As discussed above, conclusory assertions alone cannot create a genuine issue of material fact sufficient to defeat summary judgment. *See Moore U.S.A., Inc.*, 229 F.3d at 1112. Furthermore, it is worth noting that Mr. McCauley's affidavit was prepared on March 30, 2007, Pl. Supp. App. at 255, after the Defendant filed its Motion for Summary Judgment on March 2, 2007. Therefore, in addition to being conclusory, the statements in the affidavit were made several years after the events at issue in this litigation occurred and after the Plaintiff had an opportunity to review the Defendant's brief. The Plaintiff has offered no evidence of specific facts to dispute the Defendant's assertion that the fire alarm was not in compliance with the requirements of the contract as of the termination date. The Plaintiff was unable to provide such evidence in its brief or during oral argument.

The Plaintiff also alleges that a genuine issue of material fact exists about the amount of work it completed on the Project prior to termination. The Plaintiff had billed the Defendant for approximately 89% of the Project as of the termination date. Pl. Br. at 44. In support of this argument, the Plaintiff again relies on conclusory statements in Mr. McCauley's affidavit. *See id.*

The Parties do not dispute that the Plaintiff had completed at least 59% of the contract on the termination date. CSUF ¶ 69. In the July 23, 2003 show cause order, the contracting officer stated that a July 20 inspection of the buildings by the VA Safety Manager indicated that work on the contract was 59% complete. Def. App. at 44. In addition, the COTR explained in detail how he arrived at this estimation in an August 3, 2003 letter to the contracting officer. In it, the COTR broke the Project down into eleven components and assessed how close to completion the Plaintiff was with respect to each task based on the July 20 inspection and work schedules submitted by the Plaintiff. *Id.* at 57. After presenting this breakdown, the COTR stated: "Contractor is nowhere near completion. Many of the systems are still tied in with temporary wiring . . . . some aren't even started." *Id.* The 59% completion rate is a fact-based estimation of the Plaintiff's progress as of the termination date. The Plaintiff has failed to provide facts to dispute its accuracy.

Finally, the Plaintiff argues that the contracting officer may have terminated the contract to free the VA from having to deal further with the Plaintiff and therefore had an improper motive. Pl. Br. at 40-41. A default termination that is accomplished for the purpose of ridding the agency of dealing further with the contractor is arbitrary and capricious and cannot stand. *See Darwin Constr. Co. v. United States*, 811 F.2d 593, 596 (Fed. Cir. 1987).

Here, too, the Plaintiff has not provided any specific facts to support its argument. The Plaintiff relies instead on deposition testimony of the contracting officer in which he states that he "feared that the surety would use [the Plaintiff] as the replacement

contractor despite the fact that [the Plaintiff] was a competent contractor and capable of completing the Project." Pl. Br. at 40. The Plaintiff argues that this testimony raises a genuine issue as to the motive behind the termination. *Id.* This testimony does not support such an inference.

4. Excused Nonperformance

The Defendant has met its burden of proving the contracting officer's decision was justified. Therefore, the burden shifts to the Plaintiff to prove its nonperformance was excused. *See Lassiter*, 60 Fed. Cl. at 268. Although the Plaintiff has argued that its nonperformance, or delayed performance, is attributable to the Defendant's failure to respond to questions, improper directives, and ambiguity in the contract, none of these defenses is established in the record. To the contrary, we have already held that the contract was unambiguous, negating each excuse alleged by the Plaintiff.

Excusable delays in fixed-price construction contracts are dealt with in FAR section 52.249-10, Default, which governs this contract. Def. App. at 9. This provision makes clear that excusable delays are those which are "unforeseeable" and "beyond the control and without the fault or negligence of the Contractor." 48 C.F.R. § 52.249-10(b)(1) (1984). The Plaintiff has not provided evidence of unforeseeable events which caused the delay.

D. Grot's Other Claims for Money Damages

The Plaintiff seeks compensation for damages it alleges resulted from performing the contract. The Plaintiff argues that, even assuming termination for default was proper, it is not precluded as a matter of law from recovering money damages on its other claims. Pl. Br. at 41. Specifically, as mentioned above, the Plaintiff seeks compensation for unpaid progress payments, retainage, late payments, project redesign, differing site conditions, the fire watch, and its loss of bonding capacity. We deny each of these claims, with the exception of one, on the merits. First, however, we must address the Defendant's contention that default termination precludes recovery.

In support of these claims, the Plaintiff relies on *Clay Bernard Sys. Int'l, Ltd. v. United States*, 22 Cl. Ct. 804 (1991). Pl. Br. at 41. In *Clay Bernard*, the court held that the Government's default termination of a contract was improper in at least one respect. The court stated that "a contractor that is not without fault or negligence, and thus is not eligible for a settlement by the convenience termination formula, does not wholly forfeit an otherwise valid claim." 22 Cl. Ct. at 811. However, the facts of *Clay Bernard* are distinguishable from this case. In *Clay Bernard*, the court determined that the Government contributed to the circumstances that caused the default because there were deficiencies in the contract and technical specifications. *See id.* at 807. In contrast, we have already decided that the VA-Grot contract was not ambiguous and that the specifications clearly indicated that the Plaintiff was not at liberty to merely install the fire alarm system exactly as shown in the bid drawings. Grot Order at 10.

Nonetheless, the Plaintiff is correct in its contention that a claim for improper default termination is distinct from other claims arising under the contract. *See J.C. Equip. Corp. v. England*, 360 F.3d 1311, 1318 (Fed. Cir. 2004); *Armour of Am. v. United States*, 69 Fed. Cl. 587, 590-91 (2006) (holding that breach of contract claims present different factual and legal issues and are distinct and separate from a claim for improper default termination). Therefore, while the Plaintiff may maintain these claims, the question remains whether they are valid.

1. Unpaid Progress Payments (No. 03-19510)

The Defendant is entitled to summary judgment on the Plaintiff's claim for compensation for five outstanding progress payments totaling $195,331.68. This amount represents work the Plaintiff submitted invoices for and claims it completed. *See* Pl. Br. at 43-44. FAR clause 52.232-5, Payments Under Fixed-Price Construction Contracts, governs. Def. App. at 8. It states:

> The Government shall make progress payments monthly as the work proceeds, . . . on estimates of work accomplished which meets standards of quality established under the contract, as approved by the Contracting Officer.

48 C.F.R. § 52.232-5 (1997).

As evidenced by correspondence between the COTR and contracting officer before the contract was terminated, the VA estimated that the contract was only 59% complete on the termination date. *See* Def. App. at 44, 57-58. In addition, the contracting officer rejected the Plaintiff's request for equitable adjustment and payment of the five unpaid invoices stating, "the work was never certified by the COTR as being accomplished." *Id.* at 88.

As FAR clause 52.232-5 makes clear, the Plaintiff was entitled to compensation only for work that was approved by the contracting officer as being completed. The Plaintiff now disputes whether it completed the work for which it has not been paid. As discussed above, the Plaintiff relies solely on the McCauley affidavit to support its argument that it had completed 89% of the contract. *See* Pl. Br. at 43-44. The Plaintiff therefore offers conclusory statements rather than specific facts to support this claim.

2. Retainage (No. 03-19511)

The Plaintiff does not have a valid claim to recover $84,938.97 withheld by the VA as retainage. As the VA made progress payments to the Plaintiff, it retained 10 percent of the total value of the work that had been completed through the period for which the payment was being made. The Plaintiff does not dispute the right of the Defendant to withhold retainage on the Project. Rather, the Plaintiff argues that because default termination was improper, "it is entitled to recover the retainage as a part of the cost of the work in place." Pl. Br. at 45.

Retainage acts as an incentive for the contractor to complete the contract. *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir. 1990). The right to retain a portion of progress payments also protects the interests of the Government against potential defaults by the contractor. *Nat'l Sur. Corp. v. United States*, 118 F.3d 1542, 1545 (Fed. Cir. 1997). FAR section 52.232-5, which was incorporated into the VA-Grot contract, allows retainage as follows:

> [I]f satisfactory progress has not been made [during any period for which a progress payment is to be made], the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved.

48 C.F.R. § 52.232-5(e), Def. App. at 8.

We find that termination of the contract for default was proper. The Defendant was authorized under FAR provision 52.232-5(e) to retain up to 10 percent of each progress payment.

3. Late Payments (No. 03-19512)

The Plaintiff claims that it is entitled to interest penalties due to late payments by the Defendant. Specifically, the Plaintiff seeks payment of an interest penalty of $1,953.52 for the Defendant's failure to timely pay accepted invoices and an additional interest penalty "in an amount equal to 100% of the original late payment penalty," or an additional $1,953.52, for the Defendant's failure to timely pay the original interest penalty. Pl. Br. at 43.

In his June 29, 2005 Final Decision on the Plaintiff's requests for equitable adjustment, the contracting officer agreed to pay a $1,953.52 interest penalty for the late payment of eleven invoices. *See* Def. App. at 88. This amount is not in dispute and is due the Plaintiff. However, unresolved is the Plaintiff's claim for an additional interest penalty in the amount of $1,952.53 for late payment of this original interest penalty. The Defendant did not brief the issue of the additional interest penalty and, at oral argument, conceded that the Plaintiff is entitled to it.

FAR section 52.232-27(a)(6) governs the payment of additional interest penalties and was incorporated into the VA-Grot Contract. Pl. Supp. App. at 351. This provision states that, in order to receive an additional interest penalty, the contractor must make a written demand to the designated payment office in accordance with certain requirements outlined in the provision and "not later than 40 days after the date the invoice amount is paid." 48 C.F.R. § 52.232-27(a)(6)(i)© (1997). The provision further states: "The additional penalty shall be equal to 100 percent of any original late payment interest penalty . . . ." *Id.* at § 52.237(a)(6)(iii)(A). Therefore, the Plaintiff appears to be entitled to collect $1,952.53 as an additional interest penalty.

Accordingly, we deny the Defendant's Motion for Summary Judgment on this claim and enter judgment in favor of the Plaintiff in the sum of $1,953,52.

4. Project Redesign (No. 03-19513)

The Plaintiff is precluded from recovering on this claim. Our May 15 decision confirms that the contract required the Plaintiff to prepare a design for the fire alarm system incorporating the Fratto bid drawings and contract specifications and in compliance with the applicable fire codes. *See* Grot Order at 10. The Plaintiff refused to provide a design for the Project despite numerous requests and directives from the VA that it do so. *See* CSUF ¶¶ 22, 23, 28, 29.

The Plaintiff concedes that it is not entitled to recover the additional engineering costs incurred in designing the fire alarm system for installation. However, the Plaintiff alleges that its claim for design costs encompasses more than simply designing the system. Pl. Br. at 41. For example, the Plaintiff argues that it is entitled to damages for costs incurred when it complied with what it alleges were inconsistent requests from the VA first to comply with NFPA 72 and 101 then to install "not only the items required by code but also all of the items shown on the original Fratto drawings." *Id.* at 42.

It is by no means clear that there were inconsistencies between the devices required by the NFPA and those represented on the Fratto bid drawings. As our May 15 Order indicates, the contract clearly required the Plaintiff to incorporate both the bid drawings and specifications to create a complete fire alarm system that complied with the requirements of NFPA 72 and 101. Grot Order at 10-11. The contract language states that all components must be installed "as shown on the drawings and as specified" and that "[a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both." *Id.* at 10. In sum, the Plaintiff was required to install all devices to create a fully operational system in compliance with the NFPA, whether or not necessary components were specifically mentioned in the contract, drawings, or specifications. *See id.* at 11.

Finally, although the Plaintiff contends that this claim encompasses costs over and above those associated with designing the fire alarm system, the Plaintiff conceded at oral argument that it is unable to break out such additional costs. The Plaintiff further conceded that it did not break out these additional costs in its initial request for equitable adjustment to the contracting officer.

5. Differing Site Conditions (No. 03-19514)

The Plaintiff does not have a valid claim for Type I differing site conditions. The Plaintiff argues that, contrary to what it expected, there was no pre-existing conduit available to use in installing the continuous network loop around the VA hospital campus. Def. App. at 176. The Plaintiff believes that this constitutes a Type I differing site condition. Pl. Br. at 47. The Plaintiff has the burden of proving a differing site condition by a preponderance of the evidence. *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987).

Type I differing site conditions are governed by FAR clause 52.236-2(a)(1), which was incorporated into this contract. *See* Def. App. at 9. They are described as "subsurface or latent physical conditions at the site which differ materially from those indicated in th[e] contract." 48 C.F.R. § 52.236-2(a)(1) (1984). This Court has identified six requirements for a successful Type I claim: (1) the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the claim; (2) contractor must have been reasonably prudent in inspecting the contract documents; (3) the contractor must have reasonably relied on the indications of subsurface conditions in the contract; (4) the subsurface conditions actually encountered must have differed materially from those indicated in the contract documents; (5) the actual subsurface conditions encountered must have been reasonably unforeseeable; and (6) the contractor's excess costs must be shown to be solely attributable to the materially different subsurface conditions encountered. *Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl. Ct. 193 (1987), *aff'd*, 861 F.2d 728 (Fed. Cir. 1988).

The Plaintiff's differing site conditions claim fails in two respects. First, the Plaintiff is precluded from recovering on this claim because it did not act like a reasonably prudent contractor when it failed to make a pre-bid inspection of the Project site and did not attend the July 20, 2001 pre-bid conference. *See* CSUF ¶¶ 74, 77; Pl. App. at 13. Given the Plaintiff's failure to do either of these things before bidding, the Plaintiff cannot now argue that the actual subsurface conditions encountered were reasonably unforeseeable.

Second, the Plaintiff has not provided evidentiary support for its contention that the contract documents made an affirmative representation about the subsurface conditions on which it bases this claim. The primary support relied on by the Plaintiff are notes summarizing the July 20, 2001 pre-bid conference that the Plaintiff did not attend. Pl. Br. at 45-46. At this meeting, a Fratto representative stated that the site plan drawings showed that spare conduits were installed 2-3 years earlier and that "[s]pare 4" conduit runs from Building 24 to Building 4 to Building 6." Pl. App. at 15. The Fratto representative further commented that the conduit routed through the interior of the buildings and said that the "[c]ontractor will be required to use existing conduit for project as opposed to digging trenches to lay new conduit." *Id.* To bolster this claim, the Plaintiff also relies on statements by Jerry Grot in an affidavit dated April 2, 2007. *See* Pl. Br. at 46; Pl. Supp. App. at 335-37.

What is absent from the Plaintiff's brief, and was not provided at oral argument, is any citation to the site plan drawings themselves or to another portion of the contract documents which makes an affirmative representation about subsurface conditions. In fact, the Plaintiff clarified at oral argument that its differing site condition claim is based entirely on the oral statements of the Fratto representative at the pre-bid conference which were later reduced to writing.

The term "contract documents" has been interpreted broadly to include not only the solicitation documents (solicitations, drawings, specifications, and other documents furnished to offerors), but also documents and materials referred to in the solicitation documents. See John Cibinic, Ralph C. Nash, Jr. & James F. Nagle, Administration of

Government Contracts 495 (4th Ed. 2006) (citing *Hunt & Willett, Inc. v. United States*, 168 Ct. Cl. 256 (1986)). However, documents produced during performance of the contract do not qualify as contract documents. *Id.* (citing *McDevitt Mech. Contractors, Inc. v. United States*, 21 Cl. Ct. 616 (1990)). In addition, the contractor may not rely on oral representations because the representations are not a contract document. *See id.* (citing *CM of N.D., Inc.*, VABCA 3986, 95-2 BCA ¶ 27,832).

It is clear therefore that statements made by the Fratto representative at the pre-bid conference, including any subsequent written record of them, are not part of the "contract documents." Although pre-bid conference summaries have been deemed to be part of the "contract documents," *see Goss Fire Protection, Inc.*, DOTBCA 2782, 97-1 BCA ¶ 28,853, the statements in question in this case were oral, were not made by a representative of the VA, and were not made directly to the Plaintiff.

The only other evidence offered by the Plaintiff to support its claim for Type I differing site conditions are conclusory statements of Jerry Grot. Mr. Grot's statements are contained in an affidavit which was taken on April 2, 2007, the same day the Plaintiff filed its Response to the Defendant's Motion for Summary Judgment. These statements are insufficient to create a genuine issue of material fact.

6. Fire Watch (No. 03-19515)

The Plaintiff's claim for damages resulting from the fire watch is precluded as a matter of law. It is undisputed that the Plaintiff did not connect the temporary pull stations as required by the contract when it disconnected the fire alarm system in Building 1. Pl. Br. at 48. However, the Plaintiff argues that this deficiency was cured before the end of the day on July 17 when it was discovered. *Id.* at 48-49. The Plaintiff's main claim is that it was not required by the contract to "conduct a fire watch over the entire Project" as directed by the contracting officer on July 22, 2003. *Id.* at 49; Def. App. at 54. The parties dispute whether a fire watch was in fact necessary in all the buildings as directed by the COTR on July 17 and thereafter.

The contract clearly states: "The Contractor shall provide a dedicated fire watch person all times any normally protected area is disconnected from a fire alarm system as a result of the project work." Contract Specification § 13850, ¶ 1.1(E). The Defendant ordered a fire watch in buildings 1, 2, 3, 24, and 29 after an inspection by VA officials on July 20, 2003 revealed several deficiencies with the fire alarm system. Def. App. at 53-54. Specifically, the officials found 42 deficiencies in 3 buildings. The COTR's Daily Log from July 20, 2003 sets forth these deficiencies:

> The following items were found not to be in accordance with Contract specifications and NFPA Codes:
> 1. No Master Horns in Boiler/Chiller Plant.
> 2. Wiring in all FACUs is not in compliance with marketing update from Siemens dated February 18, 2001.
> 3. Duct detectors do not shut down A/C units.
> 4. Elevator Recall functions not operating.

5. Smoke doors do not function in all areas.
6. No Tamper and Flow Switches connected to system.

Def. Supp. App. at 218-19.

The VA officials concluded that these deficiencies were enough to "constitute an imminent danger to patients and personnel." *Id.* at 219. The officials therefore agreed that a fire watch was necessary in all buildings. *Id.* After ordering the fire watch, the contracting officer faxed Siemens a list of 6 deficiencies that had to be cured before the fire watch could be lifted. CSUF ¶ 86. In a letter dated August 3, 2003, the COTR indicated that most of the deficiencies discovered during the July 20 inspection still existed. Letter from COTR to contracting officer (Aug. 3, 2003), Def. App. at 54.

The Plaintiff counters that these deficiencies did not impair the fire alarm system from reporting a fire to the VA staff and building occupants and therefore did not require a fire watch. Pl. Br. at 49. The Plaintiff tries to create a genuine issue of material fact about whether the fire watch was necessary by relying again on statements by Mr. McCauley. In an unattested letter from Mr. McCauley to Jerry Grot dated July 24, 2003, Mr. McCauley wrote that there were "a few deficiencies" remaining with the fire alarm system that needed "to be corrected" and stated that "[t]he deficiencies [we]re being worked on . . . and in no way . . . impair[ed] the fire alarm system from reporting a fire alarm to the VA staff and the building occupants." Letter from Scott McCauley to Jerry Grot (July 24, 2003), Def. Supp. App. at 226. At oral argument the Plaintiff stated that Mr. McCauley's conclusion that the fire watch was not necessary was based solely on his expertise as a NICET Level 3 technician, not on any particular inspection of the Project site or other factual basis.

As we have repeatedly stated throughout this Opinion, such conclusory statements are inadequate to overcome summary judgment.

7. Loss of Bonding Capacity (No. 03-19516)

The Plaintiff may not recover damages for its loss of bonding capacity. The Plaintiff's bond on the Project is not being released pending the outcome of this litigation. Def. Br. at 34-35. The Plaintiff seeks damages in the amount of $933,635.30. The Plaintiff claims it has been "severely crippled" by its loss of bonding capacity because it has been unable to negotiate additional procurement contracts. Pl. Br. at 48, Def. Supp. App. at 185.

It is well-settled that damages resulting from the receipt or non-receipt of future contracts are not recoverable. *See Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741, 744 (1980). In *Olin Jones*, this Court held that those damages allegedly resulting from actions of the Government which affected the contractor's bonding capacity, even if proven, would be too remote and speculative to be recoverable. *Id.*; *see also William Green Constr. Co. v. United States*, 477 F.2d 930, 936 (Ct. Cl. 1973), *cert. denied*, 417 U.S. 909 (1974) (no recovery for general loss of business or loss of contracts).

IV. Conclusion

Based on the foregoing, default termination of the contract was proper. In addition, although default termination does not preclude the Plaintiff from recovering on other claims for money damages arising from the contract, with one exception, the Plaintiff has no such valid claim.

**Therefore, the Defendant's Motion for Summary Judgment is GRANTED as to Case Nos. 03-19510, 03-19511, 03-19513, 03-19514, 03-19515, and 03-19516. The Clerk of the Court is directed to enter judgment for the Defendant in each case and to dismiss the Complaint. The Court DENIES the Defendant's Motion for Summary Judgment in Case No. 03-19512. The Clerk of the Court is directed to enter judgment for the Plaintiff in this case in the amount of $1,953.52.**

**IT IS SO ORDERED.**

s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge